## IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>SVB FINANCIAL GROUP,<br><br>Debtor.[1] | Chapter 11<br><br>Case No. 23-10367 (MG) |
| JOINT OFFICIAL LIQUIDATORS OF SILICON VALLEY BANK (IN OFFICIAL CAYMAN ISLANDS LIQUIDATION),<br><br>Plaintiff,<br><br>vs.<br><br>SVB FINANCIAL GROUP<br><br>Defendant. | Adv. Pro. No. 24-_____(__)<br><br><br>**ADVERSARY COMPLAINT** |

Andrew Childe, Niall Ledwidge, and Michael Pearson, in their capacity as the duly appointed joint official liquidators (together, the "**JOLs**" or "**Plaintiff**") of Silicon Valley Bank (in Official Cayman Islands Liquidation) ("**SVB Cayman**"), an estate and statutory trust in official liquidation under the supervision of the Grand Court of the Cayman Islands, Financial Services Division (the "**Grand Court**"), Cause No. FSD 163 of 2023 (DDJ) (the "**Cayman Proceeding**"), pursuant to the Cayman Islands Companies Act (2023 Revision) (the "**Companies Act**") and associated regulations, including the Companies Winding Up Rules (2023 Consolidation) (the "**CWR**"), the Insolvency Practitioners Regulations, and the June 30, 2023 Winding Up Order issued by the Grand Court (the "**Winding Up Order**") by their undersigned United States counsel,

---

[1] The last four digits of SVB Financial Group's tax identification number are 2278.

file this Complaint in this adversary proceeding against Defendant SVB Financial Group ("**SVBFG**", "**Defendant**" or "**Debtor**"), and allege as follows:

## NATURE OF THIS ACTION

1.      This action arises out of the $294 Million distribution made by Silicon Valley Bank to SVBFG, its sole shareholder, at a time when the Bank's insolvency and collapse was a certainty and overlapping board of directors and officers were well aware of SVB's critical financial distress.

2.      The JOLs have also asserted an unsecured claim against SVBFG in connection with the damages suffered by the SVB Cayman estate and as the exclusive agent for SVB Cayman's depositors-creditors, due to the Upstream Distribution and the significant mismanagement of the SVB Cayman branch.

3.      The JOLs separately file this complaint because, as a matter of applicable non-bankruptcy law, the Upstream Distribution is void and is not property of SVBFG's bankruptcy estate. California law expressly states that payments made by a state-chartered bank in "contemplation of insolvency" which violates the priority scheme (whereby shareholders only receive payments once all liabilities are satisfied) are void. CAL. FIN. CODE § 1406.  In the alternative, Cayman law permits imposition of a constructive trust over unlawful distributions made to equityholders.

4.      As set forth below, due to the mismanagement of SVBFG, Silicon Valley Bank was a ticking time bomb by the end of 2022 when the Upstream Distribution was made. The Bank had failed numerous liquidity and stress tests and a run on the bank was an inevitability, due to its large uninsured depositor base, the rise in interest rates throughout 2022, and SVBFG's decision to place short-term profits (and executive compensation) over the long-term health of the bank.

2

5.     The JOLs are court-appointed fiduciaries of the SVB Cayman estate, tasked with administering the assets of SVB within the territorial jurisdiction of the Cayman Islands, with standing to bring claims on behalf of SVB Cayman as well as the exclusive agent of SVB Cayman's depositors-creditors. On behalf of the SVB Cayman estate as well as its depositors-creditors, the JOLs bring this action seeking a declaratory judgment that the Upstream Distribution is null and void and thus SVBFG has nothing more than bare legal title to the Upstream Distribution. *See* 11 U.S.C. § 541(d); *Entegra Power Grp. LLC v. Dewey & LeBoeuf LLP (In re Dewey & LeBoeuf LLP)*, 493 B.R. 421 (Bankr. S.D.N.Y. 2013) (Glenn, J.). The JOLs further seek imposition of a constructive trust upon Debtor's cash in the amount of the Upstream Distribution for the benefit of the SVB Cayman estate.[2]

---

[2] The JOLs are acting on behalf of depositors of SVB Cayman as their exclusive agents, under deposit agreements which it is uncontested are governed by Cayman law. The JOLs are granted authority to pursue claims on behalf of SVB Cayman and its depositors-creditors by operation of Cayman law, which SVB (and implicitly SVBFG) agreed to via registration and licensing of Silicon Valley Bank in the Cayman Islands.

While the JOLs are aware that the FDIC may seek to assert the allegations set forth herein and in the JOLs' amended proof of claim as a setoff defense in its pending litigation with SVBFG, that should be of no consequence to the JOLs' recovery. First, the FDIC has expressly stated that it will not be seeking recovery on any claims against SVBFG, and a setoff defense is not a claim. Bankruptcy courts have recognized that a defensive right of setoff exists independently of affirmative claims that may be asserted against a debtor. *See In re Reagor-Dykes Motors, LP*, No. 18-50214-RLJ-11, 2021 WL 3918869, at *2 (Bankr. N.D. Tex. Sept. 1, 2021); *In re M. Silverman Laces, Inc.*, 404 B.R. 345, 365–66 (Bankr. S.D.N.Y. 2009) (finding that "filing a proof of claim is not a prerequisite to asserting an otherwise valid setoff" raised as an affirmative defense); *Calderone v. Mancino (In re Calderone)*, 166 B.R. 825, 830 (Bankr. W.D. Pa. 1994) (same); *In re Nat'l Promoters & Servs. Inc.*, No. 13-00051, 2020 WL 1685755, at *8 (Bankr. D.P.R. Apr. 6, 2020) (same). *See also* 5 COLLIER ON BANKRUPTCY ¶ 553.07 (16th 2024) (noting "the prevailing view" that a creditor's election not to offensively assert a counterclaim for setoff through the filing of a proof of claim "does not prevent the creditor from asserting the right as a defensive matter"). Second, the FDIC has not even asserted these setoff defenses yet, as it has not yet been required to file an answer and defenses to the complaints filed by SVBFG. Third, the FDIC receivers are not acting on behalf of the SVB Cayman estate, as the FDIC does not recognize the standing of the JOLs and there is no prospect for recovery in the SVB Receivership for SVB Cayman's depositors-creditors.

While the statutes governing the FDIC's powers as receiver are inherently territorial, the automatic stay under the Bankruptcy Code is not. The JOLs submit that under typical circumstances, this complaint and the liability claims set forth in the amended proof of claim would be brought in the Cayman Courts. However, the automatic stay requires the JOLs to assert its claims before this Court, which under present circumstances will be required to act as an avatar for the Grand Court.

