### IN THE UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| SVB FINANCIAL GROUP, | Case No. 23-10367 (MG) |
| Debtor.[1] | |
| JOINT OFFICIAL LIQUIDATORS OF SILICON VALLEY BANK (IN OFFICIAL LIQUIDATION), | Adv. Pro. No. 24-04014 (MG) |
| Plaintiff, | |
| vs. | **FIRST AMENDED ADVERSARY COMPLAINT** |
| SVB FINANCIAL GROUP, | |
| Defendant. | |

Andrew Childe, Niall Ledwidge, and Michael Pearson, in their capacity as the duly appointed joint official liquidators ("**JOLs**" or "**Plaintiff**") of Silicon Valley Bank (in Official Liquidation) (the "**Cayman Liquidation**, and collectively with the JOLs, the "**SVB Cayman Estate**"), an estate and statutory trust in official liquidation under the supervision of the Grand Court of the Cayman Islands, Financial Services Division (the "**Cayman Court**"), Cause No. FSD 163 of 2023 (DDJ) (the "**Cayman Proceeding**"), pursuant to the Cayman Islands Companies Act (2023 Revision) (the "**Companies Act**") and associated regulations, including the Companies Winding Up Rules (2023 Consolidation) (the "**CWR**"), the Insolvency Practitioners Regulations, and the June 30, 2023 Winding Up Order issued by the Cayman Court (the "**Winding Up Order**")

---

[1] The last four digits of SVB Financial Group's tax identification number are 2278.

by their undersigned United States counsel, file this Complaint in this adversary proceeding against

Defendant SVB Financial Group ("**SVBFG**", "**Defendant**" or "**Debtor**"), and allege as follows:

## **NATURE OF THIS ACTION**

1.        The SVB Cayman Estate brings this litigation to impose a constructive trust under

Cayman law due to the $294 Million distribution made by Silicon Valley Bank to SVBFG, its sole

shareholder, at a time when the Bank's insolvency and collapse was a certainty and an overlapping

board of directors and officers were well aware of SVB's critical financial distress.

2.        The JOLs have also asserted an unsecured claim against SVBFG in connection with

the damages suffered by the SVB Cayman Estate and as the agent for SVB Cayman's depositors-

creditors, due to the Upstream Distribution and the significant mismanagement of SVB Cayman

(defined below).

3.        The SVB Cayman Estate separately files this complaint because, as a matter of

applicable Cayman law, the Upstream Distribution is void and is not property of SVBFG's

bankruptcy estate. Cayman law permits imposition of a constructive trust over unlawful

distributions made to equityholders. Similarly, Cayman law vests joint official liquidators upon

their appointment with the right to seek avoidance of preferential, undervalue and/or fraudulent

transactions under Sections 145-147 of the Companies Act, as well as separate Cayman statutory

provisions applicable to creditors of Cayman-registered companies (collectively, the "**Cayman**

**Clawback Claims**").

4.        As set forth below, due to the mismanagement of SVBFG, Silicon Valley Bank was

a ticking time bomb by the end of 2022 when the Upstream Distribution was made. The Bank had

failed numerous liquidity and stress tests and a run on the bank was an inevitability, due to its large

2

uninsured depositor base, the rise in interest rates throughout 2022, and SVBFG's decision to place short-term profits (and executive compensation) over the long-term health of the bank.

5.      The Cayman Clawback Claims are exclusively and solely vested in the JOLs pursuant to Cayman law.  They arise and crystallize *solely* upon the issuance of a liquidation order by the Cayman Court, which indisputably had jurisdiction over and was authorized to commence the bankruptcy of Silicon Valley Bank in Cayman.  The Cayman Clawback Claims were not and could not have been "vested" with the FDIC or SVB Receivership.  FDIC receiverships are explicitly territorial in nature and limited to the United States.  The sole mechanism for causing the SVB Receivership to have effect in Cayman was intentionally eschewed by the SVB Receivership and at no time, including the present, has the SVB Receivership been operative or had impact in Cayman.  Moreover, the Cayman Clawback Claims arose months after any claims of Silicon Valley Bank was transferred to the SVB Receivership (statutorily, upon the appointment of the FDIC as receiver).

6.      In any event, the FIRREA statutes which govern the FDIC's rights in connection with the receivership which arose as a consequence of Silicon Valley Bank's failure (the "**SVB Receivership**") *expressly* provides that domestic and foreign clawback claims held by debtor banks and creditors do not "*transfer*" to the receivership – rather, FIRREA merely contemplates that *both* the FDIC Receiver as receiver  and others maintain clawback claims, noting explicitly that the FDIC's  clawback claims are "superior" (and implicitly, that other clawback claims, such as the Cayman Clawback Claims, are inferior).

7.      In any event, the SVB Receiverships have declined to affirmatively assert any clawback claims against SVBFG.  At best and at most, the SVB Receivership has prophylactically

and provisionally asserted numerous, multi-billion dollar regulatory and tort allegations as defensive _setoffs_ to SVBFG's approximately $2 billion receivership and insurance claims.

8.     There is no statutory or precedential guidance on the nature of "superior" versus "inferior" clawback claims under FIRREA or otherwise.  But that is likely of no consequence.  If SVBFG fails in its FDIC litigation, the SVB Receivership will not be asserting clawback claims (whether superior or inferior).  If any of the FDIC or FDIC Receivers' _other_ setoff claims and torts exceed $2 billion, the SVB Receivership will not be asserting clawback claims (whether superior or inferior).  If SVBFG is successful in obtaining insured status for its deposits, the SVB Receivership will not be asserting clawback claims (whether superior or inferior).  Analogous circumstances are myriad.  At core, the SVB Cayman Estate is a structurally senior creditor as compared to SVBFG's creditors, SVBFG, the FDIC, and SVB Receivership.  The causes of action – and particularly the Cayman Clawback Claims – are just and equitable, while the wrongful dividend the structurally junior SVBFG creditors continue to enjoy is precisely the opposite.

9.     The JOLs are court-appointed fiduciaries of the SVB Cayman Estate, tasked with administering the assets of SVB within the territorial jurisdiction of the Cayman Islands, with standing to bring claims on behalf of SVB Cayman as well as the agent of SVB Cayman's depositors-creditors. On behalf of SVB Cayman as well as its depositors-creditors, the JOLs bring this action seeking a declaratory judgment that the Upstream Distribution is null and void and thus SVBFG has nothing more than bare legal title to the Upstream Distribution. _See_ 11 U.S.C. § 541(d); _Entegra Power Grp. LLC v. Dewey & LeBoeuf LLP (In re Dewey & LeBoeuf LLP)_, 493 B.R. 421 (Bankr. S.D.N.Y. 2013) (Glenn, J.). The JOLs further seek imposition of a constructive trust upon Debtor's cash in the amount of the Upstream Distribution for the benefit of the SVB Cayman Estate.

**THE PARTIES**

10.     The JOLs, are the duly appointed joint official liquidators of SVB Cayman, a Cayman Islands estate under the supervision of the Cayman Court, Cause No. FSD 163 of 2023 (DDJ).

11.     On August 16, 2007, Silicon Valley Bank, Santa Clara ("**SVB**") registered in the Cayman Islands as a foreign company under Part IX of the Cayman Islands Companies Act ("**Companies Act**").

12.     On August 30, 2007, SVB applied for and was granted a Class "B" banking license from the Cayman Islands Monetary Authority ("**CIMA**") under the Cayman Islands Banks and Trust Companies Act (2021 Revision) ("**BTC Act**").

13.     Following its registration and the granting of a Class "B" license from CIMA, SVB maintained an active branch in the Cayman Islands; the established SVB Cayman Islands branch ("**SVB Cayman**"). The primary purpose of SVB Cayman was to offer deposit products.

14.     As a condition of receiving its Class "B" banking license, SVB agreed that it would be regulated in the Cayman Islands by CIMA and subject to the winding up procedures set forth under applicable Cayman Islands law and the Cayman Court.

15.     Defendant SVBFG is the debtor in the above-captioned chapter 11 case (the "**Chapter 11 Case**").  SVBFG is a Delaware corporation established in 1999.

16.     Prior to the petition date of the Chapter 11 Case, SVBFG was and is the ultimate corporate parent of Silicon Valley Bank, an FDIC-insured state-chartered bank headquartered at all relevant times in California and established to provide banking services to Silicon Valley's growing number of technology companies.

