# Exhibit A

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>SVB FINANCIAL GROUP,[1]<br><br>     Reorganized Debtor. | Chapter 11<br><br>Case No. 23-10367 (MG) |

---

### DECLARATION OF SEBASTIAN WILLIAM ST. JOHN SAID

---

I, **SEBASTIAN WILLIAM ST. JOHN SAID**, of Appleby (Cayman) Ltd, 9th Floor, 60 Nexus Way, Camana Bay, Grand Cayman, Cayman Islands, KY1-1104, affirm as follows:

**I      INTRODUCTION**

1      I have been instructed by Sullivan & Cromwell LLP, Counsel to SVB Financial Trust as successor to SVB Financial Group ("**SVBFG**"), to provide this Declaration setting out my opinion on certain questions of Cayman Islands law.

2      My opinion is sought on issues relating to the Winding Up Order dated June 29, 2023 ("**Winding Up Order**") made by the Grand Court of the Cayman Islands ("**Grand Court**") in the proceedings captioned *In re Silicon Valley Bank* FSD No. 163 of 2023 (DDJ) ("**Cayman Proceedings**"). The Winding Up Order was made in respect of Silicon Valley Bank ("**SVB**"). However, the powers of the Joint Official Liquidators ("**JOLs**") were stated to be limited to acting in respect of the assets and affairs of the Cayman Islands branch ("**Cayman Branch**") and its creditors.

3      Based on my qualifications and experience as outlined in **Section II** below, I consider that I am qualified to opine on these matters.

---

[1] The last four digits of SVB Financial Group's tax identification number are 2278.

4      I confirm that I am independent of the parties involved in this case.[2]

5      I record that my firm is being remunerated on a time-spent basis for my work (and that of my team in assisting me)[3] in preparing this Declaration.

6      Copies of the most relevant legislation, cases and legal commentary referred to below are contained within **Exhibit 2**. Where I have not included a copy (or full copy) of a document due to its length or passing relevance, copies will be made available upon request.

7      For the purposes of giving this Declaration, at my request I have been provided with, and have reviewed to the extent they appeared relevant, various documents that I have referred to as relevant below. This includes certain unsealed documents on the court file in the Cayman Proceedings, which were made available to SVBFG after an application was made to the Registrar of the Grand Court in September 2024. Copies of the documents that I refer to from the Cayman Court file are included in **Exhibit 3**.

## II     PROFESSIONAL QUALIFICATIONS & EXPERIENCE

8      I am a Cayman Islands Attorney-at-Law, an English Barrister, and a Partner and the Head of the Dispute Resolution Practice Group at Appleby in the Cayman Islands.

9      I specialize in, amongst other things, international commercial litigation, banking and funds litigation, corporate insolvency and restructuring, corporate/shareholder disputes, and contentious trusts disputes. As part of my practice, I regularly advise on and act for clients in Cayman insolvency proceedings, on cross-border insolvency issues, and on issues of corporate law. In the last four years, I have acted as Cayman law expert and provided expert evidence in the following cases:

      (a)    *International Chamber of Commerce ("**ICC**") Arbitration (related to the Abraaj Group)*: Expert Report of Cayman law in an ICC Arbitration Claim by the Joint Official Liquidators of Abraaj Investment Management Limited against a related manager in the Abraaj Group, Abraaj Credit Managers Ltd, in which the issues raised included (i) whether Cayman law recognized a restitutionary claim to costs on grounds of unjust enrichment on any of the usual bases, in the context of the Cayman insolvency regime (JOLs of one entity performing services benefitting

---

[2] Although I do not consider that this affects my independence in relation to this unrelated matter, I do wish to record that in October 2024 I briefly acted for, amongst other parties, Messrs. Pearson and Childe, two of the JOLs, in relation to an urgent application arising from a matter I had previously been involved with, and which had concluded several years ago. I have since ceased acting on that matter. For the avoidance of doubt, that unrelated matter did not concern SVBFG, SVB, the Cayman Branch, the Cayman Depositors, or the FDIC.

[3] I have been assisted by my colleagues in the Appleby Cayman team William Porter, Charlotte Walker, and Jaemin Shin. Their hourly rates for the time spent on this matter are $630, $810, and $630 respectively, together with an hourly rate of $1,380 in respect of my time.

another entity), and (ii) the proper approach to the contractual interpretation of the indemnity provisions in the relevant Abraaj Limited Partnership Agreements.

(b)  *UK First Tier Tribunal, Tax Chamber (HMRC v BlueCrest)*: Cayman law expert for The Commissioners of Her Majesty's Revenue & Customs (the UK equivalent of the IRS), in relation to the Cayman law of Exempted Limited Partnerships, in connection with high-profile English tax proceedings relating to entities in the BlueCrest group, one of Europe's largest fund managers by assets under management.[4]

(c)  *Hong Kong Court of First Instance (China Metal v Deloitte)*: Cayman law expert for China Metal (acting by its Hong Kong Liquidators), relating to (i) the circumstances in which companies may lawfully pay dividends as a matter of Cayman law; and (ii) indemnity provisions in the company's Articles of Association; their interaction with Deloitte's engagement letter – and whether a defense to the Liquidators' claim is afforded thereby.

10    Before I qualified, I was awarded a Double First-Class Degree in Jurisprudence (BA Hons) from the University of Oxford. I subsequently gained a Distinction in the BCL (Masters in Law) from Oxford. During my time at Oxford I was awarded the Monk Prize in Law and a Domus Scholarship in Law by Pembroke College, as well as the Simms Prize by the University.

11    I was called to the Bar of England and Wales in October 2004 as a Major Scholar of Inner Temple. Following pupillage at Fountain Court Chambers, one of the English Bar's 'magic circle', I practiced at the London Commercial Bar for approximately six years as a tenant at Fountain Court, where I remain a door tenant.

12    After joining Appleby in Guernsey in April 2011, I was admitted to the Cayman Islands Bar in October 2012, later re-joining Appleby in the Cayman Islands in July 2013. I was called to the Bar of the Eastern Caribbean Supreme Court (British Virgin Islands) in 2015. I have been a full-time practicing Cayman Attorney for 12 years.

13    My practice has been recommended from 2014 onwards in the legal directories *Chambers & Partners* and *The Legal 500* for Cayman Islands Dispute Resolution.

14    I regularly write articles on current issues in Cayman Islands law and practice, which have been published variously in *The Hedge Fund Law Report*, *The Cayman Financial Review*, *The Lawyer*, and *The Trusts and Estates Law & Tax Journal*.

---

[4] My evidence in this case was filed in 2019 but I have included this case for completeness as the dispute continued after my evidence was filed.

15    I have also been invited to speak at leading conferences in my practice areas, including at C5, Offshore Alert, STEP Cayman, and the English Commercial Bar Association ("**COMBAR**") North American Meeting.

16    My professional association memberships include INSOL International ("**INSOL**"), the Recovery and Insolvency Specialists Association ("**RISA**"), COMBAR and the English Chancery Bar Association. I serve on RISA's Legal & Regulatory Committee, which considers potential legislative changes to Cayman Islands insolvency law. In 2024, I became a Fellow of INSOL, having completed the Global Insolvency Practice Course.

17    A copy of my full CV, and all publications I have authored and co-authored in the 10 years prior to this Declaration,[5] are included at **Exhibit 1**.

## III    STRUCTURE OF DECLARATION

18    To give necessary context to my substantive analysis, my Declaration contains two preliminary sections. First, in **Section IV**, I provide a summary of what I understand to be the relevant undisputed facts. Next, in **Section V**, I provide a brief overview of the Cayman Islands liquidation process, and how that differs in the case of an ancillary liquidation. Ordinarily I would also provide a section that summarizes the sources of Cayman law, the Cayman Islands Court system, and the doctrine of precedent. However, I understand that the Court is likely to be familiar with these basic principles of Cayman law, and the Cayman Court system, from prior cases. Accordingly, I have instead included this material in **Appendix 1**.

19    I then address the contentious points of Cayman law that were raised at the Court's July 18, 2024 hearing, or in the documents that have been filed in this case.

20    Specifically, in **Section VI**, I address the issue of whether the JOLs have the power to pursue claims on behalf of SVB's Cayman depositors-creditors ("**Cayman Depositors**"), as distinct from claims on behalf of SVB itself. I am aware that this issue arose during the July 2024 hearing: see Transcript at 48-51, 54-61, 65, 82-83.

---

[5] The list of those publications is: (a) articles entitled (i) *Cayman Islands Court of Appeal Confirms Orders for Security For Costs in Winding-Up-Proceedings*; (ii) *Financial Institutions and Dishonest Assistance*; (iii) *Appleby Successfully Assists Butterfield Dispose of Dishonest Assistance and Beach of Mandate Claims*; (iv) *An Unprecedented Just & Equitable Winding Up of a Captive - Re Virginia SPC Ltd.*; (v) *Abraaj Group Fraud - Summary Judgment for Receivers of Secured Lender For Information on Fraud* (vi) *Silicon Valley Bank - Grand Court of the Cayman Islands Winds Up the Bank as a Foreign Company to Protect Cayman Customers: The Opening Sequence of an Epic Battle?* (vii) *Further Developments in the Law and Practice of Claims Involving Cayman Exempted Limited Partnerships*; (viii) *Offshore Remedies for Fraud*; (ix) *Loss of Substratum: Analysis of the Conflicting Standards in Cayman Law*; (x) *Loss of Substratum: Steps to Ensure a Fund's Soft Wind-Down Does Not Result in a Winding Up Order*; (b) practitioner textbook chapter entitled 'Fund Managers', in Mark Simpson KC and Isabel Barter (eds), *Professional Negligence and Liability* (loose-leaf, Lloyd's List Intelligence, 2024).

21 In **Section VII**, I address the types of claims that can and cannot be brought by liquidators as part of a Cayman liquidation. I am aware that the characterization of particular claims was an issue that arose at the July 2024 hearing: Transcript at 48-51, 54-60, 82-88.[6]

22 Finally, in **Section VIII**, I address for completeness the effect of the Federal Deposit Insurance Corporation ("**FDIC**") process in the Cayman Islands. This is relevant because the JOLs have submitted that the FDIC process had no impact in the Cayman Islands: see for example First Amended Adversary Complaint dated November 22, 2024 at [5].

23 In summary, my main conclusions are:

(a) Contrary to their position, the JOLs are not the agents of the creditors with the power to bring legal claims on their behalf; they are the agents of the company under standard Cayman law principles. It follows that the JOLs do not have the power to bring claims which are properly brought in the names of the Cayman Depositors: see paragraphs 103 to 156 below. This includes both the creditors' Negligence Claims and the FDA claims: see paragraphs 198 and 213 to 216 below.

(b) SVB's Unlawful Dividend Claims and its Negligence Claims cannot be brought by the JOLs, if the effect of the FDIC statute is that these validly transferred to the FDIC upon its appointment as receiver. If they did, Cayman law would recognize the transfer of the proprietary rights in this property (i.e. choses in action) in accordance with that property's *lex situs*, with the *lex situs* being determined by the debtor's (SVBFG's) place of residence, i.e. Delaware. It follows that these claims never formed a part of the Cayman liquidation estate: see paragraphs 194 and 196 to 197 below.

(c) Whilst in theory the JOLs would have the power to bring the Statutory Avoidance Claims, on the novel facts of this case, in my view there are other jurisdictional and gateway issues that would preclude the Statutory Avoidance Claims being able to proceed if they were brought in the Cayman Court, or if the Cayman Court was otherwise required to undertake a fuller review of the territorial effect of the relevant provisions. I have serious reservations as to whether Doyle J would consider that he had sanctioned the JOLs to 'change tack' and place so much reliance on the Statutory Avoidance Claims. The fact that Doyle J did not provide a judgment in this case suggests to me that (i) he was not made aware of the novelty and difficulty of the claims; or (ii) these further claims were of such minor significance on the application for sanction at the 16 October 2024 hearing, that they were simply not his focus: see paragraphs 199 to 211 below.

---

[6] I understand that the distinction under US law is between "*direct*" and "*derivative*" claims. That terminology is not used in the same way under Cayman law. However, there is a distinction between claims that ought to be brought by (and in the name of) the company, and claims that ought to be brought by (and in the name of) the creditors directly; see **Section VII** below

(d) There is an unresolved issue as to whether, by submitting proofs of claim in the FDIC process, the debts of a substantial majority of the Cayman Depositors have been validly discharged. Whilst in accordance with the so-called rule in *Gibbs* Cayman law governed claims ordinarily must be discharged in accordance with Cayman law, there is also a well-established (and prima facie applicable) exception to this rule where a creditor voluntarily submits to a foreign process. A submission of a proof of claim is generally characterized to be a submission to the process, whether or not a dividend is actually received: see paragraphs 220 to 226 below.

## IV   MY UNDERSTANDING OF THE RELEVANT BACKGROUND

24   I begin by providing a brief overview of the factual background as I understand it. This provides necessary context to my analysis below.[7]

25   SVB was founded in 1983. It was incorporated in the State of California: Memorandum Opinion, Case No. 24-10076-mg ("**Chapter 15 Case**"), Dkt. No. 44 ("**Chapter 15 Opinion**") at 2 and 7. SVBFG was incorporated in the State of Delaware.

26   On August 16, 2007 SVB was registered as a foreign company in the Cayman Islands. On August 30, 2007 it was granted a 'Class B' banking license by the Cayman Islands Monetary Authority ("**CIMA**") under the Banks and Trust Companies Act ("**BTC Act**"): Chapter 15 Opinion at 8.[8] SVB operated the Cayman Branch in the Cayman Islands, but the Branch was not separately incorporated: Ibid at 23-25.

27   Through the Cayman Branch, SVB offered three types of account governed by different standard-form deposit agreements (together, "**Deposit Agreements**"): a Eurodollar Money Market Account (Dkt. No. 1335-3), a Eurodollar Operating Account (Dkt. No. 1335-4), and a Eurodollar Sweep Account (Dkt. No. 1335-2). In each case, the Deposit Agreements with the customers were governed by the laws of the State of California, whereas the accounts themselves were stated to be subject to the laws of the Cayman Islands.[9] The Deposit Agreements each stated that the accounts were not insured by the FDIC.

28   The operation of the Cayman Branch was said to be governed by an 'Intra-Group Service Level Agreement' dated February 10, 2020 (Dkt. No. 1335-5). It was stated to be between the 'Cayman Branch of Silicon Valley Bank' and 'Silicon Valley Bank (US Head Office)'.

---

[7] Unless otherwise indicated, docket number references are to those assigned in this Chapter 11 case.

[8] With a 'Class B' license, a bank is not permitted to take deposits from persons within the Cayman Islands per s 6(6)(a) of the BTC Act.

[9] In each case, the Deposit Agreements provide that "*This Agreement will be governed by and construed in accordance with the laws of the State of California (without reference to its conflict of law provisions)...*". The Deposit Agreements each go on to state that the "*deposits are deposits of the Cayman Islands branch of Silicon Valley Bank... and are subject to the laws of the Cayman Islands...*"; see the Eurodollar Money Market Account Deposit Agreement (Dkt. No. 1335-3), the Eurodollar Operating Account Deposit Agreement (Dkt. No. 1335-4), and the Eurodollar Sweep Account Deposit Agreement (Dkt. No. 1335-2).

This Agreement was "*governed by and construed in accordance with the laws of the State of California and [was] subject to the exclusive jurisdiction of the state and federal courts situated in Santa Clara, CA*": clause 32. Amongst many other provisions, it was recorded that "*Whilst this Agreement has been written based on principles of the law, both Parties recognise that it is an intra-entity agreement and therefore has no formal legal basis*": clause 31.

29      At some point during the fourth quarter (October-December) of 2022, SVB paid to SVBFG a dividend in the amount of $294 million ("**Upstream Distribution**"): SVBFG's Annual Report for the year ending December 31, 2022 at 170.[10]

30      In March 2023, there was a 'run on the bank', with SVB's customers withdrawing more than $40 billion: Chapter 15 Opinion at 12. Consequently, on March 10, 2023, the FDIC was appointed as receiver over SVB. I am aware that this appointment has numerous legal implications as a matter of US law for SVB and its property, albeit it is contentious precisely what those implications are.

31      On March 12, 2023 the Secretary of the Treasury, the Chairman of the Federal Reserve and the Chairman of the FDIC invoked the 'systemic risk exception' and announced that SVB's depositors would be repaid the full amount of their deposits, over and above the ordinary cap of $250,000 for FDIC deposit insurance (Dkt. No. 1335-8).

32      On March 13, 2013, via a Transfer Agreement, the FDIC transferred all deposits, both insured and uninsured, and substantially all assets of SVB (including as it related to the Cayman Branch), to Silicon Valley Bridge Bank N.A. ("**Bridge Bank**"): Chapter 15 Opinion at 12.

33      On March 17, 2023 SVBFG filed this Chapter 11 case.

34      On or around March 27, 2023 the FDIC entered into a Purchase and Assumption Agreement with First Citizens Bank & Trust Company covering certain SVB deposits and loans transferred to and then held at the Bridge Bank (Chapter 15 Case, Dkt. No. 42-12). This excluded the business of the Cayman Branch: Chapter 15 Opinion at 13. The Bridge Bank was thereafter itself put into FDIC receivership.

35      On March 31, 2023 the FDIC sent depositors holding Eurodollar Money Market Accounts and Eurodollar Operating Accounts notices advising that balances held by customers at the Cayman Branch were "*not deposits*" and that depositors were deemed to be unsecured creditors. Depositors holding Eurodollar Sweep Accounts were granted "*insured deposit*

---

[10] This Annual Report has been referred to in the JOLs' Adversary Complaint dated July 24, 2024 at [107]. As far as I am aware, the document has not been exhibited. However, I note that a copy of this document is available at this link: https://ir.svb.com/financials/annual-reports-and-proxies/default.aspx.

*status*", ostensibly on the basis that those depositors had parallel accounts based in the US held in the names of the individual depositors: Chapter 15 Opinion at 13 and n.4.

36    On June 13, 2023 a group of the Cayman Depositors ("**Petitioners**") filed a winding up Petition in the Grand Court. This Petition initially erroneously sought the winding up of the Cayman Branch, i.e. not SVB as a whole (Chapter 15 Case, Dkt. No. 42-13).[11]

37    On June 29, 2023 the Grand Court made the Winding Up Order in respect of SVB (Dkt. No. 1335-9). The Court appointed Messrs. Andrew Childe and Michael Pearson of FFP Ltd (in the Cayman Islands) and Mr. Niall Ledwidge of Stout Risius Ross, LLC (in New York) as the JOLs. Whilst being made in respect of SVB as a whole, the Order limited the JOLs' powers to "*acting in respect of the assets and affairs of the Cayman Islands branch of [SVB] and its creditors.*" The reasons for the Winding Up Order were explained in a judgment released on or around July 21, 2023 ("**Winding Up Judgment**") (Dkt. No. 1335-10).

38    In SVB's receivership, the FDIC imposed a deadline of July 10, 2023 for the filing of claims: Chapter 15 Opinion at 15. That day, the JOLs filed a Proof of Claim with the FDIC, albeit seemingly in the Bridge Bank's receivership rather than in SVB's receivership (Chapter 15 Case, Dkt. No. 42-17). I understand this may have been inadvertent: Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss at 19 (Case No. 24-cv-00513 (APM) ("***Ledwidge v. FDIC*** Proceedings")), Dkt. No. 31). The JOLs' claim was denied by way of letter from the FDIC dated December 26, 2023 (Chapter 15 Case, Dkt. No. 42-18): Chapter 15 Opinion at 15.