#506260071_v1

## THE PARTIES

6.      Plaintiffs, the JOLs of SVB Cayman, are the duly appointed joint official liquidators of the estate of SVB Cayman, a Cayman Islands estate under the supervision of the Grand Court, Cause No. FSD 163 of 2023 (DDJ).

7.      On August 16, 2007, Silicon Valley Bank, Santa Clara ("**SVB**") registered in the Cayman Islands as a foreign company under Part IX of the Cayman Islands Companies Act ("**Companies Act**").

8.      On August 30, 2007, SVB applied for and was granted a Class "B" banking license from the Cayman Islands Monetary Authority ("**CIMA**") under the Cayman Islands Banks and Trust Companies Act (2021 Revision) (the "**BTC Act**").

9.      Following its registration in the Cayman Islands and the granting of a Class "B" license from CIMA, SVB maintained an active branch in the Cayman Islands, the established SVB Cayman branch (the "**SVB Cayman Branch**"). The primary purpose of the SVB Cayman Branch was to offer deposit products.

10.     Defendant SVBFG is the debtor and debtor-in-possession in the above-captioned chapter 11 case (the "**Chapter 11 Case**").  SVBFG is a Delaware corporation established in 1999.

11.     Prior to the March 17, 2023 petition date of the Chapter 11 Case, SVBFG was a Delaware corporation and the ultimate corporate parent of non-party SVB, an FDIC-insured, state-chartered bank headquartered at all relevant times in Santa Clara, California and established to provide banking services to Silicon Valley's growing number of technology companies.

4

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334(a). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

13.     Venue is proper in this district pursuant to 28 U.S.C. § 1409(a), as this Adversary Proceeding arises under, arises in, or is related to a bankruptcy case pending in this District.

14.     This adversary proceeding is commenced pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure.

15.     The court has general and specific personal jurisdiction over the Defendant because: (i) the Defendant is a Chapter 11 Debtor before this Court; (ii) the Defendant is authorized to do business in New York and the United States and regularly transacted business in the United States, the place where SVBFG had its principal place of business; (iii) the Defendant transacted business in the United States and in New York with respect to matters at issue in this case; and (iv) the Defendant has engaged in the conduct requisite for liability under both United States and Cayman Islands law within the United States, including within the State of New York.

## NOTICE PURSUANT TO FED. R. BANKR. P.  7008 and 9017 AND FED. R. CIV. P. 44.1

16.     Please take notice that Plaintiff intends to raise issues in this adversary proceeding pertaining to foreign law, specifically, the law of the Cayman Islands and Orders of the Grand Court.

17.     Plaintiff consents to entry of final orders and judgments by this Court.

## GENERAL ALLEGATIONS

### I.     SVBFG's Business and Operation of SVB

18.     SVBFG has historically been in the business of financial services, and prior to March 10, 2023, the bedrock of SVBFG's business was owning and operating SVB, a state-

5

chartered bank. *Declaration of William C. Kosturos in Support of the Debtor's Chapter 11 Petition and First Day Pleadings* [Chapter 11 Case ECF No. 21] (the "**First Day Declaration**"), at ¶ 6. Prior to its collapse, SVB was a leading bank in the emerging technology sector.

19.     SVB and SVBFG shared personnel and management, and upon information and belief, all material decisions concerning operations of SVB, including bank, investment and risk management, were made by SVBFG's executives at the direction of SVBFG's and SVB's shared board of directors. *See* BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM, *Review of the Federal Reserve's Supervision and Regulation of Silicon Valley Bank*, available at: https://www.federalreserve.gov/publications/files/svb-review-20230428.pdf (last accessed June 27, 2024) (hereinafter the "**FRB Report**").

20.     There was near complete overlap between the board of SVB and the board of SVBFG (the "**Board**"). *See* CALIFORNIA DEPARTMENT OF PROTECTION AND INNOVATION & FEDERAL RESERVE BANK OF SAN FRANCISCO, *Report of Examination*, dated May 3, 2021 p. 21-27 (the "**CAMELS Report**"), a true and correct copy of which is attached hereto as **Exhibit 1.**

21.     In addition to the Board overlap, SVB and SVBFG had overlap in its officers. For example, Gregory Becker served as the President of SVBFG and the CEO of both SVB and SVBFG since 2011.

22.     Kara Hackenburg, the individual identified as SVB Cayman's "Agreement Manager" under the SLA (defined below), was Head of Data Policy and Data Risk Management for SVBFG, as well as Head of Business Risk Management for SVB.

23.     Between 2019 and 2021, SVBFG and its subsidiaries tripled in size, exploding from $71 billion in assets to $211 billion in assets, largely due to the flourishing venture capital and technology sectors at a time when interest rates were remarkably low. As described in greater

detail below, however, the Board neglected to keep pace with SVB's rapid growth and failed to implement risk and liquidity controls sufficient for a banking institution of SVB's size, which ultimately led to SVB's downfall which was a certainty as early as 2022.

## II.    SVB Cayman Branch's Operations

### A.    SVB Cayman Branch's Customer Accounts

24.    The SVB Cayman Branch offered three types of accounts to customers: 1) Eurodollar Sweep Account; 2) Eurodollar Operating Account; and 3) Eurodollar Money Market Account (collectively, the "**SVB Cayman Eurodollar Accounts**"). When SVB failed in March 2023, SVB Cayman Branch's customers had, in the aggregate, approximately $866 million deposited in three types of accounts.

#### i.    Eurodollar Sweep Account

25.    The Eurodollar Sweep Account was a business account offered by the SVB Cayman Branch. In the account agreement, SVB stated that the SVB Eurodollar Sweep Account was "held at Silicon Valley Bank's Cayman Islands Branch."  A true and correct copy of a template account agreement for a Eurodollar Sweep Account ("**Sweep Agreement**") is attached hereto as **Exhibit 2.**

26.    The Sweep Agreement states: "The SVB Eurodollar Sweep Account provides clients with a convenient way to earn interest while keeping their funds available for banking needs. Client balances automatically transfer or 'sweep' between the Deposit Account [located in the United States] and the interest-bearing SVB Eurodollar Sweep Account held at Silicon Valley Bank's Cayman Islands Branch."  Ex. 2 at p. 1.