#512622976_v1

17.    The SVB Cayman Estate's *preliminary* analysis indicates that at least the following persons had materially identical or overlapping job responsibilities at both Silicon Valley Bank and SVBFG during the relevant time period:

| Name | Position at SVBFG | Position at SVB |
|---|---|---|
| Beck, Daniel | CFO (2021-2023) | CFO (2021-2023) |
| Becker, Greg | President/CEO and Director (2021-2023) | CEO (2021-2023) |
| Benhamou, Eric | Director (2021-2023) | Director |
| Burr, Elizabeth | Director (November 2021-2023) | Director (2021-2023) |
| Cadieux, Marc | Chief Credit Officer (2021-2023) | Chief Credit Officer (2021-2023) |
| China, John | President of SVB Capital (2021-2023) | Sr. Key Executive/Technology Professional |
| Clendening, John | Director (2021-2022) | Director (2021-2023) |
| Cox, Philip | COO (2021-2023) | COO (2021-2023) |
| Daniels, Richard | Director (2021-2023) | Director (2021-2023) |
| Davis, Alison | Director (2021-2023) | Director (2021-2023) |
| Descheneaux, Michael | President of SVB (2021-2023) | President (2021-2023) |
| Draper, Michelle | Chief Marketing Officer (2021-2023) | Chief Marketing Officer (2021-2023) |
| Dunbar, Roger | Chairman of the Board (2021-2022) | Chairman of the Board/Director |
| Edmons-Waters, Christopher | Chief Human Resources Officer (2021-2022) | Chief Human Resources Officer (2021-2023) |
| Friedman, Joel | Director (2021-2023) | Director |
| Hackenburg, Kara | Head of Data Policy and Data Risk Management (2021-2023) | Head of Business Risk Management |

#512622976_v1

| Izurieta, Laura | Chief Risk Officer (2021-2022) | Sr. Key Executive (2021-2023) |
| --- | --- | --- |
| Maggioncalda, Jeffrey | Director (2021-2023) | Director |
| Matthews, Beverly Kay | Director (2021- 2023) Chairman of the Board (2022-2023) | Director (2021-2023) Chairman of the Board (2022-2023) |
| Miller, Mary | Director (2021-2023) | Director (2021-2023) |
| Mitchell, Kate D. | Director (2021-2023) | Director |
| Peters, John | Chief Auditor (2021-2023) | Chief Auditor (2021-2023) |
| Robinson, John | Director (2021) | Director (2021-2023) |
| Staglin, Garen | Director (2021-2023) | Director (2021-2023) |
| Zuckert, Michael | General Counsel (2021-2023) | General Counsel (2021-2023) |

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334(a). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

19.     Venue is proper in this district pursuant to 28 U.S.C. § 1409(a), as this Adversary Proceeding arises under, arises in, or is related to a bankruptcy case pending in this District.

20.     This adversary proceeding is commenced pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure.

21.     The court has general and specific personal jurisdiction over the Defendant because: (i) the Defendant is a Chapter 11 Debtor before this Court; (ii) the Defendant is authorized to do business in New York and the United States and regularly transacted business in the United States, the place where SVBFG had its principal place of business; (iii) the Defendant transacted business in the United States and in New York with respect to matters at issue in this case; and (iv)

#512622976_v1

the Defendant has engaged in the conduct requisite for liability under both United States and

Cayman Islands law within the United States, including within the State of New York.

**NOTICE PURSUANT TO FED. R. BANKR. P.  7008 and 9017 AND FED. R. CIV. P. 44.1**

22.     Please take notice that Plaintiff intends to raise issues in this adversary proceeding

pertaining to foreign law, specifically, the law of the Cayman Islands and Orders of the Cayman

Court.

23.     Plaintiff consents to entry of final orders and judgments by this Court.

**GENERAL ALLEGATIONS**

**I.     SVBFG's Business and Operation of SVB**

24.     SVBFG has historically been in the business of financial services, and prior to

March 10, 2023, the bedrock of SVBFG's business was owning and operating SVB. *Declaration

of William C. Kosturos in Support of the Debtor's Chapter 11 Petition and First Day Pleadings*

[Chapter 11 Case, ECF No. 21] ("**First Day Declaration**"), at ¶ 6.

25.     SVB and SVBFG shared personnel and management, and upon information and

belief, all material decisions concerning operations of SVB, including bank, investment and risk

management, were made by SVBFG executives at the direction of SVBFG's and SVB's shared

board of directors. *See* BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM, *Review of the

Federal Reserve's Supervision and Regulation of Silicon Valley Bank* (Apr. 28, 2023), available

at:  https://www.federalreserve.gov/publications/files/svb-review-20230428.pdf  (last  accessed

June 27, 2024) ("**FRB Report**").

26.     There was near complete overlap between the board of SVB and the board of

SVBFG (together, the "**Board**"). *See* CALIFORNIA DEPARTMENT OF PROTECTION AND INNOVATION

& FEDERAL RESERVE BANK OF SAN FRANCISCO, *Report of Examination* (May 3, 2021), at 21-27

("**CAMELS Report**"), a true and correct copy of which is attached hereto as **Exhibit 1.**

27.     In addition to the Board overlap, SVB and SVBFG had overlapping officers. For

example, Gregory Becker served as the President of SVBFG and CEO of both SVB and SVBFG

since 2011.

28.     Kara Hackenburg, the individual identified as the SVB Cayman "Agreement

Manager" under the SLA (defined below), was Head of Data Policy and Data Risk Management

for SVBFG, as well as Head of Business Risk Management for SVB.  Ms. Hackenberg,  and others

at SVB and SVBFG allowed and did not prevent the wrongful dissipation of the SVB Cayman and

Cayman Depositors' assets in violation of the very duties and relevant Cayman regulations they

had agreed to follow that were designed to prevent such dissipation.

29.     Between 2019 and 2021, SVBFG and its subsidiaries tripled in size, exploding from

$71 billion to $211 billion in assets, largely due to the flourishing venture capital and technology

sectors at a time when interest rates were remarkably low. As described in greater detail below,

however, the Board neglected to keep pace with SVB's rapid growth and failed to implement risk

and liquidity controls sufficient for a banking institution of SVB's size.  This ultimately led to the

SVB Collapse, which was a certainty as early as 2022 and well before the $294 million dividend.

II.     **SVB Cayman's Operations**

        A.      **SVB Cayman's Customer Accounts**

30.     SVB Cayman offered three types of accounts to customers: 1) Eurodollar Sweep

Account; 2) Eurodollar Operating Account; and 3) Eurodollar Money Market Account

(collectively, the "**SVB Cayman Eurodollar Accounts**"). When SVB failed in March 2023, SVB

Cayman's customers had, in the aggregate, approximately $866 million deposited in three types

9

of accounts.

#### i.    Eurodollar Sweep Account

31.    The Eurodollar Sweep Account was a business account offered by SVB Cayman. In the account agreement, SVB stated that the SVB Eurodollar Sweep Account was "held at Silicon Valley Bank's Cayman Islands Branch." A true and correct copy of a template account agreement for a Eurodollar Sweep Account ("**Sweep Agreement**") is attached hereto as **Exhibit 2.**

32.    The Sweep Agreement states: "The SVB Eurodollar Sweep Account provides clients with a convenient way to earn interest while keeping their funds available for banking needs. Client balances automatically transfer or 'sweep' between the Deposit Account [located in the United States] and the interest-bearing SVB Eurodollar Sweep Account held at Silicon Valley Bank's Cayman Islands Branch." Ex. 2 at p. 1.

33.    The Sweep Agreement contains provisions notifying customers-depositors of the applicability of Cayman law, that their accounts are only payable and collectible at SVB Cayman and subject to the exclusive jurisdiction of the Cayman Courts, and their duty to comply with Cayman law:

> [T]he SVB Eurodollar Sweep Account shall be and shall remain subject to the laws of the Cayman Islands and to the paragraph below. You agree not to conduct any transaction that would violate any laws of any state or the United States (including the economic sanctions administered by the U.S. Treasury's Office of Foreign Assets Control), of the Cayman Islands or of any other government.
>
> SVB Eurodollar Sweep Account deposits are deposits of the Cayman Islands branch of Silicon Valley Bank ('Cayman Branch') and are subject to the laws of the Cayman Islands. These deposits are NOT domestic deposits, are NOT insured by the FDIC and are NOT guaranteed in any way by the United States government or any government agency thereof. The obligations related to the SVB Eurodollar Sweep Account will be payable and collectible only at and by the Cayman Branch, subject to the laws (including any governmental actions, orders, decrees and/or regulations) and under the exclusive jurisdiction of the courts of the Cayman Islands.

Ex. 2 at p. 3.

10

34.     At the time of the SVB Collapse (defined below), there were forty-four (44) active Eurodollar Sweep Accounts, with total account balances of $389,562,086.

### ii.     Eurodollar Money Market Account

35.     The Eurodollar Money Market Account was a traditional, interest-bearing business money market account available to SVB Cayman customers. In the account agreement, SVB affirmatively stated that the Eurodollar Money Market Account was established "at Silicon Valley Bank's Cayman Islands branch office."  A true and correct copy of a template account agreement for a Eurodollar Money Market Account ("**Money Market Account Agreement**") is attached hereto as **Exhibit 3**.

36.     The Money Market Account Agreement contains provisions notifying customers-depositors of the applicability of Cayman law, that their accounts are only payable and collectible at SVB Cayman and subject to the exclusive jurisdiction of the Cayman Courts, and their duty to comply with Cayman law:

> [T]he Eurodollar Money Market Account(s) shall be and shall remain subject to the laws of the Cayman Islands and to the paragraph below. You agree not to conduct any transaction that would violate any laws of any state or the United States (including the economic sanctions administered by the U.S. Treasury's Office of Foreign Assets Control), of the Cayman Islands or of any other government.
>
> SVB Eurodollar Money Market Account deposits are deposits of the Cayman Islands branch of Silicon Valley Bank ('Cayman Branch') and are subject to the laws of the Cayman Islands. These deposits are NOT domestic deposits, are NOT insured by the FDIC and are NOT guaranteed in any way by the United States government or any government agency thereof. The obligations related to the SVB Eurodollar Money Market Account will be payable and collectible only at and by the Cayman Branch, subject to the laws (including any governmental actions, orders, decrees and/or regulations) and under the exclusive jurisdiction of the courts of the Cayman Islands.