39    Separately, many of the Cayman Depositors directly filed claims with the FDIC. The Chapter 15 Opinion records at 16 that:

> "*Specifically, all but 11 of the approximately 615 of SVB Cayman's former clients with positive balances in the SVB Cayman Deposit Accounts have submitted claims to the FDIC-R in its capacity as receiver for the Bank. (FDIC Recognition Objection at 2 n.5.) Of the 605 claims filed by such creditors, the FDIC indicates that 501 have been fully allowed, 18 have been partially allowed, and 76 have been disallowed. (Id.) Of the remaining 10 timely filed claims, six were duplicative claims and four were ultimately withdrawn. (Id.) Additionally, of the 94 claims that were fully or partially disallowed, 67 holders of such claims are currently challenging the FDIC's denial of their claims in the SVB Receivership in the case*

---

[11] As Doyle J later pointed out, the Grand Court does not have jurisdiction to wind up a branch that is not itself a separate legal entity: see paragraph 163 below.

*captioned Knight League Limited v. FDIC, Case No. 23-cv-03063-APM, U.S. Dist. Ct., Dist. of Colum., seeking determinations on a de novo basis.*"

40    Of the seven Cayman Depositors that filed Affidavits in support of the Winding Up Petition, six had already filed claims with the FDIC.[12] The remaining creditor stated that it was "*in the process of lodging a 'Proof of Claim'*".[13]

41    On August 11, 2023 the JOLs filed a Proof of Claim in SVBFG's Chapter 11 case (Claim No. 1247) ("**Initial Proof of Claim**"). The attachment to the Claim explained that "*the JOLs file this claim at this time in response to the Debtor's establishment of the bar date of August 11, 2023, and the JOLs reserve the right to amend or supplement this Claim as additional matters are discovered in the course of their investigation.*"

42    On January 11, 2023 the Grand Court made an Order ("**January Sanction Order**") (Chapter 15 Case, Dkt. No. 42-16) upon the application of the JOLs which provided that:

        "*1    The filing of an application by the JOLs for recognition by the United States Bankruptcy Court pursuant to Chapter 15 of the US Bankruptcy Code be and is hereby sanctioned by the Court.*

        *2    The JOLs are the representatives of an estate and a trust that is subject to Cayman Islands proceedings.*"

43    The JOLs' Skeleton Argument dated January 10, 2024 ("**January Sanction Order Skeleton**"), filed by the JOLs' Cayman attorneys in support of the application for the January Sanction Order, amongst other things:

        (a)    Acknowledged that there may be questions relating to comity between the Cayman and US courts (at [15]). However, the JOLs submitted that in permitting the JOLs to take steps in the US, it would reduce "*virtually to zero*" the prospects of a conflict of law or of the approach of the two courts given that "*recognition (and indeed the likely challenge to the FDIC's disallowance) will bring the issues squarely within the US court system to be determined in accordance with US law*" (at [18]); and

---

[12] Affidavit of Alexander Shaik dated June 12, 2023 at [20]; Affidavit of Sun Yiu Samuel Lee dated June 12, 2023 at [14]; Affidavit of Daisuke Hayashi dated June 13, 2023 at [14]; Affidavit of Jianwei Li dated June 13, 2023 at [14]; Affidavit of Yuntao Ma dated June 13, 2023 at [15]; Affidavit of Hendrick Sin dated June 28, 2023 at [14].

[13] Affidavit of Alex Tianli Zhang dated June 13, 2023 at [19].

(b)     As to the second paragraph of the January Sanction Order, explained that the JOLs' US attorneys, Holland & Knight, had written a letter of advice to them for the purposes of their sanction application (at [2]). It went on to note (at [26]):

> "At pages 5 and 6 of his letter to the JOLs, Mr Gluck explains that Chapter 15 recognition is not limited to foreign representatives of natural or legal persons but also applies to foreign representatives of "trusts" or "estates". It is submitted that it will be helpful to the US Court in considering the Chapter 15 application if this Court were to determine as part of this application within the winding up proceedings that as a result of the Grand Court's Order of 29 June 2023 the JOLs are representatives of a "estate or trust" as a matter of Cayman Islands law."

44     On January 18, 2024 the JOLs filed a Petition under Chapter 15 of the US Bankruptcy Code for recognition of the Cayman Proceedings (Chapter 15 Case, Dkt. No. 1). Chapter 15 recognition was denied for reasons explained in the Chapter 15 Opinion dated February 22, 2024 (Chapter 15 Case, Dkt. No. 44). In short, because SVB was a bank, it was not eligible for bankruptcy relief under the Bankruptcy Code.

45     On February 23, 2024 the JOLs filed a Complaint against the FDIC in the United States District Court for the District of Columbia in the *Ledwidge v. FDIC* Proceedings (*Ledwidge v. FDIC* Proceedings, Dkt. No. 1). A First Amended Complaint was later filed on May 7, 2024 (Dkt. No. 4). I understand there is an extant Motion to Dismiss (Dkt. No. 12). I understand that this Complaint seeks (i) *de novo* review of FDIC-R's disallowance of claims submitted by the JOLs and, on a provisional basis, claims submitted by SVB Cayman's depositors-creditors, pursuant to the provisions of the US Code at 12 U.S.C. § 1821(d)(6) (i.e. the statute pursuant to which the FDIC receivership of SVB has been and is conducted); (ii) a declaration that alleged acts of the FDIC in connection with SVB were *ultra vires*; and (iii) relief against the Receivers-in-Charge appointed by the FDIC to administer the receiverships of SVB and Bridge Bank – in their individual capacities – due to their alleged actions said to have resulted in SVB Cayman and SVB Cayman's depositors-creditors being deprived of property without due process under the Fifth Amendment of the United States Constitution.

46     On April 18, 2024 SVBFG filed an objection to the Initial Proof of Claim (Dkt. No. 1048). Amongst other reasons cited, this Objection cited (at [26]-[29]) the JOLs' lack of standing on the basis that the Cayman Branch possessed no separate legal existence outside of SVB, and that by operation of US law, any claims of SVB could only be brought by the FDIC.

47     On May 16, 2024 the JOLs appealed the rejection of their application for Chapter 15 recognition. I am not aware of the status of that appeal.

48    On June 24, 2024 the JOLs filed a Memorandum relating to the standing objection of SVBFG (Dkt. No. 1218) ("**JOLs' Standing Memorandum**"). I return to several comments made in this document below.

49    On or around June 28, 2024 the JOLs filed an amended Proof of Claim ("**First Amended Proof of Claim**") in this Chapter 11 case (Claim No. 1450). This alleged breaches of fiduciary duty by SVBFG (at [98]), violations of the California Financial Code (at [100]), and claims that were said to arise under Cayman law including breach of fiduciary duty (at [101](a)), and various statutory claims under ss 34(2), 145, 146, and 147 of the Companies Act (2023 Revision) ("**Companies Act**" or "the **Act**") and s 4 of the Fraudulent Dispositions Act (1996 Revision) ("**FDA**") (at [101](b)).

50    On July 11, 2024 both SVBFG (Dkt. No. 1278) and the FDIC (Dkt. No. 1277) filed responses to the JOLs' Standing Memorandum.

51    On July 18, 2024 there was a hearing in which the JOLs' standing to file a claim in this Chapter 11 case was at issue. Issues of Cayman Islands law were raised at that hearing – namely, whether the effect of the Winding Up Order was to create a separate entity as a matter of Cayman law and whether the JOLs were entitled to bring claims on behalf of the creditors directly: see for example Transcript at 43-45, 48-51, 54-62, 65, 74, 82-83. I understand that my instruction by SVBFG resulted from those issues having been raised.

52    On July 24, 2024 the JOLs filed an Adversary Complaint ("**Initial Adversary Complaint**") in this Chapter 11 case (Dkt. No. 1335). This relied on causes of action under the California Financial Code (Count I), s 34(2) of the Cayman Companies Act (which as I explain below relates to the payment of unlawful dividends in a specific scenario) (Count II), and s 541(d) of the US Bankruptcy Code (Count III). I return to statements made in the Initial Adversary Complaint below.

53    On October 16, 2024 the Grand Court made a further Order ("**October Sanction Order**") on the application of the JOLs (Dkt. No. 1561-3). On the face of the Order, it was granted following a hearing on the same day, October 16, 2024, at which the JOLs' Cayman attorneys appeared and made submissions. The Order relevantly provided:

    "5    *The JOLs be granted sanction to file and pursue the Amended Proof of Claim and the Adversary Complaint against SVB Financial Group, as filed in the United States Bankruptcy Court for the Southern District of New York on 28 June 2024 (Case No. 23-10367), and to take all steps in those proceedings as the JOLs consider necessary and appropriate.*

    6    *The JOLs be granted sanction to file and pursue claims against the executives and employees of SVB who had responsibility for managing and*

> *operating the Cayman branch of SVB, and to take all steps in those*
> *proceedings as the JOLs consider necessary and appropriate[.]*
>
> *[...]*
>
> 9     *The heading or caption of this matter be amended to: IN THE MATTER OF*
> *SILICON VALLEY BANK (IN OFFICIAL LIQUIDATION) FSD No: 163*
> *OF 2023 (DDJ)."*

54     The documents filed in relation to that application have been sealed.[14] Accordingly, I have not been able to review them.

55     On November 22, 2024, the JOLs filed an Amended Adversary Complaint ("**First Amended Adversary Complaint**") and an Amended Proof of Claim ("**Second Amended Proof of Claim**"). I am instructed that SVBFG disputes the JOLs' entitlement to file these documents. In the event they are permitted to be filed, I address them where relevant below.[15] In short:

    (a)     In the First Amended Adversary Complaint, the JOLs appear to no longer rely on alleged breaches of the California Financial Code or provisions of the US Bankruptcy Code (compare [110]-[115] and [121]-[125] of the Initial Adversary Complaint). The JOLs maintain their claim (at [164]-[167]) that the Upstream Distribution is void as a matter of Cayman corporate law, and is therefore said to be subject to a constructive trust (compare [116]-[120] of the Initial Adversary Complaint). The JOLs also seek to rely (at [168]) on various Cayman statutory avoidance claims (ss 145, 146 and 147 of the Companies Act and s 4 of the FDA) in support of the constructive trust proposition.

    (b)     In the Second Amended Proof of Claim, the JOLs no longer appear to rely on alleged breaches of the California Financial Code or breach of fiduciary duty which are said to arise as a matter of Cayman law (compare [100] and [101](a) of the First Amended Proof of Claim). The Second Amended Proof of Claim maintains reliance on the Cayman statutory avoidance provisions, now also included in the First Amended Adversary Complaint (compare [101](b) of the First Amended Proof of

---

[14] The Cayman Court has jurisdiction to make a sealing order under the Companies Winding Up Rules, O.24, r.6 if satisfied that (a) the information was confidential, and (b) sealing was necessary to protect the economic interests of the general body of stakeholders: *Re SPhinX Group* [2017] (1) CILR 176] per Smellie CJ. Under O.24 r.6(2), the liquidator and any creditor or contributory may apply to the Court for a direction that a sealed document be unsealed on the grounds that: (a) the information contained in it is no longer confidential; (b) the reasons for sealing the document no longer exist or have expired; or (c) publication of the information is not or is no longer harmful to the economic interests of creditors or contributories.

[15] I have assumed for (and limited to) the purposes of this Declaration that the particularized allegations made in the Adversary Complaints and the Amended Proofs of Claim are true.

Claim). The JOLs additionally include three different heads of negligence claims, none of which are said to be governed by Cayman law.

56    In the Second Amended Proof of Claim, the value attributed to the claims against SVBFG for the benefit of the SVB Cayman estate – consisting of the 295 of the 615 total creditors who have proved in the Cayman liquidation – is *"not less than $944,000,000"*.[16]

57    Separately from the disputes between SVBFG and the JOLs, I understand that SVBFG has been involved in litigation with the FDIC, both:

(a)    In the US District Court for the Northern District in California (Case No. 23-cv-06543-BLF); and

(b)    Before the US Court of Appeals for the Second Circuit.

58    I understand that (a) the litigation in the US District Court for the Northern District in California focuses on SVBFG's claim that its own deposits with SVB ought to be returned, repaid, or otherwise made available by the FDIC, and that the FDIC has responded by purporting to set-off against any potential liability on SVBFG's claims, alleged claims of SVB against SVBFG, to which the FDIC succeeded by operation of US law (which I understand would include at least some of the claims being asserted by the JOLs in these proceedings); and (b) the litigation before the US Court of Appeals for the Second Circuit relates to the FDIC's set-off claim and how it was treated in SVBFG's plan of confirmation in this Chapter 11 case.

## V    OVERVIEW OF RELEVANT ASPECTS OF CAYMAN ISLANDS INSOLVENCY LAW

### The Cayman Islands General Liquidation Process

59    Before I set out my views on the specific matters that appear to be at issue in this case, it is helpful to provide a summary of the key aspects of Cayman Islands law as it relates to corporate insolvency. This provides necessary context to the more specific analysis that follows.

---

[16] By way of comparison, (i) the total value of the 295 creditor claims that have apparently been filed in the Cayman Proceedings, is $284,457,173.26 (First Amended Adversary Complaint at [156]; Second Amended Proof of Claim at [139]); (ii) the total value of customer deposits that the JOLs say can be attributed to the Cayman Branch at the time of SVB's failure was $866 million (First Amended Adversary Complaint at [30]; Second Amended Proof of Claim at [14]). The figure at (ii) appears to be inclusive of the $389,562,086 in Sweep Account deposits (First Amended Adversary Complaint at [34]; Second Amended Proof of Claim at [18]) that were ultimately afforded FDIC insured status: Chapter 15 Opinion at 13. Taking that into account, the quantum of the alleged claims against SVBFG is approximately twice the amount of uninsured deposits the JOLs say can be attributed to the Cayman Branch ($477 million).

60    In the Cayman Islands, corporate insolvency is governed by Part V of the Companies Act.[17] The Act is supplemented by three sets of procedural regulations: the Companies Winding Up Rules (2023 Consolidation) ("**CWR**"); the Insolvency Practitioners' Regulations (2023 Consolidation); and the Foreign Bankruptcy Proceedings (International Co-operation) Rules 2018.[18] Only the CWR are relevant to the present issues.

61    Under s 91 of the Companies Act, the Court has jurisdiction to wind up various types of entities, which in almost all cases is exercised in relation to entities that are incorporated in the Cayman Islands. Since March 2009, the Court has also had jurisdiction to wind up foreign companies.[19] As I note below, that jurisdiction appears to have been invoked for the first time in this case.

62    Under s 92, the Court may exercise its jurisdiction to wind up a company if one of the prescribed statutory grounds are met. These relevantly include where "*the company is unable to pay its debts*": s 92(d); or where "*the Court is of opinion that it is just and equitable that the company should be wound up*": s 92(e).

63    If the Court makes a winding up order, that does not have the effect of immediately dissolving the company. Rather, the company will be dissolved by way of court order "*[w]hen the affairs of the company have been completely wound up*": s 152. The company continues to exist throughout the liquidation process.

64    The date of commencement of the winding up has some significance. In most cases (including here) the date of commencement of the winding up is deemed to occur "*at the time of the presentation of the petition for winding up*": s 100(2). Dispositions of property after this date are, unless "*the Court otherwise orders, void*": s 99. As I explain further in

---

[17] Prior to 1 March 2009, Part V of the Act was based on Part IV of the English Companies Act 1862: *Picard v Primeo Fund (in Official Liquidation)* [2013 (1) CILR 164] at [10]-[11] (overturned on appeal but this record of the history of the Act was not contested: [2014 (1) CILR 379]). The Companies (Amendment) Act 2007 made substantial changes to the Act. It replaced Part V of the Act which governs winding up and introduced Part XVII of the Act which relates to international co-operation.

[18] Each of these three sets of regulations are issued by the Insolvency Rules Committee pursuant to s 155(1)(a) of the Companies Act. The CWR provide a set of detailed procedural rules applicable to a Cayman Islands winding up. The Insolvency Practitioners' Regulations provide professional requirements for Cayman and foreign liquidators acting as official liquidators of Cayman companies, in respect of residency, independence and insurance, as well as prescribed rates of remuneration. The Foreign Bankruptcy Proceedings (International Co-operation) Rules set out the process to be adopted on inbound applications to the Cayman Islands under Part XVII of the Act for statutory recognition of foreign officeholders (including the documents required to be filed, advertisement requirements, and draft orders for recognition and assistance in the various forms which may be sought). The Foreign Bankruptcy Proceedings (International Co-operation) Rules are not relevant to this case, or to the matters of Cayman law discussed in this Declaration (see paragraphs 93 to 99 below).

[19] Prior to March 2009, it was generally considered that the Cayman courts had no jurisdiction to wind up foreign companies: *Picard v Primeo Fund (in Official Liquidation)* [2013 (1) CILR 164] at [11]. By virtue of the Companies (Amendment) Act 2007, which came into effect on 1 March 2009, the jurisdiction to wind up companies in s 91 was extended to apply to foreign companies which either have "*property located in the Islands*", are "*carrying on business in the Islands*", are "*the general partner of a limited partnership*", or are "*registered under Part IX*". Part IX allows foreign companies, by way of an administrative process, to register with the Registrar of Companies so as to conduct business in the Cayman Islands. "*Foreign company*" is defined in s 89 as "*any body corporate incorporated outside the Islands*".

**Section VI** below, the date of commencement is also the relevant date for the purposes of calculating which transactions might be subject to challenge by the official liquidators.

65    Under the Act, official liquidators have two stated functions: (i) "*to collect, realise and distribute the assets of the company to its creditors and, if there is a surplus, to the persons entitled to it*": s 110(1)(a); and (ii) "*to report to the company's creditors and contributories upon the affairs of the company and the manner in which it has been wound up*": s 110(1)(b).

66    To assist with fulfilling their functions, official liquidators are afforded various powers. The general powers of official liquidators are dealt with in s 110(2) and Schedule 3. Official liquidators are entitled to exercise the powers in Part I of Schedule 3, but only with the sanction of the Court. This relevantly includes the power "*to bring or defend any action or other legal proceeding in the name and on behalf of the company*".[20] Official liquidators are entitled to exercise the powers in Part II without sanction.[21]

67    If Court sanction is required, the relevant principles that the Court will look to are well established. They were distilled by Smellie CJ in *Re DD Growth Premium 2X Fund* [2013] (2) CILR 361] at [30]:[22]

> "*(a)    The decision whether to sanction the exercise of a power falling within Part I of the Third Schedule to the [Act] is a decision for the court (see Re Greenhaven Motors Ltd [1999] 1 BCLC 635 at 642...)*
>
> *(b)    In exercising its discretion as to sanction, the court must consider all the relevant evidence (see In re Universal & Surety Co Ltd [1992–93 CILR 149] at 152).*
>
> *(c)    The court must consider whether the proposed transaction is in the commercial best interests of the company, reflected prima facie by the commercial judgment of the liquidator (see Re Edennote Ltd (No 2) [1997] 2 BCLC 89).*

---

[20] The Part I powers (requiring sanction) also include (by way of summary) the power "*to carry on the business of the company so far as may be necessary for its beneficial winding up*", "*to dispose of any property of the company to a person who is or was related to the company*", "*to pay any class of creditors in full*", "*to make any compromise or arrangement with creditors*", "*to sell any of the company's property by public auction or private contract*", "*to raise or borrow money*", "*to engage staff*" and "*to engage attorneys and other professionally qualified persons*".

[21] The Part II powers (not requiring sanction) include (by way of summary) the power "*to take possession of, collect and get in the property of the company*", "*to do all acts and execute, in the name and on behalf of the company, all deeds, receipts and other documents*", to "*prove, rank and claim in the bankruptcy, insolvency or sequestration of any contributory*", "*to promote a scheme of arrangement*", "*to convene meetings of creditors and contributories*", and "*to do all other things incidental to the exercise of that person's powers*".

[22] The cases cited in this quotation have not been included in Exhibit 2 but can be made available upon request.