27.    The Sweep Agreement contains provisions notifying customers-depositors of the applicability of Cayman law, that their accounts are only payable and collectible at the SVB

#506260071_v1

Cayman Branch and subject to the exclusive jurisdiction of the Cayman Courts, and their duty to comply with Cayman law:

> [T]he SVB Eurodollar Sweep Account shall be and shall remain subject to the laws of the Cayman Islands and to the paragraph below. You agree not to conduct any transaction that would violate any laws of any state or the United States (including the economic sanctions administered by the U.S. Treasury's Office of Foreign Assets Control), of the Cayman Islands or of any other government.
>
> SVB Eurodollar Sweep Account deposits are deposits of the Cayman Islands branch of Silicon Valley Bank ('Cayman Branch') and are subject to the laws of the Cayman Islands. These deposits are NOT domestic deposits, are NOT insured by the FDIC and are NOT guaranteed in any way by the United States government or any government agency thereof. The obligations related to the SVB Eurodollar Sweep Account will be payable and collectible only at and by the Cayman Branch, subject to the laws (including any governmental actions, orders, decrees and/or regulations) and under the exclusive jurisdiction of the courts of the Cayman Islands.

Ex. 2 at p. 3.

28.    At the time of the SVB Collapse (defined below), there were forty-four (44) active Eurodollar Sweep Accounts, with total account balances of $389,562,086.

**ii.    Eurodollar Money Market Account**

29.    A Eurodollar Money Market Account was a traditional, interest-bearing business money market account available to SVB Cayman Branch customers. In the account agreement, SVB affirmatively stated that the Eurodollar Money Market Account was established "at Silicon Valley Bank's Cayman Islands branch office."  A true and correct copy of a template account agreement for a Eurodollar Money Market Account ("**Money Market Account Agreement**") is attached hereto as **Exhibit 3**.

30.    The Money Market Account Agreement contains provisions notifying customers-depositors of the applicability of Cayman law, that their accounts are only payable and collectible at the SVB Cayman Branch and subject to the exclusive jurisdiction of the Cayman Courts, and their duty to comply with Cayman law:

#506260071_v1

[T]he Eurodollar Money Market Account(s) shall be and shall remain subject to the laws of the Cayman Islands and to the paragraph below. You agree not to conduct any transaction that would violate any laws of any state or the United States (including the economic sanctions administered by the U.S. Treasury's Office of Foreign Assets Control), of the Cayman Islands or of any other government.

SVB Eurodollar Money Market Account deposits are deposits of the Cayman Islands branch of Silicon Valley Bank ('Cayman Branch') and are subject to the laws of the Cayman Islands. These deposits are NOT domestic deposits, are NOT insured by the FDIC and are NOT guaranteed in any way by the United States government or any government agency thereof. The obligations related to the SVB Eurodollar Money Market Account will be payable and collectible only at and by the Cayman Branch, subject to the laws (including any governmental actions, orders, decrees and/or regulations) and under the exclusive jurisdiction of the courts of the Cayman Islands.

Ex. 3 at pp. 2-3.

31.     At the time of the SVB Collapse, there were one-hundred six (106) active Eurodollar Money Market Accounts, with total account balances of $108,400,111.

### iii.    Eurodollar Operating Account

32.     The Eurodollar Operating Account was a traditional business operating account that was not interest bearing. In the account agreement, SVB affirmatively stated that the SVB Eurodollar Operating Account was established "at Silicon Valley Bank's Cayman Islands branch office." A true and correct copy of a template account agreement for a Eurodollar Operating Account ("**Operating Account Agreement**" and, together with the Sweep Agreement and the Money Market Account Agreement, the "**SVB Cayman Account Agreements**") is attached hereto as **Exhibit 4**.

33.     The Operating Account Agreement contains provisions notifying customers-depositors of the applicability of Cayman law, that their accounts are only payable and collectible at SVB Cayman and subject to the exclusive jurisdiction of the Cayman Courts, and their duty to comply with Cayman law:

[T]he Eurodollar Operating Account(s) shall be and shall remain subject to the laws

9

of the Cayman Islands and to the paragraph below. You agree not to conduct any transaction that would violate any laws of any state or the United States (including the economic sanctions administered by the U.S. Treasury's Office of Foreign Assets Control), of the Cayman Islands or of any other government.

SVB Eurodollar Operating Account deposits are deposits of the Cayman Islands branch of Silicon Valley Bank ('Cayman Branch') and are subject to the laws of the Cayman Islands. These deposits are NOT domestic deposits, are NOT insured by the FDIC and are NOT guaranteed in any way by the United States government or any government agency thereof. The obligations related to the SVB Eurodollar Operating Account will be payable and collectible only at and by the Cayman Branch, subject to the laws (including any governmental actions, orders, decrees and/or regulations) and under the exclusive jurisdiction of the courts of the Cayman Islands.

Ex. 4 at pp. 2-3.

34.     At the time of the SVB Collapse, there were four hundred eighty-four (484) active Eurodollar Operating Accounts, with total account balances of $368,212,751.

**B.      SVB Cayman Branch's Domestic Account**

35.     Upon information and belief, prior to the SVB Collapse, it was the regular practice for the SVB Cayman Branch to deposit all of its cash with SVB in a deposit account located in the United States. SVB Cayman Branch's sole asset was the depository liability owed by SVB in connection with this account (the "**SVB Cayman Domestic Account**").

36.     Upon information and belief, the SVB Cayman Branch maintained a domestic account in the United States at SVB's main headquarters with account number xxxx0000 and the notation "non-interest bearing deposits" and "foreign offices," under circumstances where the sole beneficiary for this account was the SVB Cayman Branch (as there were no other foreign deposit taking branches) and that the credits located in this domestic account were the SVB Cayman Branch's sole asset and located in the United States.

37.     Upon information and belief, SVB's main headquarters maintained domestic, United States sitused accounts for each and all of the SVB Cayman Eurodollar Accounts with the

#506260071_v1

following account numbers: (i) SVB Cayman Sweep (xxxx5000); (ii) Cayman Eurodollar MMA (xxxx6000); (iii) SVB Cash Sweep Clearing Purchases-Foreign Offices (xxxx1940); (iv) Interest Payable on SVB Cayman Sweep (xxxx0500); and (v) Interest Payable – Cayman Eurodollar MMA Deposits (xxxx0600).

38.     Upon information and belief, all credits associated with the SVB Cayman Domestic Account and the SVB Cayman Eurodollar Accounts were geographically located in the United States at all material times.

        **C.**      **The Intra-Group Service Level Agreement**

39.     The relationship between SVB and the SVB Cayman Branch was governed by an Intra-Group Service Level Agreement, entered into by and between the SVB Cayman Branch, as recipient, and Silicon Valley Bank (US Head Office), as provider (the "**SLA**").   A true and correct copy of the SLA is attached hereto as **Exhibit 5**.