Ex. 3 at pp. 2-3.

37.     At the time of the SVB Collapse, there were one-hundred six (106) active Eurodollar Money Market Accounts, with total account balances of $108,400,111.

### iii.    Eurodollar Operating Account

38.    The Eurodollar Operating Account was a traditional business operating account that was not interest bearing. In the account agreement, SVB affirmatively stated that the SVB Eurodollar Operating Account was established "at Silicon Valley Bank's Cayman Islands branch office."  A true and correct copy of a template account agreement for a Eurodollar Operating Account ("**Operating Account Agreement,**" and together with the Sweep Agreement and the Money Market Account Agreement, the "**SVB Cayman Account Agreements**") is attached hereto as **Exhibit 4**.

39.    The Operating Account Agreement contains provisions notifying customers-depositors of the applicability of Cayman law, that their accounts are only payable and collectible at SVB Cayman and subject to the exclusive jurisdiction of the Cayman Courts, and their duty to comply with Cayman law:

> [T]he Eurodollar Operating Account(s) shall be and shall remain subject to the laws of the Cayman Islands and to the paragraph below. You agree not to conduct any transaction that would violate any laws of any state or the United States (including the economic sanctions administered by the U.S. Treasury's Office of Foreign Assets Control), of the Cayman Islands or of any other government.
>
> SVB Eurodollar Operating Account deposits are deposits of the Cayman Islands branch of Silicon Valley Bank ('Cayman Branch') and are subject to the laws of the Cayman Islands. These deposits are NOT domestic deposits, are NOT insured by the FDIC and are NOT guaranteed in any way by the United States government or any government agency thereof. The obligations related to the SVB Eurodollar Operating Account will be payable and collectible only at and by the Cayman Branch, subject to the laws (including any governmental actions, orders, decrees and/or regulations) and under the exclusive jurisdiction of the courts of the Cayman Islands.

Ex. 4 at pp. 2-3.

40.    At the time of the SVB Collapse, there were four hundred eighty-four (484) active Eurodollar Operating Accounts, with total account balances of $368,212,751.

### B. SVB Cayman's Domestic Operating Account

41.    Upon information and belief, prior to the SVB Collapse (defined below), it was the regular practice for SVB Cayman to deposit all of its cash with SVB in a deposit account located in the United States.  SVB Cayman's sole asset was the depository liability owed by SVB in connection with this account (the "**SVB Cayman Domestic Account**").

42.    Upon information, writings and belief, SVB Cayman maintained a domestic account in the United States at SVB's main headquarters with account number xxxx0000 and the notation "non-interest bearing deposits" and "foreign offices," under circumstances where the sole beneficiary for this account was SVB Cayman (as there were no other foreign deposit taking branches), and the credits located in this domestic account were SVB Cayman's sole asset and located in the United States.

43.    Upon information and belief, SVB's main headquarters maintained domestic, United States sitused accounts for each and all of the SVB Cayman Eurodollar Accounts with the following account numbers: (i) SVB Cayman Sweep (xxxx5000); (ii) Cayman Eurodollar MMA (xxxx6000); (iii) SVB Cash Sweep Clearing Purchases-Foreign Offices (xxxx1940); (iv) Interest Payable on SVB Cayman Sweep (xxxx0500); and (v) Interest Payable – Cayman Eurodollar MMA Deposits (xxxx0600).

44.    The SVB Cayman Domestic Account and its status as a "deposit liability" of SVB, as well as the Cayman Depositor accounts were jurisdictionally significant, regulated assets that required the SVB Receivership to obtain Cayman Court recognition to validly control.  Otherwise and prior to the Cayman Liquidation, various individuals including Ms. Hackenberg and *inter alia,* SVBFG, maintained supervisory authority and responsibility for these assets and proper management of the SVB Cayman operations.

#512622976_v1

45.    SVBFG filed statements with the SEC that expressly state that its internationally-based banking branch in the Cayman Islands was subject to the laws and regulations promulgated by CIMA:

> Our international-based subsidiaries and offices and global activities, including our bank subsidiary in the U.K., banking branches in Germany, Canada and the Cayman Islands as well as our joint venture bank in China, are subject to the respective laws and regulations of those countries and the regions in which they operate. This includes laws and regulations promulgated by, but not limited to…the Cayman Islands Monetary Authority. . . .

> To the extent we are able to commence operations in any other international market, we will also become subject to the regulatory regimes of those jurisdictions. In jurisdictions where we do not currently have certain licenses or other regulatory authorizations, our activities may be limited.

SVB Financial Group, Feb. 24, 2023 Form 10-K, at 17.

46.    Additionally, SVB Financial Group disclosed that "international regulatory frameworks, such as the Basel Committee on Banking Supervision, can affect the Bank and SVB Financial globally as national regulators implement the frameworks in local jurisdictions." *Id.*

## C.    The Intra-Group Service Level Agreement

47.    The relationship between SVB and SVB Cayman was governed by an Intra-Group Service Level Agreement, entered into by and between SVB Cayman, as recipient, and Silicon Valley Bank (US Head Office), as provider ("**SLA**").   A true and correct copy of the SLA is attached hereto as **Exhibit 5**.

48.    The recitals to the SLA expressly note that SVB Cayman is regulated by CIMA, that SVB is separately regulated by the California Department of Business Oversight and the Federal Reserve, and that the SLA is being entered into on an "arm's length basis."  *SLA*, Recitals.

49.    Under the SLA, SVB Cayman looked to SVB's, and by necessity, SVBFG's California office structure for staffing needs in select service areas such as finance, IT services, legal and risk management ("**Shared Services**"). SLA, Schedule 1. SVB and SVB Cayman were

14

each required to appoint separate representatives, known as "Agreement Managers," who served as the primary point of contact with the corresponding party. *SLA*, §§ 5.1, 5.2.

50.    As noted above, the Agreement Manager listed for SVB Cayman was Kara Hackenburg, Head of Data Policy and Data Risk Management for SVBFG. SVBFG therefore had knowledge of and agreed to the application of Cayman Law to the Cayman depositors and SVB's operations, and each has consented to the jurisdiction of the Cayman Court and the liquidation procedures for Cayman bank branches under Cayman law (respectively, as bank and shareowner).[2]

51.    Each Agreement Manager had full authority to act for, and on behalf of, the respective party on all matters relating to the SLA. *Id.*, § 5.2(c). Further, each Agreement Manager was required to meet with his or her counterpart at regular intervals to discuss compliance with the terms of the SLA, any issues of concern to either party, and proposed solutions for addressing issues of concern. *Id.*, § 5.3.

52.    The SLA acknowledged that CIMA and other Cayman governmental agencies regulated SVB Cayman, and provided:

> In providing the Services, the Provider agrees to: A. Comply with all applicable Regulatory Requirements and Compliance Requirements necessary to perform its obligations under this Agreement; and B. Obtain and maintain all necessary licences, permits, consents and regulatory approvals from the relevant Regulators, if any, and to the extent applicable, necessary to perform its obligations under this Agreement.

*Id.*, § 12.1.

53.    The SLA further provides for primary contact and reporting person items for any inquiries from CIMA:

> The Recipient will be responsible, unless otherwise agreed in writing by the Parties, for all communications and correspondence with its Regulator(s) (which, for the

---

[2] SVBFG has exercised rights pursuant to this consent to Cayman jurisdiction as recently as fall, 2024, when it sought to inspect the otherwise restricted Court file of the SVB Cayman Estate.  By coincidence, it appears SVBFG were until recently unaware of a series of restricted and sealed Court filings, orders and hearings that occurred at the Cayman Court's suggested dates, shortly following the SVBFG inspection.

purposes of this Agreement, shall be the Cayman Island Monetary Authority) in relation to the receipt of the Services and this Agreement.

The Provider will direct enquiries from the Recipient's Regulator relating to this Agreement to the Recipient unless the enquiry is specifically addressed to, or concerns, the Provider or the Provider is prevented from doing so by applicable Law or Regulatory Requirements.

Each Party shall provide the other Party and/ or any Regulator all reasonable assistance in connection with any enquiry or investigation by any Regulator concerning this Agreement or the relevant Party and shall notify the other Party of any enquiries or investigations unless prevented from doing so by applicable Law or Regulatory Requirements.

*Id.*, §§ 13.1, 13.2, 13.3.

54.    SVB Cayman's day-to-day management was vested in a dedicated Cayman Branch team under the leadership of a Cayman Branch Executive Director.  Additionally, SVB Cayman's corporate governance was vested with the Cayman Branch Operating Committee, which provided leadership and strategic oversight for all of SVB Cayman's activities.