(d)      *The court should give the liquidators' views considerable weight unless the evidence reveals substantial reasons for not doing so (Re Edennote Ltd (No 2) [1997] 2 BCLC 89 at 92).*

(e)      *The liquidator is usually in the best position to take an informed and objective view (see Re Greenhaven Motors Ltd [1999] 1 BCLC 635 at 643)."*

68     These principles have been applied in subsequent cases: see for example *Re Ascentra Holdings Inc* (unrep., 3 November 2022, Doyle J) at [27]; *Re Canterbury Securities Ltd* (unrep., 24 April 2024, Kawaley J) at [17].[23]

69     As these principles suggest, the Court will typically be deferential to the commercial judgment of the liquidators. Indeed, in *Re Saad Investments Company Ltd (in Official Liquidation)* (unrep., 1 October 2019, Smellie CJ) the Court noted at [39] that the "*net effect*" of the authorities was that "*the Court should ordinarily respect the commercial judgment of the liquidator and grant sanction, unless the course of action proposed by the liquidator is regarded by the Court as so unreasonable or untenable that no reasonable liquidator would take it*".

70     In terms of the commencement of litigation, "*the court must be satisfied that [the liquidators] do have causes of action against the proposed defendants with a reasonable prospect of success and that the interests of the creditors will be best served by allowing proceedings to be commenced*": *Re ICP Strategic Credit Income Fund Ltd* [2014 (1) CILR 314] ("***ICP Strategic Credit***") at [10]. The Court will also factor in how the proposed litigation is to be funded: Ibid at [11].[24]

71     Returning to the functions and powers of official liquidators, they may bring various claims to swell the assets that are available for distribution to creditors. I provide an overview of these types of claims in **Section VII** below.

72     Alongside the process of realizing assets, the Act contains various provisions relating to the admission of claims from creditors, the ranking of debts, and the eventual payment of dividends to creditors: see for example ss 139-142.

73     It is only once the winding up of a company is complete, and an order for its dissolution is made, that it is dissolved: s 152(1). To the extent that the official liquidators hold unclaimed

---

[23] This case has not been included in Exhibit 2 but can be made available upon request.

[24] The merits assessment that the Court undertakes, or its weight or effect, should not be overstated. For example, the litigation that was sanctioned in *ICP Strategic Credit* was the subject of a successful motion to dismiss before this Court: *In re ICP Strategic Credit Income Fund Ltd*, No. 13-12116 (REG) (Bankr. S.D.N.Y. Sep. 15, 2015). The Chapter 15 application in the present case is of course another example where litigation was sanctioned, and then dismissed.

dividends or assets at the time of dissolution, those assets *"shall be held by [the now former liquidators] as trustee[s] upon trust for the benefit of the contributories or creditors to whom such funds are owed"*: s 153(1); see also CWR O.23, r.1. After a year has passed, the former official liquidators are then obliged to transfer those unclaimed assets to the Cayman Islands Government, represented by the Financial Secretary: s 153(2); CWR O.23, r.6.

### Differences Where a Liquidation is "Ancillary"

74    I am aware that the JOLs' position is that the Cayman Proceedings are ancillary in nature.[25] That was also the position of their expert, Dr Riz Mokal (**"Dr Mokal"**), at the Chapter 15 hearing: Chapter 15 Opinion at 28, noting Dr Mokal's evidence that in his view *"Justice Doyle made a standard, ancillary winding up order"*. Subject to my comments below, that characterization is *broadly* consistent with the Winding Up Judgment and the Winding Up Order. In the Winding Up Judgment, Doyle J correctly identified that he did not have jurisdiction to wind up the Cayman Branch: at [53]. Instead, the Judge made the Winding Up Order in respect of SVB as a foreign company (Dkt. No. 1335-9).

75    As noted above, since 2009 the Grand Court has had the statutory jurisdiction to wind up foreign companies: Companies Act, s 91(d). Whilst this jurisdiction has existed for over 15 years, this case is, as far as I am aware, the first and only occasion on which the Court has exercised this statutory jurisdiction.[26] It follows that there is no Cayman authority that directly addresses how the ancillary liquidation of an overseas company in the Cayman Islands ought to proceed.[27] Given the novelty of this case from a Cayman perspective, reference to the more well-developed English jurisprudence (as well as that of other similar common law jurisdictions) is necessary.

76    By way of overview, ancillary liquidations are liquidations of foreign companies that are focused on gathering the assets and compiling creditor claims within the territorial jurisdiction of the place of appointment. In that way it is different from a standard

---

[25] That is the JOLs' stated position in the First Amended Adversary Complaint at [93]: *"The Cayman Proceeding is an ancillary winding up of a US Bank in the Cayman Islands."* It is also consistent with how the JOLs have described themselves in the Initial Adversary Complaint at [5] and the First Amended Adversary Complaint at [9]: *"The JOLs are court-appointed fiduciaries of the SVB Cayman Estate, tasked with administering the assets of SVB within the territorial jurisdiction of the Cayman Islands"* (emphasis added).

[26] The only other case I am aware of where the Cayman Court has made an order in respect of a foreign company is *Re Dyoll Insurance Company Ltd* [2004-05 CILR 412], which was decided before there was an express statutory jurisdiction to wind up foreign companies. As Jones J noted in *Picard v Primeo Fund (in Official Liquidation)* [2013 (1) CILR 164] at [11], *Dyoll* relied on *"a novel and highly artificial interpretation"* of the Act. The subsequent law change would have been unnecessary had *Dyoll* been correct. *Dyoll* has not been included in Exhibit 2 but can be made available upon request.

[27] It also follows that to the extent that Dr Mokal suggested in his Affirmation (at [48], [52], and [54]) that there was a *"long-established"* approach to ancillary liquidations in the Cayman Islands, or that there is an established *"practice"* (at [46]), those views would not be supportable with reference to any actual Cayman cases.

liquidation, where the liquidation is considered to have extraterritorial application over the company's property, wherever located: *Re Bank of Credit and Commerce International SA (No 10)* [1997] Ch 213 ("***BCCI (No 10)***") at 246; Richard Sheldon (ed), *Cross Border Insolvency* (4th ed, Bloomsbury, 2015) ("***Cross Border Insolvency***") at [7.2]-[7.5].

77    The starting point is that under the common law (including as applied in the Cayman Islands), it is well-established that an insolvency process in the jurisdiction of the company's place of incorporation is treated as the primary insolvency process: *Singularis Holdings Ltd v PricewaterhouseCoopers* [2014] UKPC 36, [2015] AC 1675 ("***Singularis***") at [23] and [112];[28] *Re GTI Holdings Ltd* [2022 (1) CILR 472] ("***GTI Holdings***") at [29]-[53]; *Re Silver Base Group Holdings Ltd* (unrep., 8 December 2021, Doyle J) ("***Silver Base Group***") at [6]-[12];[29] and *Re Sun Cheong Development Holdings Ltd* [2020 (2) CILR 942] ("***Sun Cheong***") at [6].

78    The law of the place of incorporation is said to govern the collection and distribution of the company's assets on an extraterritorial, worldwide basis: *Singularis* at [10]; *Stichting Shell Pensioenfonds v Krys* [2014] UKPC 41, [2015] AC 616 ("***Stichting Shell***") at [14].

79    However, in practice, the English authorities have long-recognized the limited territorial reach of an English liquidation of a foreign company: *BCCI (No 10)* at 241-242. The English courts therefore developed the device of ancillary liquidations, usually limited, given the practical constraints, to the local collection of English assets, and compilation of creditor claims, in aid of the primary insolvency: *Singularis* at [10];[30] *Re HIH Casualty and General Insurance Ltd* [2008] UKHL 21, [2008] 1 WLR 852 at [8]-[9].

80    To that end, the leading English authorities make clear that the Court can limit the extraterritorial aspects of an ancillary liquidation so as to ensure that the ancillary process does not conflict with the primary insolvency process: *Cross Border Insolvency* at [7.5]. As Millet J (later Lord Millet) explained in *Re International Tin Council* [1987] Ch 419 ("***ITC***") at 446-447:

> "*Where the company is simultaneously being wound up in the country of its incorporation, the English court will naturally seek to avoid unnecessary conflict, and so far as possible to ensure that the English winding up is conducted as ancillary to the principal liquidation. In a proper case, it may authorise the*

---

[28] While *Singularis* was a Privy Council decision hearing an appeal from Bermuda, it has been cited with approval in the Cayman Islands on several occasions: see for example *Re GTI Holdings Ltd* [2022 (1) CILR 472] at [34]; *Re China Agrotech Holdings Ltd* [2017 (2) CILR 526] at [20], [23]-[26]; *Re Silver Base Group Holdings Ltd* (unrep., 8 December 2021, Doyle J) at [9].

[29] This case has not been included in Exhibit 2 but can be made available upon request.

[30] Noting that in such cases "*[t]he English courts recognised the limits of the international reach of their own proceedings by treating the English winding up as ancillary to the principal winding up in the country of the company's incorporation. They exercised their power of direction over the liquidator by limiting his functions to getting in the English assets...*".

*liquidator to refrain from seeking to recover assets situate beyond the jurisdiction, thereby protecting him from any complaint that he has been derelict in his duty.*"

81    That passage was cited with approval more recently by the Privy Council in *Singularis* at [10] and in the Cayman Islands in *GTI Holdings* at [47]. A similar statement is found in *BCCI (No 10)* at 241-242 where Scott V-C explained:

> "*The statutory insolvency scheme purports to have worldwide, not merely territorial, effect... The liquidators must get in and realise the company's assets as best they may whatever may be the country in which the assets are situated. But, if the company is incorporated abroad, English liquidators' ability to get in and realise the company's foreign assets will be very limited. It follows that, if a foreign company has a winding up order made against it in its country of incorporation and a winding up order made against it in England, the English liquidators' role is likely, perforce, to be limited to getting in, realising and distributing the English assets. It was in that sense, I think, that Kay J was describing the English liquidation as 'merely... ancillary'.*"

82    That decision has likewise been cited with approval in the Cayman Islands in *GTI Holdings* at [49] and *Pashtany Tejaraty Bank v BCCI (Overseas) Ltd* [2002 CILR 473] at [21]-[23].[31] The authors of *Cross Border Insolvency* similarly explain at [7.66] (footnotes omitted):

> "*As an ancillary winding up is prima facie limited to assets in England, it must follow that the liquidator's role as a whole is similarly restricted. Thus, although the court has extensive extraterritorial powers under the Act – such as to set aside preferences and transactions at an undervalue – one would not ordinarily expect such powers to be exercised extraterritorially in an ancillary winding up. Indeed, Sir Peter Millett [in his article 'Cross-Border Insolvency: The Judicial Approach' (1997) 6 IIR 99 at 103] has gone as far as stating that the 'courts should not allow any of the relevant sections to be invoked in an ancillary liquidation'.*"

83    As noted in paragraph 80 above, Sir Peter Millet was also the judge in *ITC*. He went on to become a highly respected judge in the House of Lords. The authors of *Cross Border Insolvency* are less trenchant in their views, noting at [7.66] that "*it cannot be said that powers with an extraterritorial element can never be exercised in relation to a foreign company that is also in liquidation in its country of incorporation*" (emphasis in original). The authors cite *Lehman Bros Inc v Phillips; Re Mid-East Trading Ltd* [1998] 1 All ER 577 (CA) as an example. There, the ancillary liquidators in England obtained an

---

[31] This case has not been included in Exhibit 2 but can be made available upon request.

extraterritorial document production order. However, as was noted in that case (at 580), the order was sought with the approval of the principal liquidator located in Lebanon.[32]

84    I should make clear that the boundaries of what ought to be permissible as part of an ancillary liquidation remain somewhat uncertain, and in any given case the ancillary liquidators may play a more or less active role depending on the precise facts: *Cross Border Insolvency* at [7.6][33] and [7.16].[34] Notwithstanding that, however, and despite the English judicial practice of ancillary liquidations going back to (at least) the 1884 case of *Re Matheson Bros Ltd* (1884) 27 Ch D 225, I have not been able to identify any case where an ancillary liquidator has been permitted to assert avoidance claims within the jurisdiction of the primary insolvency (still less any case where those steps can fairly be characterized as hostile to the primary insolvency itself).[35]

85    Grounding those general principles in the present case, in my view, the limitation that Doyle J imposed on the powers of the JOLs in the original Winding Up Order – to "*acting in respect of the assets and affairs of the Cayman Islands branch of [SVB] and its creditors*", rather than in respect of SVB as a whole – was the Judge's attempt at imposing a limitation on the scope of the Cayman Proceedings to reflect their ancillary nature. In that respect, I agree with the JOLs' summary of the scope of their role in the Initial Adversary

---

[32] The other case I have located that has been cited as support for the exercise of liquidators' powers extraterritorially, in cases where they are appointed over a foreign company, is *Re Howard Holdings Ltd* [1998] BCC 549 (Ch) (cited in Ian Kawaley & Ors (eds), *Cross-Border Judicial Co-operation in Offshore Litigation* (2nd ed, Wildy, 2016) at 279). In that case, Chadwick J held that the wrongful trading provision in s 214 of the English Insolvency Act 1986 could be exercised in respect of a Panamanian company over which the English Court had appointed liquidators. Critically, however, there was no primary Panamanian (or other) insolvency process and the Court noted (at 555C), therefore, that (and unlike this case) "*this is not a case in which the court is faced with a choice between competing jurisdictions.*" In that sense, it was not a classic ancillary liquidation. The Petitioners' attorneys, in their Supplemental Skeleton Argument dated June 27, 2023 seeking the Winding Up Order in the Cayman Islands, quoted the relevant section at length, but did not cite the two cases referred to, or explain the differences between each of them. Those two cases were *Re Howard Holdings Ltd* (as just discussed) and *Re Mid-East Trading Ltd* [1998] 1 All ER 577 (CA) (discussed at paragraph 83 above).

[33] At [7.6] it is said that "*despite the significant number of occasions on which the courts have endorsed the concept of the ancillary winding up, indeed despite the recent consideration of the concept by the House of Lords in Re HIH, fundamental questions remain unanswered as to both the basis and conduct of such a winding up.*"

[34] At [7.16] it is said that "*[w]here the English court declares that its proceedings will be ancillary to the principal liquidation abroad, no fixed or rigid course of conduct is thereby set in motion, still less a course of conduct that will be precisely duplicated in all other ancillary winding-up cases. Rather, 'ancillary' winding up should be seen as part of a broader spectrum of available assistance in cross-border insolvency cases.*" The 'classic' or standard ancillary liquidation is described as follows: "*territorial proceedings (in respect of assets in England and creditors who choose to prove in England) are conducted with a view ultimately to sending assets to the principal liquidation abroad; avoidance powers and investigatory powers may at times be invoked (similarly, on a territorial basis).*" An 'extended' ancillary liquidation is described as follows, seemingly with *Re Mid-East Trading Ltd* [1998] 1 All ER 577 (CA) discussed at paragraph 83 above (cited in the prior paragraph [7.15]) in mind: "*as in (4) above, but with the English liquidator playing a greater role, for instance in relation to the investigation of the company's affairs and at times even seeking to exercise appropriate powers extraterritorially.*"

[35] My team and I have conducted a search of Westlaw UK, a comprehensive UK case law database, for cases in the UK in which the word "*ancillary*" appears within the same sentence as (a) the root term "*liquidat\**" (to account for terms such as "*liquidator*" or "*liquidation*"), and/or (b) the word "*winding*" (to account for variations of the term "*winding up*"). This returned 180 results. We ran a further search among these 180 results for any containing the term "*avoidance*", which returned a subset of 35 results (including some duplicates). Most of these 35 results were irrelevant to the topic of ancillary liquidations, and none of those involving ancillary liquidation were cases in which an ancillary liquidator was permitted to commence or maintain avoidance claims in the jurisdiction of the primary liquidation.

Complaint at [5] and the First Amended Adversary Complaint at [9], where they state that they are "*tasked with administering the assets of SVB within the territorial jurisdiction of the Cayman Islands*".

86    At least in respect of the January Sanction Order (where the papers are not sealed), the commentary summarized above – to the effect that ancillary liquidators ought generally not take steps outside of the jurisdiction of their appointment – does not appear to have been brought to the Judge's attention.

87    Another unusual feature of this ancillary liquidation is what is likely to occur (or not) in respect of remission of assets from the Cayman ancillary liquidation to the primary FDIC receivership.

88    A common feature of ancillary liquidations is that, subject to the ancillary Court being satisfied that there will be no discrimination of local creditors, assets realized in the ancillary liquidation are remitted to be distributed by the principal liquidators. As the authors of *Cross Border Insolvency* explain at [7.5] and [7.63] (footnotes omitted):

> "*Where an ancillary winding up is ordered, it may be convenient for the powers of the English liquidator to be restricted to collecting the English assets and settling a list of creditors in England. Such assets, after satisfying preferred creditors in England and other approved payments, are to be remitted to the foreign court conducting the main liquidation.*
>
> *[...]*
>
> *In short, an ancillary winding up envisages the handing over of English assets to the principal liquidator abroad; but, since the very first reported English decision on the subject, it has been required that English creditors will not be discriminated against in the foreign proceedings.*"[36]

89    In this case, the JOLs appear virtually certain to say that the FDIC process involves impermissible discrimination (indeed, that was a core premise of both the Cayman Winding Up Petition and the Cayman Winding Up Judgment, as well as the *Ledwidge v. FDIC* Proceedings).[37]

---

[36] And to like effect, in *Singularis*, Lord Sumption stated at [17] that: "*The principle justifying judicial assistance in a foreign insolvency which was stated in In re African Farms [1906] TS 373 and affirmed in Cambridge Gas was subject to 'such conditions as the court may impose for the protection of local creditors, or in recognition of the requirements of our local laws' or, as it was put more broadly in HIH itself [2008] 1 WLR 852, para 30, 'justice and UK public policy'.*"

[37] See (1) Petitioners' Consolidated Skeleton Argument dated June 21, 2023 at [18]: "*FDIC Receiver has dealt with the assets of the Branch without taking any steps to seek recognition of its appointment in the Cayman Islands and in a manner which: (i) constitutes a potential preference of the US deposit holders; (ii) proposes to distribute the assets in a manner which does not accord*

90    Whilst for the reasons I discuss below I do not consider that the JOLs are likely to succeed in their claims, it may be relevant to the Court's determination of the issues before it at this stage that:

(a)    It is very likely (based on the discrimination the JOLs allege against Cayman creditors in the FDIC process) there will be no remission of the proceeds of any claims by the JOLs, including this claim, to the FDIC process, as would otherwise be standard in the case of an ancillary liquidation;

(b)    The quantum of this claim materially exceeds the quantum of the Cayman creditor claims;[38]

(c)    As a result, the 295 Cayman Depositors would receive 100 cents on the dollar on their claims; and

(d)    Those Cayman Depositors would be sharing in the proceeds to the exclusion of any other creditors who, by the terms of the Winding Up Order (limited to creditors of the Cayman Branch), would be barred from participating in the Cayman liquidation process.

91    That outcome can be seen to be providing an 'end-run' around the FDIC process, by which only a subset of creditors benefit from recovery on behalf of SVB (as a whole) – in circumstances where (a) almost all of the Cayman Depositors, and the JOLs have filed proofs of claim in the FDIC process, and (b) the JOLs are availing themselves of the *de novo* Court review provided for in the FDIC statutory scheme.

92    In the papers that I have reviewed, I have seen no discussion by the JOLs as to how this issue is proposed to be resolved, nor is it clear whether Doyle J is yet aware of, or has been apprised of, this issue.