40.     The recitals to the SLA expressly note that the SVB Cayman Branch is regulated by CIMA, that SVB is separately regulated by the California Department of Business Oversight and the Federal Reserve, and that the SLA is being entered into on an "arm's length basis." *SLA*, Recitals.

41.     Under the SLA, the SVB Cayman Branch looked to SVB's California office for staffing needs in select service areas such as finance, IT services, legal and risk management (the "**Shared Services**"). SLA, Schedule 1. SVB and the SVB Cayman Branch were each required to appoint separate representatives, known as "Agreement Managers," who served as the primary point of contact with the corresponding party. SLA, §§ 5.1, 5.2.

42.     As noted above, the Agreement Manager listed for the SVB Cayman Branch was Kara Hackenburg, Head of Data Policy and Data Risk Management for SVBFG.  As such, SVBFG

would have full knowledge and would have agreed to the application of Cayman Law to the Cayman depositors, and had consented to the jurisdiction of the Cayman Court and the liquidation procedures for Cayman bank branches under Cayman law.

43.     Each Agreement Manager had full authority to act for, and on behalf of, the respective party on all matters relating to the SLA. *SLA*, § 5.2(c). Further, each Agreement Manager was required to meet with his or her counterpart at regular intervals to discuss compliance with the terms of the SLA, any issues of concern to either party, and proposed solutions for addressing issues of concern. *SLA*, § 5.3.

44.     The SLA acknowledged that CIMA and other Cayman governmental agencies regulated the SVB Cayman Branch, and provided:

> In providing the Services, the Provider agrees to: A. Comply with all applicable Regulatory Requirements and Compliance Requirements necessary to perform its obligations under this Agreement; and B. Obtain and maintain all necessary licences, permits, consents and regulatory approvals from the relevant Regulators, if any, and to the extent applicable, necessary to perform its obligations under this Agreement.

*SLA*, § 12.1.

45.     The SLA further provided that the SVB Cayman Branch was the primary contact and reporting person for any inquiries from CIMA:

> The Recipient will be responsible, unless otherwise agreed in writing by the Parties, for all communications and correspondence with its Regulator(s) (which, for the purposes of this Agreement, shall be the Cayman Island Monetary Authority) in relation to the receipt of the Services and this Agreement.

> The Provider will direct enquiries from the Recipient's Regulator relating to this Agreement to the Recipient unless the enquiry is specifically addressed to, or concerns, the Provider or the Provider is prevented from doing so by applicable Law or Regulatory Requirements.

> Each Party shall provide the other Party and/ or any Regulator all reasonable assistance in connection with any enquiry or investigation by any Regulator concerning this Agreement or the relevant Party and shall notify the other Party of any enquiries or investigations unless prevented from doing so by applicable Law or Regulatory Requirements.

*SLA*, §§ 13.1, 13.2, 13.3.

46.     While it relied on SVB's operational staff, risk management, and infrastructure in certain circumstances, the SVB Cayman Branch also operated independently of SVB in many respects. For example, the SVB Cayman Branch's day-to-day management was vested in a dedicated Cayman Branch team under the leadership of a Cayman Branch Executive Director.

47.     Additionally, the SVB Cayman Branch's corporate governance was vested with the Cayman Branch Operating Committee, which provided leadership and strategic oversight for all of SVB Cayman's activities.

48.     In addition to Karen Hackenburg, all other executives and managers appointed to corporate governance positions for the SVB Cayman Branch were also executives at SVBFG, SVB or both.

49.     Under the SLA, the SVB Cayman Branch was permitted to terminate the SLA on 60 days' notice, and it reserved the right to independently audit SVB's books and records. *SLA*, §§ 11, 19.

## III.    The SVB Collapse and Its Shockwaves

### A.    The Commencement of the SVB Receivership

50.     In 2020, SVB reaped the benefits of a "golden age" for the startup technologies sector, enjoying "record rates of investment and private financings, resulting in a flood of deposits into [SVB's] coffers." *First Day Declaration* at ¶ 21. During this period, SVB invested deposits heavily in U.S. Treasuries and other long-dated government bonds, exposing SVB to significant

#506260071_v1

interest rate risk, relying on the assumption that the benchmark interest rate would remain hovering near zero. *Id*.

51.     In March 2022, the Federal Reserve Board of Governors (the "**Federal Reserve**") raised the federal interest rate by 25 basis points to combat inflation, and from March 2022 to March 2023, increased rates seven more times. *Id*. at ¶ 22. SVB's exposure was compounded by the corresponding fall of prices, decimating the value of SVB's bond portfolio. *Id*. To make matters worse, SVB's customers' withdrawal patterns accelerated, and SVB was forced to sell substantially all of its bond portfolio – at a loss of $1.8 billion – to fund withdrawals. *Id*.

52.     SVB announced plans to raise capital to address the shortfall, but its customers' confidence was shaken. The ripple effect was immediate, triggering a run on the bank.

53.     On March 9, 2023, SVB customers withdrew more than $40 billion and, at the close of business, SVB had a negative cash balance of $958 million, effectively resulting in its collapse (the "**SVB Collapse**").

54.     On March 10, 2023, the California Department of Financial Protection and Innovation ("**DFPI**") determined that (a) SVB's liquidity position was inadequate, and it could not reasonably be expected to pay its obligations as they came due; (b) SVB was insolvent; and (c) SVB was conducting its business in an unsafe manner due to its financial condition.

55.     As a result, DFPI ordered that SVB's property and business be placed into a receivership (the "**SVB Receivership**") with the Federal Deposit Insurance Corporation (in this capacity, "**FDIC-R1**").

56.     On March 10, 2023, the day that SVB was closed, Federal Deposit Insurance Corporation in its corporate capacity ("**FDIC-C**") created the Deposit Insurance National Bank of

Santa Clara ("**DINB**") and transferred all insured deposits of SVB to the DINB. The FDIC-C then
announced that:

> All insured depositors will have full access to their insured deposits no later
> than Monday morning, March 13, 2023. The FDIC will pay uninsured
> depositors an advance dividend within the next week. Uninsured depositors
> will receive a receivership certificate for the remaining amount of their
> uninsured funds. As the FDIC sells the assets of Silicon Valley Bank, future
> dividend payments may be made to uninsured depositors.

A true and correct copy of FDIC-C's March 10, 2023 press release is attached hereto as **Exhibit
6**.

57.     Over the weekend of March 11, 2023, it was determined that the appointment of
FDIC-R1 as receiver did not calm concerns that there would be further mass withdrawals from
deposit accounts. Further, the initial attempts by FDIC-R1 and FDIC-C to find a purchaser bank
for SVB were unsuccessful.