### III.    Regulation of SVB in the Cayman Islands Under the BTC Act

55.    Under Section 5(1) of the BTC Act, "no banking business may be transacted from within the Islands, whether or not such business is carried on in the Islands, except by a person who is in possession of a valid license granted by the Authority authorizing that person to carry on such business."

56.    A "bank" is defined as a person carrying on banking business, and "banking businesses" means the business of receiving (other than from a bank or trust company) and holding on current, savings, deposit or other similar account money which is repayable by cheque or order and may be invested by way of advances to customers or otherwise. A "licensee" means a person holding a license under the BTC Act.

57.    Pursuant to Section 6(2)(a) of the BTC Act, a license shall not be granted to a bank unless it has "a place of business in the Islands, approved by the Authority, which will be its

16

principal office in the Islands."

58.    Importantly, the BTC Act prohibits all licensees from "ceas[ing] to have a principal office in the Islands" and "chang[ing] its principal office in the Islands without the prior approval of the Authority." BTC Act, § 6(4)(a), (b).

59.    Further, Section 6A of the BTC Act empowers CIMA to take certain actions when faced with hinderance to effective supervision of the licensee:

(1) Without prejudice to any other power that the Authority may have under this or any other law, the Authority may refuse to grant a license or may impose conditions on a licensee where, in the Authority's opinion, either —

(a) the structure of an applicant's or a licensee's economic group, if any, will hinder effective supervision; or

(b) the activities of any entity in the Cayman banking group are likely to negatively impact the financial stability of the licensee or prejudice the interests of the licensee's depositors.

(2) The conditions that may be imposed by the Authority under subsection (1) include the condition that the economic group or the Cayman banking group undergo a restructure.

60.    SVB in the Cayman Islands, as a class B licensee, was required to maintain a specific net worth. BTC Act, § 8(2). This section of the BTC Act further requires that the _parent banking group_ ensure this minimum net worth be maintained:

The parent undertaking of a Cayman banking group is required to ensure that the net worth stipulated in this section, or such higher net worth as the Authority may direct, is maintained both in respect of the licensee on a solo basis and on a consolidated basis taking into account all the entities in the Cayman banking group.

BTC Act, § 8(6).

61.    In addition, the BTC Act imposes capital funds and capital adequacy ratio requirements on a "licensee" operating in the Cayman Islands and on the "parent undertaking of a Cayman banking group." BTC Act, §§ 9, 10.

62.    Under Section 10 of the BTC Act, SVB in the Cayman Islands, as "a licensee

17

holding a license for the carrying on of banking business and incorporated under the Companies

Act," was prohibited from having "at any time" a "capital adequacy ratio of less than ten per cent."

BTC Act, § 10(1) (emphasis added).

63.    A "parent undertaking of a Cayman banking group" is subject to two additional

capital adequacy obligations:

- Pursuant to Section 10 (2A), "[t]he parent undertaking of a Cayman banking group, which may be a licensee, is required to ensure that capital requirements and other prudential measures that may be issued by the Authority are met on a consolidated basis by the Cayman banking group."

- Pursuant to Section 10(2B), "[t]he parent undertaking of a Cayman banking group, which may be a licensee, shall be required to ensure that any prudential, supervisory or risk management measures that may be issued by the Authority from time to time are met on a consolidated basis by the Cayman banking group."

64.    Pursuant to Section 10(3) of the BTC Act: "[w]here a licensee or the parent

undertaking of a Cayman banking group fails to comply with a requirement of this section, the

licensee may, for the purpose of section 18, be treated by the Authority as carrying on business in

a manner detrimental to the public interest, the interest of its depositors or other creditors."

## IV.    CIMA Regulatory Measures Applicable to SVB Cayman

65.    SVB Cayman was also subject to the various statutes and regulatory policies

established by CIMA.

66.    CIMA publishes the Banking Services Regulatory Measures along with a

Regulatory Policy for Licensing Banks (Revised 2014), which applies to "host-regulated banks"

like SVB in the Cayman Islands, *i.e.*, banks that are part of a banking group[3] that is subject to

consolidated supervision by another banking regulator.

---

[3] A "group" means at least one other entity that is connected to the applicant in that one entity legally or beneficially owns and/or controls the other(s) (e.g.: parent-subsidiary relationship); or another entity legally or beneficially owns and/or controls the entities (e.g.: sister companies); or the entities have common director(s) and/or common management.

67.    Host-regulated banks are (i) *Subsidiaries* – banks incorporated in the Cayman Islands that are controlled or owned ultimately by a bank or banking group incorporated outside the Cayman Islands that is subject to consolidated supervision by another banking regulator; and (ii) *Branches* – banks that are extensions of a foreign bank not incorporated in the Cayman Islands. Regulatory Policy for Licensing Banks § 6.1.

68.    For host-regulated banks, the home regulator must confirm "that the prudential and operational framework of the home regulator assesses such risk areas including corporate governance, capital adequacy, large exposures, related party exposures and liquidity." *Id.* § 6.3.

69.    Further, host-regulated banks must:

- Demonstrate that its directors will be able to apply independent judgement to the governance of the bank in an informed way, free from any conflicts of interest. *Id.* § 8.2.5.

- Demonstrate that adequate controls will be in place with respect to group shareholders and related entities to avoid undue risks in regard to related party transactions and credit risks. *Id.* § 8.3.10

- Demonstrate that proper controls will be in place to prevent the shareholder or persons in senior positions from overriding policies and procedures in a manner that would be prejudicial to depositors, creditors or the public interest. *Id.* § 8.3.11

- Demonstrate that all significant management decisions will be made by more than one person ("four eyes" principle) (generally, any such decision that could impact the applicant's ability to meet its capital, liquidity, legal and regulatory requirements as well as impact depositors and creditors negatively). The "four eyes" criterion is to be met on a continual basis and those persons must demonstrate a balance of appropriate qualifications, skills and experience and form or be a part of the overall management team. *Id.* § 8.3.14

- Demonstrate in its business plan, that it has adequate resources, in terms of manpower, systems and expertise, to meet its objectives and should contain details, including, but not limited to…details and statement of adequacy of domestic operational resources, in particular staff qualifications and experience and information systems including disaster recovery and business continuity arrangements. *Id.* § 8.5.4.

- Demonstrate that they have effectively developed, with the aim of implementing, their own Internal Capital Adequacy Assessment Process (ICAAP) for the purpose

#512622976_v1

of setting internal capital targets and developing strategies for achieving those internal targets that are consistent with their complexity, business activities, risk profile and operating environment. They must also be able to demonstrate the reasonableness of their proposed capital plan and must reflect their own circumstances and group-wide data. Applicants should be guided by the Authority's Supervisory Review Process (Pillar 2) Rules and Guidelines. *Id.* § 8.6.5.

70.     Regarding financial resources, CIMA requires "a branch of an overseas banking applicant to provide written confirmation from its head office **that the head office will provide financial support to the branch sufficient to enable it to meet obligations as and when they fall due**." *Id.* § 8.4.7 (emphasis added).

## V.    The SVB Collapse and Its Shockwaves

### A.    The Commencement of the SVB Receivership

71.     In 2020, SVB reaped the benefits of a "golden age" for the startup technologies sector, enjoying "record rates of investment and private financings, resulting in a flood of deposits into [SVB's] coffers." *First Day Declaration* at ¶ 21. During this period, SVB invested deposits heavily in U.S. Treasuries and other long-dated government bonds, exposing SVB to significant interest rate risk, relying on the assumption that the benchmark interest rate would remain hovering near zero. *Id.*

72.     In March 2022, the Federal Reserve Board of Governors ("**Federal Reserve**") raised the federal interest rate by 25 basis points to combat inflation, and from March 2022 to March 2023, increased rates seven more times. *Id.* at ¶ 22. SVB's exposure was compounded by the corresponding fall of prices, decimating the value of SVB's bond portfolio. *Id.* To make matters worse, SVB customers' withdrawal patterns accelerated, and SVB was forced to sell substantially all of its bond portfolio – at a loss of $1.8 billion – to fund withdrawals. *Id.*

73.     SVB announced plans to raise capital to address the shortfall, but its customers' confidence was shaken. The ripple effect was immediate, triggering a run on the bank.

20

74.    On March 9, 2023, SVB customers withdrew more than $40 billion and, at the close of business, SVB had a negative cash balance of $958 million, effectively resulting in its collapse ("**SVB Collapse**").

75.    On March 10, 2023, the California Department of Financial Protection and Innovation ("**DFPI**") determined that (a) SVB's liquidity position was inadequate, and it could not reasonably be expected to pay its obligations as they came due; (b) SVB was insolvent; and (c) SVB was conducting its business in an unsafe manner due to its financial condition.

76.    As a result, DFPI ordered that SVB's property and business be placed into a receivership with the FDIC (in this capacity, "**FDIC-R1**").

77.    On March 10, 2023, the day that SVB was closed, FDIC in its corporate capacity ("**FDIC-C**") created the Deposit Insurance National Bank of Santa Clara ("**DINB**") and transferred all deposits of SVB to the DINB. The FDIC-C then announced that:

> All insured depositors will have full access to their insured deposits no later than Monday morning, March 13, 2023. The FDIC will pay uninsured depositors an advance dividend within the next week. Uninsured depositors will receive a receivership certificate for the remaining amount of their uninsured funds. As the FDIC sells the assets of Silicon Valley Bank, future dividend payments may be made to uninsured depositors.