---

with Cayman Islands law; (iii) proposes to distribute the assets in a manner which does not accord with US law since it is proposed to use the Bank's assets to guarantee all US deposits thus greatly (perhaps to an extreme degree) reducing the surplus available for distribution to the unsecured Cayman creditors; and (iv) it has recently been reported that the FDIC has refused to set off deposits against loans for creditors holding deposits with the Branch . If the liquidators overturn or unwind (i) or (ii) it would benefit all of the Petitioners and (iii) is likely to have an impact on many of the Cayman deposit holders"; (2) Winding Up Judgment at [7]: "On behalf of the Petitioners it is said that it appears that all of the assets of the Bank will be applied by the FDIC receiver to pay claims of creditors of the Bank including US depositors whose claims will apparently be paid in full in priority to the depositors of the Branch"; (3) Complaint in the *Ledwidge v. FDIC* Proceedings dated February 23, 2024 (*Ledwidge v. FDIC* Proceedings, Dkt. No. 1) at [96]-[97]: "... more than 90% by holder (and 99% by value) of the Operating/Money Market Account Holders of SVB Cayman are of Chinese origin or China-investment connected, while the demographics of holders of the Eurodollar Sweep Accounts are mixed and nominal – resulting in a stark disparity of outcome as a result of the FDIC-R's decisions. The discretionary decisions to over-insure the Sweep Account depositors above $250,000 and waive the U.S. person limitation, but **not** waive the U.S. geographic situs limitation (by implication) was arbitrary and capricious or an impermissible exercise of discretion based upon national origin – especially under circumstances where the only possible party impacted by the U.S. Geographic situs limitation was SVB Cayman and its depositors-creditors – given SVB Cayman was the sole foreign deposit-taking branch of Silicon Valley Bank" (emphasis in original).

[38] See paragraph 56 and n.16 above.

**Statutory and Common Law Assistance to Foreign Officeholders in Cayman**

93    For completeness, I note that in a separate part of the Companies Act, Part XVII, there is a statutory regime which grants the Grand Court certain powers to assist with foreign insolvency proceedings.[39] For the avoidance of doubt, Part XVII has no application as it relates to the Cayman Proceedings, which are governed by Part V of the Act (being the part of the Act I outlined in paragraphs 59 to 73 above).

94    The regime in Part XVII is more limited than the UNCITRAL Model Law on Cross-Border Insolvency, which the Cayman Islands has not adopted. In particular, Part XVII only applies where a *"debtor"* is *"subject to a foreign bankruptcy proceeding in the country in which it is incorporated or established"*: s 240.

95    This codifies the common law principle that foreign insolvency proceedings should generally only be recognized where they are taking place in the jurisdiction in which the debtor company is incorporated: *Picard v Primeo Fund (in Official Liquidation)* [2013 (1) CILR 164] (*"**Primeo**"*) at [13]. That common law principle reflects the primacy afforded to the process in the place of incorporation, which I described in paragraph 77 above.

96    I say *"generally"* in the previous paragraph because there is a very limited category of cases where liquidators appointed outside the Cayman Islands, over a Cayman company, have been recognized for the limited purpose of facilitating a restructuring – at common law rather than under the statutory regime (which, as above, is not available in the case of a foreign appointment over a Cayman company). In *Re China Agrotech Holdings Ltd* [2017 (2) CILR 526], Segal J recognized at [30] that the Court could assist Hong Kong appointed liquidators of a Cayman company in such circumstances. Likewise, in *Re Changgang Dunxin Enterprise Company Ltd* (unrep., 1 March 2018, Mangatal J),[40] provisional liquidators appointed in Hong Kong in respect of a Cayman company were recognized for the limited purposes of allowing them to apply to have the company put into liquidation in the Cayman Islands, all for the purposes of facilitating a restructuring.

97    In *Sun Cheong* Smellie CJ made clear at [7]-[8] that these cases were the exception to the rule, and that common law recognition of foreign insolvency proceedings in respect of Cayman companies is typically only permissible where:

> *"(a)     there is a particularly strong nexus between the company and the foreign jurisdiction such that the legitimate expectation of interested parties as to*

---

[39] I note that the Cayman courts have held that *"Part XVII supplements and partially codifies the common law. It does not abolish the common law rules which continue to exist alongside the new statutory provision"*: *Picard v Primeo Fund (in Official Liquidation)* [2013 (1) CILR 164] at [13] (this decision was overturned on appeal but this point was not challenged: see *Picard v Primeo Fund (in Official Liquidation)* [2014 (1) CILR 379]). In *Re China Agrotech Holdings Ltd* [2017 (2) CILR 526] Segal J expressed agreement at [22].

[40] This case has not been included within Exhibit 2 but it can be made available upon request.

*the locus of the primary insolvency proceedings, has shifted to that foreign jurisdiction;*

*(b)    the foreign court had already appointed officers seeking to effect a restructuring for the benefit of stakeholders; and*

*(c)    there were no competing proceedings in the Cayman Islands."*

98    I also note that in *Picard v Primeo Fund* [2014 (1) CILR 379] at [50]-[55], the Cayman Islands Court of Appeal held that Part XVII does not permit the Cayman Court to apply the avoidance provisions of foreign insolvency laws to claims brought in the Cayman Islands by foreign officeholders. Rather, such officeholders were required to bring avoidance claims governed by Cayman law (which I explain in more detail in paragraph 200 below).

99    It follows from (i) the terms of Part XVII in respect of the statutory process of recognition, and (ii) the cases setting out the limits of common law recognition of foreign officeholders, that if the facts of this case were reversed, and the Californian Court appointed officeholders over a Cayman incorporated company that had a branch in California, a Cayman Court would not grant recognition to those officeholders under statute or at common law. Avoidance actions governed by foreign law would not be permitted by the Cayman Court under Part XVII (which in any event would provide no jurisdiction for any recognition at all), and assistance in the form of Cayman or foreign law avoidance actions would not be permitted under the common law[41] (which again would not, in any event, provide a basis for recognition).

## VI    DO THE JOLS HAVE THE POWER TO PURSUE CLAIMS ON BEHALF OF THE CAYMAN DEPOSITORS, AS DISTINCT FROM CLAIMS ON BEHALF OF SVB ITSELF?

100    I first address the question of whether the JOLs have the power to act as agents of, and bring claims on behalf of, the Cayman Depositors as distinct from claims on behalf of SVB itself. As I explain below, liquidators generally act as agents of the company. In my view, the JOLs do not have the power to act as agents on behalf of the company's creditors directly.

---

[41] This is the effect of the decision in *Singularis* – that the Court cannot, under common law recognition and assistance, simply permit the local statutory provisions to be made available 'as if' they applied: [24] (Lord Sumption), [38] and [64] (Lord Collins). There is no Cayman common law equivalent of avoidance actions that could be made available (even were recognition possible, which it is not, as explained above), avoidance actions being creatures of statute, with no equivalent in the general common law. In *Singularis*, at [98]-[102], Lord Collins expressed the view that it follows from the decision of the Privy Council in that case that Jones J was wrong to apply the statutory avoidance provisions under the common law in *Primeo*.

101    In approaching this question, my analysis is structured as follows:

(a)    My understanding of the basis on which this agency relationship is said to arise;

(b)    A summary of how liquidators are generally considered under Cayman law to act as agents of the company;

(c)    Why the "*statutory trust*" does not support the existence of an agency relationship between a company's liquidators and its creditors;

(d)    The relevant Cayman case law, which does not support the existence of an agency relationship with creditors;

(e)    The terms of the Winding Up Order and why the limitation on the power of the JOLs' powers to "*acting in respect of the Cayman Branch of [SVB] and its creditors*" does not create an agency on behalf of the creditors;

(f)    The position under relevant Cayman contract and agency law;

(g)    The October Sanction Order and why that does not indicate that the Judge was agreeing with the merits of the JOLs' assertions on this point; and

(h)    Why the Cayman Depositors still have a remedy, if a substantive claim does in fact exist.

**The Basis on which the Alleged Agency Relationship is Said to Arise**

102    The JOLs consider that they have the power to act directly on behalf of the Cayman Depositors on three theories (which appear to have developed over time as further filings have been made and, I infer, as problems with the prior theories have been identified):

(a)    *First*, under the usual principles governing liquidations under Cayman law: see for example:

(i)    The Declaration of Niall Ledwidge dated February 12, 2024 (Chapter 15 Case, Dkt. No. 42) at [92] ("*As the Official Liquidators, the JOLs are empowered under Cayman Islands law to assert claims not only on behalf of SVB Cayman, but are also empowered as agent to assert claims on behalf of SVB Cayman's creditors, such as the uninsured holders of SVB Cayman Deposit Accounts*");

(ii)    The Initial Adversary Complaint at [5] ("*The JOLs are court-appointed fiduciaries of the SVB Cayman estate, tasked with administering the assets of SVB within the territorial jurisdiction of the Cayman Islands, with standing to bring claims on behalf of SVB Cayman as well as the exclusive*

*agent of SVB Cayman's depositors-creditors*") and n.2 ("*The JOLs are granted authority to pursue claims on behalf of SVB Cayman and its depositors-creditors by operation of Cayman law*"); and

    (iii)   The First Amended Adversary Complaint at [9] (making the same comment just quoted), [132] ("*Upon the making of a winding up order in relation to a company, a statutory trust comes into effect... It is well accepted that upon a winding up order being made, the assets of the company are impressed with a statutory trust in the sense that they constitute a fund to be administered by the liquidator as officer of the court and agent for all persons interested in the winding up*"), [146] ("*the JOLs are empowered under Cayman Islands law to assert claims not only on behalf of SVB Cayman but are also empowered as agent to assert claims on behalf of SVB Cayman's creditors*") and [147] ("*the liquidator is a trustee of the well-recognized statutory trust whose beneficiaries are the creditors. In this context the liquidator may also act as and assume agency for some or all of the company's creditors in certain contexts*").

(b)    *Second*, pursuant to the specific terms of the Winding Up Order and the Winding Up Judgment: see for example:

    (i)   The JOLs' Standing Memorandum at 3-4 ("*the JOLs' standing and authority are based on the Winding Up Order entered by the Grand Court of the Cayman Islands*"); and

    (ii)   The First Amended Adversary Complaint at [140] ("*The Winding Up Order also granted the JOLs with certain duties, requiring them to act as agent on behalf of the Cayman depositors-creditors by bringing litigation in the United States to safeguard the rights and interests of this particular group of creditors*") and [148] *("The JOLs' mandate included acting on behalf of the Cayman depositors-creditors based upon a combination of... the explicitly referenced creditor-specific provisions of the Winding Up Order").*

(c)    *Third*, pursuant to the Deposit Agreements or some other express or implied appointment or ratification by the Cayman Depositors: see for example:

    (i)   The Initial Adversary Complaint at 3 n.2 ("*The JOLs are acting on behalf of depositors of SVB Cayman as their exclusive agents, under deposit agreements which it is uncontested are governed by Cayman law*"). I note that this explicit reference to the Deposit Agreements has been removed from the First Amended Adversary Complaint; and

(ii)     The First Amended Adversary Complaint at [149] ("*In addition to the authorization and mandate contemplated in the Winding Up Order, the JOLs' authority to act on behalf of the creditors of SVB in the Cayman Islands also arose by implicit agreement and ratification, as well as explicit agreement*").

**Liquidators Act as Agents of the Company Over Which They Are Appointed**

103     It is very well-established that during the liquidation, as a matter of Cayman law, the liquidators act as agents <u>of the company</u> over which they were appointed. I have been unable to identify any support for the further proposition that liquidators have the power to act as agents of, or bring claims on behalf of, the company's creditors directly.

104     The position is correctly stated in Kristin van Zwieten (ed), *Goode on Principles of Corporate Insolvency Law* (5th ed, Sweet & Maxwell, 2018) ("***Goode***") at [5-04] (footnotes omitted, emphasis added):

>  "*On behalf of the creditors, <u>the liquidator can bring proceedings in the name of the company in respect of causes of action vested in the company but he has no locus standi to pursue claims vested in persons qua creditors</u>. So if a company establishes a subsidiary to carry on the business of deposit-taking and the parent runs the subsidiary as its alter ego, effectively depriving the subsidiary's directors of any management function and using the subsidiary as a façade through which deposited funds are transferred to the parent, then if in consequence the subsidiary is driven into insolvent liquidation, the liquidator may be able to pursue a claim in the name of the subsidiary against its parent, but has no standing to assert claims that the subsidiary's depositors have against the parent, who must pursue their own proceedings. A possible solution in cases of this kind is for creditors to assign the claims that they have against persons other than the company to the company, so as to become the company's property: in such a case, the liquidator can bring the proceedings in the name of the company (as assignee) in the ordinary way. But this solution will be available only where the creditors' claims can be validly assigned to the company.*"

105     The status of liquidators as agents of the company, and not as agents of or trustees for the creditors, is also supported by other leading practitioner texts. Andrew Keay (ed), *McPherson & Keay's Law of Company Liquidation* (5th ed, Sweet & Maxwell, 2021) ("***McPherson & Keay***") notes at [8-040] that "*[i]n relation to the company, viewed as a*

*corporate entity, there is little doubt that the liquidator occupies the position of agent.*" It later adds at [9-003] (footnotes omitted, emphasis added):

> "*Upon winding up, the directors of the company are displaced and their functions assumed by <u>the liquidator, who, in exercising his or her powers, acts as the agent of the company</u>. All the normal consequences incidental to the agency relationship are therefore present: the acts and the transactions into which they enter bind the company, not liquidators personally, and this is so whether the company is being wound up voluntarily or compulsorily.*"

106     There is no reference in *McPherson & Keay* to liquidators acting as agents of the creditors directly.

107     Andrew Clutterbuck and Paul Greenwood, *Loose & Griffiths on Liquidators* (9th ed, Lexis Nexis, 2019) ("***Loose & Griffiths***") notes at [8.6] that "*the better analysis of the capacity in which the liquidator exercises his powers is that he is the company's agent and as such occupies a fiduciary position vis-à-vis the company. Accordingly, he must use his powers in the interests of the company and also of the creditors and contributories.*"

108     The leading common law text on agency, Peter Watts and FMB Reynolds (eds), *Bowstead & Reynolds on Agency* (23rd ed, Sweet & Maxwell, 2024) ("***Bowstead & Reynolds***"), makes various references to liquidators acting as agents of the company: see for example at [1-028] ("*Liquidators, administrators and receivers of companies can also be regarded as agents of the affected company for many, if not all, purposes, although special rules apply to them, including as to the revocability of their authority*");[42] [10-018] and n.157 ("*A liquidator will usually himself act as agent of the relevant company*").[43] *Bowstead & Reynolds* similarly does not make any references to liquidators acting as agents of the creditors.

109     The analyses provided by these leading texts align with the statutory framework. It is implicit in the functions and powers afforded to liquidators in the Act that they act in an agency capacity vis-à-vis the company. Under Schedule 3, Part I of the Act, liquidators are empowered (with Court sanction) to "*to bring or defend any action or other legal proceeding <u>in the name and on behalf of the company</u>*" (para 1) and to "*to <u>carry on the business of the company</u> so far as may be necessary for its beneficial winding up*" (para 2) (emphasis added). Under Schedule 3, Part II, liquidators are empowered (without Court sanction) to "*do all acts and execute, <u>in the name and on behalf of the company</u>, all deeds,*

---

[42] Citing *Re Anglo-Moravian Co* (1875) 1 Ch D 130 at 133; *Re Southern Pacific Personal Loans Ltd* [2013] EWHC 2485 (Ch), [2014] Ch 426 at [24]; *Dunphy v Sleepyhead Manufacturing Co Ltd* [2007] 3 NZLR 602 (NZCA) at [22]. These cases have not been included in Exhibit 2 but can be provided upon request.

[43] Again citing *Dunphy v Sleepyhead Manufacturing Co Ltd* [2007] 3 NZLR 602 (NZCA) at [22].

*receipts and other documents*" (para 2) (emphasis added). There are no references in the Act to liquidators acting as agents of the creditors, or to liquidators carrying out functions directly for the creditors.[44]

110    The CWR are even more explicit. Order 18, r.1(2) provides that "*[t]he official liquidator is empowered, <u>as agent of the company</u>, to collect, take possession, retain, manage and realise the company's property*" (emphasis added). There are no references in the CWR to the liquidators acting as agents of creditors, or to the liquidators carrying out functions directly for the creditors.[45]

111    The lack of any reference in the Act or CWR to liquidators acting as agents of creditors is unsurprising. It is simply not necessary for the purposes of the two stated functions of liquidators, which I described at paragraph 65 above, for them to act as agents of parties other than the company in liquidation.

**The "Statutory Trust" Analogy Does Not Support an Agency Relationship with Creditors**

112    In the absence of a clear statement of support in the Companies Act, the CWR or the leading texts, the JOLs place reliance on the analogy that is used in the cases that the assets of a liquidated company are held on "*statutory trust*", to derive support for the alleged agency relationship with the Cayman Depositors. For example, at [147] of the First Amended Adversary Complaint and [123] of the Second Amended Proof of Claim the JOLs state:

> "*At the same time, the liquidator is a trustee of the well-recognized statutory trust whose beneficiaries are the creditors. In this context, the liquidator may also act as and assume agency for some or all of the company's creditors in certain contexts.*"

113    In light of the clearly established position that a liquidator is not a true trustee, and creditors and not true beneficiaries, I consider this reference to be misleading.

114    To provide some context, as a matter of Cayman law, during the liquidation of a company, title to the company's property remains in the company's name. In *Ayerst (Inspector of Taxes) v C&K (Construction) Ltd* [1976] AC 167 (HL) ("*Ayerst*"), Lord Diplock distinguished winding up orders from personal bankruptcies, noting at 177E: "*whereas the*

---

[44] The word "*agent*" appears 12 times in the Act (ss 65, 67, 84(4), 193, 206(2)(c), 224(4)(b), 226(3) and 264(1)). None of these uses of the word are relevant. The word "*agency*" appears once in s 264(1) but that is also irrelevant.

[45] The word "*agent*" appears in the CWR three times. In addition to CWR O.18, r.1(2), there are two irrelevant references to an agent of the petitioning creditor in O.3, r.3(3)(b) and O.15, r.4(3)(c). The word "*agency*" does not appear.

*legal title in the property of the bankrupt vests in the trustee… a winding-up order does not of itself divest the company of the legal title to any of its assets.*"[46]

115    While the company retains the <u>legal</u> title in its property, it is recognized that the company ceases to hold the <u>beneficial</u> interest in that property but is rather required to apply the property to discharge the company's liabilities in accordance with the statutory scheme of distribution: *Goode* at [3-09]. It is this separation of the legal and beneficial interests upon a winding up order that underlies the idea of a "*statutory trust*". But the authorities are unambiguous that the "*statutory trust*" is not a true trust, the liquidators are not true trustees, and the creditors are not true beneficiaries.

116    The case most often cited in support of the statutory trust proposition is *Ayerst*. There, the House of Lords considered who the "*beneficial owner*" of the "*proprietary interests*" in a company was for the purposes of a tax statute. Having summarized several earlier authorities that had referred to the idea of a statutory trust, Lord Diplock explained at 180E:

> "*All that was intended to be conveyed by the use of the expression 'trust property' and 'trust' in these and subsequent cases… was that the effect of the statute was to give to the property of a company in liquidation that essential characteristic which distinguished trust property from other property, viz., that it could not be used or disposed of by the legal owner for his own benefit, but must be used or disposed of for the benefit of other persons.*"

117    As that passage makes clear, the phrase "*statutory trust*" in the authorities has a limited meaning.

118    As far back as 1891, in *Knowles v Scott* [1891] 1 Ch 717 ("**Knowles v Scott**") at 721-722 Romer J, in clarifying the effect of *Re Oriental Inland Steam Co* (1874) LR 9 Ch App 557 ("**Oriental Inland Steam Co**"),[47] held that liquidators are "*not a trustee in the strict sense*" and <u>not</u> "*a trustee for each creditor or contributory of the company*".

119    That same clarification, and general emphasis on the potentially misleading nature of the "*statutory trust*" analogy, has been recognized in the leading texts. For example, *McPherson & Keay* explains at [8-041] (footnotes omitted, emphasis added):

---

[46] That passage from *Ayerst* has been cited with approval in the Cayman Islands in *Re Caledonian Securities Ltd (in Official Liquidation)* [2016 (1) CILR 309] at [57]. The fact that the company retains legal title in itself illustrates that the liquidators cannot be true trustees. If liquidators were trustees, they would themselves hold legal title in the assets for the benefit of any beneficiaries.