**B.     Transfer of SVB Assets in the Wake of the SVB Collapse**

58.     Accordingly, FDIC-C and FDIC-R1 took two steps. First, FDIC-C rescinded the
agreement transferring insured deposits to the DINB, and FDIC-R1 transferred all deposits at SVB
— insured and uninsured, alike — to the newly created, federally-chartered Silicon Valley Bridge
Bank (the "**Bridge Bank**").

59.     On March 13, 2023, via a Transfer Agreement (the "**Transfer Agreement**"),
FDIC-R1 transferred all deposits, both insured and uninsured, and substantially all assets of SVB
and SVB Cayman to Bridge Bank, which was newly created and operated by FDIC-R1 pursuant
to applicable federal law.

60.     Upon information and belief, depositors-creditors of SVB Cayman – the account
holders of the SVB Cayman Eurodollar Accounts – had full access to funds in their accounts now
being held by the Bridge Bank up and until March 31, 2023.

#506260071_v1

61.     This was consistent with the press statements made by the FDIC at the time. On March 13, 2023, the FDIC published its own independent press release stating that its March 12, 2023 transfer of "all deposits — both insured and uninsured — and substantially all assets of" Silicon Valley Bank to Bridge Bank was "an action designed to protect all depositors of Silicon Valley Bank," and "[d]epositors will have full access to their money beginning this morning, when Silicon Valley Bridge Bank, N.A., the bridge bank, opens and resumes normal banking hours and activities."

62.     Moreover, upon the Bridge Bank's opening on March 13, 2023, the FDIC announced on its website that all funds on account with the Bridge Bank were safe and that all deposit holders would have full access to their funds:

> IS MY MONEY SAFE? **Yes!** No one lost any money on deposit as a result of the closure of this bank. All deposits, regardless of dollar amount, were transferred to Silicon Valley Bank, N.A. [*i.e.*, Bridge Bank].

A true and correct copy of a printout from the FDIC's website is attached hereto as **Exhibit 7**.

63.     Upon information and belief, the transfer of all funds to the newly created, FDIC-R operated Bridge Bank included the transfer of all funds associated with the SVB Cayman Domestic Account and the SVB Cayman Eurodollar Accounts.

64.     Second, over the March 11, 2023 weekend, Treasury Secretary Yellen invoked the systemic risk exception.

65.     Generally, depositors at FDIC-insured depository institutions are insured up to a maximum amount of $250,000. *See* 12 U.S.C. §§ 1821(a)(1)(A), (a)(1)(E). Congress established the federal Deposit Insurance Fund ("**DIF**"), which is funded with deposit insurance premium payments collected from banking institutions, and guarantees repayments of insured deposits up to the statutory insured limit of $250,000 upon a bank's failure. *See* 12 U.S.C. § 1821(a)(4).

66.     Other than the $250,000 cap, the other limitations on FDIC insurance status include (i) that the depositor be a U.S. citizen and (ii) that the account is payable in the United States. *See* 12 U.S.C. §§ 1813(l)(5) and 1813(m).

67.     On March 12, 2023, a joint statement press release (the "**Joint Statement Press Release**") was issued by Secretary of the Treasury Janet L. Yellen, Federal Reserve Board Chair Jerome H. Powell, and FDIC Chairman Martin J. Gruenberg, announcing that all SVB assets were transferred to FDIC-R1, assuring all SVB depositors that they would have full access to their money on Monday morning, March 13, 2023, and that they would be made whole, beyond the standard insured amount of $250,000.  A true and correct copy of the Joint Statement Press Release is attached hereto as **Exhibit 8**.

68.     The FDIC's announcement was based upon Treasury Secretary Janet Yellen's invocation of the systemic risk exception (the "**SRE**"), which was based on the unanimous recommendation of the FDIC-C, the Federal Reserve, and in consultation with the President of the United States. Such invocation mandates the FDIC-C to insure and pay the full amount of all deposits for all depositors of SVB above the $250,000 cap, and further removes the requirement that the insured account holder be a U.S. person within the meaning of the Federal Deposit Insurance Act. These decisions, at best, left only the geographic credit situs limitation intact.

69.     On or about March 27, 2023, the FDIC-C and FDIC-R1 entered into a Purchase and Assumption Agreement (the "**P&A Agreement**") with First-Citizens Bank & Trust Company ("**First-Citizens**"), covering certain SVB deposits and loans transferred to and then held at the Bridge Bank.

70.     The P&A Agreement included a purchase of approximately $72 billion of the Bridge Bank's assets at a discount. Notably, the P&A Agreement gave First-Citizens the express

option to purchase the Canadian, German, and Hong Kong foreign branches (all of which did not

accept deposits and only provided lending services), but did not provide First-Citizens with the

option to purchase the SVB Cayman Branch (the only foreign branch of SVB that accepted

deposits).

71.     As a result, the SVB Cayman Branch was not purchased by or transferred to First-

Citizens pursuant to the P&A Agreement.

72.     In connection with the P&A Agreement, the Bridge Bank was formally placed into

receivership with the Federal Deposit Insurance Corporation (in this capacity, "**FDIC-R2**").

73.     Upon information and belief, on March 31, 2023, without the consent of, or notice

to, holders of the Eurodollar Money Market Accounts and Eurodollar Operating Accounts, FDIC-

R transferred all SVB Cayman funds out of their accounts with the Bridge Bank, and left these

accounts with a $0 balance.

**C.     SVB Cayman's Winding Up Proceedings**

74.     As a result of the SVB Collapse and the subsequent zeroing of the SVB Cayman

account balances, on June 13, 2023, certain SVB Cayman depositors-creditors which had been

classified as uninsured, general creditors of the SVB Receivership, submitted a Winding Up

Petition to the Grand Court seeking, *inter alia*, the winding up of SVB under the Companies Act,

and the appointment of joint official liquidators for SVB Cayman (the "**Winding Up Petition**").

75.     On June 30, 2023, the Grand Court of the Cayman Islands issued the Winding Up

Order, which authorizes Plaintiffs Michael Pearson, Andrew Childe, and Niall Ledwidge to act

jointly and severally as joint official liquidators of SVB Cayman (the "**Winding Up Order**"). A

true and correct copy of the Winding Up Order is attached hereto as **Exhibit 9**.

76.     On July 21, 2023, the Grand Court entered a Judgment explaining the justifications for the Winding Up Order (the "**July 2023 Opinion**"). A true and correct copy of the July 2023 Opinion is attached hereto as **<u>Exhibit 10</u>**.