A true and correct copy of FDIC-C's March 10, 2023 press release is attached hereto as **Exhibit 6**.

78.    Over the weekend of March 11, 2023, it was determined that the appointment of FDIC-R1 as receiver did not calm concerns that there would be further mass withdrawals from deposit accounts. Further, the initial attempts by SVBFG, FDIC-R1 and FDIC-C to find a purchaser bank for SVB were unsuccessful.

**B.    Transfer of SVB Assets in the Wake of the SVB Collapse**

79.    FDIC-C rescinded the agreement transferring insured deposits to the DINB, and

FDIC-R1 transferred all deposits at SVB — insured and uninsured, alike — to the newly created, federally-chartered Silicon Valley Bridge Bank that was operated by FDIC-R1 pursuant to applicable federal law ("**Bridge Bank**"). These deposits included the SVB Cayman Depositor and SVB Estate funds even though FDIC-R1 was not authorized to deal in these assets, no recognition or extension of the SVB Receivership was sought in Cayman, and SVBFG maintained continuing responsibilities in respect of SVB Cayman as outlined above. Culminating in a Transfer Agreement ("**Transfer Agreement**"), FDIC-R1 transferred all deposits, both insured and uninsured, and substantially all assets of SVB and SVB Cayman to the Bridge Bank.

80.     Over the March 11, 2023 weekend, Treasury Secretary Yellen invoked the systemic risk exception.

81.     Generally, depositors at FDIC-insured depository institutions are insured up to a maximum amount of $250,000. *See* 12 U.S.C. §§ 1821(a)(1)(A), (a)(1)(E). Congress established the federal Deposit Insurance Fund ("**DIF**"), which is funded with deposit insurance premium payments collected from banking institutions, and guarantees repayments of insured deposits up to the statutory insured limit of $250,000 upon a bank's failure. *See* 12 U.S.C. § 1821(a)(4).

82.     Other than the $250,000 cap, the other limitations on FDIC insurance status include (i) that the depositor be a U.S. citizen and (ii) that the account is payable in the United States. *See* 12 U.S.C. §§ 1813(l)(5) and 1813(m).

83.     On March 12, 2023, a joint statement press release ("**Joint Statement Press Release**") was issued by Secretary of the Treasury Janet L. Yellen, Federal Reserve Board Chair Jerome H. Powell, and FDIC Chairman Martin J. Gruenberg, announcing that all SVB assets were transferred to FDIC-R1, assuring all SVB depositors that they would have full access to their money on Monday morning, March 13, 2023, and that they would be made whole, beyond the

standard insured amount of $250,000.  A true and correct copy of the Joint Statement Press Release is attached hereto as **Exhibit 7**.

84.    The FDIC's announcement was based upon Treasury Secretary Janet Yellen's invocation of the systemic risk exception ("**SRE**"), which was based on the unanimous recommendation of the FDIC-C, the Federal Reserve, and in consultation with the President of the United States. Such invocation mandates the FDIC-C to insure and pay the full amount of all deposits for all depositors of SVB above the $250,000 cap, and further removes the requirement that the insured account holder be a U.S. person within the meaning of the Federal Deposit Insurance Act. These decisions, at best, left only the geographic credit situs limitation intact.

85.    In discussions and negotiations that culminated around March 27, 2023, the FDIC-C and FDIC-R1 entered into a Purchase and Assumption Agreement ( "**P&A Agreement**") with First-Citizens Bank & Trust Company ("**First-Citizens**").

86.    Notably, the P&A Agreement gave First-Citizens the express option to purchase the Canadian, German, and Hong Kong foreign branches of SVB (all of which did not accept deposits and only provided lending services), but did *not* provide First-Citizens with the option to purchase SVB Cayman (the only foreign branch of SVB that accepted deposits).  SVB Cayman was therefore excluded from the Agreement, orphaned, and SVBFG knew or should have known it at all relevant times.

87.    In connection with the P&A Agreement, the Bridge Bank was purportedly placed into further receivership with the Federal Deposit Insurance Corporation (in this capacity, "**FDIC-R2**").

88.    Upon information and belief, around March 31, 2023, without the consent of, or notice to, holders of the Eurodollar Money Market Accounts and Eurodollar Operating Accounts,

23

FDIC-R terminated access to all SVB Cayman accounts, with the credits having long been transferred (around March 11), and showing these accounts bearing a $0 balance.

### C.    SVB Cayman's Winding Up Proceedings

89.    On June 13, 2023, certain SVB Cayman depositors-creditors which had been classified as uninsured, general creditors of the SVB Receivership, submitted a Winding Up Petition to the Cayman Court seeking, *inter alia*, the winding up of SVB Cayman under the Companies Act, and the appointment of joint official liquidators for SVB Cayman ("**Winding Up Petition**").

90.    On June 30, 2023, the Cayman Court issued the Winding Up Order, which authorizes Plaintiffs Michael Pearson, Andrew Childe, and Niall Ledwidge to act jointly and severally as joint official liquidators of SVB Cayman ("**Winding Up Order**").  A true and correct copy of the Winding Up Order is attached hereto as **Exhibit 8**.

91.    On July 21, 2023, the Cayman Court entered a Judgment explaining the justifications for the Winding Up Order ("**July 2023 Opinion**"). A true and correct copy of the July 2023 Opinion is attached hereto as **Exhibit 9**.

92.    In the July 2023 Opinion, the Cayman Court found that jurisdiction existed under section 91(d)(iv) of the Companies Act for the Cayman Court to order SVB Cayman's winding up, *notwithstanding* the United States-based receivership of SVB, and confirmed that doing so is just and equitable given the public interest in investigating and understanding the interests of the depositors-creditors, and to protect their interests.

93.    The Cayman Proceeding is an ancillary winding up of a U.S. Bank in the Cayman Islands, whereby the Grand Court ordered the winding up of SVB itself and provided that the JOLs' "powers shall be limited to acting in respect of the assets and affairs of the Cayman Islands

#512622976_v1

branch of [SVB] and its creditors." Winding Up Order at 1-2.

94.    In commencing the Cayman Proceeding, Justice Doyle carefully noted the statutory basis for the Cayman Insolvency Proceeding, the reasons that the commencement was within his authority, and the unique circumstances of the Cayman depositors within the resolution of the bank by the FDIC that necessitated a "just and equitable" winding up under the supervision of the Grand Court. July 2023 Opinion ¶ 63.

95.    Justice Doyle found that SVB "is and remains registered under Part IX," and the Grand Court therefore had jurisdiction to wind it up. July 2023 Opinion ¶¶ 51, 54. Justice Doyle further found that the Debtor has and has had "a clear and sufficient connection with the Cayman Islands," including that it received funds within the jurisdiction and "is regulated by" CIMA. *Id.* ¶¶ 51, 56.

96.    Fully satisfied that the "core requirements" for exercising jurisdiction had been met and the fact that the Debtor was unable to pay its debts, Justice Doyle concluded it was appropriate for the Grand Court to exercise its discretion in favor of making the Winding Up Order. *Id.* ¶¶ 59, 61- 63. Yet, Justice Doyle went further: "I should add not only am I satisfied on the inability to pay debts ground but I would also be satisfied on a just and equitable basis." *Id.* ¶ 63. Justice Doyle recognized there was "a reasonably probability of a benefit of those applying for a winding up order if the winding up order is made," noting "that the liquidators can investigate the matter and can take action to establish the status of the Cayman depositors." *Id.* ¶ 57.

97.    The rare remedy of a "just and equitable" winding-up is reserved for cases concerning corporate misconduct that shock the conscience.

98.    Justice Doyle acknowledged and considered the FDIC's position and unwillingness to appear before the Grand Court:

- "I note the communications dated 27 June 2023 and 28 June 2023 from Dentons for the FDIC receiver. There is reference to the court hearing today but there is no request for an adjournment. Indeed, it appears that the FDIC receiver is not minded to submit to the jurisdiction of this court." July 2023 Opinion, ¶ 11.

- "I have also considered the letters dated 27 and 28 June 2023 from Dentons who act for the FDIC, to Campbells who act for the Petitioners, and also a letter from Dentons dated 27 June 2023 to the General Registry Department in the Cayman Islands. It is the intention of FDIC not to submit to the jurisdiction of the Grand Court." *Id.* at ¶ 49.

99.     In granting the Petition and appointing the JOLs to act on behalf of SVB, Justice Doyle confirmed that doing so was "just and equitable" and necessary to protect the interests of Cayman depositor-creditors who would otherwise be left with no remedy:

> I am satisfied that I should exercise my discretion in making a winding up order. I should add not only am I satisfied on the inability to pay debts grounds but I would be satisfied on a just and equitable basis. There appears to be a battle looming in respect of the treatment of the American and Cayman depositors. **An investigation needs to be taken place in respect of the apparent removal of any moneys and assets from the Branch out of this jurisdiction. The position of the Cayman depositors needs to be investigated further and where appropriate safeguarded**.