[47] In that case, James LJ said (at 559) that "*[t]he English Act of Parliament has enacted that in the case of a winding-up the assets of the company so wound up are to be collected and applied in discharge of its liabilities. That makes the property of the company clearly trust property. It is property affected by the Act of Parliament with an obligation to be dealt with by the proper officer in a particular way. Then it has ceased to be beneficially the property of the company; and, being so, it has ceased to be liable to be seized by the execution creditors of the company.*"

> *"The true position is that, like a director, the liquidator is <u>at most a quasi-trustee</u> with some of the rights, duties and liabilities of a trustee, <u>but is principally and really an agent for the company</u> who occupies a position which is fiduciary in some respects and who is bound by the statutory duties imposed by the Act."*

120    Earlier, at [7-008], *McPherson & Keay* notes that the authorities referring to the *"statutory trust"* concept *"do not go to the length of establishing that the assets are subject to a trust in the strict sense"*, and that the *"reason is that although the effect of winding up is to deprive a company of what is described as the beneficial ownership of its property, certain of the features of a trust are lacking. In particular, the creditors and contributories are not cestuis que trust and possess no right in rem in the property of the company"* (footnotes omitted).

121    In *Re Stanford International Bank Ltd (In Liquidation)* [2010] EWCA Civ 137, [2011] Ch 33 at 96, Arden LJ (as she then was) cited with approval an earlier edition of Geoffrey Morse (ed), *Palmer's Company Law*, which noted at [15-323] (citations omitted, emphasis added):

> *"In certain respects [the liquidator] is a trustee for the creditors as a general body. However, as mentioned above the property does not vest in him without an order; he is chosen and remunerated on a commercial basis for his professional skills; he is not protected from liability for breach of trust under s 30 of the Trustee Act 1925 and the right of tracing property which passes through his hands is more limited than in the case of an ordinary trustee.*
>
> *Nevertheless the assets are impressed with a trust in this sense, that they constitute a fund to be administered by the liquidator as officer of the court and agent for the company, under the direction of the court, for the benefit of all persons interested in the winding up. <u>This does not mean that the liquidator is trustee for individual creditors while the company is still in existence</u>."*

122    The authors of *Halsbury's Laws of England* (5th ed, 2017), Vol 16 likewise opine at [433] that *"[t]he liquidator is not, however, a trustee, in the strict sense of being a trustee, for each creditor or contributory of the company."*

123    In *Loose & Griffiths* the authors note at [8.5], n.1 that the fact that liquidators are <u>not</u> trustees of individual creditors *"is largely now taken as given"*.[48]

124    The idea of the *"statutory trust"* has been recognized in the Cayman Islands on a number of occasions. For example, in *Ahmad Hamad Algosaibi and Brothers Co v Saad*

---

[48] Citing *Kyrris v Oldham* [2003] EWCA Civ 1506, [2004] BCC 111, which found that administrators and liquidators owe no general duty of care to creditors.

*Investments Company Ltd* [2018 (3) CILR 1] at [67], Smellie CJ noted that *"[i]t is trite as a matter of Cayman law that these assets are subject to a statutory trust which requires the liquidators to deal with them for the benefit of all the creditors in keeping with the order of priorities determined by the statutory scheme."* See also *Wight v Eckhardt Marine GmbH* [2003] UKPC 37, [2004] 1 AC 147 (*"**Wight v Eckhardt Marine**"*)[49] at [22] (citing *Ayerst*).

125  However, the limitation on the use of the *"statutory trust"* analogy has also been recognized in the Cayman authorities. In *Re Caledonian Securities Ltd (in Official Liquidation)* [2016 1 CILR 309] (*"**Caledonian Securities**"*) at [58], Smellie CJ cited with approval the following passage from the English decision in *Re Berkeley Applegate (Investment Consultants) Ltd (in liquidation)* [1989] Ch 32 (*"**Berkeley Applegate**"*) at 44: *"A liquidator is not a trustee for anyone: he is a substitute for the board of directors. He is only the agent of the company..."* (emphasis added).[50]

126  In sum, whilst the authorities do recognize that a company's <u>property</u> is impressed with a *"statutory trust"* upon a winding up order being made (reflecting the change in stakeholders as a result of the winding up order being made), in light of the clearly established position that liquidators are not trustees for creditors, in my view the notion of a *"statutory trust"* cannot provide a basis on which to say that the JOLs have the power to act on behalf of the Cayman Depositors as their agents.

127  It also follows from this summary that the JOLs' stated position at [147] of the First Amended Adversary Complaint and [123] of the Second Amended Proof of Claim, quoted in paragraph 112 above, is directly contradicted by well-established and widely recognized legal principles.

**Cayman Case Law Does Not Provide Support for an Agency Relationship with Creditors**

128  To confirm the position, my team and I have conducted a search of vLex, the main case law database in the Cayman Islands, for the terms *"liquidator"* and *"agent"* (i.e. with both terms appearing). This search returned 186 results (including many duplicates). Of these cases, most results were irrelevant to the current issue.

129  The only *potential* support for the proposition that liquidators might act on behalf of creditors directly are some *obiter* comments made by Smellie CJ in two related cases. In

---

[49] This was a Privy Council appeal from the Cayman Islands.

[50] *Berkeley Applegate* has not been included within Exhibit 2 but it can be made available upon request.

the more recent case, *Re Saad Investments Company Ltd* [2019 (2) CILR 828], Smellie CJ noted in a footnote (at [39] n.4):

> "*In the usual case, upon a winding-up order being made, the assets of the company are impressed with a statutory trust in the sense that they constitute a fund to be administered by the liquidator as officer of the court and agent for all persons interested in the winding up. See, for instance, AHAB v. SICL (2010 (1) CILR 553, citing Oriental Inland Steam Co., In re, Ex p. Scinde Ry. Co. (1874), L.R. 9 Ch. App. 557).*"

130    The reference to *AHAB v SICL* is a reference to an earlier decision of Smellie CJ (the second case referred to above, the full reference of which is *Ahmad Hamad Algosaibi and Brothers Co v Saad Investments Company Ltd* [2010 (1) CILR 553]), where Smellie CJ similarly noted at [104]:

> "*In the usual case, upon a liquidation order being made, the assets of the company are impressed with a statutory trust in the sense that they constitute a fund to be administered by the liquidator as officer of the court and agent of all persons interested in the winding up (see, for instance, [Oriental Inland Steam Co]).*"

131    While the phrase "*agent for all persons interested in the winding up*" could be taken to suggest a direct relationship with those persons, in my view it is clear that Smellie CJ was <u>not</u> using this phrase to indicate that the accurate or precise legal position is that liquidators act as agents of the creditors (rather than, as is accurate, that they act as agents of the company, for the benefit of those persons who are ultimately entitled to share in the assets of the company under the statutory scheme of distribution).

132    I am confident in that view because:

(a)    As I noted in paragraph 125 above, in *Caledonian Securities*, where the point was more directly relevant, Smellie CJ himself cited English authority that confirmed that liquidators are conventionally considered as agents of the company and "*not a trustee for anyone... He is only the agent of the company*".[51] A Cayman Court considering the question would take this more direct statement of the same Judge as better reflecting the correct position in Cayman law; and

(b)    Smellie CJ's reliance on *Oriental Inland Steam Co* must and would also be considered in the context of the clarification of that case in *Knowles v Scott*, to the effect that *Oriental Inland Steam Co* does <u>not</u> stand for the proposition that the

---

[51] *Caledonian Securities* at [58], citing *Berkeley Applegate* at 44. *Berkeley Applegate* was the key authority relied upon by Smellie CJ for the jurisdiction he then exercised in *Caledonian Securities*, at [62] and [63].

liquidator of a company is "*a trustee for each creditor or contributory of the company*": see paragraph 118 above.[52]

133    In sum, I have been unable to identify any credible or authoritative support for the proposition that liquidators are entitled to act as agents of creditors as a matter of Cayman law, whether in the Act, the CWR, the leading commentary or in the case law.

**Terms of the Winding Up Order Do Not Support an Agency Relationship with Creditors**

134    Aside from the JOLs' reliance on the general position at law (which as I have explained lacks foundation), I understand that the JOLs place reliance on the specific words in the Winding Up Order. As noted in paragraph 37 above, in the Winding Up Order, the Grand Court limited the powers of the JOLs to "*acting in respect of the assets or affairs of the Cayman Islands branch of [SVB] and its creditors*" (Dkt. No. 1335-9). I understand the JOLs' position is that the words "*and its creditors*" suggest that the Grand Court intended that the JOLs would act directly on behalf of the Cayman Depositors: First Amended Adversary Complaint at [148](ii). As I have just explained, that role would be unconventional and, as far as I have been able to ascertain, entirely novel.

135    In my view, that is not what was likely to be intended through the inclusion of those words. As I explained in detail in paragraphs 74 to 92 above, in the case of ancillary liquidations, it is standard that there is a limitation on the powers of liquidators out of a recognition that the usual extra-territorial effect of the winding up order does not apply. As the authors of *Cross Border Insolvency* explain at [7.5]: "*That a winding up is declared by the court to be ancillary to the main liquidation abroad means that the scope of the English proceedings should be restricted or, as Scrutton LJ once said, 'carefully limited in effect'*" (referring to *Sedgwick, Collins and Co Ltd v Rossia Insurance Co of Petrograd* [1926] 1 KB 1 at 13) (emphasis added).[53]

136    Consistently with that, and by including the extraordinary limitation of powers in the Winding Up Order, Doyle J has "*carefully limited*" the powers of the JOLs to acting in respect of the Cayman Branch. Naturally, that also means that the powers and responsibilities of the JOLs are limited to dealing with the Cayman Depositors. The Court would not, for example, have expected that the JOLs would process claims of US-based depositors of SVB. In my view, if Doyle J had intended to confer on the JOLs a power that

---

[52] If it considered the matter more formally as a matter of precedent, a Cayman Court would not consider that the dicta of Smellie CJ in either judgment should be followed. As *Knowles v Scott* was not cited, the judgments would be considered *per incuriam*. And, more straightforwardly, the relevant comments are *obiter dicta* in each case.

[53] In that decision, Scrutton LJ warned that "*the operations of the winding up of this company here should be very carefully limited. There is already a liquidation in the country of origin, Russia. As far as I can find winding-up orders here have hitherto been treated only as ancillary to the main liquidation and carefully limited in effect*" (emphasis added).

appears, based on my survey of the authorities, to be entirely novel, I would have expected the Judge to have been explicit in that grant of authority.

137     I am reaffirmed in that view because, as I noted above, the Petitioners had initially sought to wind up the Cayman Branch (see paragraph 36 above and the Petition at Chapter 15 Case, Dkt. No. 42-13). In the Order that was sought in the Petition, there was no wording that would have permitted the JOLs to act as agents of the creditors. Instead, the limitation on the JOLs' powers followed Doyle J's legal conclusion that he did not have jurisdiction only to wind up the Cayman Branch: Winding Up Judgment at [53]. By carefully limiting the powers of the JOLs by the terms of his Order, he has achieved the same practical outcome. In my clear view, that is what the relevant wording related to, i.e. it was not intended to and did not create an agency for the Cayman Depositors on the part of the JOLs.

**No Agency For Creditors as a Matter of Contract Law and/or Ratification of Conduct**

138     Before I substantively address this point, I note that even if the Cayman Depositors had conferred authority on the JOLs to act on their behalf, it remains my view that, because of the absence of authority (discussed above), the JOLs would not be entitled to undertake this extra-statutory function (at least in their official capacity as JOLs). But, in any event, I do not consider there is a basis on which to say that such authority has been validly conferred.

139     As noted above, the JOLs also appear to suggest that a general agency relationship arises from the terms of the Deposit Agreements: Initial Adversary Complaint at n.2. As noted above, given that this assertion has not been carried forward to the First Amended Adversary Complaint, it is not clear whether reliance on this line of argument is maintained (which is unsurprisingly given there is no basis for it factually or as a matter of Cayman law). I will briefly address it for completeness.

140     I should note at the outset it is my understanding that the Deposit Agreements are governed by the laws of the State of California whilst the deposits themselves were said to be governed by the laws of the Cayman Islands: see the Eurodollar Money Market Account Agreement (Dkt. No. 1335-3), the Eurodollar Operating Account Agreement (Dkt. No. 1335-4), and the Eurodollar Sweep Account Agreement (Dkt. No. 1335-2). In light of these competing choice of law provisions, it is not clear whether the JOLs say the agency relationship is governed by California law or Cayman law. I will provide the analysis below on the basis that Cayman law governs the matter.

141     It is well-established that the "*essential relationship between a bank and its customer is contractual*": John Odgers and Ian Wilson (eds), *Paget's Law of Banking* (16th ed, Lexis Nexis, 2023) at [4.1]; see also Hugh G Beale (ed), *Chitty on Contracts* (35th ed, Sweet & Maxwell, 2023) at [37-265]; *Ritter v Butterfield Bank (Cayman) Ltd* [2018] 1 CILR 529,

Williams J) at [127].[54] As the UK Supreme Court recently explained in *Philipp v Barclays Bank UK plc* [2023] UKSC 25, [2024] AC 346 at [29]: "*As in the case of every contractual agency, a bank is bound to act in accordance with the authority conferred upon it by its principal and to perform what it has agreed to do*".[55]

142    The starting point in determining the scope of any agency relationship between SVB and the Cayman Depositors is the terms of the Deposit Agreements.

143    Of the three types of Deposit Agreement, the only Agreement that expressly purports to appoint SVB as agent is the Sweep Account Agreement, and the scope of that authority is limited to processing "*the transfer of your balances between the Deposit Account and the SVB Eurodollar Sweep Account.*"[56]

144    There is otherwise no language in the Deposit Agreements that could support the existence of an agency relationship between the JOLs (acting on behalf of SVB as the party to the Deposit Agreements) and the Cayman Depositors. On that basis, I have been unable to ascertain any basis on which there could be a contractual agency relationship, granting authority to the JOLs to bring claims on behalf of the Cayman Depositors.

145    The JOLs also suggest that an agency relationship arises from "*implicit agreement and ratification*": First Amended Adversary Complaint at [149]; Second Amended Proof of Claim at [132]. *Bowstead & Reynolds* confirms at [2-057] that the notion of ratification of acts taken without authority can apply to Court filings. In support, they cite *Causwell v The General Legal Council* [2019] UKPC 9 ("**Causwell**") and *McHugh v Eastern Star Gas Ltd* [2012] NSWCA 169 ("**McHugh**").

146    In *Causwell*, the Privy Council held (at [16]) that whether the authorized filing of legal proceedings could be ratified turned on whether the initial act of filing those proceedings without authority was treated as a nullity. Acts which are a nullity cannot be ratified. If, here, the JOLs' act of filing the Adversary Complaints and Proofs of Claim without authority was treated as a nullity as a matter of US law, then under the common law principles of agency, those acts could not later be ratified.

147    In *McHugh*, the New South Wales Court of Appeal, relying on earlier English and Australian authority, noted (at [56]) that "*[w]hether the conduct of the principal amounts*

---

[54] This case has not been included within Exhibit 2 but it can be made available upon request.

[55] As above.

[56] Clause 1 of that Agreement provides: "*You appoint us and our representatives to act as your agent to process the transfer of your balances between the Deposit Account and the SVB Eurodollar Sweep Account, as set forth below. You instruct and authorize us to establish the SVB Eurodollar Sweep Account in your name and for your account. Transactions will be recorded in the SVB Eurodollar Sweep Account assigned by us.*" In any case, I understand that the Sweep Account depositors were afforded FDIC insured status (Chapter 15 Opinion at 13 and n.4), meaning that they do not form part of the Cayman Depositors on behalf of whom the JOLs purport to act.

*to ratification is a question of fact, but there should be 'clear adoptive acts'"* and that *"the conduct must be unequivocal"*.

148    In the present case, it is not clear on the face of the First Amended Adversary Complaint or the Second Amended Proof of Claim which facts are said to support this *"implicit agreement and ratification"*, but I assume it is the matters set out at [149]-[160] of the First Amended Adversary Complaint and [132]-[140] of the Second Amended Proof of Claim. On any view, I do not consider that any of these pleaded matters constitute a *"clear adoptive act"* or can fairly be said to be *"unequivocal"* acts of ratification.

**Irrelevance of Sanction**

149    To the extent the JOLs may seek to rely on the granting of the October Sanction Order to suggest that the Cayman Court has explicitly ruled that, as a matter of Cayman law, the JOLs have the power to act on behalf of the Cayman Depositors as their agent, I would respectfully disagree for four reasons.

150    *First*, it is important to be clear about what the Court's sanction can and cannot do. The Court <u>can</u> sanction powers sought to be exercised pursuant to the JOLs' appointment, functions and duties, under the statutory scheme. It is a process which is subsidiary to those matters, relating to the exercise of powers within their appointment. But the Court <u>cannot</u>, on a sanction application, expand the duties of the JOLs beyond their appointment, functions and duties under the statutory scheme, which would be the effect of seeking to rely on the October Sanction Order to say the JOLs were thereby somehow granted the power to act as agent of the Cayman Depositors. This would be a power <u>beyond</u> their appointment, functions and duties. As an example of this, the power to sanction proceedings under Schedule 3, Part I of the Act expressly relates to sanction of the power *"to bring or defend any action or other legal proceeding <u>in the name and on behalf of the company</u>,"* (emphasis added)*"* and not to power to sanction the filing of actions or proceedings <u>on behalf of creditors</u>.

151    *Second*, as I have already explained in paragraphs 67 to 69 above, in a sanction application, the Court is generally deferential to the commercial views of liquidators. As it relates to the filing of legal claims, the Court is only considering whether those claims are arguable: see paragraph 70 above. In my view, it follows that the most that could be said is that, had the matter been explicitly brought to the Court's attention, the Court was satisfied that this point was arguable.

152    *Third*, and relatedly, it is not possible to accurately assess what the Court has considered because the materials that were put before the Court have been sealed. Whilst that may have been appropriate in the case of privileged material that was put before the Court, it does limit the ability to safely draw conclusions about the level of detail the Judge was

provided with, particularly where he was being asked to retrospectively approve the filing of three dense foreign legal filings (the Initial Adversary Complaint, the First Amended Proof of Claim, and the Complaint in the *Ledwidge v. FDIC* Proceedings), where the references to the JOLs acting as agents of the Cayman Depositors were interspersed and rolled-up with references to the more accurate position that liquidators act on behalf of the entity over which they were appointed.[57]

153     *Fourth*, since the Court made the October Sanction Order, the First Amended Adversary Complaint and the Second Amended Proof of Claim – neither of which were before the Court on the application for the October Sanction Order[58] – have been filed. These documents have further refined the basis on which the agency relationship is said to arise (such as, for example, appearing to withdraw reliance on the Deposit Agreements, and adding the idea that there has been implicit agreement, or ratification, by the creditors). This indicates that the JOLs did not have a settled theory as to how it is the alleged agency relationship with the creditors was said to arise at the time of the October Sanction Order.

154     For these reasons, in my view, it cannot be said that by making the October Sanction Order, Doyle J can be taken to have decided that the JOLs are the agents of the creditors.

**Denial of Agency Relationship Does Not Deny Claim**

155     I note for completeness that the denial of an agency relationship does not mean that the Cayman Depositors would be without a remedy under Cayman law, if they do in fact have independent claims against SVBFG. Those claims would simply need to be brought by the Cayman Depositors directly in their own names (as opposed to indirectly through the JOLs, purporting to act on their behalf).

**Conclusion**

156     For the reasons noted, in my opinion it is clear that the JOLs do not have the power to bring legal proceedings on behalf of the Cayman Depositors.

---

[57] See for example First Amended Proof of Claim at [97] (*"the JOLs, acting on behalf of the SVB Cayman estate and as the exclusive agent of SVB Cayman's creditors-depositors"*); Initial Adversary Complaint at [5] (*"The JOLs are court-appointed fiduciaries of the SVB Cayman estate, tasked with administering the assets of SVB within the territorial jurisdiction of the Cayman Islands, with standing to bring claims on behalf of SVB Cayman as well as the exclusive agent of SVB Cayman's depositors-creditors. On behalf of the SVB Cayman estate as well as its depositors-creditors, the JOLs bring this action"*).