77.     In the July 2023 Opinion, the Grand Court found that jurisdiction existed under section 91(d)(iv) of the Companies Act for the Grand Court to order SVB's winding up, *notwithstanding* the United States-based receivership of SVB, and confirmed that doing so is just and equitable given the public interest in investigating and understanding the interests of the depositors-creditors, and to protect their interests.

78.     On January 11, 2024, the Grand Court entered an Order holding that, under Cayman law, the JOLs are the representatives of an estate and a trust that is subject to Cayman Islands proceedings (the "**Sanction Order**"). A true and correct copy of the Sanction Order is attached hereto as **<u>Exhibit 11</u>**. As such, SVB Cayman now exists as an insolvency estate and trust to be administered under Grand Court supervision for the benefit of its creditors and stakeholders.

## IV.     SVB's Financial Distress and the Upstream Distribution

### A.     The Board's Mismanagement of SVB Leading to the SVB Collapse

79.     In April 2023, the Federal Reserve released a detailed analysis of SVB and its demise, and ultimately concluded that the SVB Collapse was directly attributable to the failures of the Board and SVBFG's senior managerial personnel.

80.     The FRB Report makes clear that egregious managerial errors of the Board and management were the root cause of the catastrophic SVB Collapse:

> [SVB] failed because of a textbook case of mismanagement by the bank. Its senior leadership failed to manage basic interest rate and liquidity risk. Its board of directors failed to oversee senior leadership and hold them accountable.

*FRB Report*, opening letter by Michael Barr p. 1.

81.     Broadly, the Board and SVBFG's executives failed to update their risk management

practices upon SVB's rapid growth and failed to sufficiently address the serious risks that were

evident once interest rates began to increase:

> The report shows that Silicon Valley Bank was a highly vulnerable firm in ways that both its board of directors and senior management did not fully appreciate. These vulnerabilities—foundational and widespread managerial weaknesses, a highly concentrated business model, and a reliance on uninsured deposits—left Silicon Valley Bank acutely exposed to the specific combination of rising interest rates and slowing activity in the technology sector that materialized in 2022 and early 2023.
>
> The full board of directors did not receive adequate information from management about risks at Silicon Valley Bank and did not hold management accountable for effectively managing the firm's risks. The bank failed its own internal liquidity stress tests and did not have workable plans to access liquidity in times of stress. Silicon Valley Bank managed interest rate risks with a focus on short-run profits and protection from potential rate decreases, and removed interest rate hedges, rather than managing long-run risks and the risk of rising rates. In both cases, the bank changed its own risk-management assumptions to reduce how these risks were measured rather than fully addressing the underlying risks.
>
> On March 8, 2023, Silicon Valley Bank announced a balance sheet restructuring that included the sale of certain securities and an intention to raise capital. This occurred during a period of heightened uncertainty for the technology sector, and the bank faced a run by depositors on March 9. Deposit outflows were over $40 billion on March 9, and management expected $100 billion more the next day. This unprecedented outflow led the California Department of Financial Protection and Innovation (CDFPI) to close the bank on March 10.

*FRB Report* at Key Takeaways, p. (i).

82.    The FRB Report lays out in exacting detail the myriad shortcomings and derogation

of duties committed by the Board and specifically identifies three main areas of internal failure as

major shortcomings precipitating the SVB Collapse: Governance and Risk Management, Liquidity

Risk, and Interest Rate Risk Management. *FRB Report*, p. 45.

83.    SVBFG did not keep pace with SVBFG and SVB's rapid growth, and failed to

implement appropriate risk management and control infrastructures. Indeed, the FRB Report

concludes that the SVBFG's internal risk management was insufficient for SVBFG when it was a

$50 billion firm, "let alone when it grew to be a $200 billion firm." *FRB Report*, p. 46.

20

B.     **SVB's Financial Distress in 2022 Made Its Collapse a Certainty**

84.     SVBFG's shortcomings did not end there, but instead spread to its inability to effectively manage liquidity risks. In particular, SVBFG's funding reliance on large, concentrated, and uninsured deposits, together with "broadly deficient liquidity risk-management practices" rendered SVBFG unprepared and unable to respond to its liquidity crisis in March 2023. *FRB Report*, p. 52. By way of comparison, SVB's uninsured deposits as a percentage of total deposits were more than double the large banking organization ("**LBO**") average. *Id.* at p. 22.

85.     SVB's heavy emphasis on investing client deposits in "held-to-maturity" ("**HTM**") government or agency-issued mortgage-backed securities left it unable to be nimble enough to adjust its portfolio when interest rates began to increase. SVBFG's HTM portfolio as a percentage of total securities was more than double its LBO peer group at year end 2022, magnifying its vulnerability. *FRB Report*, p. 22.

86.     SVB's "foundational weaknesses" in liquidity risk management were clear well in advance of the March 2023 SVB Collapse through both its mandated internal liquidity stress tests ("**ILST**") and contingency funding plans.

87.     In fact, in July 2022, after SVBFG exceeded the $100 billion threshold and became subject to enhanced prudential standards of Regulation YY, *see* 12 C.F.R. pt. 252, SVBFG repeatedly failed its own ILST. *FRB Report*, p. 3. In response, management initiated efforts to increase funding capacity, but such efforts were not fully implemented by March 2023. Additionally, in order to mask these risks, "[m]anagement also switched to using less conservative stress testing [which] was particularly problematic due to a highly concentrated deposit base that management assumed was more stable than it proved to be." *Id*.

88.     Management displayed further blind spots when it came to interest rate risk

management. In short, SVBFG management was short-sighted and ignored long-term risks which would have been clear had management utilized various metrics. The FRB Report further concludes that SVBFG management "did not consider idiosyncratic risks to SVBFG or the uniqueness of its customer base and the manner in which it could be impacted by rate increases." *FRB Report*, p. 62. SVBFG also failed to implement sufficient internal governance, audits and controls. The FRB Report states:

> SVBFG did not conduct back-testing, had limited sensitivity testing, and did not have an adequate second line function to provide review and challenge to decisions and model assumptions. SVBFG's interest rate risk policy, which is a firm's governing document for the management and measurement of IRR, exhibited many weaknesses. The policy did not specify scenarios to be run, how assumptions should be analyzed, how to conduct sensitivity analysis, or articulate model back-testing requirements. Further, there was no description of how limits were set and calibrated. It was also not apparent that limits had been reviewed for potential recalibration or that the current level of the limits had been supported since at least 2018.

*FRB Report*, p. 63.