Id. ¶ 63. (emphasis added)

100.     On January 11, 2024, the Cayman Court entered an Order holding that, under Cayman law, the JOLs are the representatives of an estate and a trust that is subject to Cayman Islands proceedings ("**Sanction Order**"). A true and correct copy of the Sanction Order is attached hereto as **Exhibit 10**. As such, SVB Cayman now exists as an insolvency estate and trust to be administered under Cayman Court supervision for the benefit of its creditors and stakeholders.

## IV.    SVB's Financial Distress and the Upstream Distribution

### A.    The Board's Mismanagement of SVB Leading to the SVB Collapse

101.     In April 2023, the Federal Reserve released a detailed analysis of SVB and its demise, and ultimately concluded that the SVB Collapse was directly attributable to the failures of the Board and SVBFG's senior managerial personnel.

26

102.   The FRB Report makes clear that egregious managerial errors of the Board and

management were the root cause of the catastrophic SVB Collapse:

> [SVB] failed because of a textbook case of mismanagement by the bank. Its senior
> leadership failed to manage basic interest rate and liquidity risk. Its board of
> directors failed to oversee senior leadership and hold them accountable.

*FRB Report*, opening letter by Michael Barr p. 1.

103.   Broadly, the Board and SVBFG's executives failed to update their risk management

practices upon SVB's rapid growth and failed to sufficiently address the serious risks that were

evident once interest rates began to increase:

> The report shows that Silicon Valley Bank was a highly vulnerable firm in ways
> that both its board of directors and senior management did not fully appreciate.
> These vulnerabilities—foundational and widespread managerial weaknesses, a
> highly concentrated business model, and a reliance on uninsured deposits—left
> Silicon Valley Bank acutely exposed to the specific combination of rising interest
> rates and slowing activity in the technology sector that materialized in 2022 and
> early 2023.
>
> The full board of directors did not receive adequate information from management
> about risks at Silicon Valley Bank and did not hold management accountable for
> effectively managing the firm's risks. The bank failed its own internal liquidity
> stress tests and did not have workable plans to access liquidity in times of stress.
> Silicon Valley Bank managed interest rate risks with a focus on short-run profits
> and protection from potential rate decreases, and removed interest rate hedges,
> rather than managing long-run risks and the risk of rising rates. In both cases, the
> bank changed its own risk-management assumptions to reduce how these risks were
> measured rather than fully addressing the underlying risks.
>
> On March 8, 2023, Silicon Valley Bank announced a balance sheet restructuring
> that included the sale of certain securities and an intention to raise capital. This
> occurred during a period of heightened uncertainty for the technology sector, and
> the bank faced a run by depositors on March 9. Deposit outflows were over $40
> billion on March 9, and management expected $100 billion more the next day. This
> unprecedented outflow led the California Department of Financial Protection and
> Innovation (CDFPI) to close the bank on March 10.

*FRB Report* at Key Takeaways, p. (i).

104.   The FRB Report lays out in exacting detail the myriad shortcomings and derogation

of duties committed by the Board and specifically identifies three main areas of internal failure as

#512622976_v1

major shortcomings precipitating the SVB Collapse: Governance and Risk Management, Liquidity

Risk, and Interest Rate Risk Management. *FRB Report*, p. 45.

105.    SVBFG did not keep pace with SVBFG and SVB's rapid growth, and failed to

implement appropriate risk management and control infrastructures. Indeed, the FRB Report

concludes that the SVBFG's internal risk management was insufficient for SVBFG when it was a

$50 billion firm, "let alone when it grew to be a $200 billion firm." *FRB Report*, p. 46.

**B.      SVB's Financial Distress in 2022 Made Its Collapse a Certainty**

106.    SVBFG's shortcomings did not end there, but instead spread to its inability to

effectively manage liquidity risks. In particular, SVBFG's funding reliance on large, concentrated,

and uninsured deposits, together with "broadly deficient liquidity risk-management practices"

rendered SVBFG unprepared and unable to respond to its liquidity crisis in March 2023. *FRB*

*Report*, p. 52. By way of comparison, SVB's uninsured deposits as a percentage of total deposits

were more than double the large banking organization ("**LBO**") average. *Id.* at p. 22.

107.    SVB's heavy emphasis on investing client deposits in "held-to-maturity" ("**HTM**")

government or agency-issued mortgage-backed securities left it unable to be nimble enough to

adjust its portfolio when interest rates began to increase. SVBFG's HTM portfolio as a percentage

of total securities was more than double its LBO peer group at year end 2022, magnifying its

vulnerability. *FRB Report*, p. 22.

108.    SVB's "foundational weaknesses" in liquidity risk management were clear well in

advance of the March 2023 SVB Collapse through both its mandated internal liquidity stress tests

("**ILST**") and contingency funding plans.

109.    In fact, in July 2022, after SVBFG exceeded the $100 billion threshold and became

subject to enhanced prudential standards of Regulation YY, *see* 12 C.F.R. pt. 252, SVBFG

repeatedly failed its own ILST. *FRB Report*, p. 3. In response, management initiated efforts to increase funding capacity, but such efforts were not fully implemented by March 2023. Additionally, in order to mask these risks, "[m]anagement also switched to using less conservative stress testing [which] was particularly problematic due to a highly concentrated deposit base that management assumed was more stable than it proved to be." *Id.*

110.    Management displayed further blind spots when it came to interest rate risk management. In short, SVBFG management was short-sighted and ignored long-term risks which would have been clear had management utilized various metrics. The FRB Report further concludes that SVBFG management "did not consider idiosyncratic risks to SVBFG or the uniqueness of its customer base and the manner in which it could be impacted by rate increases." *FRB Report*, p. 62. SVBFG also failed to implement sufficient internal governance, audits and controls. The FRB Report states:

> SVBFG did not conduct back-testing, had limited sensitivity testing, and did not have an adequate second line function to provide review and challenge to decisions and model assumptions. SVBFG's interest rate risk policy, which is a firm's governing document for the management and measurement of IRR, exhibited many weaknesses. The policy did not specify scenarios to be run, how assumptions should be analyzed, how to conduct sensitivity analysis, or articulate model back-testing requirements. Further, there was no description of how limits were set and calibrated. It was also not apparent that limits had been reviewed for potential recalibration or that the current level of the limits had been supported since at least 2018.

*FRB Report*, p. 63.

111.    Beyond simple shortcomings, the Board seemed to actively manipulate its internal risk metrics to conceal its vulnerabilities. Due to the inherent incompatibility between long-duration securities and short-duration deposits, SVBFG had breached its long-term interest rate risk limits intermittently since 2017. Rather than addressing the actual underlying risk, SVBFG "made counterintuitive modeling assumptions about the duration of deposits to address the limit breach." *FRB Report*, p. 3.

29

112.    During this same period, SVBFG removed interest rate hedges that would have provided a buffer against rising interest rates. *Id.* "In sum, when rising interest rates threatened profits and reduced the value of its securities, SVBFG management took steps to maintain short-term profits rather than effectively manage the underlying balance sheet risks." *Id.*

113.    Remarkably, public reports show that SVBFG's risk committee did not have a chair between April 2022 and January 2023.

114.    This is particularly notable when considering that an institution of SVBFG's size was subject to rigorous oversight by various state and federal agencies, which flagged the obvious vulnerabilities of SVB to the Board.

115.    For example, in a Joint Target Examination Report, dated December 27, 2022, issued to the "Board of Directors, SVB Financial Group/Silicon Valley Bank," the Federal Reserve Bank of San Francisco together with DFPI concluded that SVBFG/SVB's internal audit processes suffered "material weaknesses" and were "not fully effective." *See Supervisory Letter* dated December 27, 2022, attached hereto as **Exhibit 11**.

116.    In fact, SVBFG scored "below supervisory expectations" in four out of eight areas of evaluation of SVBFG and SVB's joint internal audit process, "partially consistent with supervisory expectations" in two areas, and received a "generally consistent with supervisory expectations" score in only two areas. *Id.* at p. 2. Still, the Board failed to implement swift remediation, and ultimately, "shortcomings in judgment and a slow pace to further act on concerns led to missed opportunities for early intervention or to require timely remediation." *FRB Report* at p. 52.

117.    Notwithstanding the alarm bells surrounding SVB's growing financial distress, executive compensation approved by the Board continued to grow, with executives essentially

incentivizing near term profit over measured and appropriate risk management. The Board "put short-run profits above effective risk management and often treated resolution of supervisory issues as a compliance exercise rather than a critical risk-management issue." *FRB Report*, p. 3.

118.    "Compensation packages of senior management through 2022 were tied to short-term earnings and equity returns and did not include risk metrics [such that] managers had a financial incentive to focus on short-term profit over sound risk management." *Id*. Indeed, in January 2023, notwithstanding SVB's deteriorating financial position, the Board's Compensation Committee approved stock and cash incentive bonuses for 2022 performance, which were paid out on March 10, 2023, the very day of the SVB Collapse. *Id.* at p. 75.

119.    In short:

> SVBFG's failure can be tied directly to the failure of the board of directors and senior management. The board and management failed to effectively oversee the risks inherent in SVBFG's business model and balance sheet strategies. SVBFG did not take sufficient steps in a timely fashion to build a governance and risk-management framework that kept up with its rapid growth and business model risks.