[58] I infer this from the fact they were not mentioned in the October Sanction Order and were filed after that Order was made.

## VII WHAT ARE THE TYPES OF CLAIMS THAT CAN AND CANNOT BE BROUGHT BY LIQUIDATORS AS PART OF A CAYMAN ISLANDS LIQUIDATION?

157     I now turn to address the question of what claims can and cannot be brought by the liquidators as part of a Cayman liquidation. Before I address the specific claims that have been brought in this case, it is necessary to address the following preliminary points of Cayman law:

(a)     The Winding Up Order did not have the effect of creating a separate legal entity. This is relevant because, as I explain below, claims that could have been brought by a company prior to a winding up order can equally be brought after the winding up order, and are properly brought in the name of the company itself.

(b)     What property is subject to liquidation proceedings – in the sense of being able to be realized for the benefit of those entitled under the statutory scheme of distribution – is determined by the *lex situs* of the property. As I explain below, if ownership of property is validly transferred prior to the making of a winding up order, that property will not be subject to the liquidation. This principle applies to intangible property, such as choses in action.

(c)     In terms of available remedies, unless the recipient of property continues to hold that property or its traceable proceeds (or it can be traced into the hands of third parties who are not bona fide purchasers for value without notice), the relief that will be available to a claimant as against that recipient is personal, not proprietary, in nature (i.e. it is an ordinary unsecured claim).

158     I will now explain these preliminary points in more detail, before addressing the specific claims that have been brought by the JOLs.

**Preliminary Matters**

The Winding Up Order Did Not Create a Separate Legal Entity

159     I am aware that the issue of whether the Winding Up Order has the effect of creating a separate legal entity arose during the hearing on July 18, 2024: see Transcript at 43-45, 62, 74. I understand this may have arisen because the JOLs submitted that the Winding Up Order *"created a separate estate and trust on behalf of SVB Cayman and its creditors"*: JOLs' Standing Memorandum at 4 (emphasis added).

160     It is not clear whether the JOLs maintain this point. In the First Amended Adversary Complaint (at [93]) and the Second Amended Proof of Claim (at [125]), the JOLS now state that *"[t]he Cayman Proceeding is an ancillary winding up of a U.S. Bank in the*

*Cayman Islands*". The JOLs have also (by the October Sanction Order) sought to update the caption in the Cayman Proceedings to reflect the fact they have been appointed as liquidators of SVB, not liquidators of the Cayman Branch.[59] In the event that this point continues to be at issue, and because it provides clarity in relation to claims that may be brought by liquidators, I will address it below.

161    As a factual matter, it is accepted that the Cayman Branch was not separately incorporated in the Cayman Islands: Chapter 15 Opinion at 23-24. In my opinion, the Winding Up Order did not have the effect of creating a separate entity. I will make three points that support my conclusion.

162    *First*, it is well-established that, as a matter of Cayman (and English) law, branches are not treated as if they are separate legal entities.[60] As Smellie CJ noted in *Re Bank of Credit and Commerce International (Overseas) Limited* [2009 CILR 373] at [5]: "*The laws of the Cayman Islands, under the principle of universality, do not recognize a branch as being a separate legal entity from the head office*". See also *Re Bank of Credit and Commerce International SA* [1992] BCLC 570 (Ch) at 574.[61]

163    This aligns with how Doyle J understood the position in the present case. As the Judge noted at [53] of the Winding Up Judgment, "*[u]nless I have fundamentally misunderstood the position... a branch is not a separate legal entity.*"

164    *Second*, a winding up order does not in itself affect the corporate personality of the company: *McPherson & Keay* at [7-004].[62] As noted in paragraph 73 above, it does not have the effect of dissolving the company. That occurs at the conclusion of the liquidation, at which point the company's corporate existence ends: Companies Act, s 152(1).

---

[59] From my review of the Cayman Court file, it appears that when the winding up petition was filed, it was erroneously filed in respect of the branch rather than the Bank. As noted above, this was then rightly corrected by Doyle J prior to the Winding Up Order being made. However, the caption of the proceedings "*SILICON VALLEY BANK (CAYMAN ISLANDS) BRANCH*" was only recently updated to reflect the Order that had actually been made: October Sanction Order at [9] ("The heading or caption of this matter be amended to "*SILICON VALLEY BANK (IN OFFICIAL LIQUIDATION) FSD No. 163 of 2023 (DDJ)*")

[60] There is a reference to winding up a "*local branch*" in s 242(2) of the Act, which falls within Part XVII. As noted in paragraph 93 above, that part addresses "*International Co-operation*" and the assistance that the Cayman Court can provide to foreign bankruptcy proceedings. In my view, it is apparent from the structure of the Act and the legislative history that the reference here to "*local branch*" is an awkward cross-reference back to the Court's jurisdiction to wind up a "*foreign company*" in s 91(d). That is consistent with the Memorandum of Objects and Reasons for the Bill that became the Companies (Amendment) Act 2007 at 4, which noted that "*[t]he jurisdiction of the Court is extended by section 91 to enable it to make winding up orders in respect of the Cayman branches of foreign companies... registered under the Cayman Islands law.*"

[61] In this decision of the English High Court, Browne-Wilkinson V-C noted that "*[t]his winding-up petition is a petition to wind up BCCI as a whole, not simply the United Kingdom branch of it. A winding-up petition could not be brought simply to wind up the English branches of BCCI.*"

[62] The authors note that in the case of an official liquidation, "*it has always been assumed that [the] liquidation... does not affect the corporate personality of the company, which remains a separate entity from the members who comprise it, and that the powers of the company are neither restricted nor enlarged by the fact that it has gone into liquidation*" (footnotes omitted).

165    *Third*, as I have addressed above, whilst it is said that after a winding up order has been made, the assets of the company are held on "*statutory trust*", it is not contested that the company remains the legal owner of the property during the liquidation process (see paragraph 113 above). Moreover, as has already been established, the "*statutory trust*" is not a true trust. More fundamentally, under Cayman (and English) law, a trust is not a separate legal person as distinct from the trustee(s): *Equity Trust (Jersey) Ltd v Halabi* [2022] UKPC 36, [2023] AC 877 at [58] ("*A trust is not an institution, still less a legal person, separate from the trustee. A trust is essentially the obligations enforceable in equity against the trustee*"); *Gayhart v Buchanan* (unrep., 14 August 2020, Kawaley J) at [22] ("*a trust has no separate legal personality*").[63]

166    The further reference to the word "*estate*" adds little more in the context of corporate insolvency. In fact, when the JOLs first applied for the January Sanction Order, they sought an Order that the Court make a declaration that the "*the JOLs are the representatives of an estate and/or a trust*" (emphasis added), indicating a conceptual 'hedging of the bets' as to which of these terms were more appropriate: Summons dated January 10, 2024 at [2]. The JOLs ultimately submitted to Doyle J that the "*estate*" represents the assets that fall "*within [the] statutory trust*": January Sanction Order Skeleton at [30].

167    In my experience in the Cayman Islands, in the corporate insolvency context, the word "*estate*" is most often used as a shorthand descriptor to describe the corpus of assets and liabilities that are being administered as part of the liquidation process.[64] "*Estate*" is not a term that is statutorily defined in the Companies Act. To the extent it has any established meaning in the case law, it is to recognize that there is authority to the effect that the proceeds of successful statutory avoidance claims are not considered "*assets of the company*" but are rather held for the benefit of creditors: *ICP Strategic Credit* at [15]; *Primeo* at [19]-[20].[65]

168    Of course, in the January Sanction Order, Doyle J agreed (at [2]) to include a statement that "*[t]he JOLs are the representatives of an estate and a trust that is subject to Cayman Islands proceedings*". But the context for that Order is important. The record shows that this statement was included because it was intended to be helpful to the US Court for the

---

[63] These cases have not been included within Exhibit 2 but can be made available upon request.

[64] See for example *Stichting Shell* at [15] (as quoted in paragraph 173 below); *Rubin v Eurofinance SA* [2012] UKSC 46, [2013] 1 AC 236 at [114] (referring to the types of claims available to swell the "*insolvent estate*"); *Re Omni Securities (No 5)* [2000 CILR 187] at 190 (referring to realizing the assets of the "*liquidation estate*"). The latter case has not been included within Exhibit 2 but can be made available upon request.

[65] This convoluted result is to ensure that such proceeds are not simply paid to a secured creditor that has a charge over all of the assets of the company: *Re Yagerphone* Ltd [1935] Ch 392; *McPherson & Keay* at [11-202].65 I have seen no suggestion that technical distinction would be relevant on these facts in any case.

purposes of the Chapter 15 recognition application. As I have already noted, the January Sanction Order Skeleton stated at [26]:

> "*At pages 5 and 6 of his letter to the JOLs, Mr Gluck explains that Chapter 15 recognition is not limited to foreign representatives of natural or legal persons but also applies to foreign representatives of "trusts" or "estates". It is submitted that it will be helpful to the US Court in considering the Chapter 15 application if this Court were to determine as part of this application within the winding up proceedings that as a result of the Grand Court's Order of 29 June 2023 the JOLs are representatives of a "estate or trust" as a matter of Cayman Islands law.*"

169    The Skeleton Argument that was put before the Judge relied (at [28]) on *Ayerst* for the proposition that a company's assets are held on statutory trust. In that context, I consider that in referring to an "*estate and a trust*", the Judge was using those terms in the same way that they are commonly understood in the Cayman law of corporate insolvency. And as I have already addressed in detail, *Ayerst* itself makes clear the "*statutory trust*" is not a true trust. Instead, it is a useful shorthand to recognize that upon a winding up order being made, the prior stakeholders are substituted for those persons entitled to share under the statutory scheme of distribution. As I have just explained, "*estate*" is used in a similar way.

170    In my view, it would be quite wrong to take the terms of an Order that was issued for a specific purpose – to assist the US Court for the purposes of a (since dismissed) Chapter 15 application – and characterize it as having substantive effect in support of the novel propositions that (i) a company after a winding up order is legally distinct from that which existed prior, or (ii) a winding up order (or any subsequent order) may create a new legal entity that did not exist prior to such orders being made.

171    For those reasons, in my view it is clear that as a matter of Cayman law, the Winding Up Order did not have the effect of creating a new entity that is legally distinct from SVB itself. This has relevance to the claims that the liquidators are entitled to bring because, as I explain below, claims which could have been brought by SVB prior to the Winding Up Order can continue to be brought by SVB.

## What Property is Subject to a Cayman Liquidation Depends on Proprietary Interests Determined by the *Lex Situs* of the Property

172    Aside from the limitations that are generally recognized to exist in the case of ancillary winding up (which I have outlined above), in cross-border cases there is a separate question as to whether property has come into, and forms part of, the liquidation estate (to use that term in the sense described above).

173    The question of whether property (including choses in action/causes of action) properly comes into a liquidation estate is determined by the *lex situs* of the property.[66] In *Stichting Shell*, the Privy Council relevantly explained at [15] that:[67]

> "The lex situs is of course relevant to the question what assets are truly part of the insolvent estate. It will generally determine whether the company had at the relevant time a proprietary interest in an asset, and if so what kind of interest. Thus, if execution is levied on an asset of the company within the territorial jurisdiction of a foreign court before the company is wound up, it will no longer be regarded by the winding up court as part of the insolvent estate."

174    Thus, if property is situated in another jurisdiction, and under the law of that jurisdiction that property is validly transferred from the company to another person prior to the company being wound up, that property will not be subject to the liquidation.

175    It is therefore necessary to identify the *lex situs* of the property at issue. The relevant property here is choses in action, i.e. alleged legal claims against SVBFG. The leading text on conflict of laws, Lawrence Collins and Jonathan Harris (eds), *Dicey, Morris & Collins on the Conflict of Laws* (16th ed, Sweet & Maxwell, 2022) ("*Dicey, Morris & Collins*"), sets out the following rule for determining the *lex situs* of such assets (rule 136 [23R-023]): "*Choses in action generally are situate in the country where they are properly recoverable or can be enforced.*" That rule was cited with approval in the Cayman Islands in *Schroder Cayman Bank and Trust Company Ltd v Schroder Trust AG* [2015 (1) CILR 239] ("*Schroder*") at [46].

176    The general rule is that choses in action are "*properly recoverable*" in the jurisdiction where the defendant resides. In the English case of *Jabbour v Custodian of Israeli Absentee Property* [1954] 1 WLR 139 (QB), the Court noted (at 145) that "*[i]t is established by the decided cases that not only debts, but also other choses in action, are for legal purposes localized and are situated where they are properly recoverable <u>and are properly recoverable where the debtor resides</u>*" (citing several earlier authorities) (emphasis added).[68]

---

[66] It is well-established that choses in action are treated as an asset of the company for the purposes of the winding up process: *ICP Strategic Credit* at [15]; *McPherson & Keay* at [11-003].

[67] While *Stichting Shell* was considering an appeal from the British Virgin Islands, the Privy Council's decision has been cited with approval several times in the Cayman Islands: see for example *Re Ardent Harmony Fund Inc (in Official Liquidation)* (unrep., 31 May 2016, Smellie CJ) at [31]-[43]; *Re China Agrotech Holdings Ltd* [2017 (2) CILR 526] at [30](b), [33](c)(ii) and [34](d); *Re Wimbledon Fund, SPC (in Voluntary Liquidation)* (unrep., 14 December 2017, Parker J) at [11]-[15], reported in [2017 (2) CILR Note 10]. Other than *China Agrotech*, these cases have not been included within Exhibit 2 but can be made available upon request.

[68] That general principle was reaffirmed by the Privy Council in *Kwok v Commissioner of Estate Duty* [1988] 1 WLR 1035 (PC)

177     For these purposes, a company is considered to reside in all of the jurisdictions where it carries on business: *Masri v Consolidated Contractors International Company SAL* [2011 (1) CILR 79] at [30], citing *New York Life Insurance Co v Public Trustee* [1924] 2 Ch 101 (CA) [69] at 120 and *Kwok v Commissioner of Estate Duty* [1988] 1 WLR 1035 (PC) at 1041. It is my understanding that SVBFG is incorporated in the State of Delaware. I am not aware of SVBFG itself (as distinct from SVB) ever having carried on business in the Cayman Islands. Accordingly, it would appear that any claims against SVBFG would be situated, according to the principles of Cayman law, in the State of Delaware.

178     It follows that if, according to the state or federal laws applicable in the State of Delaware, claims that SVB had against SVBFG were validly transferred to the FDIC prior to the commencement of the Cayman Proceedings (deemed to occur on the filing of the Winding Up Petition on June 13, 2023 (Chapter 15 Case, Dkt. No. 42-13)), that transfer would be recognized as a matter of Cayman law. Such claims would not be considered to come into the liquidation estate.[70]

<u>Relief is Personal, and Not Proprietary Unless the Property is Still Held by the Recipient or is Traceable into the Hands of Third Parties</u>

179     Given that the Initial Adversary Complaint and First Amended Adversary Complaint appear to be predicated on the basis that proprietary relief (i.e. relief *in rem*) is available in respect of the claims made, it is helpful to address this matter at this stage.

180     The Initial Adversary Complaint (at [5]) and First Amended Adversary Complaint (at [9]) suggest that the effect of Cayman law is that, if the claims put forward in those documents are successful, a constructive trust would be imposed over SVBFG's "*cash in the amount of the Upstream Distribution for the benefit of the SVB Cayman estate*". The JOLs also state that "*SVBFG has nothing more than bare legal title to the Upstream Distribution.*"

181     I will provide an overview of the claims that the JOLs have made below. For current purposes, it is sufficient to note that the claims that are made in relation to the Upstream Distribution are that it was unlawful as a matter of Cayman corporate law and/or that the

---

at 1040-1041 (which was cited in the Cayman Islands in *Schroder* at [46]). See also *The Ocean Marine Insurance Company Ltd v CSR Ltd* [2012] NSWSC 1229 at [68]; Adrian Briggs, *The Conflict of Laws* (5th ed, Oxford University Press, 2024) at 325-326 (these materials have not been included in Exhibit 2 but can be made available upon request).

[69] This case has not been included in Exhibit 2 but can be made available upon request.

[70] As explained at paragraph 201 below, this analysis does not apply to the Statutory Avoidance Claims (as defined below), being ss 145, 146 and 147 of the Companies Act, which only vest in the liquidator as at the date of their appointment. So insofar as, and only to the extent that, that is what is suggested in the final sentence of [140] of the First Amended Adversary Complaint, I would agree. However, whether the FDIC obtained recognition or not is irrelevant to that issue. There are, however, different problems in respect of the Statutory Avoidance Claims, as I explain in detail from paragraph 202 onwards below.

Upstream Distribution is liable to be set aside under the Cayman statutory avoidance provisions in ss 145, 146, and 147 of the Companies Act and s 4 of FDA.

182    First addressing the corporate law claim, whilst the cases do often refer to the recipient of unlawful dividends as "*liable to account as constructive trustee*", the reference to a trust in this context is (like the "*statutory trust*") liable to mislead. In cases where the recipient still holds the asset that is the subject of the claim, or its traceable proceeds, the claimant has a proprietary right to the asset in the hands of the recipient. Where the asset (or its traceable proceeds) is no longer available, the claimant may still have a claim against the recipient, but that claim is personal in nature.[71]

183    Neither the Initial Adversary Complaint nor the First Amended Adversary Complaint assert that the cash that is held by SVBFG is the same cash that was received at the time that the Upstream Distribution was paid in Q4 of 2022. Without such an assertion being made and then proven, from a Cayman law perspective, there is a fundamental flaw in the claim to proprietary relief. As a factual matter, I am instructed that the cash now held by SVBFG principally derives from the sale of SVB Capital as part of this bankruptcy process. If that is factually correct, it would preclude any proprietary claim by the JOLs to this unrelated asset.

184    The analysis is the same with respect to the Statutory Avoidance Claims.[72] In that context, the Privy Council has held that whilst the legislation may invalidate transactions, the actual form of remedy is left to the common law: *Skandinaviska Enskilda Banken AB (Publ) v Conway* [2019] UKPC 36, [2019 (2) CILR 245] at [63]. In that case, the Board explained at [75] that "*where property has been transferred and remains in the hands of the transferee, the consequence of the avoidance is to deprive the transferee of his title. The liquidator therefore has a claim to recover the property on the basis of the company's title.*" In other words, the liquidator (on behalf of the company) has a proprietary claim to the return of that property. However, on the facts of that case, like the pleadings in the present case, there had been no claim to particular property and no attempt made to trace the proceeds (at [76]). In the absence of such a claim, the Board noted that "*the liquidators are in principle entitled to restitution of a payment which is avoided under section 145 at*

---

[71] *Byers v Saudi National Bank* [2023] UKSC 51, [2024] AC 1191 at [42], [157]; Lynton Tucker & Ors (eds), *Lewin on Trusts* (20th ed, Sweet & Maxwell, 2020) at [8-012]; Paul Matthews & Ors (eds), *Underhill & Hayton: Law Relating to Trusts and Trustees* (20th ed, Lexis Nexis, 2022) at [3.7] (citing at n.1 *DD Growth Premium 2X Fund (In Official Liquidation) v RMF Market Neutral Strategies (Master) Ltd* [2017] UKPC 36, [2017 (2) CILR 739] ("***DD Growth***")). *Lewin on Trusts* and *Underhill & Hayton* have not been included within Exhibit 2 but can be provided upon request.

[72] See paragraph 186(d) below.

*common law on the ground of unjust enrichment.*" Such an unjust enrichment claim is personal, rather than proprietary, in nature.[73]

185    It follows from this analysis that, unless further amendments are made, in my view, the JOLs' pleaded case does not support a proprietary remedy in Cayman law.