89.    Beyond simple shortcomings, the Board seemed to actively manipulate its internal risk metrics to conceal its vulnerabilities. Due to the inherent incompatibility between long-duration securities and short-duration deposits, SVBFG had breached its long-term interest rate risk limits intermittently since 2017. Rather than addressing the actual underlying risk, SVBFG "made counterintuitive modeling assumptions about the duration of deposits to address the limit breach." *FRB Report*, p. 3.

90.    During this same period, SVBFG removed interest rate hedges that would have provided a buffer against rising interest rates. *Id.* "In sum, when rising interest rates threatened profits and reduced the value of its securities, SVBFG management took steps to maintain short-term profits rather than effectively manage the underlying balance sheet risks." *Id.*

91.    Remarkably, public reports show that SVBFG's risk committee did not have a chair between April 2022 and January 2023.

22

92.     This is particularly notable when considering that an institution of SVBFG's size was subject to rigorous oversight by various state and federal agencies, which flagged the obvious vulnerabilities of SVB to the Board.

93.     For example, in a Joint Target Examination Report dated December 27, 2022 issued to the "Board of Directors, SVB Financial Group/Silicon Valley Bank" the Federal Reserve Bank of San Francisco together with DFPI concluded that SVBFG/SVB's internal audit processes suffered "material weaknesses" and were "not fully effective." *See Supervisory Letter* dated December 27, 2022, attached hereto as **Exhibit 12**.

94.     In fact, SVBFG scored "below supervisory expectations" in four out of eight areas of evaluation of SVBFG and SVB's joint internal audit process, "partially consistent with supervisory expectations" in two areas, and received a "generally consistent with supervisory expectations" score in only two areas. *Id.* at p. 2. Still, the Board failed to implement swift remediation, and ultimately, "shortcomings in judgment and a slow pace to further act on concerns led to missed opportunities for early intervention or to require timely remediation." *FRB Report* at p. 52.

95.     Notwithstanding the alarm bells surrounding SVB's growing financial distress, executive compensation approved by the Board continued to grow, with executives essentially incentivizing near term profit over measured and appropriate risk management. The Board "put short-run profits above effective risk management and often treated resolution of supervisory issues as a compliance exercise rather than a critical risk-management issue." *FRB Report*, p. 3.

96.     "Compensation packages of senior management through 2022 were tied to short-term earnings and equity returns and did not include risk metrics [such that] managers had a financial incentive to focus on short-term profit over sound risk management." *Id*. Indeed, in

January 2023, notwithstanding SVB's deteriorating financial position, the Board's Compensation

Committee approved stock and cash incentive bonuses for 2022 performance, which were paid out

on March 10, 2023, the very day of the SVB Collapse. *Id.* at p. 75.

97.    In short:

> SVBFG's failure can be tied directly to the failure of the board of directors and senior
> management. The board and management failed to effectively oversee the risks inherent in
> SVBFG's business model and balance sheet strategies. SVBFG did not take sufficient steps
> in a timely fashion to build a governance and risk-management framework that kept up
> with its rapid growth and business model risks.

*FRB Report*, p. 2.

### C.    **The Board's Knowledge of SVB's Financial Distress**

98.    During this time, the Board was aware that SVB's financial position was

deteriorating, with customer deposits slowing by the second quarter of 2022, and internal reports

in the third quarter of 2022 showing a lack of sufficient highly liquid assets that could be monetized

on a quick turnaround. *FRB Report*, p. 55-56.

99.    By the fourth quarter of 2022, the Board was well aware of the downtrend in deposit

and increase in external financial pressures, and considered a balance sheet restructuring at that

time. *Id.* at p. 57.

100.    Additionally, when internal controls did signal cause for concern, management

elected to alter methodologies to reduce the appearance of instability rather than to address the

cause of the issues. *Id.* at 58 ("Changing model assumptions, rather than improving the actual

liquidity position, is not an appropriate way to restore compliance . . . .").

101.    It was not only internal audits signaling trouble, however, and at the time of the

SVB Collapse, SVBFG had 31 open supervisory findings – roughly triple that of peer firms. *FRB*

24

*Report*, p. 6.[3]

102.   In June 2022, when SVB received its first large bank rating, the Federal Reserve Bank of San Francisco ("**FRBSF**") downgraded SVB. In August 2022, FRBSF notified SVB of its intent to initiate a formal enforcement action and began working on a memorandum of understanding in collaboration with the FRB. The action was not finalized by the time of the SVB Collapse. U.S. GOV'T ACCOUNTABILITY OFFICE GAO-23-106736, Report to the Committee on Financial Services, House of Representatives, *Preliminary Review of Agency Actions Related to March 2023 Bank Failures* (2023) (hereinafter, "**GAO Report 23-106736**").

103.   Throughout SVB's rapid growth, one significant risk factor remained unchanged and unchecked: SVB's unusually high reliance on uninsured deposits.

104.   In fact, as of year-end 2021, SVB reported uninsured deposits to total assets of 80%. *GAO Report 23-106736*, p. 13. By year-end 2022, approximately 94% of total deposits were uninsured, and thus, vulnerable for a run on the bank. *FRB Report* p. 21 (citing Data derived from SVB's December 31, 2022, Call Report and SVBFG's December 31, 2022, Consolidated Financial Statement for Holding Companies (Form FR Y-9C)).

105.   This exposure to customer-withdrawal volatility was heightened when combined with SVB's inability to quickly liquidate assets due to its heavy reliance on long-dated securities. As of year-end 2022, SVB reported over $15 billion in unrealized losses in its held-to-maturity securities portfolio, an amount equivalent to 89% of its common equity tier 1 capital. *GAO Report 23-106736*, p. 15.

### D.   The Upstream Distribution

106.   It is against this backdrop that the Board deemed it appropriate to make a significant

---

[3] Supervisory findings are issued by the Federal Reserve and include matters requiring attention and matters requiring immediate attention. *FRB Report*, p. 6 n.9.

#506260071_v1

distribution from SVB to SVBFG in 2022.

107.    In SVBFG's Annual Report for fiscal year ending December 31, 2022, the Condensed Statement of Income notes an upstream distribution from SVB of $294 million ($294,000,000) (the "**Upstream Distribution**") in "dividend income from bank subsidiary."

108.    SVB was required to submit quarterly Federal Financial Institutions Examination Council Call Reports. The $294 million figure is reflected in SVB's 2022 Call Report for Q-4 as "cash dividends declared on common stock" in Schedule RI-A - Changes in Bank Equity Capital. The "cash dividends declared on common stock" for Q-1, Q-2, and Q-3 of 2022 are all $0.