*FRB Report*, p. 2.

**C.    The Board's Knowledge of SVB's Financial Distress**

120.    During this time, the Board was aware that SVB's financial position was deteriorating, with customer deposits slowing by the second quarter of 2022, and internal reports in the third quarter of 2022 showing a lack of sufficient highly liquid assets that could be monetized on a quick turnaround. *FRB Report*, p. 55-56.

121.    By the fourth quarter of 2022, the Board was well aware of the downtrend in deposit and increase in external financial pressures, and considered a balance sheet restructuring at that time. *Id.* at p. 57.

122.    Additionally, when internal controls did signal cause for concern, management elected to alter methodologies to reduce the appearance of instability rather than to address the

#512622976_v1

cause of the issues. *Id.* at 58 ("Changing model assumptions, rather than improving the actual liquidity position, is not an appropriate way to restore compliance . . . .").

123.    It was not only internal audits signaling trouble, however, and at the time of the SVB Collapse, SVBFG had 31 open supervisory findings – roughly triple that of peer firms. *FRB Report*, p. 6.[4]

124.    In June 2022, when SVB received its first large bank rating, the Federal Reserve Bank of San Francisco ("**FRBSF**") downgraded SVB. In August 2022, FRBSF notified SVB of its intent to initiate a formal enforcement action and began working on a memorandum of understanding in collaboration with the FRB. The action was not finalized by the time of the SVB Collapse. U.S. GOV'T ACCOUNTABILITY OFFICE GAO-23-106736, Report to the Committee on Financial Services, House of Representatives, *Preliminary Review of Agency Actions Related to March 2023 Bank Failures* (2023) ("**GAO Report 23-106736**").

125.    Throughout SVB's rapid growth, one significant risk factor remained unchanged and unchecked: SVB's unusually high reliance on uninsured deposits.

126.    In fact, as of year-end 2021, SVB reported uninsured deposits to total assets of 80%. *GAO Report 23-106736*, p. 13. By year-end 2022, approximately 94% of total deposits were uninsured, and thus, vulnerable for a run on the bank. *FRB Report* p. 21 (citing Data derived from SVB's December 31, 2022, Call Report and SVBFG's December 31, 2022, Consolidated Financial Statement for Holding Companies (Form FR Y-9C)).

127.    This exposure to customer-withdrawal volatility was heightened when combined with SVB's inability to quickly liquidate assets due to its heavy reliance on long-dated securities. As of year-end 2022, SVB reported over $15 billion in unrealized losses in its held-to-maturity

---

[4] Supervisory findings are issued by the Federal Reserve and include matters requiring attention and matters requiring immediate attention. *FRB Report*, p. 6 n.9.

#512622976_v1

securities portfolio, an amount equivalent to 89% of its common equity tier 1 capital. *GAO Report 23-106736*, p. 15.

> **D.**     **The Upstream Distribution**

128.    It is against this backdrop that the Board deemed it appropriate to make a significant distribution from SVB to SVBFG in 2022.

129.    In SVBFG's Annual Report for fiscal year ending December 31, 2022, the Condensed Statement of Income notes an upstream distribution from SVB of $294 million ($294,000,000) ("**Upstream Distribution**") in "dividend income from bank subsidiary."

130.    SVB was required to submit quarterly Federal Financial Institutions Examination Council Call Reports. The $294 million figure is reflected in SVB's 2022 Call Report for Q-4 as "cash dividends declared on common stock" in Schedule RI-A - Changes in Bank Equity Capital. The "cash dividends declared on common stock" for Q-1, Q-2, and Q-3 of 2022 are all $0.

131.    Accordingly, SVB made a $294 million upstream distribution to its sole shareholder in the months prior to the SVB collapse at a time when SVBFG's mismanagement of SVB would result in the certain insolvency and collapse of SVB.

**V.**    **Effect of the Winding Up Order and Statutory Claims Arising Upon Appointment of the JOLs in the Cayman Islands**

132.    Upon the making of a winding up order in relation to a company, a statutory trust comes into effect. *See* Exhibit 10. It is well accepted that upon a winding up order being made, the assets of the company are impressed with a statutory trust in the sense that they constitute a fund to be administered by the liquidator as officer of the court and agent for all persons interested in the winding up.

133.    The winding up of a foreign company delimits the ambit of the trust and the powers of the liquidators, but it does so in aid of collectivity as well, and in particular, with a view to

ensuring that creditors subject to the Cayman court's jurisdiction are not treated disadvantageously in the foreign insolvency proceeding. If and once satisfied to this effect, the Cayman court may permit even the assets located outside of the Cayman Islands to be transferred to and be distributed in the foreign proceeding.

134.    Amongst the implications of the existence of the statutory trust in the Cayman proceedings is that the application or dissipation of assets, within a look-back period prior to the commencement of the winding up proceeding, in such a way as to disadvantage creditors who submit to the insolvency jurisdiction of the Cayman courts compared to their position under the trust may, as a matter of Cayman law, be avoidable at the instance of the company's liquidators. This may be the case even in the absence of any moral blame on the part of the recipient and even if the recipient is a trustee for others.

135.    For this reason, the company's insolvency estate includes the right to bring proceedings to recover assets which have been misapplied. Under the Cayman Companies Act (sections 145-147), and the JOLs have statutory powers to bring proceedings to avoid certain acts done by or on behalf of SVB including, but not limited to, transfer to foreign estates or receiverships, prior to the commencement of the Cayman Proceeding. Acts susceptible to avoidance under Cayman Islands law include (at least) voidable preferences, dispositions at an undervalue, and fraudulent trading as well as unlaw distributions to shareholders.

136.    By way of example, section 145 of the Companies Act provides for the avoidance of any transaction within a six-month period concluding with the making of the winding-up order by which the debtor pays some of its creditors in preference to others.

137.    Under Cayman law, these claims do not come into existence until after the company goes into liquidation.  The claim is never vested in the company itself, which is never entitled to

34

bring it.  Neither can the claim (nor, if successful, any recovery therefrom) constitute property of the company.  Statutory rights of action available only to the official liquidator as a result of the winding-up order having been made, such as the right to pursue clawback claims, do not form part of the "company's property," which official liquidators are empowered to sell because such rights are an incidence of office and must be exercised by the officeholder personally, subject to the supervisory control of the court.

138.    The statutory right of the JOLs to assert such claims does not impinge or otherwise conflict with the pending SVB Receivership in the United States, which in any and all events has never been effective in Cayman, which jurisdiction the SVB Receivership has assiduously sought to avoid.  In particular, while 12 U.S.C. § 1821(d)(17) gives FDIC-R the "right" to initiate avoidance actions, by its express language the statute indicates that such right is not exclusive but rather "superior" to the rights of others.

139.    Additionally, Cayman law-governed claims held by the JOLs could not have been assigned by operation of law to the SVB Receivership.  Where the SVB Receivership was commenced in March 2023, it is a factual and legal impossibility that any clawback or fraudulent transfer claims would have vested with the SVB Receivership, as such claims did not arise until the appointment of the JOLs by the Cayman Court in June 2023.

140.    The Winding Up Order also granted the JOLs with certain duties, requiring them to act as agent on behalf of the Cayman depositors-creditors by bringing litigation in the United States to safeguard the rights and interests of this particular group of creditors.  These causes of actions or "choses of action" arise only upon the making of the Winding Up Oder.  Because the SVB Receivership never appeared in the Cayman Islands to seek recognition, at a minimum, Cayman law-governed claims could not have been assigned by operation of law to the SVB

Receivership.

141.    To wit, on October 16, 2024, the Cayman Court entered an Order sanctioning the

JOLs' filing of its claims against SVBFG on behalf of the SVB Cayman Estate and its creditor-

depositors, as well as amending the caption for the Cayman Liquidation.  *See* Case No. 23-130367-

MG (ECF No. 1561) at Ex. C.

142.    Under Section 241(1) of the Companies Act, the Cayman Court may enter orders

with respect to foreign proceedings similar to the effect of an order of recognition under chapter

15 of the United States Bankruptcy Code.  The Cayman Court will grant recognition where it "will

best assure an economic and expeditious administration of the debtor's estate." Notably, however,

the Companies Act provides certain criteria as guideposts for whether recognition is warranted.

Companies Act, § 242(1).

143.    A general principle underlying the Cayman Islands' insolvency regime is that the

property of the company shall be applied in satisfaction of its liabilities *pari passu* and subject

thereto shall be distributed amongst the members according to their rights and interests in the

company. This is without prejudice to and after taking into account and giving effect to the rights

of preferred and secured creditors. *Companies Act*, § 140. The Companies Act also provides that

transfers made improperly to prefer certain creditors over others within six months of the

commencement of liquidation proceedings are voidable. *Companies Act*, § 145.

144.    Absent recognition, a foreign officeholder such as a receiver is not authorized under

Cayman Islands law to exert control over assets of a bank in the Cayman Islands subject to Cayman

Islands banking regulations. The FDIC has at no time sought recognition of the SVB Receivership,

and, upon the issuance of the unappealable order directing the commencement of the Cayman

Proceeding and appointment of the JOLs, is now no longer able to do so.