**The JOLs' Claims in This Case**

186    Before I substantively assess whether the JOLs have the power to bring the claims as a matter of Cayman law, it is helpful to briefly summarize what those claims actually are:

(a)    **Unlawful Dividend Claim**: The JOLs have alleged that the Upstream Distribution was an unlawful distribution which was prohibited by s 34(2) of the Companies Act and/or Cayman common law: Initial Adversary Complaint at [117]; First Amended Adversary Complaint at [168](v); First Amended Proof of Claim at [101](b)(v); Second Amended Proof of Claim at [146](v).[74] It is further alleged that "*[u]nder Cayman law, a shareholder who receives an unlawful distribution may be liable for the amount of that distribution, as a constructive trustee, on the basis of knowingly receiving the distribution and the circumstances that it was unlawful*": Initial Adversary Complaint at [118]; First Amended Adversary Complaint at [165]. As to relief, the JOLs say that "*[u]nder Cayman Law, a constructive trust should be imposed over the cash of Defendant in the amount equal to the Upstream Distribution*", such relief being stated to be "*for the benefit of the SVB Cayman estate and its depositors-creditors*": Initial Adversary Complaint at [120]; First Amended Adversary Complaint at [169]. I will refer to this as the "**Unlawful Dividend Claim**".

(b)    **Breaches of Fiduciary Duty**: The JOLs have alleged that SVBFG is liable for breaches of fiduciary duties owed to SVB and its stakeholders. It is said that "*SVBFG breached its duties (and aided and abetted the breach of duties of SVB's and SVBFG's overlapping Board and Management) through the mismanagement of SVB and the SVB Cayman breach as set forth above*": First Amended Proof of Claim at [101](a). This claim appears to have been dropped by the JOLs given that

---

[73] See for example *Ahmad Hamad Algosaibi and Brothers Co v Saad Investments Company Ltd* [2021 (2) CILR 704] at [956]-[958], where the Cayman Islands Court of Appeal considered "*claims of dishonest assistance, conspiracy and unjust enrichment*" (emphasis added) and held that such claims "*are all personal claims. A remedy in the event of success would be an award of damages or equitable compensation*" and that a successful applicant "*would rank pari passu with other unsecured creditors of the relevant respondent in respect of any such damages or compensation.*" This very lengthy case has not been included within Exhibit 2 but it can be made available upon request.

[74] The First Amended Adversary Complaint and the First and Second Amended Proofs of Claim refer to the common law whereas the Initial Adversary Complaint does not.

it has not been included in the Second Amended Proof of Claim. Accordingly, it will not be my focus below.

(c) **Negligence Claims**: The JOLs have alleged in their Second Amended Proof of Claim that SVBFG is liable to SVB and the Cayman Depositors under three different theories of negligence (none of which are said to be governed by Cayman law), which I will refer to as the "**Negligence Claims**":

(i) First, that SVBFG was negligent in its *alleged failure to properly oversee SVB and its Cayman operations* and is consequently liable to SVB (Count II);

(ii) Second, that SVBFG is *vicariously liable to SVB for the alleged negligence of SVB's management* (Count III); and

(iii) Third, that SVBFG is liable to SVB and the Cayman Depositors for its *alleged negligent oversight of SVB which resulted in the invocation of the systemic risk exception* and consequent loss to the Cayman Depositors and "*SVB Cayman Estate*" (Count IV).

(d) **Statutory Avoidance Claims**: The JOLs have alleged that they have three statutory avoidance claims in relation to the Upstream Distribution which arise under the Companies Act, which I will refer to as the "**Statutory Avoidance Claims**": First Amended Proof of Claim at [101](b); Second Amended Proof of Claim at [146]; First Amended Adversary Complaint at [168]. In particular, the JOLs have asserted that:

(i) The Upstream Distribution constitutes a voidable preference under s 145 of the Act;

(ii) The Upstream Distribution constitutes a disposition of property at an undervalue in breach of s 146 of the Act; and

(iii) The business of SVB was carried on with the intent to defraud its creditors in breach of s 147 of the Act.

(e) **Fraudulent Disposition**: The JOLs have alleged that the Upstream Distribution constitutes a fraudulent disposition for the purposes of a separate statute, the Fraudulent Dispositions Act (1996 Revision) (which I have defined above as the "**FDA**"). I will refer to this claim as the "**FDA Claim**".

**Claims That Could Have Been Brought Irrespective of the Liquidation**

187     I now assess whether the JOLs have the power to bring each of the claims made.

188     As noted above, one function of liquidators is to *"collect, realise and distribute the assets of the company"*: Companies Act, s 110(1)(a). It is well-established that *"assets"* can include rights of action that could have been brought by the company prior to the liquidation: *ICP Strategic Credit* at [15]; *McPherson & Keay* at [11-003]; *Goode* at [5-04] and [6-04].

189     Accordingly, liquidators can (with the sanction of the Grand Court) cause the company to bring legal proceedings to vindicate its pre-existing rights. Such claims are properly brought in the name of the company. As the authors of *McPherson & Keay* explain at [11-195] (footnotes omitted, emphasis added):[75]

> *"Liquidation does not have the effect of depriving the company of its corporate state or corporate powers, including its power of taking proceedings for the recovery and protection of its property. Hence, whenever the object of proceedings is to recover a debt, or to recover or protect property the title to which is in the company, the liquidator ought to sue in the name of the company and not in his or her own name. So that if a liquidator decides to take action against a director of the company on the basis that there was a breach of directors' duties, the liquidator must bring the proceedings, for the loss suffered by the company, in the name of the company."*

190     It follows that, from a Cayman law perspective, the JOLs' claims (other than the Statutory Avoidance Claims) have been improperly brought, given that SVB has not itself been named as a plaintiff. I cannot comment on how this may interact with any US procedural (e.g. proper party or plaintiff, or standing) requirements.

Unlawful Dividend Claim

191     Subject to the points noted below, the Unlawful Dividend Claim also falls into the category of claims that could have been brought irrespective of SVB being put into liquidation. It does not turn on SVB now being placed into liquidation. Rather, it is based on the alleged unlawfulness of the payment at the time that it was made. Under Cayman law, if an unlawful dividend is paid to a shareholder, who has knowledge of the relevant facts, that shareholder is liable to repay that dividend to the company: *DD Growth* at [8], [58], [64]; *Re Omni Securities (No 5)* [2000 CILR 187] at 191.

---

[75] See also *Goode* at [5-04] (*"On behalf of the creditors, the liquidator can bring proceedings in the name of the company in respect of causes of action vested in the company"*) and n.47 (*"The liquidator has no power to bring proceedings in their own name except where provided by statute"*, citing *Kirkpatrick v Snoozebox Ltd* [2014] BCC 477); *Loose & Griffiths* at [1.5] (*"if the liquidator litigates so as to recover assets belonging to the company or to enforce obligations owed to it, he must do so in the name of the company and not in his own name"*).

192   On the facts of this case, however, there are two reasons why the Unlawful Dividend Claim cannot be brought as a matter of Cayman law.

193   *First*, there is no <u>Cayman law</u> claim that is available to the JOLs. I say this because:

(a)   The JOLs rely at least in part on s 34(2) of the Companies Act.[76] That section specifically regulates the payment of dividends out of the 'share premium account'. That is an account that may, if permitted under the company's constitutional documents, be established to reflect the difference in value between the nominal value of shares and the actual consideration paid for those shares. Distributions may only be made from the share premium account where, "*immediately following the date on which the distribution or dividend is proposed to be paid, the company shall be able to pay its debts as they fall due in the ordinary course of business*": s 34(2).

(b)   Section 34(2) has no application to foreign companies. As a matter of straightforward statutory interpretation, for most purposes, the word "*company*" is defined in the Act to mean "*a company formed and registered under this [Act]*": s 2(1). In other words, the reference is to a company that has been incorporated in the Cayman Islands itself. On that definition, SVB would not fall within the definition of "*company*", and accordingly s 34(2) would have no application.

(c)   The definition of "*company*" is extended to include a "*foreign company*" in Part V of the Act: s 89. However, s 34 does not fall within Part V – it falls within Part III – and therefore the extended definition of "*company*" in Part V has no application to s 34.

(d)   This analysis is supported by the general principles of Cayman private international law. *Dicey, Morris & Collins* rule 187(2) [30R-020] provides that "*all matters concerning the constitution of a corporation are governed by the law of the place of incorporation*".[77] This specifically includes "*the ability of the corporation to make a distribution to its members*" (*Dicey, Morris & Collins* at [30-030]) (footnote omitted). It follows that under the Cayman rules of private international law,

---

[76] First Amended Adversary Complaint, First Count, at [164]: "*Under Cayman law, a distribution to shareholders is unlawful and prohibited under Section 34(2) of the Companies Act to the extent that the distribution was made at a time when the company was insolvent.*"

[77] This rule (together with its equivalent in predecessor editions of *Dicey, Morris & Collins*) has been cited with approval in the Cayman Islands on several occasions: see for example *Silver Base Group* at [8] (where Doyle J described it as a "*fundamental principle*"); *GTI Holdings* at [35] (quoting from *Silver Base Group*); *Re Reserve International Liquidity Fund Ltd (in Liquidation)* (unrep., 16 April 2010, Jones J) at [11] (noting that the rules are "*very well established*"). See also Alistair Alcock, *Gore-Browne on Companies* (loose-leaf, 45th ed, Lexis Nexis, 2024) at 63[48]-[54]. These materials have not been included within Exhibit 2 but can be made available upon request.

whether SVB can lawfully make a distribution to its members/shareholders is a question to be decided under California law.

194    *Second*, even if there was a claim that existed under Cayman (or California) law, if the effect of the FDIC process is that all property of SVB was transferred to the FDIC sometime prior to June 13, 2023,[78] I consider that the analysis in paragraphs 172 to 178 above would apply. Whether these choses in action came into the Cayman liquidation estate would be determined by the law of their *situs*, and that is ordinarily determined by the residence of the debtor. SVBFG is incorporated in the State of Delaware and causes of action against it would be considered to be situated in that jurisdiction. A transfer of the assets in accordance with the laws of that jurisdiction would be recognized and given effect under Cayman law. Accordingly, these claims would not have come within the Cayman liquidation estate.

195    For these reasons, in my view applying Cayman law, the JOLs cannot pursue the Unlawful Dividend Claim.

Negligence Claims

196    The analysis with respect to the Negligence Claims is effectively the same. Ordinarily, a negligence claim that could have been brought by a company prior to it being wound up could be brought by the liquidators (acting in the name of the company) during the course of the liquidation. That claim is considered to be property of the company to be realized by the liquidators.

197    However, because these claims (which relate to events that occurred, and loss that was suffered, prior to the commencement of the Cayman Proceedings) are brought against SVBFG, they would be considered to be situated in the State of Delaware. Valid transfers of property in accordance with the laws of the State of Delaware would be given effect under Cayman law.

198    For completeness, I note that to the extent the Negligence Claims are pursued in relation to loss that has been suffered by the Cayman Depositors[79] (as distinct from SVB itself), because the JOLs do not have the power to bring claims on behalf of creditors directly (see **Section VI** above), I do not consider that the JOLs have the power to bring those claims. Instead, from a Cayman law perspective, such claims ought to be brought by the Cayman Depositors directly.

---

[78] When the Winding Up Petition was filed and the liquidation of SVB was deemed to commence: Companies Act, s 100(2).

[79] See [149], [152]-[153], and [155] of the Second Amended Proof of Claim, which each allege harm suffered by Cayman Depositors.

**Statutory Claims that Can be Brought in a Liquidation**

199    In addition to claims that could have been brought irrespective of the liquidation, there are statutory claims that official liquidators can bring to swell the assets that are available to creditors. These are the Statutory Avoidance Claims that have been relied on by the JOLs.

200    To provide an overview of what these claims require:

(a)    **Voidable preference under s 145 of the Act**: Under this section, a payment or transfer that is made within six months immediately prior to the commencement of the winding up (i.e. the filing of the winding up petition), at a time when the company is unable to pay its debts (i.e. cash flow insolvent),[80] may be avoided if it is made "*in favour of any creditor… with a view to giving such creditor a preference over the other creditors*". A payment made to a creditor that is a related party of the company (which is defined to mean where the creditor "*has the ability to control the company or exercise significant influence over the company in making financial and operating decisions*") is deemed to be made with a view of preferring that creditor.

(b)    **Disposition at an undervalue under s 146 of the Act**: This section provides that "*[e]very disposition of property made at an undervalue by or on behalf of a company with intent to defraud its creditors shall be voidable at the instance of its official liquidator.*"

(c)    **Fraudulent trading under s 147 of the Act**: Under this section, the Court may order that a person make a contribution to the assets of the company if that person was knowingly party to the company being "*carried on with intent to defraud creditors*" or "*for any fraudulent purpose*".

201    These statutory avoidance claims are vested in the liquidators personally, rather than in the company itself, and so are properly brought in the names of the liquidators: *McPherson & Keay* at [11-195]. The JOLs are correct in their statements that these claims are only considered to arise upon the making of the Winding Up Order: Second Amended Proof of Claim at [116] ("*these causes of actions or 'choses of action' arise only upon the making*

---

[80] The Cayman Courts have held that the "*unable to pay its debts*" test does permit the consideration of debts that "*will become due in the reasonably near future*": *Re Weavering Macro Fixed Income Fund Ltd (in Liquidation)* [2016 (2) CILR 514] ("*Weavering*") at [40] (this point was not addressed in the subsequent Privy Council decision). What counts as "*the reasonably near future*" depends on the circumstances, but it must be sufficiently proximate so as to not turn into a speculative exercise: *BNY Corporate Trustee Services Ltd v Neuberger* [2013] UKSC 28, [2013] 2 All ER (Comm) 531 (sometimes referred to as *Eurosail*) at [37]. See also Rebecca Parry & Ors (eds), *Transactional Avoidance in Insolvencies* (3rd ed, Oxford University Press, 2018) at [4.138], where it is noted that future events should only be referred to where they "*have a high degree of certainty about them.*" For context, in *Weavering* itself, Martin JA expressed the view (at [40]) that it would be artificial to exclude from consideration a debt that was due the following day, i.e. in the very near future.

*of the Winding Up Order*"); see also *Primeo* at [20]; *ICP Strategic Credit* at [15].[81] This means that these claims would not be the subject of the analysis in paragraphs 172 to 178 above regarding the transfer of claims prior to the commencement of the liquidation pursuant to the *lex situs* of the choses in action.

202    Whilst in theory the JOLs do have the <u>power</u> to bring the Statutory Avoidance Claims, on the novel facts of this case, it is my view that other jurisdictional and gateway issues would preclude the Statutory Avoidance Claims being able to proceed if they were brought in the Cayman Court or if the Cayman Court was otherwise required to undertake a fuller review of the territorial effect of the relevant provisions.[82] I say that for four reasons.

203    *First,* in the case of an ancillary liquidation there is a question as to whether the Court ought to permit ancillary liquidators to exercise the powers to bring such avoidance claims extra-territorially. I have addressed this point in detail in paragraphs 80 to 84 above. For ease of reference, the prevailing view is summarized in *Cross Border Insolvency* at [7.66] as follows (emphasis added):

> "*As an ancillary winding up is prima facie limited to assets in England, it must follow that the liquidator's role as a whole is similarly restricted. Thus, although the court has extensive extraterritorial powers under the Act – such as to set aside preferences and transactions at an undervalue – <u>one would not ordinarily expect such powers to be exercised extraterritorially in an ancillary winding up. Indeed, Sir Peter Millett has gone as far as stating that the 'courts should not allow any of the relevant sections to be invoked in an ancillary liquidation'</u>.*"

204    *Second,* even in the case of a full Cayman liquidation (i.e. a Cayman liquidation being the primary liquidation), there is English authority to the effect that there must be a sufficient connection between the transaction that is sought to be challenged and the overseas jurisdiction: *Re Paramount Airways Ltd* [1993] Ch 223 (CA) at 239-240, endorsed more recently in *Bilta (UK) Ltd (in liquidation) v Nazir* (No 2) [2015] UKSC 23, [2016] AC 1 at [110].[83]

205    In the present case, the Upstream Distribution has <u>no</u> apparent connection with the Cayman Islands. It was made from a California incorporated company to a Delaware incorporated

---

[81] In each of these cases, Jones J notes that these causes of action were "*available only to the official liquidator as a result of a winding up order having been made*" (emphasis added). See also Rebecca Parry & Ors (eds), *Transaction Avoidance in Insolvencies* (3rd ed, Oxford University Press, 2018) at [25.12], noting that for officeholder claims, the causes of action are only considered to accrue upon the appointment being made because it is only on that date that the officeholder has the right to sue.

[82] The ultimate relevance of the important further Cayman law considerations to the issues to be determined at the hearing, is obviously a matter for the Court, following argument of the parties' respective counsel.

[83] That authority has been followed in the Cayman Islands in related contexts: *Raiffeisen International Bank AG v Scully Royalty Ltd* [2020 (2) CILR 469] at [172]-[173], [179]-[180]; *Grupo Torras SA v Bank of Butterfield International (Cayman) Ltd* [2002 CILR 550] at [51]; *Re Pelletier* [2020 (2) CILR 581] at [102]-[103]; *Re Pelletier* [2021 (1) CILR 636] at [142]-[154]. Other than *Raiffeisen*, these cases have not been included within Exhibit 2 but can be made available upon request.

company, in a transaction that Cayman law would say is governed by California law (see paragraph 193(d) above). Similarly, there is no pleaded allegation that this payment was made to, from or via the Cayman Islands. Nor is it clear how much, if any, of the Upstream Distribution could be attributed to the activities of the Cayman Branch. Based on the fact that, even on the JOLs' case, SVB customers on a single day (March 9, 2023) withdrew close to 50 times the total deposits attributable to the Cayman Branch, it is fair to assume the connection is, at best, very slim: see First Amended Adversary Complaint at [30] and [74].

206   In circumstances where even in the case of a full Cayman primary liquidation, it appears that there is an insufficient connection to the Cayman Islands, and where there is a good argument (supporting by leading jurists such as Lord Millet) that the exercise of the avoidance powers in ancillary liquidations, extraterritorially, is impermissible (or at the very least, ought to be substantially curtailed), I have serious reservations as to whether Doyle J would consider that he had sanctioned the JOLs to pursue the present case as now formulated, in the absence of a fully reasoned judgment. I return to this point below.

207   *Third*, as a matter of Cayman law, the JOLs could not bring claims in a Cayman Court against SVBFG as a foreign party, without first obtaining leave to serve the claim out of the Cayman Islands.[84] Leave to serve out would not be granted unless, amongst other factors,[85] the JOLs could show that there is a serious issue to be tried on the merits: *Wang v Credit Suisse AG* (unrep., 27 September 2021, Doyle J) at [19].[86]

208   There are two important flaws in the manner in which the Statutory Avoidance Claims have been stated that would, in my view, likely lead a Cayman Court (on a contested application for leave to serve out) to conclude that there was not a serious issue to be tried:

(a)   In relation to the voidable preference claim (s 145), the First Amended Adversary Complaint (at [166]) and Second Amended Proof of Claim (at [145]) contain no more than a bare assertion of insolvency at the time the Upstream Distribution was actually paid (and in respect of the latter, the pleading does not specify whether it referred to balance sheet or cash flow insolvency). The factual allegations in the pleadings proceed on the basis there was imprudent management of SVB's balance

---

[84] Service out of the jurisdiction is governed by Order 11 of the Grand Court Rules (2023 Revision), which are the equivalent of the Federal Rules of Civil Procedure.

[85] The requirements are that: *"(1) there is a serious issue to be tried on their merits; (2) there is a good arguable case that the claim falls within one or more of the classes of cases in which permission to serve out of the jurisdiction may be given… under Order 11, Rule 1… of the Grand Court Rules; and (3) in all the circumstances the Cayman Islands is clearly or distinctly the appropriate forum for the trial of the dispute and that in all the circumstances the Court ought to exercise its discretion to permit service of the proceedings out of the jurisdiction"*: *Wang v Credit Suisse AG* (unrep., 27 September 2021, Doyle J) at [19].