109.    Accordingly, SVB made a $294 million upstream distribution to its sole shareholder in the months prior to the SVB collapse at a time when SVBFG's mismanagement of SVB would result in the certain insolvency and collapse of SVB.

## CAUSES OF ACTION

### First Count: Declaratory Judgment That Upstream Distribution Is Void

110.    Plaintiff repeats and re-alleges each of the foregoing paragraphs as if fully set forth herein.

111.    California law, which applies to payments from state-charted banks such as SVB, prohibits transfers by a bank when the bank is insolvent or "in contemplation of insolvency" that are taken "with a view to the preference of one creditor over another." CAL. FIN. CODE § 1406 provides, in part:

> (c) No bank may pay or secure a creditor if the bank does so (1) after committing an act of insolvency or in contemplation of insolvency and (2) with a view to preventing the application of its assets in the manner prescribed in Chapter 7 (commencing with Section 600) of Division 1 or with a view to the preference of one creditor to another.

> (d) Any transaction made by a bank in violation of this section is void.

CAL. FIN. CODE §1406.

112.     The Upstream Distribution was made at a time when SVB was insolvent, committed an act of insolvency or was in contemplation of insolvency.

113.     The Upstream Distribution was made with a view towards preventing the application of its assets in the manner prescribed in Chapter 7 of the California Financial Code. Specifically, California Financial Code § 682 provides that distributions to shareholders shall only be made following payment of liquidation expenses, claims of depositors, and other liabilities of the bank.  *See* CAL. FIN. CODE § 682. Further, the Upstream Distribution was made with a view towards the preference of one creditor over the other.

114.     In the alternative, to the extent that Delaware law applies to the determination of whether the Upstream Distribution is void, it is well-settled that a Delaware shareholder such as SVBFG's receipt of a dividend from an insolvent subsidiary is an illegal distribution and thus void. *EBS Litig. LLC v. Barclays Global Investors, N.A.*, 304 F.3d 302 (3rd Cir. 2002); *see* DEL. CODE ANN. tit. 8, §§ 170(a), 173; *Crowthers McCall Pattern, Inc. v. Lewis*, 129 B.R. 992, 1000-01 (S.D.N.Y. 1991) (denying a motion to dismiss a claim for unlawful dividends under Delaware law and stating that the court must concentrate on the economic substance of the transaction rather than its form).

115.     Accordingly, the Upstream Distribution was in violation of applicable law and thus void *ab initio*.

### Second Count: Declaratory Judgment that Upstream Distribution is Unlawful and Imposition of Constructive Trust Under Cayman Law

116.     Plaintiff repeats and re-alleges each of the foregoing paragraphs as if fully set forth herein.

117.     Under Cayman law, a distribution to shareholders is unlawful and prohibited under Section 34(2) of the Companies Act to the extent that the distribution was made at a time when the company was insolvent.

118.     Under Cayman law, a shareholder who receives an unlawful distribution may be liable for the amount of that distribution, as a constructive trustee, on the basis of knowingly receiving the distribution and the circumstances that it was unlawful.  *See DD Growth Premium 2X Fund (In Official Liquidation) (Appellant) -v- RMF Market Neutral Strategies (Master) Limited (Respondent) (Cayman Islands)* 2017 2 CILR 739.

119.     The Upstream Distribution was made at a time when SVB was unable to pay its debts when they came due in the ordinary course of business, and thus was an unlawful distribution under Cayman law.

120.     Under Cayman law, a constructive trust should be imposed over the cash of Defendant in the amount equal to the Upstream Distribution, for the benefit of the SVB Cayman estate and its depositors-creditors.

### **Third Count: Imposition of Constructive Trust Under 11 U.S.C. § 541(d)**

121.     Plaintiff repeats and re-alleges each of the foregoing paragraphs as if fully set forth herein.

122.     Section 541(d) of the Bankruptcy Code provides, in relevant part, as follows:

Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest … becomes property of the estate under subsection (a)(1) or (2) of this section *only to the extent* of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

11 U.S.C. § 541(d) (emphasis added)

123.     Applicable non-bankruptcy law determines a debtor and debtor-in-possession's interest in property.

124.   Under applicable non-bankruptcy law, Defendant holds, at most, no more than legal title to the Upstream Distribution.

125.   A constructive trust should be imposed upon such cash of the Defendant in an amount sufficient to repay the Upstream Distribution to the JOLs, for the benefit of the SVB Cayman Estate and for the benefit of its depositors-creditors, as assets held in trust are not property of the Defendant's bankruptcy estate under § 541(d) of the Bankruptcy Code.

**WHEREFORE**, based upon the foregoing, the JOLs, on behalf of SVB Cayman, respectfully request judgment against the Defendant, as follows:

A.   On Count I: a declaratory judgment that the Upstream Distribution is void under applicable non-bankruptcy law and that Defendant only holds bare legal title to the Upstream Distribution.

B.   On Count II:  a declaratory judgment that the Upstream Distribution is unlawful under applicable non-bankruptcy law, as well as imposing a constructive trust for the benefit of the SVB Cayman estate and its depositors-creditors over an amount of the Debtor's cash equal to the Upstream Distribution.

C.   On Count III:

- a declaratory judgment that the Upstream Distribution is not property of the Defendant's bankruptcy estate pursuant to § 541(d) of the Bankruptcy Code; and

- an amount of the Debtor's cash equal to the Upstream Distribution is impressed with a constructive trust for the benefit of the SVB Cayman estate and its depositors-creditors.

D.   Awarding such other, further, and different relief as this Court may deem just, equitable, and proper.

29

Dated: July 24, 2024
      New York, New York        HOLLAND & KNIGHT LLP

                                     */s/ Warren E. Gluck, Esq.*
                                     Warren E. Gluck, Esq.
                                     Marie E. Larsen, Esq.
                                     HOLLAND & KNIGHT LLP
                                     787 Seventh Avenue
                                     31st Floor
                                     New York, New York 10019
                                     Telephone:  212-513-3200
                                     Warren.Gluck@hklaw.com
                                     Marie.Larsen@hklaw.com

                                     Richard A. Bixter, Jr., Esq. (*pro hac vice*
                                     forthcoming)
                                     HOLLAND & KNIGHT LLP
                                     150 N. Riverside Plaza Suite 2700
                                     Chicago, Illinois 60606
                                     Telephone: 312-263-3600
                                     richard.bixter@hklaw.com

                                     *Counsel for the Joint Official Liquidators*
                                     *of Silicon Valley Bank (in Official Cayman Islands*
                                     *Liquidation)*