145.   In addition to powers delineated in the Companies Act and its implementing regulations, the Winding Up Order authorizes the JOLs to act jointly and severally as joint official liquidators of SVB Cayman. See Winding Up Order ¶ 4. Pursuant to the Winding Up Order and under Cayman law, the JOLs have been designated by the Grand Court as the exclusive representatives of the Cayman depositors.

146.   As fiduciaries and officers of the Grand Court, the JOLs are duly authorized and empowered by the Grand Court to investigate the affairs of SVB Cayman, to administer the distribution of its assets, and to act as the duly authorized representatives of SVB Cayman. In this circumstance, the JOLs are empowered under Cayman Islands law to assert claims not only on behalf of SVB Cayman but are also empowered as agent to assert claims on behalf of SVB Cayman's creditors.

147.   Pursuant to Cayman law, the liquidator is first and foremost the agent of the company to which they have been appointed. At the same time, the liquidator is a trustee of the well-recognized statutory trust whose beneficiaries are the creditors. In this context the liquidator may also act as and assume agency for some or all of the company's creditors in certain contexts..

148.   The JOLs' mandate included acting on behalf of the Cayman depositors-creditors based upon a combination of (i) the fact that the Cayman Court would have exclusive jurisdiction over all Silicon Valley account creditors disputes and creditors in relation to disputes under the agreement, and (ii)  the explicitly referenced creditor-specific provisions of the Winding Up Order. See Winding Up Order, ¶ 2 (appointing the JOLs and directing that JOLs are "…acting in respect of the assets and affairs of the Cayman Islands branch of the Company [Silicon Valley Bank] and its creditors); July 2023 Opinion ¶¶ 4-7 (noting depositor creditor status); id. ¶¶ 63-63 (describing a "battle looming in respect of the treatment of the American and Cayman depositors…"and "[t]he

37

position of the Cayman depositors needs to be investigated further and where appropriate safeguarded").

149.   In addition to the authorization and mandate contemplated in the Winding Up Order, the JOLs' authority to act on behalf of the creditors of SVB in the Cayman Islands also arose by implicit agreement and ratification, as well as explicit agreement.

150.   The customers-depositors of SVB Cayman understand this to be the case are supportive of the grant of authority, and have further explicitly granted this  authority as principal, to the JOLs as agents.

151.   On June 30, 2023, the day after the JOLs' appointment by the Winding Up Order, the JOLs registered a website to keep depositors updated on the status of the SVB Cayman Liquidation. The website is located at www.svbcaymanliquidation.com and has copies of Cayman Court orders, general updates, proof of debt forms, and notices to SVB Cayman's creditors, as well as contact information for the JOLs' offices.

152.   On July 5, 2023, the JOLs issued notice of our appointment to creditors, which was published in the *Cayman Islands Gazette*.

153.   The JOLs have ensured that all required statutory filings have been submitted to the Cayman Court (including filing the First Report of the Joint Official Liquidators on September 12, 2023) and the Registrar of Companies.

154.   On September 20, 2023, the JOLs held the first meeting of creditors of SVB Cayman, where the SVB Cayman Liquidation Committee ("**Cayman Liquidation Committee**") was elected. The Cayman Liquidation Committee was formally constituted on October 31, 2023.[5] There was substantial participation at the meeting, with 159 creditors (with an aggregate claim

---

[5] The JOLs later filed an Official Liquidators' Certificate on February 12, 2024, certifying that SVB Cayman was insolvent and that the Cayman Liquidation Committee had been constituted.

value of $252,792,537.27) participating in the meeting and tendering votes in connection with the

composition of the Cayman Liquidation Committee. The Cayman Liquidation Committee is

currently comprised of five SVB Cayman creditors with an aggregate claim value of approximately

$40 million.

155.    Throughout the Cayman Insolvency Proceeding, the JOLs have regularly

communicated with depositors and creditors to address queries and concerns regarding the winding

up process and how it will impact them. The JOLs have also invited all known and prospective

creditors to submit their claims against SVB Cayman.

156.    There has been significant creditor participation in the Cayman Liquidation, and

the JOLs have received 295 filed claims from SVB Cayman depositors, with an aggregate claim

value of $284,457,173.26.

157.    The JOLs discussed various strategies for maximizing recovery and protecting the

interests of SVB Cayman depositors with the Cayman Liquidation Committee, and the Cayman

Liquidation Committee has at all times been engaged and supportive of the JOLs' efforts on behalf

of the SVB Cayman depositors.

158.    Additionally, since their appointment, the JOLs have closely collaborated with

CIMA, including through regular meetings, to provide updates on the steps being taken by and

through the Cayman Liquidation, via document exchanges and updates.

159.    No party objected to entry of the Winding Up Order, no party sought to appeal the

Winding Up Order and no party (other than the FDIC and SVBFG) has objected to the steps taken

by the JOLs to date.

160.    The SVB Cayman depositors not only know that pursuant to the Winding Up Order,

the JOLs became their exclusive agent, but supported this as the best possible avenue for

economical and equitable recovery, and otherwise support and agree to contractual recovery.

## CAUSES OF ACTION

### First Count: Declaratory Judgment that Upstream Distribution is Void and Imposition of a Constructive Trust Under Cayman Law

161.    Plaintiffs repeat and re-allege each of the foregoing paragraphs as if fully set forth herein.

162.    Pursuant to the Winding Up Order, Plaintiff have standing to bring these claims directly in their role as joint official liquidators  and as exclusive agents of the depositors-creditors of SVB Cayman.

163.    The statutory right of the JOLs to assert such claims does not impinge or otherwise conflict with the pending SVB Receivership in the United States pursuant to 12 U.S.C. § 1821(d)(17).

164.    Under Cayman law, a distribution to shareholders is unlawful and prohibited under Section 34(2) of the Companies Act to the extent that the distribution was made at a time when the company was insolvent.

165.    Under Cayman law, a shareholder who receives an unlawful distribution may be liable for the amount of that distribution, as a constructive trustee, on the basis of knowingly receiving the distribution and the circumstances that it was unlawful.  *See DD Growth Premium 2X Fund (In Official Liquidation) (Appellant) -v- RMF Market Neutral Strategies (Master) Limited (Respondent) (Cayman Islands)* 2017 2 CILR 739.

166.    The Upstream Distribution was made at a time when SVB was unable to pay its debts when they came due in the ordinary course of business, and thus was an unlawful distribution under Cayman law.

#512622976_v1

167.    The unlawful distribution resulted in particularized harm to Cayman depositors, the only customers whose accounts were subject to Cayman law, and the only non-insider customers with unsecured creditor status in the SVB Receivership under the FDIC application of the SRE.

168.    The Upstream Distribution constitutes an avoidable transaction under Cayman statutory law available to joint official liquidators, including: (i) Section 145 of the Companies Act (voidable preference); (ii) Section 146 of the Companies Act (disposition of property made at an undervalue); (iii) Section 4(1) of the Cayman Islands Fraudulent Dispositions Law; (iv) Section 147 of the Companies Act (liability for carrying out business of SVB with intent to defraud the company's creditors); and (v) Section 34(2) of the Companies Act and Cayman common law (pertaining to unlawful distributions).

169.    Under Cayman law, a constructive trust should be imposed over the cash of Defendant in the amount equal to the Upstream Distribution, any further unlawful and avoidable transactions learned through discovery and damages therefrom, pre-judgment interest and fees, for the benefit of the SVB Cayman Estate and its depositors-creditors.

**WHEREFORE**, based upon the foregoing, the JOLs, on behalf of SVB Cayman, respectfully request judgment against the Defendant, as follows:

A.    A declaratory judgment that the Upstream Distribution is void and avoidable under applicable Cayman law and that Defendant only holds bare legal title to the Upstream Distribution;

B.    Imposition of a constructive trust for the benefit of the SVB Cayman Estate and its depositors-creditors over an amount of the Debtor's cash equal to the Upstream Distribution, any further unlawful and avoidable transactions learned through discovery and damages therefrom, pre-judgment interest and fees.

#512622976_v1

C.      Awarding such other, further, and different relief as this Court may deem just,

equitable, and proper.

Dated: November 22, 2024
      New York, New York        HOLLAND & KNIGHT LLP


                        */s/ Warren E. Gluck, Esq.*
                        Warren E. Gluck, Esq.
                        Marie E. Larsen, Esq.
                        HOLLAND & KNIGHT LLP
                        787 Seventh Avenue
                        31st Floor
                        New York, New York 10019
                        Telephone:  212-513-3200
                        Warren.Gluck@hklaw.com
                        Marie.Larsen@hklaw.com

                        Richard A. Bixter, Jr., Esq. (*pro hac vice*)
                        HOLLAND & KNIGHT LLP
                        150 N. Riverside Plaza Suite 2700
                        Chicago, Illinois 60606
                        Telephone: 312-263-3600
                        richard.bixter@hklaw.com

                        *Counsel for the Joint Official Liquidators*
                        *of Silicon Valley Bank (in Official Liquidation)*

#512622976_v1