[86] Citing *AK Investment CJSC v Kyrgyz Mobil Tel Ltd* [2011] UKPC 7, [2012] 1 WLR 1804 and *Nilon Ltd v Royal Westminster Investments SA* [2015] UKPC 2, [2015] 3 All ER 372. The Privy Council in *AK Investment* noted at [71] that this means there is a *"real (as opposed to a fanciful) prospect of success"*. These cases have not been included within Exhibit 2 but can be made available upon request.

sheet and mix of deposits such that it was vulnerable when the Federal Reserve raised during the period from March 2022 to March 2023: see for example First Amended Adversary Complaint at [71]-[74], [101]-[127]. There is no suggestion that SVB was not meeting customer withdrawal requests or other commitments prior to the 'run on the bank' on March 9, 2023. This is particularly important given that there were approximately three months between the latest that the Upstream Distribution could have been paid (December 31, 2022) and the collapse of SVB, during which intervening events – most obviously, the 'run on the bank' – could <u>later</u> have caused SVB to become cash flow insolvent (that is, <u>after</u> the payment of the Upstream Distribution).

(b) The claims under ss 146 and 147 require the JOLs to allege and prove an "*intent to defraud*" on the part of the prospective defendant(s). This must involve actual dishonesty, not merely blameworthiness: *Bernasconi v Nicholas Bennett & Co* [2000] BCC 921 (Ch) at [13]-[16]; *Bank of India v Morris* [2005] EWCA Civ 693, [2005] BCC 739 at [8]; *McPherson & Keay* at [16-034]; *Goode* at [14-25].[87] To that end, I have not been able to identify any allegations in the Adversary Complaints or in the Proofs of Claim that rise to the level of alleging actual dishonesty. In fact, when the Upstream Distribution is described at [131] of the First Amended Adversary Complaint and [107] of the Second Amended Proof of Claim, the documents cite "*mismanagement*" as the cause of SVB's collapse: "*Accordingly, SVB made a $294 million upstream distribution to its sole shareholder in the months prior to the SVB collapse at a time when SVBFG's <u>mismanagement</u> of SVB <u>would</u> result in the certain insolvency and collapse of SVB*" (emphasis added). In the absence of dishonesty being alleged and proven, any claims under ss 146 and 147 would be bound to fail, and hence would not satisfy 'the serious issue to be tried' test, applicable on application for leave to serve out of the jurisdiction.[88] I note, in this regard, that the JOLs have previously stated that "*[t]he JOLs submit that under typical circumstances, this complaint and the liability claims set forth in the amended proof of claim would be brought in the Cayman Courts. However, the automatic stay requires the JOLs to assert its [sic] claims before this Court, which under present circumstances will be required to act as an avatar for the Grand Court*": Initial Adversary Complaint at [5], n.2.

209   *Fourth*, in light of this analysis, and as mentioned above, I have serious reservations as to whether Doyle J would consider that he had sanctioned the JOLs to 'change tack' and place so much reliance on the Statutory Avoidance Claims. In the documents that are cited as

---

[87] These authorities consider the English equivalent in s 213 of the Insolvency Act, which also contains the phrase "*carried on with intent to defraud creditors of the company or creditors of any other person, or for any fraudulent purpose*". In the absence of local Cayman authority that directly addresses this point, the Cayman Court would very likely follow this longstanding English authority, being highly persuasive in the usual way in the Cayman Islands.

[88] I have also emphasized the word "*would*", as this suggests that even on the JOLs' pleaded case, the alleged "*mismanagement*" had not yet resulted in insolvency (which is internally inconsistent with the later assertion that SVB was or would imminently become insolvent: Second Amended Proof of Claim at [146]). This is relevant to the cash flow insolvency point discussed above.

having been sanctioned in the October Sanction Order, the Statutory Avoidance Claims play a relatively minor role. They are cited without any detail being provided in the First Amended Proof of Claim at [101](b) as the last of a series of "*further*" claims (most of which appear to have since been dropped and replaced with other theories of liability). Now, my impression from the changes that were made between the First Amended Proof of Claim and the Second Amended Proof of Claim, and between the Initial Adversary Complaint and the Second Adversary Complaint, is that the JOLs place <u>primary</u> reliance on these claims.

210    In my experience, if a Cayman Judge is confronted with a novel issue (particularly in a high-profile matter with implications for later cases), they would very likely provide a fully reasoned judgment explaining the reasons why they considered they had the power to, and it was otherwise appropriate to, make the decision that they did. The fact that Doyle J did not provide a judgment in this case suggests to me that (i) he was not made aware of the novelty and difficulty of the claims; or (ii) these further claims were of such minor significance on the application for sanction at the 16 October 2024 hearing, that they were simply not his focus.

211    I acknowledge that the October Sanction Order does permit the JOLs to "*take all steps in those proceedings as the JOLs consider necessary and appropriate.*" Notwithstanding that, however, I do not consider that by this wording Doyle J intended to give the JOLs *carte blanche* to significantly recast the basis for their claims in the proceedings, in particular given the serious legal issue as to whether the Statutory Avoidance Claims ought be permitted to be pursued extraterritorially in the case of an ancillary liquidation. Indeed, I note that in other contexts Doyle J has expressed the view that JOLs ought not be given "*blanket authority*" to exercise powers that otherwise require the sanction of the Court: *GTI Holdings* at [69]. In light of this uncertainty, in my view, it would be prudent for the JOLs to confirm that they do in fact have the Court's permission to be bringing what appear, based on my analysis, to be claims invoking an extraterritorial jurisdiction, which respected commentary suggests is impermissible or highly exceptional in an ancillary liquidation.[89]

212    In any case, I note that where liquidators are acting extraterritorially, it is obviously for the Court of the jurisdiction in which steps have been taken to decide, in accordance with its own rules of private international law, whether the liquidators could legitimately act in relation to a corporation, in light of (i) a competing claim to legitimate control of that corporation and (ii) that corporation's competing insolvency process in that jurisdiction. It would equally be a matter for that Court as to whether to permit foreign avoidance actions to be brought. As I explained in paragraph 99 above, under Cayman law, if the situation

---

[89] In this respect, *McPherson & Keay* suggests at [9-044]-[9-045] that liquidators ought to apply to the Court for directions in the event uncertainty arises during the course of the liquidation.

were to be reversed, this would not be permitted (recognition not being possible under statute or at common law), and. further, avoidance actions governed by foreign law may not be brought within the Cayman Islands by foreign officeholders, even on a successful application for statutory recognition (which as I say is not possible here), pursuant to the procedure for foreign officeholders in Part XVII of the Act.

## FDA Claim

213    Section 4 of the FDA provides that, "*[s]ubject to this [Act], every disposition of property made with an intent to defraud and at an undervalue shall be voidable at the instance of a creditor thereby prejudiced.*"

214    The phrase "*at the instance of a creditor thereby prejudiced*" is important. In this case, the underlying allegation appears to be that the Cayman Depositors, as creditors of SVB, were prejudiced through the payment of the Upstream Distribution. For example, the First Amended Adversary Complaint states at [167] that "*[t]he unlawful distribution resulted in particularized harm to Cayman depositors.*" For this purpose, neither SVB, nor the JOLs as representatives of SVB, are creditors of SVB for the purposes of the FDA. It is the Cayman Depositors that are creditors of SVB.[90] It is, per s 4, "*at [their] instance*" that the Upstream Distribution must be alleged to be a fraudulent disposition under the FDA.

215    Accordingly, the FDA Claim should properly be brought by and in the names of the Cayman Depositors directly.

216    For the reasons I have already addressed in **Section VI** above, I do not consider the JOLs have the power to act on behalf of the Cayman Depositors directly or to bring the FDA Claim on their behalf.

## VIII    EFFECT OF FDIC PROCESS IN THE CAYMAN ISLANDS

217    Finally, I address the legal effect of the FDIC process in the Cayman Islands, as a matter of Cayman law. I address this because the JOLs have submitted that the FDIC process had no effect on SVB in the Cayman Islands: see for example First Amended Adversary Complaint at [5]; Second Amended Proof of Claim at page 1. Without further context, I consider that this statement could be potentially misleading.

---

[90] This issue of standing was in fact one of the reasons why ss 146 and 147 of the Companies Act were introduced as part of the Companies (Amendment) Act 2007. The Report of the Law Reform Commission, which led to the passage of the Amendment Act, explained that the FDA "*provides a remedy for the creditors of companies whose assets have been improperly disposed of at an undervalue. However, the effectiveness of the remedy is limited by the fact that the liquidator of a company does not fall within the definition of 'creditor'*": "Review of the Corporate Insolvency Law and Recommendations for the Amendment of Part V of the Companies Law" (April 2006) at [11.1].

218     *First*, where the Cayman Court has made an ancillary liquidation order – as it is accepted by the JOLs it has in this case – the ancillary liquidation necessarily requires a primary insolvency process which it is intended to support. Here, the primary insolvency process must be the FDIC process. It is clear from the terms of the Winding Up Order (at [2]) that the Cayman Court proceeded on that basis – treating the FDIC process as primary, and therefore carefully limiting the terms of appointment of the JOLs in light of that fact. The fact there was a pre-existing and primary insolvency process being administered by the FDIC therefore had a real impact on how SVB's Cayman liquidation was fashioned.

219     *Second*, before that time, i.e. until the Winding Up Order was made, as a matter of corporate law, if the FDIC was entitled under California law to act in the name of SVB (whether in the Cayman Islands or not), under Cayman principles of private international law, Cayman law would defer to California law on this question of corporate capacity: *Dicey, Morris & Collins* at [30-030] ("*The cases at least establish that the law of the place of incorporation determines… who are the corporation's officials authorised to act on its behalf*").

220     *Third*, there is an important unresolved issue in relation to the submission of the vast majority of the Cayman Depositors to the FDIC process. As noted in the Chapter 15 Opinion at 16, "*all but 11 of the approximately 615 of SVB Cayman's former clients with positive balances in the SVB Cayman Deposit Accounts have submitted claims in the FDIC-R in its capacity as receiver for the Bank.*"

221     Ordinarily, as a matter of Cayman law, a debt will only be recognized as discharged or extinguished, or modified or adjusted, if that occurs in accordance with the law governing the obligation: *Wight v Eckhardt Marine* at [11]. In the case of Cayman law-governed debt between SVB and the Cayman Depositors, Cayman law would only recognize a discharge of that debt if it occurred in accordance with Cayman law. In fact, the Petitioners relied on this as one of the reasons by the Winding Up Order was justified in the first place. The Petitioners' Consolidated Skeleton Argument dated June 21, 2023 cites a passage from *McPherson & Keay* (at [18-112]) that refers to the rule in *Antony Gibbs & Sons v Société Industrielle et Commerciale des Metaux* (1890) 25 QBD 399 (which will be familiar to the Court – the rule in *Gibbs*). It then goes on to record at [24]:

> "*So, debts to which Cayman law applies, which the deposits in this case are, cannot be discharged by a foreign insolvency proceeding. Therefore, in order for the assets and liabilities of the Branch to be fully and properly dealt with either a foreign representative applying Cayman law must do so or, preferably, a Cayman liquidator should be appointed to do so.*"

222     However, there is a well-established exception to the rule in *Gibbs*. That is where the creditor has submitted to the foreign process: *Re OJSC International Bank of Azerbaijan* [2018] EWCA Civ 2802, [2019] Bus LR 1130 at [28]; *Dicey, Morris & Collins* at [30-

151]. As Lord Collins explained in *Rubin v Eurofinance SA* [2012] UKSC 46, [2013] 1 AC 236 at [167], the creditor "*should not be allowed to benefit from the insolvency proceeding without the burden of complying with the orders made in that proceeding.*" In *Stichting Shell*, the Privy Council (at [30]) cited that statement with approval. The Board went on at [31] to find that a creditor filing a proof of claim in the liquidation amounted to a submission to the jurisdiction (in that case the British Virgin Islands), whether or not the creditor received a dividend from the liquidation, and stated that:

> "*the submission of a proof for claim A does not in itself preclude the creditor from taking proceedings outside the liquidation on claim B. But what he may not do is take any step outside the liquidation which will get him direct access to the insolvent's assets in priority to other creditors. This is because by proving for claim A, he has submitted to a statutory scheme for the distribution of those assets pari passu in satisfaction of his claim and those of other claimants.*"

223   In the present case, I understand that from a US law perspective, claims that creditors have against the subject bank may be determined to succeed to the FDIC by operation of law, which would, if that is found to be the legal effect, operate as a discharge of the debt from the creditor's perspective because the creditor no longer has a claim against the bank directly.[91]

224   Whilst the application of the exception to the rule in *Gibbs* is not always clear-cut,[92] in my view there is a real question as to whether by filing a claim in the FDIC process, the 604 Cayman Depositors would be deemed to have submitted to that process, such that the exception to the rule in *Gibbs* applies and the relevant Cayman Depositors ought to be bound by the burden of the FDIC process as well as the potential benefits. I am reaffirmed in my view on the relevance of this point given that the Cayman Petitioners' Attorneys raised the rule in *Gibbs*, prior to the Winding Up Order being made.

225   Despite its potentially substantial implications, from the material that I have reviewed (which as I mentioned above is not all the material that has been placed before the Cayman Court), it does not appear that this issue has been considered further by the JOLs or brought to Doyle J's attention – beyond the initial reference to the *Gibbs* rule quoted above.

---

[91] See for example the similar context of the <u>discharge</u> in *Wight v Eckhardt Marine* (in which a scheme was established in Bangladesh, in the exercise of powers contained in s 77(4) of the Banking Companies Act 1991, vesting all assets and liabilities of the bank in that country in a newly-established bank). *Wight v Eckhardt Marine* was an application of the *Gibbs* rule itself (discharge by the jurisdiction of the proper law of the debt – in Bangladesh), rather than as here an application of the exception to the *Gibbs* rule by proving in the FDIC process (allowing discharge in a jurisdiction – California – other than the proper law of the debt – Cayman law – because of submission to the jurisdiction).

[92] The authors of *Cross Border Insolvency* note at [13.24] note that it does not operate in a "*mechanistic*" way. However, they do go on to note at [13.26] that "*Where a debt has been discharged under the law applicable to foreign insolvency proceedings and the creditor has submitted to those proceedings by taking, or seeking to take, a distributive share of the insolvent's assets thereunder, the creditor will generally be bound at common law by the foreign discharge.*"

226    If a US law discharge or modification is given effect under Cayman law, such that the relevant Cayman Depositors' claims against SVB were discharged or modified, I consider that the JOLs would be obliged to reject the creditor claims (pursuant s 139(1) of the Companies Act and CWR O.16, r.6), or to apply to expunge the claims if they had already been admitted (pursuant to CWR O.16, r.20(2)).

221    The effect of this would be a radically reduced creditor constituency in the Cayman liquidation, with a very small number of remaining creditors standing to benefit from any recoveries made by the JOLs on any claim. Whether, and the extent to which, that may be relevant to the Court's consideration of the standing question is again a matter for the Court, with the assistance of argument from the parties' respective counsel.

I declare under penalty of perjury under the laws of the United States that the forgoing is true and correct to the best of my knowledge.

**SEBASTIAN WILLIAM ST. JOHN SAID**

Executed: January 24, 2025

At: Camana Bay, Grand Cayman, Cayman Islands

## Appendix 1

### Overview of sources of Cayman Islands law & the doctrine of precedent

1      To understand the sources of Cayman Islands law requires a brief history of the jurisdiction. The Cayman Islands is a British Overseas Territory, and it has had recognition as such since the 1670 Treaty of Madrid. The Islands were first settled as a British colony in the 18th century, with the deemed date of settlement being 1734: *Quayum v Hexagon Trust* [2002 CILR 161] ("***Quayum***") at 170.[93]

2      The Cayman Islands formally became a dependency of Jamaica for administrative purposes in 1863. The Islands remained a dependency of Jamaica until 1962, which was until then itself a British colony. Following Jamaica's independence and withdrawal of membership from the short-lived West Indies Federation, formed in 1958, the Cayman Islands re-emerged as a separate British colony in 1962. Cayman Islands law has consequently been heavily influenced by English law, and to a much more limited extent, Jamaican law. The common law in general, and English law in particular, remain highly influential in the development of Cayman Islands jurisprudence.

3      Due to the history of the Islands, Cayman law is derived from a number of sources:

(a)    The English common law and legislation that was in force at the time of settlement and which was applicable to local circumstances and conditions, as subsequently applied, developed, modified, repealed or replaced by local jurisprudence or legislation: *Quayum* at 168-170.

(b)    Any laws enacted by the Jamaican Legislature (or the West Indies Federation's Federal Legislature) and extended to the Cayman Islands when the Islands were a dependency of Jamaica during the years 1863 to 1962, which have not been repealed by subsequent enactments.

(c)    Orders in Council made by prerogative Order of the British Sovereign and specifically made applicable to the Cayman Islands.

(d)    Acts of the United Kingdom Parliament which have been expressly extended to apply to the Cayman Islands.

---

[93] This judgment has not been included in Exhibit 2 but may be provided upon request.

(e)  Primary Legislation (i.e. those laws enacted by the Cayman Islands' own Parliament).[94]

(f)  Binding decisions of the Cayman courts.

4    The doctrine of judicial precedent applies in the Cayman Islands. The Grand Court, which is the Court of first instance, will, as a matter of judicial comity, follow its own previous decisions unless they are shown to be wrong: *Re China Shanshui Cement Group Ltd* [2015 (2) CILR 255] at [64].[95] The Grand Court is bound by decisions of the Cayman Islands Court of Appeal ("**CICA**"). The Grand Court and CICA are in turn bound by decisions of the Judicial Committee of the Privy Council ("**Privy Council**") on appeals originating from the Cayman Islands.[96]

5    As well as having regard to its own jurisprudence, the Cayman courts will look to decisions of the English courts and the courts of other common law jurisdictions for guidance and authority, particularly on a doctrine of the common law and/or where there is no Cayman authority on a particular issue. Decisions of the English Court of Appeal and the UK Supreme Court ("**UKSC**") (and its predecessor, the House of Lords) are highly persuasive, as are decisions of the Privy Council on appeals originating from other jurisdictions.

6    As Chadwick P observed in the CICA decision of *Miller v R* [1998 CILR 161] at 164, *"a decision of the English Court of Appeal, while not formally binding upon this court automatically, is necessarily one of great persuasive authority, especially where it is unanimous and is directed towards a doctrine of the common law."*[97] The position is logically even stronger with UKSC and House of Lords decisions.

7    For similar reasons, the Cayman courts regularly refer to and follow authoritative textbooks from other common law jurisdictions. In the insolvency, and conflicts of laws, contexts, textbooks such as Andrew Keay (ed), *McPherson & Keay's Law of Company Liquidation* (5th ed, Sweet & Maxwell, 2021) and *Dicey, Morris & Collins on the Conflict of Laws* (16th ed, Sweet & Maxwell, 2022) are examples of such authoritative texts.

---

[94] Prior to 3 December 2020, the Cayman Islands Parliament was known as the "Legislative Assembly", and what are now called Acts were previously "Laws": Citation of Acts of Parliament Act, 2020 and Article 3 of The Cayman Islands Constitutional (Amendment) Order, 2020.

[95] This judgment has not been included in Exhibit 2 but may be provided upon request.

[96] The Privy Council is the highest court of appeal for the Crown Dependencies (i.e. Jersey, Guernsey and the Isle of Man), many Commonwealth countries, as well as the United Kingdom's Overseas Territories. It serves that role for the Commonwealth countries of Antigua and Barbuda, The Bahamas, the Cook Islands and Niue (Associated States of New Zealand), Grenada, Jamaica, St Christopher and Nevis, Saint Vincent, the Grenadines and Tuvalu. The Overseas Territories it serves are Anguilla, Bermuda, the British Antarctic Territory, the British Indian Ocean Territory, the British Virgin Islands, the Cayman Islands, the Falkland Islands, Gibraltar, Montserrat, Pitcairn Islands, St Helena, Ascension and Tristan da Cunha, and the Turks and Caicos Islands. It also hears appeals from the independent states of Brunei, Trinidad and Tobago, Mauritius and Kiribati.

[97] This judgment has not been included in Exhibit 2. It may be provided upon request.