**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| SVB FINANCIAL GROUP, | : | Case No. 23-10367 (MG) |
| | : | |
| Reorganized Debtor.[1] | : | |

---------------------------------------------------------x

| | | |
|---|---|---|
| JOINT OFFICIAL LIQUIDATORS OF | : | Adv. Proceeding No. 24-04014 (MG) |
| SILICON VALLEY BANK (IN OFFICIAL | : | |
| CAYMAN ISLANDS LIQUIDATION), | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | |
| | : | |
| SVB FINANCIAL GROUP, | : | |
| | : | |
| Defendant. | : | |

---------------------------------------------------------x

### PRE-TRIAL BRIEF OF THE JOINT OFFICIAL LIQUIDATORS OF SILICON VALLEY BANK (IN OFFICIAL LIQUIDATION) IN SUPPORT OF STANDING

Warren E. Gluck, Esq.
Marie E. Larsen, Esq.
HOLLAND & KNIGHT LLP
31 W. 52nd Street
New York, NY 10019
Telephone: 212-513-3200
Warren.Gluck@hklaw.com
Marie.Larsen@hklaw.com

Richard A. Bixter, Jr., Esq. (*pro hac vice*)
HOLLAND & KNIGHT LLP
150 N. Riverside Plaza Suite 2700
Chicago, Illinois 60606
Tel: 312-263-3600
richard.bixter@hklaw.com

*Counsel for the Joint Official Liquidators*
*of Silicon Valley Bank (in Official Liquidation)*

---

[1] The last four digits of SVB Financial Group's tax identification number are 2278.

# **TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ..................................................................................................2

SUMMARY OF OPPOSITION AND COUNTER-POINTS...........................................................6

THE JOLS' STANDING...............................................................................................................12

POINT I:  THE SVB CAYMAN PROCEEDING AND ORDERS SHOULD BE GRANTED
COMITY.......................................................................................................................14

POINT II: THE CAYMAN ORDERS ARE FINAL, VALID, AND CAYMAN LAW DOES
NOT PRECLUDE US LITIGATION..............................................................................19

   A.    THERE IS NO RESTRICTION ON THE JOLS' ACTING OR COMMENCING
LITIGATION OUTSIDE OF THE CAYMAN ISLANDS.............................................22

POINT III: THE JOL CLAIMS THAT ARE AND WILL BE ASSERTED ARE NOT
FORECLOSED BY FIRREA..........................................................................................24

   A.    THE CLAWBACK CLAIMS DO NOT IMPINGE .......................................................25

   B.    THE PARTICULARIZED TORT AND DEPOSITOR CLAIMS DO NOT
IMPINGE AND FDIC-R HAS NOT SUCCEEDED TO THEM ...................................27

   C.    IN ANY EVENT, THE FDIC RECEIVERSHIP WAS NEVER EFFECTUATED
IN CAYMAN SUCH THAT FDIC-R COULD SUCCEED TO ANY CHOSE IN
ACTION RIGHTS ........................................................................................................32

POINT IV: THE JOLS' STATUS AS AGENTS FOR THE CAYMAN DEPOSITORS IS
PERMISSIBLE UNDER CAYMAN LAW AND IN ANY EVENT IS A TRIAL
ISSUE ..........................................................................................................................37

CONCLUSION...........................................................................................................................40

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aaron v. Illinois Nat'l Ins. Co.*,
No. 19-10341, 2023 WL 7389034 (E.D. La. Nov. 8, 2023) ................................................24, 28

*Adato v. Kagan*,
599 F.2d 1111 (2d Cir. 1979) ..................................................................................24, 27, 28

*In re Agrokor d.d.*,
591 B.R. 163 (Bankr. S.D.N.Y. 2018) .................................................................................12

*In re Axona Int'l Credit & Commerce Ltd.*,
88 B.R. 597 (Bankr. S.D.N.Y. 1988) ..............................................................................17, 18

*In re Bank United Fin. Corp.*,
442 B.R. 49 (Bankr. S.D. Fla. 2010) ................................................................................24, 29

*Barnes v. Harris*,
783 F.3d 1185 (10th Cir. 2015) ......................................................................................24, 28

*In re Beach First. Nat. Bancshares, Inc.*,
702 F.3d 772 (4th Cir. 2012) .........................................................................................24, 28

*Branch v. F.D.I.C.*,
825 F. Supp. 384 (D. Mass. 1993) ..............................................................................9, 25, 28

*Calderone v. Mancino (In re Calderone)*,
166 B.R. 825 (Bankr. W.D. Pa. 1994) .................................................................................26

*In re Culmer*,
25 B.R. 621 (Bankr. S.D.N.Y. 1982) ...................................................................................17

*Duke Power Co. v. Carolina Environmental Study Group, Inc.*,
438 U.S. 59, 98 S. Ct. 2620, 57 L. Ed. 2d 595 (1978) .............................................................12

*Electrical Const. & Maintenance Co. v. Maeda Pacific Corp.*,
764 F.2d 619 (9th Cir. 1985) ...........................................................................................9

*Gadd v. Pearson*,
351 F. Supp. 895 (M.D. Fl. 1972) .....................................................................................17

*In re Gee*,
53 B.R. 891 (Bankr. S.D.N.Y. 1985) ..................................................................................17

*In re Globo Comunicacoes e Participacoes S.A.*,
   317 B.R. 235 (S.D.N.Y. 2004) .................................................................................................18

*Harris v. Rivera*,
   454 U.S. 339, 102 S.Ct. 460, 70 L.Ed.2d 530 (1981) ............................................................21

*In re Hellas Telecommunications (Luxembourg) II SCA*,
   524 B.R. 488 (Bankr. S.D.N.Y. 2015) ..............................................................................13, 37

*Hilton v. Guyot*,
   159 U.S., 16 S.Ct. (1895) ............................................................................................8, 17, 21

*Kelleran v. Andrijevic*,
   825 F.2d 692 (2d Cir. 1987) ...................................................................................................21

*In re Klaynberg*,
   643 B.R. 309 (Bankr. S.D.N.Y. 2022) ......................................................................................4

*Koreag, Controle et Revision S.V. v. Refco F/X Assocs. (In re Koreag, Controle et Revision S.A.)*,
   961 F.2d 341 (2d Cir. 1992) ..............................................................................................13, 17

*Laspro Consultores LTDA v. Alina Corp. (In re Massa Falida Do Banco Cruzeiro Do Sul S.A.)*,
   567 B.R. 212 (Bankr. S.D. Fla. 2017) ...................................................................................13

*Levin v. Miller*,
   763 F.3d 667 (7th Cir. 2014) ......................................................................................24, 28, 29

*In re Liggett*,
   118 B.R. 219 (Bankr. S.D.N.Y. 1990) ...................................................................................21

*Lubin v. Skow*,
   382 F. App'x 866 (11th Cir. 2010) ....................................................................................24, 28

*In re M. Silverman Laces, Inc.*,
   404 B.R. 345 (Bankr. S.D.N.Y. 2009) ...................................................................................26

*Michelsen v. Penney*,
   10 F.Supp. 537 (S.D.N.Y.1934) .............................................................................................27

*Moyal v. Münsterland Gruppe GmbH & Co. KG*,
   539 F. Supp. 3d 305 (S.D.N.Y. 2021) ....................................................................................17

*In re Nat'l Promoters & Servs. Inc.*,
   No. 13-00051, 2020 WL 1685755 (Bankr. D.P.R. Apr. 6, 2020) ...........................................26

*Ortiz v. Deutsche Bank AG (In re Estrategias en Valores, S.A.)*,
    628 B.R. 722 (Bankr. S.D. Fla. 2021) ...................................................................13

*Philadelphia Gear Corp. v. Philadelphia Gear de Mexico*,
    S.A., 44 F.3d 187 (3d Cir. 1994) .........................................................................17

*Rajamin v. Deutsche Bank Nat'l Trust Co.*,
    757 F.3d 79 (2d Cir. 2014)...................................................................................13

*In re Reagor-Dykes Motors, LP*,
    No. 18-50214-RLJ- 11, 2021 WL 3918869 (Bankr. N.D. Tex. Sept. 1, 2021) .....................26

*RHTC Liquidating Co. v. Union Pac. R.R. (In re RHTC Liquidating Co.)*,
    424 B.R. 714 (Bankr. W.D. Penn. 2010) ...............................................................18

*In re Richmond Produce Co.*,
    118 B.R. 753 (Bankr.N.D.Ca., 1990) .....................................................................9

*Shull v. Pilot Life Ins. Co.*,
    313 F.2d 445 (5th Cir. 1963) ................................................................................9

*In re Silicon Valley Bank (Cayman Islands Branch) (in Official Liquidation)*,
    658 B.R. 75 (Bankr. S.D.N.Y. 2024).............................................................15, 16

*Simon v. Eastern Kentucky Welfare Rights Organization*,
    426 U.S. 26, 96 S. Ct. 1917, 48 L. Ed. 2d 450 (1976)...........................................12

*Sterrett v. Second Nat'l Bank*,
    248 U.S. 73 (1918)..............................................................................................34

*In re SVB Financial Group*,
    662 B.R. 53 (Bankr. S.D.N.Y. 2024)....................................................................26

*SVBFT v. FDIC-R*,
    Case No. 24-cv-01321-BLF ................................................................................11

*Vertiv, Inc. v. Wayne Burt PTE, Ltd.*,
    92 F.4th 169 (3d Cir. 2024) ................................................................................17

*Warth v. Seldin*,
    422 U.S. 490, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1974)...........................................12

*Zucker v. Rodriquez*,
    919 F.3d 649 (1st Cir. 2019)........................................................................24, 29

**Statutes**

11 U.S.C. § 541...........................................................................................................34

11 U.S.C. § 554 .......................................................................................................................27

11 U.S.C. §§ 1501 *et seq* ......................................................................................................2, 15

11 U.S.C. § 1509(b) ..............................................................................................................15

12 U.S.C. § 1821(d)(2)(A)(i) ...................................................................................24, 30, 35

12 U.S.C. § 1821(d)(11)(B) ..................................................................................................28

12 U.S.C. § 1821(d)(17) ........................................................................................................25

12 U.S.C. § 1821(d)(17)(A-D) ..............................................................................................24

12 U.S.C. § 3102(b) ..............................................................................................................18

28 U.S.C. § 754 ................................................................................................................34, 35

**Other Authorities**

1 Michie, Banks and Banking ch. 3, s 69 (1973) ...........................................................27

Fed. R. Civ. P. 15(a) ..............................................................................................................9

Gatto, Joseph D., "Branches, Subsidiaries and Foreign Bank Insolvency," 7 J. of
    Comp. Bus. & Cap. Market L. 173 (1985) ....................................................................18

H.R. Rep. No. 109-31, 109th Cong. 1st Sess. 110 (2005) ...........................................16

The following pre-trial brief is submitted by Andrew Childe, Niall Ledwidge, and Michael Pearson, in their capacity as the duly appointed joint official liquidators (together, the "**JOLs**") of Silicon Valley Bank (in Official Liquidation) ("**SVB Cayman**"), an estate and statutory trust in official liquidation under the supervision of the Grand Court of the Cayman Islands, Financial Services Division (the "**Grand Court**"), Cause No. FSD 163 of 2023 (DDJ) (the "**Cayman Proceeding**"), pursuant to the Cayman Islands Companies Act (2023 Revision) (the "**Companies Act**") associated regulations and the June 30, 2023 Winding Up Order issued by the Grand Court (the "**Winding Up Order**"), in support of their standing to be heard in relation to claims to be asserted, including but not limited to unsecured claims set forth via a proof of claim, as amended on November 22, 2024 [Claim No. 1489] ("**Amended POC**"), and proprietary claims set forth via adversary proceeding in a November 22, 2024 Amended Complaint (Adv. No. 24-04014 ECF No. 11) ("**Amended Complaint**") against SVB Financial Group/SVB Financial Trust ("**SVBFT**").[2] The JOLs' Brief is supported by (i) the March 25, 2025 Declaration of Niall Ledwidge ("**Ledwidge Decl.**") and exhibits filed concurrently herewith, (ii) the February 12, 2024 Affirmation of Dr. Riz Mokal (ECF No. 1730-1)  ("**RM-1**"); (iii) the January 24, 2025 Affirmation of Dr. Riz Mokal (ECF No. 1730-2) ("**RM-2**"); (iv) the February 14, 2025 Affirmation of Dr. Riz Mokal (ECF No. 1730-3) ("**RM-3**"); and (v) the designated testimony of Dr. Mokal ("**Mokal Tr.**") and William St. John Said ("**Said Tr.**") (ECF No 1730-4 through 1730-6).  In further support of this Pre-Trial Brief, the JOLs respectfully state:

---

[2] The JOLs have not consented to the amendment of the respective captions.  The JOLs note that in proceeding in the Northern District of California, SVBFT has consented that the nomenclature associated with the SVB Financial Group ("**SVBFG**") and SVBFT does not impact their relevant rights and defenses.  The JOLs use the term SVBFT, Debtor and SVBFG herein only for convenience and interchangeably to refer to SVBFG and SVBFT, reserving any rights to the extent that the distinction is material for purposes of these proceedings.

## PRELIMINARY STATEMENT

The standing dispute ("**Standing Dispute**") presently before the Court is narrow – the JOLs and SVBFT have agreed that it is confined to the question of whether the JOLs have *standing* to assert unsecured claims via a proof of claim and proprietary claims via an adversary proceeding in the bankruptcy case before this Court. Both in consideration of the Court's schedule and as a matter of efficiency, the parties forwent discovery on fact issues and agreed to relegate matters to the disputed Cayman and United States law issues that go to standing. No significant fact discovery has occurred and the parties are relying on publicly accessible documents. The core question for this Court is thus – do the JOLs have the right to be heard?

The answer is clearly "yes." The fact that this Court denied the JOLs' petition for recognition pursuant to 11 U.S.C. 1501 *et seq*. is not material to the analysis. Rather, within the written opinion itself, this Court explicitly noted the remaining argument that a relevant Court could recognize the Cayman Proceeding and the JOLs' rights to bring causes of action as a matter of international comity.

The decision to extend comity is discretionary – as to this point there is no question. But the JOLs respectfully submit that the Cayman Proceeding and the JOLs' appointment by the Grand Court are, respectively, precisely the sort of foreign court proceeding and precisely the sort of litigant that the doctrine of international comity was designed to accommodate. The SVB Cayman Proceedings were validly commenced in and the JOLs were duly appointed by the Grand Court. The genesis of the SVB Cayman Proceeding is gross inequity and substantial injustice that *in the final analysis, only the Courts of the United States can remediate and solve.*

Silicon Valley Bank's Cayman operations and depositors were orphaned in the wake of the bank's collapse. It is the first time that foreign depositors have *not* been insured in connection with the invocation of the systemic risk exception by the FDIC. Meanwhile, the FDIC Receivership of Silicon Valley Bank ("**FDIC-R**") is in the exclusive control of the Federal Deposit Insurance Corporation ("**FDIC-C**"). But the FDIC-C is a creditor of FDIC-R and stands to lose - *on a 1:1 basis* - every dollar that FDIC-R pays to any creditor *other* than FDIC-C. Despite the fact that if there had been no invocation of the systemic risk exception, Silicon Valley Bank's depositors would have received 90% of their total deposits (including the depositors associated with Silicon Valley Bank's Cayman branch ("**Cayman Depositors**")), the shortfall has instead been *concentrated* on the Cayman Depositors, who will receive zero unless standing is granted to the JOLs in the Courts of the United States.

Silicon Valley Bank ("**SVB**") operated internationally and specifically in the Cayman Islands. It agreed to be regulated by the Cayman Islands Monetary Authority and abide by the Cayman Banking laws. The Grand Court was aware that Silicon Valley Bank had been made the subject of receivership in the United States ("**SVB Receivership**") but was equally aware that contrary to law, equity and conscience, the Cayman Depositors were acutely prejudiced by the FDIC's conduct and actions as insurer and receiver. Moreover, it remains apparent and obvious that such conduct and actions are diametrically opposed to the explicit rationale and mandate for their invocation of the systemic risk exception – that *all depositors would be insured – period.*

As has been obvious from the outset, this is one of those rare cases where an ancillary proceeding in respect of a foreign company that is itself involved in either insolvency or receivership proceedings in its place of incorporation is both prudent and required. Creditors of Silicon Valley Bank whose accounts are governed by the laws of the Cayman Islands, and which

governing documents disputes under those accounts *must* be brought in the Cayman Islands Grand Court, have been wronged -- the core principles associated with *pari passu* distribution and equity have been flipped on their head, resulting in one of the most egregious fact patterns in history.[3]

It is also relevant that much of SVBFG's conduct and specious argument concerning the Cayman Proceeding is incongruent with the role of a fiduciary debtor-in-possession. *In re Klaynberg*, 643 B.R. 309, 317 (Bankr. S.D.N.Y. 2022) (Glenn, J.) (holding that the debtor-in-possession owes fiduciary duty to estate and its creditors). Particularly given that SVBFG has suffered – at least from a procedural and due process perspective – the same treatment that SVBFG has curiously chosen to pay forward and amplify as opposed to condemn. In the past nine months SVBFG: (i) engaged in an unnoticed distribution followed by a *purported* limitation of management's fiduciary duties, (ii) filed a largely false tirade [ECF No. 1605]; and (iii) engaged in professionally curious conduct in expert discovery [ECF No. 1728]. By contrast, when faced with an apparently specious claim for nearly $17 million in *attorney fees* as "contribution" to the SVBFG estate, SVBFG ultimately determined to cast the large payment as "immaterial." But such money is material to the JOLs and it is material to the Cayman Depositors. The SVB Cayman operations and the Cayman Depositors are the very company and customers that SVBFG managed, grew, built, induced, and have statutory and common law duties to protect, oversee, support and generally represent a source of strength.

It is clear that the Cayman Depositors' sole recourse is for the JOLs to engage in litigation – in the United States – with the FDIC-C, FDIC-R and other parties that bear responsibility for

---

[3] Ms. Lee A. Shephard, a renowned United States legal policy journalist, published an article in Tax Notes, one of the nation's impartial, foremost and most formal legal journals, entitled "SOME FOREIGN SILICON VALLEY DEPOSITORS GOT SHAFTED." The article referenced and quoted famously centrist Congressman Cooper's video remarks comparing the impropriety and erroneous decisions in this matter to the mistakes made during Japanese internment following Pearl Harbor. (Ledwidge Decl. at Ex. 2).

and are liable with respect to the SVB Cayman Estate's *total* and unjust shortfall. Other than the FDIC-C and FDIC-R, Silicon Valley Bank's holding company and its management bear both responsibility and liability for this outer-bound circumstance. The JOLs have therefore filed both the Amended POC and the Amended Complaint against the bankrupt Silicon Valley Bank parent company – whose stakeholders are structurally junior to the depositors of Silicon Valley bank at the most fundamental of levels – and which submissions set forth the contours of:

> (i) the officeholder claims ("**Officeholder Claims**") and tort claims ("**Tort Claims**") that the JOLs – qua JOLs – like JOLs in every Cayman Official Liquidation are authorized to bring, and which the currently known or knowable factual matrix support;

> (ii) the proprietary remedy – constructive trust ("**Constructive Trust**"), that Cayman law affords to JOLs in connection with certain of the Officeholder and Tort Claims; and

> (iii) the claims of the Cayman Depositors ("**Depositor Claims**"), which claims are asserted and will continue to be asserted by the JOLs based upon their contractual designation by the Cayman depositors as their agent – pursuant to the ordinary tenets of agency law in the Cayman Islands, and as *envisioned* in the Winding Up Order.

In support of the JOLs' Officeholder Claims, Tort Claims, Depositor Claims and Constructive Trust remedy, the JOLs further present the sworn declarations and deposition testimony of Dr. Riz Mokal, a Cayman law expert, which set forth their legal underpinnings – statutes, applicable precedent, and the Grand Court orders in this case (the "**Mokal Evidence Submissions**"). The Mokal Evidence Submissions make clear that that (i) the JOLs would have standing and basis to make claims against FDIC-C, FDIC-R, SVBFT and the former management if they were subject to the jurisdiction of the Grand Court, (ii) that the Grand Court properly exercised its discretion to commence the Cayman Proceeding, a standard ancillary winding-up governed by common law principles developed over 150 years by the English Courts that the Grand Court follows and applies, and (iii) under the novel and extreme fact patter presented, the

Grand Court sanctioned the litigation that is brought and will be brought with respect to all of the authorized defendants, including but not limited to SVBFG.

Federal statute dictates the possible venues for the FDIC-C and FDIC-R claims, while statutes governing personal jurisdiction control the same analysis in respect of the management claims. But by contrast, it happens to be the case that Silicon Valley Bank's direct corporate parent and sole shareholder, SVBFG, entered into bankruptcy proceedings in the Southern District of New York Bankruptcy Court prior to the commencement of the Cayman Proceeding. Under the United States Bankruptcy Code and relevant precedent, there is a global stay in relation to any and all claims against the debtor by any litigant – including the JOLs. As a corollary, the sole permissible recourse for such litigants – including the JOLs – is to file any such claims in this bankruptcy proceeding. That is what the JOLs have done here – and therefore this Court occupies a comparatively unique position amongst the United States Courts in which the JOLs have filed or will file claims: it must not merely determine whether comity ought to be extended in respect of the Cayman Proceeding and whether to grant standing as to the JOLs' claims against SVBFG in the United States, its decision will further constitute a holding as to whether the JOLs have a right to be heard on claims against SVBFG *anywhere* in the United States.

### SUMMARY OF OPPOSITION AND COUNTER-POINTS

SVBFG does not believe that the JOLs have a right to be heard in this Court or any United States Court. It argues that the Cayman Proceeding and its JOLs are at most relegated to acting and litigating within the territorial jurisdiction of the Cayman Islands while steadfastly maintaining the exclusive claims *concursus* of this Court for claims proximate to the global stay. No remedy; no right to be heard; no justice for depositors that were the *sine qua non* of SVBFG's existence and property – for depositors and business operations that it *agreed* to administer under Cayman

6

law in exchange for the privilege of its subsidiary's Cayman banking license and profitable operations.

SVBFG contends that because there has not been a previous instance in which JOLs appointed by the Grand Court have been authorized to commence litigation in a debtor's place of incorporation, it is not permissible under Cayman law. As discussed by Dr. Mokal, the argument conflates expediency with impermissibility – and fatally so. Officeholder litigation in the courts of a foreign company's place of incorporation is both inherently fraught and would not generally be a feature within a healthy cross-border insolvency regime. But that does not mean it is impermissible – and in fact Dr. Mokal convincingly testifies to the opposite: that Cayman and English Courts must actually insert *restrictive language* within ancillary winding up orders in the name of expediency because otherwise, the default and *a fortiori* obligatory rule is in fact, and rather, global reach. (RM-3 at ¶¶ 5-51). With this argument, SVBFG wholly ignores the extreme scenario of total adversity in the form of a creditor-*cum*-controlling-Receiver. It also ignores that circumstances where the Courts of the United States will provide guardrails and appellate structure to litigation that the Cayman Grand Court has authorized to be brought in the United States precisely under that precise rubric, the prospect of *judicial conflict* is materially lessened if not zero.

SVBFG seems to acknowledge that the question of whether one person is the agent of another under Cayman law is a fact issue, but it nevertheless rejects the concept that the JOLs have assumed this role. There is no dispute that the JOLs are not agents of the SVB Cayman creditors *solely* as a result of their appointment. But the JOLs' and creditors' conduct, agreements, beliefs, understandings and ratifications are effectively undisputed (and certainly so for the purposes of a

standing analysis), and relate to fundamental agency English and Cayman agency principles that are akin to black-letter law here.

In the face and likely because of this reality, and subject to the interaction between the FIRREA statute and the claims at issue discussed in detail herein, SVBFG's remaining arguments as to most issues are impermissible and without merit. It (and the FDIC) lay a red-herring in the form of a *counter-factual* as to the dissolved status of Silicon Valley Bank in California it knew to be untrue (and in any event would be irrelevant). It argues that the Cayman Court must not have realized what it was doing when it authorized United States litigation – a notion that is incompatible with Cayman private or judicial professionalism and the clear statements of Justice Doyle in his judgment:

> I am satisfied that I should exercise my discretion in making a winding up order. I should add not only am I satisfied on the inability to pay debts grounds but I would be satisfied on a just and equitable basis. **There appears to be a battle looming in respect of the treatment of the American and Cayman depositors.** An investigation needs to be taken place in respect of the apparent removal of any moneys and assets from the Branch out of this jurisdiction. **The position of the Cayman depositors needs to be investigated further and where appropriate safeguarded.**

Ledwidge Decl. at ¶ 28 (emphasis added).

The argument also ignores the obvious – that each of the four litigations that the Grand Court authorized and sanctioned are obviously and clearly litigations to be filed in the United States against United States defendants with the respective drafts provided.

SVBFG could have appeared before the Grand Court at any time and challenged or appealed the liquidation. But its Cayman expert also suggested that there were no grounds to do so, given Silicon Valley Bank was not dissolved in California and in any event it has declined to do so. Perhaps most importantly, SVBFG's remarkable devotion of time and estate resources toward collaterally attacking the Cayman Orders *here - in this Court -* instead of in Cayman is clear waste. *Hilton v. Guyot*, 159 U.S. at 203, 16 S.Ct. at 158 (1895) (a foreign judgment may not

be collaterally attacked "upon the mere assertion of the party that the judgment was erroneous in law or in fact"). Nothing in SVBFG's submissions to date relate to the principles that govern standing and the extension of comity. In fact, there is a very significant argument that SVBFG has waived such arguments and consented to the jurisdiction of the Cayman Court in respect of the Cayman Proceeding by appearing in that proceeding and exercising its rights – as shareholder in respect of the Cayman Proceeding – to inspect the Court file. (Ledwidge Decl. ¶ 17).

SVBFG also quibbles with the factual recitations in the Amended POC and Amended Complaint when it *knows* that the JOLs are the only relevant party in relation to the collapse of Silicon Valley Bank that has been denied access to all discovery and even the records of the Silicon Valley Bank Cayman operations. The question is clearly rather whether the JOLs have a right to be heard and whether there are allegations that can be derived from the public record or the presence of material that would support such allegations. SVBFG has repeatedly stated that in the event this Court grants standing to the JOLs, SVBFG would move to dismiss the various claims. That is SVBFG's right, but it is also the JOLs right to amend in response to what will unquestionably be the *first* motion to dismiss that has been filed in respect of either the unsecured or proprietary claims. *See* Fed. R. Civ. P. 15(a).[4]

Many of the elements of the various claims conceivable under Cayman law are not in *material* dispute. Although, by way of example, SVBFG misconstrues the analysis associated

---

[4] While at this point the JOLs will likely still be reliant on public information, the JOLs will meet their burden with respect to each element of each claim at issue in Dr. Mokal's reports that are pled by the JOLs. Even then, the obviously novel and extreme facts of this case naturally engender numerous issues of first impression. As discussed in *Branch v. F.D.I.C.*, 825 F. Supp. 384, 397-398 (D. Mass. 1993) (hereinafter "***Branch***"): "it is worth noting that courts should generally be reluctant to grant a motion to dismiss when the claim in question asserts a novel theory of recovery. Novel theories of recovery are best tested for legal sufficiency in light of actual, rather than alleged facts. *Electrical Const. & Maintenance Co. v. Maeda Pacific Corp.*, 764 F.2d 619, 623 (9th Cir. 1985); *Shull v. Pilot Life Ins. Co.*, 313 F.2d 445 (5th Cir. 1963); *In re Richmond Produce Co.*, 118 B.R. 753, 755 (Bankr.N.D.Ca., 1990)."

with "creditor" status in relation to a preference claim because once a dividend is declared, SVBFG

*transmogrifies* from shareholder to creditor for purposes of the Cayman clawback claims.[5]

At a high level, the Officeholder Claims are effectively those that sound in clawback and

insolvent or wrongful trading.   Similarly, the Tort Claims arise from the <u>*fact*</u> that the bank credits

in connection with the SVB Cayman operating account and the Cayman Depositors' accounts –

jurisdictionally significant, Cayman-regulated and Cayman-law governed accounts, were

transferred and removed beyond Cayman judicial reach and SVBFG and SVB Cayman

management either acquiesced to such instruction or did not stop the total capitalization strip when

they had a duty to do so.   The breach of duty by SVBFG, which duty is in part delineated by the

Cayman banking statutes, *either* gives rise to a private right of action or is evidence of tortious

conduct.   While SVBFG disputes that a private right of action exists for SVBFG's breach of the

Cayman banking statutes, there is no direct Cayman precedent.   But Dr. Mokal argues that it is a

matter of straight-forward statutory construction and a plain reading of the statute's text –

particularly those provisions that create *safe harbor from private right of action liability* – which

dispositively dictate the result. But at core, these arguments remain both premature and inapposite

with respect to this limited standing inquiry.

SVBFG's other apparent arguments relate to the FIRREA statutes or impermissible double

recovery associated with the *setoff* defenses of the FDIC-R and FDIC-C in their litigations with

SVBFG in California's Northern District, the application of proprietary and *in rem* concepts

applicable to constructive trusts to the facts of this matter, or some formulation of *Gibbs* arguments

that this Court has already considered and rejected in other cases.   These arguments can be easily

dispensed – either finally or for purposes of this limited standing inquiry:

---

[5] Once a dividend was declared, SVBFG became a creditor of Silicon Valley Bank, which ultimate creditor distribution
was then made to an insider for no consideration.

- *First*, as to the Clawback Claims, the FIRREA statutory regime, contrary to its approach in respect of a number of other company, creditor and shareholder claims, <u>clearly and explicitly declines</u> to exclusively vest clawback claims in the FDIC Receiver. Rather, the framework merely contemplates that (real, not hypothetical) clawback claims of the FDIC Receiver would be "superior" as compared to the "[implicitly] inferior" clawback claims of others. Here, the proposition that there are or will be relevant "superior" clawback claims asserted by the FDIC-R against SVBFG is dubious at best. The FDIC parties have avoided this Court's jurisdiction and declined to file any traditional claims against SVBFG. At most, they have interposed arguments concerning clawback as a <u>setoff defense</u> – not a claim. Moreover, the now-clear presentation of that defensive argument makes clear that it is an impermissibly <u>hypothetical</u> *constructive fraudulent transfer* contention that comprises just one paragraph of their relevant answer and affirmative defenses. *See SVBFT v. FDIC-R*, Case No. 24-cv-01321-BLF ("**SVBFT v. FDIC-R Action**") at ECF No. 135, p. 123. But as SVBFT <u>correctly</u> notes in its pending motion to strike that setoff defense, the FDIC-R statement merely contends that "*IF*" SVBFG was insolvent, then the dividend <u>would</u> be a constructive fraudulent transfer. But FDIC-R does not contend that SVBFG was insolvent. *See* SVBFT v. FDIC-R Action at ECF No. 160. Moreover, and in any event, it is one setoff amongst a litany of far more significant FDIC setoff defenses, the remainder of which are conspicuously set forth in meticulous, Rule 9(b)-style detail and set forth damages and causation in the likely range of *$20 billion dollars*. So, not only is the dividend a barely featured, hypothetical *setoff,* it is barely material compared to non-overlapping affirmative defenses and setoff torts *each and all of which* serve as a complete defense to a $1.9 billion claim.

- *Second,* as to the Depositor Claims and Tort Claims, the salient legal question turns both on a circuit split *and* a conclusion that such claims are unique to the Cayman operational sphere and base. The answer here is clearly "yes." They arise almost solely as a result of the unprecedented orphaning of the Cayman operations and the removal of the Cayman credits from the jurisdictionally significant, Cayman-law governed Cayman Depositor and SVB Cayman operational accounts that are in turn subject to the exclusive jurisdiction of the Cayman Courts in relation to all disputes and controversies. By definition they are claims unique to the particular Cayman Depositor accounts and SVB Cayman operational accounts, as well as the JOLs and the Cayman Depositors.

- *Third,* by way of supplement to the unique/derivative/direct analysis *and* as an <u>alternative to it,</u> the FDIC Receivership of this particular California-incorporated bank, and more particularly FDIC-R's authority to act in respect of the bank, did not effectively reach the shores of Cayman. Both parties' experts agree as to the nature and architecture of the "ping-pong" choice of law analysis under Cayman law. Neither can opine on the outcome for the simple reason that it hinges on the substantive US law. In a nutshell however, the analysis of a corporation's personhood under Cayman law (including the identity of those that may act on its behalf), is governed by Cayman common law in the first instance, which in turn points to the law of the company's place of incorporation. In the case of Silicon Valley Bank, that means California. But applicable California law does not *automatically*

11

provide the right to act in connection with property of a company in receivership extraterritorially (and in respect of *some* procedural forms, not at all).[6]

- *Fourth,* there is a linear nexus between the assets within the SVBFG estate and the subset of Officeholder and Tort Claims that give rise to the remedy of constructive trust. At a core level, SVBFG upstreamed $294 million in December 2022 for the *precise purpose of having and holding* that cash on its balance sheet so as to buoy the SVBFG stock price. In contrast to the more complicated (but still valid) circumstance where the money is "spent" on an asset or similar investment and a "tracing" must then occur, the money in this particular case just stayed put. There is similarly no need for the type of "first in last out" accounting analysis on this fact pattern. As SVBFG has argued in the Northern District of California – bank credits are an identifiable *res* – by adding $294 million to its cash pile and keeping it, the *res* over which the constructive trust should be asserted in this particular case is clear.

- *Fifth,* any contention that the Depositor Claims asserted by the JOLs cannot proceed because certain Cayman Depositors *additionally* submitted general creditor claims in the FDIC Receivership pursuant to *Gibbs* or a *Gibbs-like* framework should be rejected in this case as without merit. *See In re Agrokor d.d.*, 591 B.R. 163, 196 (Bankr. S.D.N.Y. 2018) (Glenn, J.) (refusing to apply the *Gibbs* rule within the territorial jurisdiction of the United States, stating "England, of course, is free to continue to adhere to the *Gibbs* rule, but that does not mean that a U.S. bankruptcy court must follow the rule in deciding whether to recognize and enforce the decision of a court of another jurisdiction."). And even if *Gibbs* was applicable here, there would be a trial issue which would necessitate a clear exception to the *Gibbs* submission exception, under circumstances where the Cayman Depositors were provided non-voluntary and misleading notices of their general unsecured creditor status and the potential to obtain recovery from the SVB Receivership, which was never a possibility absent litigation.

## <u>THE JOLS' STANDING</u>

The question of standing is whether the plaintiff is the proper party to have the court decide the merits of the dispute or of particular issues. *Warth v. Seldin*, 422 U.S. 490, 498, 95 S. Ct. 2197, 2204-05, 45 L. Ed. 2d 343 (1974). In order to establish standing, a plaintiff must "show an injury

---

[6] A careful review of relevant precedent demonstrates that at a *minimum,* the Receivership must be "registered" for the Receiver to be authorized to deal in the company's assets even in *other federal judicial districts*. In Cayman, outside the realm of full faith and credit, this means *recognition* (or potentially, the FDIC's failed attempt at "deregistration" that in any event occurred *after* the jurisdictionally significant Cayman bank credits were dissipated). Not only does this form one of the bases for the already-pled allegations that the FDIC-R acted on an *ultra vires* basis, it also follows that the Cayman claims are not subsumed because FDIC-R has not taken the required steps to do so *in Cayman, as per California law.*

to himself that is likely to be redressed by a favorable decision," so as to have "a [sufficient] personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction." *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 38, 96 S. Ct. 1917, 1924, 48 L. Ed. 2d 450 (1976); *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 74, 98 S. Ct. 2620, 2631, 57 L. Ed. 2d 595 (1978).  The prudential standing rule bars litigants from asserting the rights or legal interests of others in order to obtain relief from injury to themselves. *Rajamin v. Deutsche Bank Nat'l Trust Co*., 757 F.3d 79, 86 (2d Cir. 2014)

Here, the JOLs' standing to assert claims as Joint Official Liquidators of SVB Cayman and as agent of the SVB Cayman Depositors is governed in the first instance by Cayman law on the presumption of comity, and is then *arguably* subject to modification pursuant to the dictates of the FIRREA federal bank receivership regime.

As the Second Circuit Court of Appeals has recognized, it is a well-established principle of U.S. law that the rights and powers granted to foreign liquidators – *i.e.* their standing to appear in United States Courts toward asserting claims on behalf of themselves and others, rests upon the rights and powers afforded to them under applicable foreign law. *Laspro Consultores LTDA v. Alina Corp. (In re Massa Falida Do Banco Cruzeiro Do Sul S.A.)*, 567 B.R. 212, 222 and 225 (Bankr. S.D. Fla. 2017) (holding that the foreign representative could bring New York fraudulent conveyance claims on behalf of creditors of the Brazilian debtor because Brazilian law authorized the foreign representative to assert claims on behalf of "the aggregate body of creditors of the Brazilian bankruptcy estate"); *see also Koreag, Controle et Revision S.V. v. Refco F/X Assocs. (In re Koreag, Controle et Revision S.A.)*, 961 F.2d 341, 348 (2d Cir. 1992) (holding that for the purposes of section 304 of the Bankruptcy Code, the predecessor to Chapter 15, "the estate of a foreign debtor is defined by the law of the jurisdiction in which the foreign proceeding is

pending"); *Ortiz v. Deutsche Bank AG (In re Estrategias en Valores, S.A.)*, 628 B.R. 722, 734

(Bankr. S.D. Fla. 2021) (holding that authority of foreign representative, a Colombian-court

appointed liquidator, to bring claims on behalf of creditors depended on "the scope of the

Plaintiff's authority under Colombian law.").  Indeed, this Court has previously recognized this

same analytic framework. *In re Hellas Telecommunications (Luxembourg) II SCA*, 524 B.R. 488,

523-24 (Bankr. S.D.N.Y. 2015) (Glenn, J.) (authority of U.K. foreign representative to bring New

York fraudulent transfer claims "turns on whether U.K. law vests the Plaintiffs, as liquidators with

authority to assert causes of action on behalf of the Debtor's creditors").

Here, the JOLs have submitted expert Cayman law evidence that supports their authority

to assert the Officeholder Claims, the Tort Claims, the Constructive Trust Remedy, and the

Depositor Claims as agents, under Cayman law.  In fact, the Grand Court has explicitly authorized

the JOLs to assert all of these claims against the applicable Defendants including but not limited

to SVBFG.  (Ledwidge Decl. ¶¶ 31-34).

## POINT I:  THE SVB CAYMAN PROCEEDING<br>AND ORDERS SHOULD BE GRANTED COMITY

The SVB Cayman Proceeding was commenced in *precisely* the manner envisaged by the

Cayman banking regulations to which Silicon Valley Bank and SVBFG agreed to be bound and

under which banks that maintain branches and operations in Cayman are subject to bankruptcy in

Cayman's courts, and by which holding companies of banks such as SVBFG are prescribed

specific duties and regulation (RM-2 ¶¶ 30.1-30.6; RM-3 ¶ 11).  Further, it is undisputed among

the Cayman experts that Cayman statutory law permits the winding up of a foreign registered

company.  (RM-2 ¶ 22) (SWS-1 ¶¶ 65, 74-75).

Justice Doyle's July 2023 Opinion commencing the SVB Cayman Liquidation explicitly

notes the statutory basis for the insolvency, the reasons that commencement is within his authority,

and that the Cayman Proceeding was implemented in conscious and specific recognition of, and in fact response to, the SVB Receivership and the conduct of the various Defendants (Ledwidge Decl. ¶¶ 25-30). Justice Doyle commenced the Cayman Liquidation contemplating a "battle" for justice between the SVB Cayman estate both for itself and for the Cayman Depositors (which agency role as to the JOLs the depositors' both assented to and ratified), and which battle would need to be fought by and brought by the JOLs in the United States. Subsequent to entry of the Winding Up Order, Justice Doyle entered Orders sanctioning the JOLs to assert claims against the FDIC, in both its corporate and receivership capacity, as well as the claims at issue here. (Ledwidge Decl. ¶¶ 31-34).

Therefore, as a core and fundamental matter of first order, this Court should grant comity to the Orders of Justice Doyle, as well as the JOLs and their mandate. The fact that the Cayman Proceeding was not recognized under 11 U.S.C. §§ 1501 *et seq* ("**Chapter 15**") does not bar this Court from extending comity. This Court's dismissal of the Chapter 15 Case was solely predicated on its finding that the foreign debtor was excluded as a debtor under Section 109(b), and thus relief under Chapter 15 of the Bankruptcy Code could not be granted to the JOLs under Section 1501(c)(1). While the JOLs respectfully disagree with this Court's determination and have appealed the dismissal,[7] in no way is dismissal determinative of the JOLs standing to bring claims in the United States. To the contrary, while this Court had the authority to expressly limit the JOLs standing through its dismissal (*see* Section 1509(d)), the Court dedicated the final portion of its Opinion to the "remedies" afforded to the JOLs despite the "gating issue" of Section 109(b):

> While recognition and provisional relief cannot be granted as SVB Cayman is prohibited from seeking Chapter 15 relief generally, the JOLs are not without remedy. Section 1509(f)

---

[7] In the event that this Court's dismissal is reversed on appeal and this Court subsequently grants Chapter 15 recognition, substantially all standing arguments would likely be moot. *See* 11 U.S.C. § 1509(b) (upon Chapter 15 recognition, a foreign representative has the capacity to sue or be sued in the United States and U.S. courts are required to grant comity and cooperation to the foreign representatives).

of the Bankruptcy Code provides that "[n]otwithstanding any other provision of this section, the failure of a foreign representative to commence a case or to obtain recognition under this chapter does not affect any right the foreign representative may have to sue in a court in the United States to collect or recover a claim which is the property of the debtor."

*See In re Silicon Valley Bank (Cayman Islands Branch) (in Official Liquidation)*, 658 B.R. 75, 91

(Bankr. S.D.N.Y. 2024) ("**Chapter 15 Opinion**").  This Court further opined on the likeliness that

the JOLs satisfied the other objective criteria for Chapter 15 recognition, and provided its

endorsement of Justice Doyle's entry of the Winding Up Order of SVB Cayman on behalf of its

creditors-depositors:

> Additionally, as both the JOLs' and the FDIC's Cayman law experts testified, the Cayman Proceeding was properly commenced under Cayman law and, therefore, would have otherwise likely constituted a "foreign proceeding." (*See* Feb. 14, 2024 Hr'g Tr. at 131:6–8 (Dr. Mokal testifying that a "careful delimitation of the terms of [Justice Doyle's] order [left him] no doubt whatsoever that . . . Justice Doyle made a standard, ancillary winding up order"); *id.* at 184:20–25 (Mr. Lowe testifying that the Court need not sit in a court of review of the Winding Up Order as what Justice Doyle "did was entirely correct" and he was "not suggesting [Justice Doyle] did anything wrong").)
>
> * * *
>
> Here, it is undisputed that the Cayman Proceedings are pending in the Cayman Islands, a foreign country, and that SVB Cayman, as part of the Bank, is to be wound up under the supervision of the Grand Court. (*See* Pearson Declaration, Ex. 14 ¶ 1 (stating that the Bank is to be "wound up by the Court under the provisions of the [Companies Act]").) Indeed, the FDIC's own expert witness testified that Justice Doyle's Winding Up Order was correctly issued. (*See* Feb. 14, 2024 Hr'g Tr. at 257:8–13 (The Court pointing out that Mr. Lowe "testified at length [and] acknowledged that Justice Doyle was correct in his order . . . [and] acted correctly in entering his judgment").) However, as SVB Cayman was unable to overcome the gating section 109(b)(2) issue, the Court cannot grant recognition or provisional relief at this juncture and must dismiss the Chapter 15 petition.

*Id*.[8]

---

[8] This Court's comments regarding other avenues to standing arising from comity, such in the case at bar, is consistent with the legislative purpose of Chapter 15.  The legislative history for BAPCPA and Congress' passage of Chapter 15 explains that the Chapter 15 debtor exclusion for "banks" in Section 1501(c)(1) "constitutes, for the United States, the exclusion provided in article I, subsection (2) of the Model Law. Foreign representatives of foreign proceeding which are excluded from the scope of Chapter 15 *may seek comity from courts* other than the bankruptcy court since the limitations of section 1509(b)(2) and (3) *would not apply to them*." H.R. Rep. No. 109-31, 109th Cong. 1st Sess. 110 (2005) (emphasis added).

The origin of modern common-law on international comity is *Hilton v. Guyot*, which is instructive:

> [W]e are satisfied that, where there has been opportunity for a full and fair trial abroad before a court of competent jurisdiction, conducting the trial upon regular proceedings, after due citation or voluntary appearance of the defendant, and under a system of jurisprudence likely to secure an impartial administration of justice between the citizens of its own country and those of other countries, and there is nothing to show either prejudice in the court, or in the system of laws under which it was sitting, or fraud in procuring the judgment, or any other special reason why the comity of this nation should not allow it full effect, the merits of the case should not, in an action brought in this country upon the judgment, be tried afresh, as on a new trial or an appeal, upon the mere assertion of the party that the judgment was erroneous in law or in fact.

*Hilton*, 159 U.S. at 202-03; *see also In re Culmer*, 25 B.R. 621, 629 (Bankr. S.D.N.Y. 1982) ("Comity is to be accorded a decision of a foreign court as long as that court is of competent jurisdiction and as long as the laws and public policy of the forum state are not violated."). U.S. courts regularly grant comity to the decisions of Cayman Islands' courts. *See In re Axona Int'l Credit & Commerce Ltd.*, 88 B.R. 610 (Bankr. S.D.N.Y. 1988); *see also In re Gee*, 53 B.R. 891, 901 (Bankr. S.D.N.Y. 1985) (granting comity to the Companies Law of the Cayman Islands and noting that "[p]articularly where the foreign proceeding is in a sister common law jurisdiction with procedures akin to our own, exceptions to the doctrine of comity are narrowly construed."); *Moyal v. Münsterland Gruppe GmbH & Co. KG*, 539 F. Supp. 3d 305, 309 n.1 (S.D.N.Y. 2021) (deeming "absurd" the notion that Chapter 15 recognition should be a prerequisite to seeking relief as it would "fly in the face of comity principles"). The Third Circuit recently sought to offer clarity on the matter in *Vertiv, Inc. v. Wayne Burt PTE, Ltd.*, 92 F.4th 169 (3d Cir. 2024), setting forth a "refreshed" version of the test it articulated in *Philadelphia Gear Corp. v. Philadelphia Gear de*

*Mexico*, S.A., 44 F.3d 187 (3d Cir. 1994) to "govern adjudicatory comity with regard to pending foreign bankruptcy proceedings." *Vertiv*, 92 F.4th at 169.[9]

While the Cayman Court has made clear that the SVB Cayman Proceeding is an ancillary proceeding in respect of Silicon Valley Bank (as opposed to the liquidation of a "branch") the fact is that neither formulation would be incompatible with fundamental public policy.  In fact, unlike other legal systems, the United States has articulated specialized rules and processes in relation to the juridical personhood and winding up of bank "branches." *See* 12 U.S.C. § 3102(b) ("Except as otherwise specifically provided in this chapter or in rules, regulations, or orders adopted by the Comptroller under this section, operations of a foreign bank at a Federal branch or agency shall be conducted with the same rights and privileges as a national bank at the same location and shall be subject to all the same duties, restrictions, penalties, liabilities, conditions, and limitations that would apply under the National Bank Act to a national bank doing business at the same location . . . ."); *See also* Gatto, Joseph D., "Branches, Subsidiaries and Foreign Bank Insolvency," 7 J. of Comp. Bus. & Cap. Market L. 173, 180 (1985) ("As with a noninsured brank, the Comptroller may appoint a receiver of an insured federal branch [of a foreign bank] if he is satisfied that the parent bank is insolvent, if the branch's authority to operate is revoked, or if a judgment creditor remains unpaid for thirty days.").

In the bankruptcy context, creditors of a foreign debtor, even one already subject to a foreign insolvency proceeding, may seek the commencement of an involuntary bankruptcy case under the U.S. Bankruptcy Code, creating a separate estate for the debtor's U.S. operations and

---

[9] *Cf Gadd v. Pearson*, 351 F. Supp. 895, 900 (M.D. Fl. 1972) (in action brought by liquidator of Bahamian bank, "Plaintiff's ultimate duty is to collect the assets of the [bank], liquidate them, and apply the liquidated assets to the varying demands of creditors and depositors. In carrying out this Bahamian court-ordered function, plaintiff has come into this Court enforcing a cause of action belonging to the bank. Such a chose in action is an asset of the bank."); *Koreag, Controle et Revision S.V. v. Refco F/X Assocs. (In re Koreag, Controle et Revision S.A.)*, 961 F.2d 341, 348 (2d Cir. 1992).

assets. *See, e.g., RHTC Liquidating Co. v. Union Pac. R.R. (In re RHTC Liquidating Co.)*, 424

B.R. 714 (Bankr. W.D. Penn. 2010); *In re Globo Comunicacoes e Participacoes S.A.*, 317 B.R.

235 (S.D.N.Y. 2004); *In re Axona Int'l Credit & Commerce Ltd.*, 88 B.R. 597 (Bankr. S.D.N.Y.

1988).

What these cases reveal is the fact that U.S. law recognizes the power of courts to exercise

insolvency jurisdiction over foreign entities operating in the United States and their assets in the

name of protecting creditors, <u>exactly</u> as the Grand Court did here with respect to Silicon Valley

Bank's presence in the Cayman Islands. The actions taken here by the Grand Court to protect the

Cayman creditor-depositors of Silicon Valley Bank are entirely consistent with the jurisdiction

and authority exercised by the FDIC, in the case of the U.S. branches of foreign banks, and by

U.S. bankruptcy courts with respect to entities that are eligible to be debtors under the Bankruptcy

Code.  Accordingly, this Court should grant comity to the Cayman Proceedings and the Sanction

Order and permit the JOLs both due process and their day in Court.

### <u>POINT II: THE CAYMAN ORDERS ARE FINAL, VALID, AND<br>CAYMAN LAW DOES NOT PRECLUDE US LITIGATION</u>

In granting the Winding Up Petition and appointing the JOLs for the SVB Cayman estate,

Justice Doyle confirmed that doing so was "just and equitable" and necessary to protect the

interests of Cayman depositor-creditors who would otherwise be left with no remedy:

> I am satisfied that I should exercise my discretion in making a winding up order. I should add not only am I satisfied on the inability to pay debts grounds but I would be satisfied on a just and equitable basis. **There appears to be a battle looming in respect of the treatment of the American and Cayman depositors.** An investigation needs to be taken place in respect of the apparent removal of any moneys and assets from the Branch out of this jurisdiction. **The position of the Cayman depositors needs to be investigated further and where appropriate safeguarded.**

Amended Complaint, Exhibit 9, ¶ 63 (emphasis supplied); *see also* Amended Complaint, Exhibit

8, ¶ 2 (appointing the JOLs and directing that they are "…acting in respect of the assets and affairs

of the Cayman Islands branch of the Company [Silicon Valley Bank] ***and its creditors***.") (emphasis supplied).

Subsequent to entry of the Winding Up Order, the Grand Court has issued a number of Sanction Orders (collectively, the "**Sanction Orders**") with respect to the JOLs asserting the claims against SVBFG and others within the United States (*see* Ledwidge Decl. ¶ 30-34):

- In January 2024, the JOLs, by and through Cayman counsel, sought and obtained entry of the Sanction Order (the "**January 11, 2024 Sanction Order**") by the Grand Court, authorizing the JOLs to file a petition for recognition under chapter 15;

- On October 16, 2024, the Grand Court issued a sanction order (the "**October 16, 2024 Sanction Order**") granting sanction to the filing of (i) the complaint against the FDIC-R in the United States District Court for the District of Columbia (*see id.* at ¶ 4); (ii) the Amended POC (*see id.* ¶ 5); and (iii) the Adversary Complaint against SVBFG (*see id.*), and to "take all steps in those proceedings as the JOLs consider necessary and appropriate." The October 16, 2024 Sanction Order also authorizes the JOLs to "file and pursue claims against the executives and employees of SVB who had responsibility for managing and operating the Cayman branch of SVB, and to take all steps in those proceedings as the JOLs consider necessary and appropriate." *See* October 16, 2024 Sanction Order, ¶ 6; and

- On November 21, 2024, the Grand Court issued a Sanction Order (the "**November 21, 2024 Sanction Order**") specifically authorizing the JOLs to commence litigation in the United States District Court for the Northern District of California against the FDIC-C and the (now former) FDIC Chairman Martin Gruenberg.

The only Cayman expert that has questioned the validity of the Grand Court's Order – and only on a hypothetical basis – is Mr. Said. Mr. Said dedicates a significant portion of his Reply Report to the notion that, <u>only</u> in the event that SVB was formally dissolved as a matter of non-Cayman law, then Justice Doyle did not have authority to enter the Winding Up Order, and that in such an event an out-of-time appeal of the Winding Up Order could be permissible. (SWS-2 at ¶ 10-14).

No such appeal has been filed, of course, because SVBFT understands the obvious: SVB remains an entity in good standing in the State of California, and no formal dissolution of SVB existed at the time of the Winding Up Order or now. At his deposition, Mr. Said admitted that, (i)

he had been instructed that SVB had not been formally dissolved, that the extraordinary circumstances permitting an out-of-time appeal was only predicated on formal dissolution and thus SVBFG is bound by the Winding Up Order, and (ii) that in the absence of formal dissolution, Mr. Lowe was correct that the ancillary Winding Up Order was appropriate. (Said Tr. at 62:8-25).[10]

Regardless of Mr. Said's deposition testimony, the attempts by SVBFT and Mr. Said to not only contest the recognition of the Winding Up Order, but its validity as a final and non-appealable Order, is an impermissible collateral attack. *See Harris v. Rivera*, 454 U.S. 339, 348 n.21, 102 S.Ct. 460, 70 L.Ed.2d 530 (1981) ("[t]he strong interest in preserving the finality of judgments ... as well as the interest in orderly trial procedure, must be overcome before collateral relief can be justified") (*quoting Henderson v. Kibbe*, 431 U.S. 145, 153, n.13, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977)); *Kelleran v. Andrijevic*, 825 F.2d 692, 695 (2d Cir. 1987) ("Bankruptcy proceedings may not be used to re-litigate issues already resolved in a court of competent jurisdiction."); *In re Liggett*, 118 B.R. 219, 221 (Bankr. S.D.N.Y. 1990) (holding that bankruptcy court was not the appropriate forum to collaterally attack the "facial validity" of a non-bankruptcy order). Even as to an international judgment and Order, the Supreme Court has held that a judgment may not be collaterally attacked "upon the mere assertion of the party that the judgment was erroneous in law or in fact," *Hilton v. Guyot*, 159 U.S. at 203, 16 S.Ct. at 158 (1895). (*See* RM-2 ¶¶ 19-19.2) (concerning finality of Cayman Orders).

---

[10] Indeed, there is a disagreement between Dr. Mokal and Mr. Said as to the authority to wind up a company which remains registered in the Cayman Islands but was formally dissolved in its place of incorporation. *See* RM-2 at ¶¶ 16-23, SWS-2 ¶¶ 12-14. But as Dr. Mokal stated at his deposition, the fact that SVB is in fact not formally dissolved "removes -- it takes off the table one possible issue which otherwise the court would have to engage with, which is the question, as I say, a technical question of the interpretation of the statute conferring on the Cayman court the winding-up power in relation to foreign companies[.]" Mokal Tr. 90:9-16.

21

## A. **THERE IS NO RESTRICTION ON THE JOLS' ACTING OR COMMENCING LITIGATION OUTSIDE OF THE CAYMAN ISLANDS**

On this point, there is disagreement between the parties' experts. However, as noted by Dr. Mokal in his deposition testimony, and affording substantial acknowledgement and respect to Mr. Said's general expertise, it is not just that Mr. Said is "wrong" in declaring that ancillary liquidators are not permitted to act outside the territory of the ancillary liquidation generally or specifically in the company's place of incorporation, it is that he is "plainly fallacious." (RM-3 ¶ 5; Mokal Tr. 185:6-186:13 (Mokal testimony on ancillary liquidations)).

Citing the same English common law authority as Mr. Said, Dr. Mokal sets the record straight. Regardless of the existence of a liquidation in the primary jurisdiction, the statutory insolvency scheme under English and Cayman statutory and common law has <u>worldwide</u>, and not merely territorial, effect in the first instance (RM-3 ¶¶ 15-23). While it is undoubtedly true that in a typical ancillary liquidation, and purely for practical concerns, the ancillary court *may* issue limiting provisions in the ancillary liquidation order that *authorize* the ancillary liquidator to restrict his duties to the territorial jurisdiction so as to *protect* that liquidator from claims that by not acting outside the territorial jurisdiction it was breaching its duties, authorize the ancillary liquidator not to attempt recovery outside the territorial jurisdiction, and absolve the ancillary liquidator from any claim that it breached its fiduciary duty by not doing so, the concept necessarily and inherently entails that the ancillary liquidator has (and an ancillary liquidation grants and imposes) such powers and duties in the first instance.

Rather, Mr. Said then proceeds from factually true premises that (i) there has never *before* been a Cayman ancillary liquidation in which actions were taken outside the territory of the Cayman Islands, and (ii) the *reasons* why British Common-law courts often restrict ancillary liquidators from acting outside the ancillary jurisdiction are often good and sound, to the

*impermissible and fundamentally flawed* conclusion that extra-territorial actions by ancillary liquidators (and particularly so in the company's incorporation jurisdiction) are *impermissible.* Logic, that any such restriction must come from an order implementing the ancillary liquidation and not the statutes themselves, and the total failure to incorporate the extreme and unusual circumstances of this case *all and each* foreclose SVBFT's arguments.

As early as the Chapter 15 Petition, to which the FDIC objected, it was clear that any cooperation between the FDIC Receiver and the JOLs was not possible.[11] As stated by Dr. Mokal: the facts of the present case are indeed highly unusual, and not merely "*from a Cayman perspective.*" It is not often the case that a primary insolvency proceeding is alleged to have operated so as improperly to disadvantage certain of the debtor's creditors in circumstances where such allegedly disadvantaged creditors are subject to the protection of the court of a different jurisdiction. (RM-3 at ¶ 9).

In sum, it cannot be credibly argued that Cayman law prohibits the JOLs from seeking recovery of assets within the United States, or even that Justice Doyle found it inexpedient to do so. To the contrary, Justice Doyle entered the Winding Up Order on "just and equitable" grounds, due to the "battle looming" concerning the Cayman depositors, a collection of which initiated the Winding Up proceeding due to their treatment in the SVB Receivership. (Ledwidge Decl. ¶¶ 25-

---

[11] The intent of the JOLs to bring claims in the United States was well known from the outset and obvious at the time the JOLs sought recognition. For example, this Court asked numerous questions of the foreign law experts in the Chapter 15 case concerning the JOLs' right to bring claims on behalf of the SVB Cayman estate as well as the depositors. *See* Chapter 15 Case ECF No. 48 at p. 196:14-19 ("So Dr. Mokal was asked this question at the end of the examination about [choses] in action. Is that a -- so if someone deposited a billion dollars in the Cayman branch and it disappeared, would Cayman law recognize if somebody had done something nefarious doing that, a chosen action to recover the value?"); *id.* at p. 48:15-18 ("But let's assume that management breached their fiduciary duty, committed gross negligence, and lost a billion dollars in deposits in the Cayman Branch. You're saying the JOLs can't sue to recover that?"); *id.* at p. 213:2-6 ("So let me ask you this hypothetical. 500 depositors deposit a billion dollars in the Cayman branch, and management absconds with the money; they transfer it to some other haven. Is there a cause of action by the depositors in the Cayman?").

28).  Further, Justice Doyle has entered the Sanction Orders, permitting the JOLs to bring claims

in the United States against the FDIC, the Debtor in this case, and the managers of the Cayman

branch of SVB (Ledwidge Decl. ¶¶ 31-34).

### POINT III: THE JOL CLAIMS THAT ARE AND WILL BE ASSERTED ARE NOT FORECLOSED BY FIRREA

As set forth above, the JOLs have asserted or will assert Cayman-law-governed

Officeholder Claims, Tort Claims and Depositor Claims.  In a vacuum, the JOLs have standing to

assert those claims and comity should be afforded to the SVB Cayman Proceeding and the orders

of the Grand Court.  At the same time, there is no question that this is not a vacuum – rather there

is an FDIC Receivership of Silicon Valley Bank pending, which adds and requires a further layer

of analysis.

12 U.S.C. § 1821(d)(2)(A)(i) provides that the FDIC "shall, as . . . receiver, and by

operation of law, succeed to . . . all rights, titles, powers, and privileges of the insured depository

institution, and of any stockholder, member, accountholder, depositor, officer, or director of such

institution with respect to the institution and the assets of the institution."  As the following analysis

makes clear, while seemingly broad, this statute contains important textual limitations and has

been further limited by United States Courts when the claims at issue are _unique_ to particular

"stakeholder" claimants and as opposed to general claims of the subject bank of class. *See Adato*

*v. Kagan*, 599 F.2d 1111, 1117 (2d Cir. 1979); *In re Bank United Fin. Corp.*, 442 B.R. 49, 53

(Bankr. S.D. Fla. 2010); *Aaron v. Illinois Nat'l Ins. Co.,* No. 19-10341, 2023 WL 7389034, at *4

(E.D. La. Nov. 8, 2023) (key inquiry is "source of the harm" and whether it is distinct from the

harm suffered by the bank.)[12]

---

[12] The Fourth, Seventh, Tenth, and Eleventh Circuit have agreed with the *Aaron* decision. *Levin v. Miller*, 763 F.3d 672 (7th Cir. 2014); see also *Barnes v. Harris*, 783 F.3d 1185 (10th Cir. 2015); *In re Beach First. Nat. Bancshares,*

Moreover and importantly, 12 U.S.C. § 1821(d)(17)(A-D) defines and governs clawback claims held by the FDIC Receiver pursuant to the FIRREA framework.  Unlike other causes of action to which the FDIC Receiver "succeeds" (to the rights of the bank, its depositors and others), in respect of clawback actions, the FDIC Receiver merely has rights that are "superior" to other parties.

Here, the vast majority of the claims are unique and particular to the SVB Liquidation and the Cayman Depositors.  While ordinarily, the clawback claims arising from the $294 million dividend would be "generalized," it is *both* the case that FIRREA proscribes a different and non-succession based regime for such claims (*i.e.* superior/inferior) *and* that FDIC-R has waived and otherwise failed to meaningfully assert a clawback claim.  Additionally, there is significant questions as to the inherent, territorial limitation of the "succession" rights of the FDIC Receiver here.

### A.      THE CLAWBACK CLAIMS DO NOT IMPINGE

The Officeholder Claims are exclusively and solely vested in the JOLs pursuant to Cayman law. (RM-2 ¶¶ 65-88). They arise and crystallize *solely* upon the issuance of a liquidation order by the Cayman Court, which indisputably had jurisdiction over and was authorized to commence the bankruptcy of Silicon Valley Bank in Cayman. Immediately, there is an analytical problem associated with the notion that the FDIC-R could have "succeeded" to such claims in that they did not exist when the FDIC Receivership was commenced and therefore could not have been subsumed into FDIC-R.  More importantly, as to the clawback claims, it is plain that the FDIC-R rights are not predicated on a subsummation/succession framework.  Rather, any such rights are

---

*Inc.*, 702 F.3d 772 (4th Cir. 2012); *Lubin v. Skow*, 382 F. App'x 866 (11th Cir. 2010); *but see Zucker v. Rodriquez,* 919 F.3d 649, 656-57 (1st Cir. 2019) (minority view that is in any event distinguishable).

merely "superior" to those of others and naturally presupposes the existence of other such, presumptively inferior, claims. *See* 12 U.S.C. § 1821(d)(17).

Here though, the analysis is simplified. The FDIC-R has assiduously avoided the jurisdiction of this Court and has knowingly failed to assert intentional or constructive fraudulent transfer claims against SVBFG and has abandoned the claims for present purposes. *See Branch v. F.D.I.C.*, 825 F. Supp. 384, 402-405 (D. Mass. 1993) (discussing abandonment of claims succeeded to the FDIC Receivership).

The conclusion of abandonment is sound for multiple reasons. Claims or choses in action are property that is capable of assignment and have universal value. A defensive right of setoff is not a "claim" and is not universal – it is valuable *solely* to a person or entity who has a mutuality of debts and obligations in respect of the transferee and is at base useful *only* as a defense (including a hard limitation as to the claim value). Bankruptcy Courts have long recognized the essential distinction, which is why the assertion of defensive setoffs are at core, neither stay violating acts nor those for which a proof of claim is required. *See in re SVB Financial Group*, 662 B.R. 53 (Bankr. S.D.N.Y. 2024) (Glenn, J.) (differentiating between the FDIC's unasserted claims and rights of setoff)*; In re Reagor-Dykes Motors, LP*, No. 18-50214-RLJ- 11, 2021 WL 3918869, at *2 (Bankr. N.D. Tex. Sept. 1, 2021); *In re M. Silverman Laces, Inc.*, 404 B.R. 345, 365–66 (Bankr. S.D.N.Y. 2009) (finding that "filing a proof of claim is not a prerequisite to asserting an otherwise valid setoff" raised as an affirmative defense); *Calderone v. Mancino (In re Calderone)*, 166 B.R. 825, 830 (Bankr. W.D. Pa. 1994) (same); *In re Nat'l Promoters & Servs. Inc.*, No. 13-00051, 2020 WL 1685755, at *8 (Bankr. D.P.R. Apr. 6, 2020) (same).

If that were not enough, it is plain that the FDIC-R has, in fact, failed to even *asser*t a clawback setoff against SVBFG. A careful review of the FDIC-R and FDIC- answers reveal just

a single paragraph in the FDIC-R Answer purporting to assert constructive fraudulent transfer as a "setoff" affirmative defense to the SVBFG claims. (Ledwidge Decl. ¶ 71).  However, as the FDIC itself recognizes and as SVBFG has already argued, constructive fraudulent transfer claims under U.S. law require a showing that the bank was insolvent at the time of the dividend, and therefore FDIC-R only asserts the defense "***IF***" Silicon Valley Bank was insolvent.  SVBFG has already moved to dismiss the defense on that precise ground – that it is asserted as a hypothetical, and will surely prevail.  (Ledwidge Decl. ¶ 72, Ex. 19).

But there is more.  FDIC-R asserts more than a dozen affirmative defenses to the ultimately limited SVBFG claims, any one of which would be sufficient to eliminate the entirety of the $1.9 billion deposit claim by SVBFG (Ledwidge Decl. ¶ 71, Ex. 18).  If FDIC-R prevails on *any* of these defenses, the effect will be the same as outright abandonment and the underlying and valuable clawback claim will "vaporize."  Similarly, even if just the FDIC-R breach of duty claims *and* FDIC-R had (*counterfactually*) pled a non-hypothetical constructive fraudulent transfer, the breach of duty claims are significantly larger than the constructive fraudulent transfer claims, only one may succeed, and the net result is once again, that 99% of the value is "vaporized."  When the same scenario is run in respect of the multiple dollar-value setoff defenses, it is even worse.  That is not what Congress intended in respect of failed banks.  *See also* 11 U.S.C. § 554 (abandonment of assets and claims in the bankruptcy context).

### B.    THE PARTICULARIZED TORT AND DEPOSITOR CLAIMS DO NOT IMPINGE AND FDIC-R HAS NOT SUCCEEDED TO THEM

The overwhelming majority position is that the FDIC-R does not succeed to particularized and individual claims that are not common to either the bank, its shareholders or the depositors as a whole.  The landmark case of *Adato v. Kagan*, 599 F.2d 1111, 1117 (2d Cir. 1979) is often cited

for the proposition that Section 1821(d)(2)(A)(i) as only allocating (common) <u>derivative claims</u> to

the FDIC Receiver:

> As a general rule, wrongdoing by bank officers that adversely affects all depositors creates
> a liability which is an asset of the bank, and only the bank or its receiver may sue for its
> recovery. *Michelsen v. Penney*, 10 F.Supp. 537, 539 (S.D.N.Y.1934); 1 Michie, Banks and
> Banking ch. 3, s 69 at 289-91 (1973); *See* 12 U.S.C. § 1821(d). **Individual depositors may
> sue in their own right, however, if they have suffered a wrong that is distinctly theirs
> and not common to all**.. . .

> It can hardly be denied that, as of now, appellants stand in a different position from that of
> the other depositors. Their right to be treated as depositors has been disputed by both the
> FDIC and Bank Leumi, and appellants have a suit pending against the FDIC. Under the
> circumstances, the FDIC is hardly the proper party to represent them in this proceeding. If
> appellants have a claim, it is not common to those of other depositors whose interests are
> represented by the FDIC.

*Id*. (emphasis added).[13]

In *Aaron v. Illinois Nat'l Ins. Co.,* No. 19-10341, 2023 WL 7389034, at *4 (E.D. La. Nov.

8, 2023), the Court reviewed a number of various appellate decisions addressing the standard for

determining ownership of claims under Section 1821(d)(2)(A)(i).  The court explained that the key

inquiry is the "<u>source of the harm</u>" and "whether the harm that the trustee alleges is distinct from

the harm suffered by the bank." *Aaron*, 2023 WL 7389034, at *4.   With respect to the minority

position, the Court stated "[w]hile *Zucker* may not have expressly applied a direct and derivative

---

[13] See also *Branch*, 825 F. Supp. At 404 ("Section 1821(d)(11)(B), however, substantially undermines a literal
interpretation of section 1821(d)(2)(A)(i). Under section 1821(d)(11)(B), also enacted in 1989 by FIRREA, the
shareholders of a failed national bank remain entitled to "distribution ... of amounts remaining [in the receivership]
after payment of all other claims and expenses." 12 U.S.C. § 1821(d)(11)(B). Thus, through section 1821(d)(11)(B),
failed financial institutions' shareholders retain virtually the same rights as do the shareholders of any other bankrupt
corporation the rights to the residual assets once debts to higher priority creditors have been satisfied. Therefore,
despite its strong language, section 1821(d)(2)(A)(i) does not transfer all incidents of stock ownership.  In light of the
language and juxtaposition of these two sections, this Court cannot conclude that Congress intended to preserve
shareholders' rights to the residual assets of the failed financial institution, yet terminate the shareholders' ability to
protect the failed institution's interests. Such a bold departure from common law adjudicatory principles would place
unfettered discretion in the hands of FDIC-Receiver, and might deny shareholders any avenue of redress should the
FDIC improperly neglect to assert the failed institution's rights.").

distinction, the function of the inquiry is the same: to determine whether the harm to the claimant

occurred indirectly through harm to the Bank or occurred directly through harm to the claimant."[14]

The case of *Levin v. Miller*, 763 F.3d 667 (7th Cir. 2014) is instructive.  In *Levin,* the court

explained that 1821(d)(2)(A)(i) does not transfer to the FDIC "every investor's claim of every

description" but only "those that investors (but for § 1821(d)(2)(A)(i)) would pursue derivatively

on behalf of the failed bank." *Id.* at 672.   The bank holding company entered bankruptcy when its

subsidiary banks failed and were taken over by the FDIC. The bankruptcy trustee for the holding

company filed suit against the holding company's directors and officers.   The FDIC intervened,

with both the FDIC and the directors and officers arguing that the bankruptcy trustee's claims

belonged to the FDIC under 1821(d)(2)(A)(i).  The Court did not agree:

> Section 1821(d)(2)(A)(i) is designed to allocate claims between the FDIC and other injured
> parties; **it is not designed to vaporize claims that otherwise exist after a business
> failure**. Yet if count 3 is dismissed, the claim will disappear; no one will be able to pursue
> it. It would not be sensible to read § 1821(d)(2)(A)(i) that way.

*Id.* at 671 (emphasis added).

The *Levin* Court permitted two claims to proceed: (i) a claim for unlawful distribution made

by holding company to its shareholders; (ii) a claim that the holding company directors authorized

an unwarranted contribution to the bank, throwing good money after bad.  Both claims were not

derivative of damages suffered by the failed bank.

Meanwhile, *In re Bank United Fin. Corp.*, 442 B.R. 49, 53 (Bankr. S.D. Fla. 2010) held

that derivative claims brought on behalf of the Bank fall within the ambit of the FDIC, but

derivative claims brought on behalf of the bank's holding company do not.  In *Bank United*, the

---

[14] The Fourth, Seventh, Tenth, and Eleventh Circuit have agreed with the *Aaron* decision. *Levin v. Miller*, 763 F.3d
672 (7th Cir. 2014); see also *Barnes v. Harris*, 783 F.3d 1185 (10th Cir. 2015); *In re Beach First. Nat. Bancshares,
Inc.*, 702 F.3d 772 (4th Cir. 2012); *Lubin v. Skow*, 382 F. App'x 866 (11th Cir. 2010).

bank and its parent holding company both failed. The holding company was a chapter 11 debtor. The officers and directors of the bank and the holding company were identical, and each officer and director was a named beneficiary under a single Directors' and Officers' liability policy.

*Zucker v. Rodriquez*, 919 F.3d 649, 656-57 (1st Cir. 2019) reflects both a minority view, and constitutes a self-described "narrow" holding[15] that is fundamentally distinguishable from the facts at bar.  In *Zucker,* a Chapter 11 trustee for a holding company of a failed bank in FDIC receivership brought an action against a holding company's former directors and officers and their insurer alleging breach of fiduciary duty owed *to the holding company* caused by subsidiary bank's failure and holding company's resultant loss in value.  The FDIC filed its own case against the overlapping directors and officers.  In connection with the FDIC's intervention in the case, the First Circuit held that the holding company bankruptcy trustee's claims were held by the FDIC under 12 U.S.C. § 1821(d)(2)(A)(i).

Here, the gravamen of the JOL Tort Claims and the Depositor Claims that sound in tort, contract inducement breach and private rights of action under Cayman Banking law applicable to holding companies of licensed Cayman banks are uniquely and fundamentally particular to the JOLs and the Cayman Depositors for which they act as agent.  These claims all arise from the "orphaning" of the Cayman operations and Cayman depositors-*cum*-creditors of Silicon Valley Bank.  The Cayman accounts were Cayman regulated and Cayman law governed.  The capital requirements and support requirements uniquely arise under Cayman banking law and are neither evidence of negligence nor provide a private right of action to anyone aside from the JOLs and

---

[15] *Id.* at 656 ("Our ruling is a limited one: it applies only to claims like those before us. The claims are brought by a former bank holding company to recover its interest in a wholly owned subsidiary bank (a bank that made up over ninety percent of the holding company's assets). And the holding company seeks to recover from assets, like insurance, that the FDIC also seeks in its own action related to the Bank's failure. We do not establish any broader principles, and future claims by holding companies and other shareholders of banks in FDIC receivership will need to be evaluated on their own terms.").

Cayman Depositors.  All of these claims arise from the dissipation and usurpation of the Cayman Account credits beyond the reach of the Cayman Court (and Cayman regulators).  The gravamen of these claims is that the transfer of the Cayman account credits in violation of the relevant Cayman regulations and capital requirements was a wrongful act and that allowing or facilitating those transfers was similarly tortious.  These are *not* generalized claims of either the bank or its depositors.

A complete table of the claims that arise from the presently known and knowable factual matrix, the party asserting them, their core basis, and their particularized (or general) nature is set forth in the table below:

| Party Asserting Claim | Core Basis of Claim | Particularized or General Nature |
|---|---|---|
| JOLs – Officeholder Claim | Companies Act Section 145 (avoidance of preference)<br><br>• The $294 million dividend paid by SVB to SVBFG in December 2022 ("**Upstream Distribution**") was a preferential transfer made within six months of SVB's winding up<br><br>• Asserted as both an unsecured and proprietary claim | Particularized Officeholder Claim |
| JOLs – Officeholder Claim | Companies Act Section 146 (undervalue transaction)<br><br>• Upstream Distribution was a transfer for undervalue with intent to defraud creditors<br><br>• Asserted as both an unsecured and proprietary claim | Particularized Officeholder Claim |
| JOLs – Officeholder Claim | Companies Act Section 147 (fraudulent trading)<br><br>• Upstream Distribution constituted carrying on business with a fraudulent purpose and with an intent to defraud creditors<br><br>• Asserted as both an unsecured and proprietary claim | Particularized Officeholder Claim |
| JOLs – Agent of Cayman Depositors | Section 4(1) of the Cayman Fraudulent Dispositions Law<br><br>• Upstream Distribution constituted a fraudulent disposition and setting aside the Upstream Distribution is necessary to satisfy the obligation to the Cayman Depositors | Particularized avoidance action claims tied to losses suffered only by Cayman Depositors |

| | | |
|---|---|---|
| | • Asserted as both an unsecured and proprietary claim | |
| JOLs – Agent of Cayman Depositors | Claims of Cayman Depositors Based on Breach of Statutory Duty under the Cayman Banks and Trust Companies Act<br><br>• Failure of SVBFG, as parent to SVB, to maintain adequate net worth, capital adequacy, and other prudential requirements for the benefit of Cayman Depositors, and to ensure regulatory and risk management measures are followed<br><br>• Cayman Depositors were the limited class of intended beneficiaries for these statutory duties, which were breached by SVBFG and its executives | Particularized claim based on damages suffered by Cayman Depositors |
| JOLs – Agent of Cayman Depositors | Liability for Procuring SVB's breach of Cayman deposit account agreements<br><br>• Aiding and abetting SVB's breach of the Cayman account agreements and related agreements (*e.g.* requirement that deposits be payable and collectible in the Cayman Islands) | Particularized claim tied to breach of Cayman-governed account agreements |
| JOLs – Agent of Cayman Depositors and on behalf of SVB | Negligence Under Cayman Law<br><br>• Failure to maintain account credits in the Cayman Islands in connection with accounts in the name of the Cayman Depositors and SVB's Cayman Branch, leading to seizure of these credits by the FDIC | Particularized claim tied to breach of Cayman duties |
| JOLs – Agent of Cayman Depositors and on behalf of SVB | Vicarious Liability with Respect of SVBFG Management with Cayman Responsibility<br><br>• Failure to maintain account credits (similar to negligence claim above), under circumstances of overlapping management, Board and executives between SVB and SVBFG | Particularized claim tied to breach of Cayman duties |
| JOLs – Agent of Cayman Depositors and on behalf of SVB | Negligence Under Cayman Law<br><br>• Gross mismanagement by SVBFG and its executives and Board of Directors resulting in the collapse of SVB<br><br>• Brought under the Amended POC in the event of a final ruling that Cayman depositors are not granted insured depositor status under FIRREA and are not provided full coverage under the systemic risk exception | Particularized claim tied to damages suffered by Cayman Depositors |

**C.      IN ANY EVENT, THE FDIC RECEIVERSHIP WAS NEVER EFFECTUATED IN CAYMAN SUCH THAT FDIC-R COULD SUCCEED TO ANY CHOSE IN ACTION RIGHTS**

Both experts largely agree regarding the architecture of the "ping pong" choice of law analysis that governs the FDIC Receivership and the property rights of the Receiver under Cayman law. To the extent there is a distinction, it arises in consideration of the *nature* of the Cayman Court analysis associated with recognition of corporate personhood and rights. Dr. Mokal persuasively argues that in the first instance, recognition of corporate personhood is a common-law construct. Both experts agree that Cayman law binding precedent regarding corporate recognition and the powers of a Receiver in respect of that corporation requires application of California law in this case which involves a California-incorporated bank. To the extent there is a meaningful distinction between the two views, it would likely rest on a fact-intensive analysis as to whether there could be a set of circumstances in which the substantive outcome of the choice of law analysis would yield an outcome that *defies* core principles of corporate or social norms.[16]

This is without question an outer-bound case. There is similarly no question that the precise conflict of interest of the FDIC-C as receiver of FDIC-R maintains in this matter is both abnormal and without modern precedent.[17] However, it is by no means clear – but in fact rather doubtful, that even under ordinary California law as it concerns Receiverships and this FDIC Receivership of Silicon Valley Bank, that FDIC-R effectively gained or succeeded to Cayman-law choses in

---

[16] For instance, an outer bound counterfactual example might be if California law provided that any person who successfully mounts an armed incursion in the Company's headquarters and holds captive the CEO for a period of 30 days is automatically the judicially appointed Receiver of the Company.

[17] There has never been an invocation of the systemic risk exception in which the FDIC was directed to insure all depositors but then unilaterally defy that mandate (presumptively *ultra vires* as to the agency) leaving a uniquely homogenous set of innocent foreign depositors a 100% loss under circumstances where *absent* systemic risk intervention, the same depositors would have received 90% of their claims in bank liquidation. (Ledwidge Decl. ¶ 9) (comments of FDIC officials concerning bank liquidation would have resulted in 90% payout to all depositors); *see also* independent investigation conducted by Cleary Gottlieb Steen & Hamilton LLP for the Special Review Committee of the Board of Directors of the FDIC, constituting the current position of the FDIC, April, 2024 (Ledwidge Decl. ¶ 7, Ex. 3) (concluding there was regular discriminatory and racist conduct at the FDIC, perpetrated by officials at the highest level) ("The Field Office Supervisor made disparaging race-based comments as well. Several FDIC employees reported that these comments were largely directed toward people of Asian-descent, and, in particular, Asian men.").

action, some of which additionally implicate exclusive Cayman Court forum selection clauses, or otherwise could have "succeeded" to any of the choses in action relevant to this case.

Aside from the "extreme" scenario, both experts agree California law controls the issue under Cayman law regarding authority of "jurisdictionally significant" Cayman property.[18] The commencement of the domestic and inherently territorial SVB Receivership did not alter the Cayman regulatory landscape or vest FDIC-R with the power to act internationally and in connection with non-domestic accounts. What SVBFG cannot cite – *because it is does not appear to exist* – is legal precedent for the notion that its § 1821(d)(2)(A) succession rights extend outside the territorial jurisdiction of the United States.

Rather, the territorial limitation of FDIC receivers is consistent with well-settled principles of U.S. receivership law. With the limited exception of a bankruptcy trustee with authority over assets "wherever located" (*see* 11 U.S.C. § 541), it is a fundamental principle of insolvency law in the United States that, while a receiver may sue in any appropriate jurisdiction via that jurisdiction's grant of comity absent ancillary relief or appropriate filings in the foreign court - the administrative powers and authority of the receiver come to a halt at the applicable border. *See, e.g.*, 28 U.S.C. § 754 (permitting a federal equity receiver to sue or be sued in any federal district, but limiting the receiver's rights over receivership property to the appointing district court absent filings with the non-appointing district court where property is located). Indeed, the Supreme Court has recognized that the principles of comity applied, not only between the United States and other nations, but with respect to the sovereignty of individual states to limit the territorial reach of a bank receivership:

> The functions and authority of such receiver are confined to the jurisdiction in which he was appointed. . . . This practice has become general in the courts of the

---

[18] The analysis at bar concerns choses in action. The dual nature of bank credits as a *res* and as an obligation is similarly complex.

United States, and is a system well understood and followed. ***It permits an application for an ancillary receivership in a foreign jurisdiction where the local assets may be recovered and, if necessary, administered.***

*Sterrett v. Second Nat'l Bank*, 248 U.S. 73, 76-77 (1918) (emphasis added) (citations omitted). The limitations territorial of state law receiverships are even more draconian.[19]

Here, it is plain that the California Court does not have *in personam* jurisdiction over the JOLs or the Cayman Depositors. As a threshold prerequisite to attain jurisdiction over property and persons in other districts (let alone internationally or to "succeed" to the otherwise distinct property interests of third parties pursuant to 12 U.S.C. § 1821(d)(2)(A)(i) – itself a unique statute that would require a Cayman comity analysis): a federal receiver *must* file the order of appointment and copies of the complaint "within ten days of the entry of his order of appointment… in the district court for each district in which the property is located." 28 U.S.C. § 754. Failure to do so "shall divest the receiver of jurisdiction and control over all such property in that district." *Id*.

Here, there is of course a mechanism by which the FDIC Receiver can "register" the Receivership order in Cayman – it can make a recognition application to the Cayman Court pursuant to the Cayman law equivalents of Chapter 15 and the cross-border insolvency regimes.[20] United States Receivers, trustees, and similar court fiduciaries regularly make such applications in Cayman with success.

Hence, for the FDIC-R to effectuate any "succession" rights it has in respect of jurisdiction significant Cayman property or other Cayman-connected entities and persons over whom the

---

[19] Briefing on the precise interplay between a failure of a state bank, invocation of the systemic risk exception, and appointment of a "federal court supervised" FDIC receiver can be provided to the Court upon request.

[20] The JOLs did not properly articulate the relevance of the FDIC-R cooperation with other ancillary liquidations in the Chapter 15 proceedings. The instinctual relevance was nascent. The relevance is that the FDIC-R *acknowledges* its own territorial limitations when it is convenient, and there, the work of the Canadian liquidators to collect from borrowers will inure to the benefit of FDIC-R. (Ledwidge Decl. ¶¶ 37-50). However, absent "recognition" or this cooperation, FDIC-R's powers are limited because the California Court does not have personal jurisdiction over the foreign borrowers.

California Court does not have jurisdiction, it needs to, as a matter of "California law" apply for recognition of the SVB Receivership over Silicon Valley Bank in the Cayman Islands – the equivalent of "registration" pursuant to 28 U.S.C. 754.   It chose not to do so.

Instead, FDIC-R sent letters through its counsel, Dentons, to Cayman counsel for the JOLs, raising various objections to the Cayman Proceeding, but stating that "[f]or the avoidance of doubt, FDIC-R has not and does not submit to the jurisdiction of the Grand Court . . . ." (Ledwidge Decl. ¶ 14). The FDIC-R sought to achieve an end run around the Grand Court, and instead of appearing in the Cayman Proceeding, demanded that the JOLs' counsel present this letter to the Grand Court. (Ledwidge Decl. ¶ 14).

The same day, in a glaring acknowledgement and admission of the Cayman Court's authority, FDIC-R attempted to "deregister" Silicon Valley Bank from the Cayman Islands Register. (Ledwidge Decl. ¶ 15).  These efforts proved ineffective according to Justice Doyle, and Silicon Valley Bank was not deregistered and, in any event, remained subject to CIMA, the Companies Act, and other applicable law of the Cayman Islands. (Ledwidge Decl. ¶¶ 15, 23). The following day, FDIC-R sent a further letter to the JOLs' counsel, again requesting that the JOLs' counsel deliver the letters to the Grand Court, rather than FDIC-R appearing itself to deliver its arguments and objections or seeking recognition of its receivership by the Grand Court. (Ledwidge Decl. ¶ 16).

The letters and their contents were discussed with the Grand Court at the Winding Up Hearing, and the Winding Up Order even notes that the FDIC-R failed to appear on behalf of Silicon Valley Bank but instead submitted the letters. (Ledwidge Decl.¶¶ 26-27). Faced with FDIC-R's failure to appear, let alone seek recognition of its receivership, the Grand Court entered the Winding Up Order. (Amended Complaint ¶¶ 28; 90-98).

36

Had FDIC-R obtained recognition of the SVB Receivership in the Cayman Islands, FDIC-R could have made applications to the Grand Court to administer Silicon Valley Bank's jurisdictionally significant accounts, assets and affairs. It is also virtually certain, however, that the Grand Court would have directed FDIC-R to take actions to protect SVB Cayman's depositors with regard to those assets, rather than simply using those assets to reduce the shortfall necessary to pay U.S. depositors in full pursuant to the invocation of the systemic risk exception. FDIC-R's decision not to seek recognition of its receivership in the Cayman Islands, and its refusal to participate in the Cayman Proceeding, means that the appointment of the JOLs and the jurisdiction of the Grant Court to wind up the Company as to its Cayman Island assets and estate is now *res judicata* as a matter of Cayman law. (RM-2 ¶¶ 25-29).

For his part, Dr. Mokal opines in the event that applicable U.S. law territorially limits FDIC-R to the United States, the types of Cayman-governed claims asserted by the JOLs would belong to the SVB Cayman Estate under administration of the JOLs:

> Finally on this point, any causes of action originally vested in the Bank for any breach of contractual, statutory, and/or tortious duty that arose in the Cayman Islands may not have become vested in the FDIC Receiver (though whether and to what extent any such vesting occurred was a matter for applicable US law). In principle, such claim may be vested in the Bank's estate created upon the making of the Winding-Up Order. Such claims may be pressed by the JOLs acting on the Bank's behalf.

(RM-2 ¶ 115.4). Accordingly, due to the territorial limits placed on FDIC-R and its failure to obtain recognition in the Cayman Islands, there is no impingement due to the Cayman-governed claims asserted by the JOLs in the Amended Complaint and Amended POC.

## POINT IV: THE JOLS' STATUS AS AGENTS FOR THE CAYMAN DEPOSITORS IS PERMISSIBLE UNDER CAYMAN LAW AND IN ANY EVENT IS A TRIAL ISSUE

The JOLs have asserted Clawback Claims and Tort Claims on behalf of the creditors of the SVB Cayman Estate, the only non-insider depositors of Silicon Valley Bank that suffered damages

due to the SVB collapse. Under applicable Cayman law,[21] the JOLs bring these claims not solely

by virtue as their role as estate fiduciaries, but due to the common law agency relationship that

arose under the circumstances of their appointment and ratified by the Cayman creditors. As stated

by Dr. Mokal:

> The liquidator is an agent of the company to which they have been appointed but not, in general, an agent for that company's creditors. However, the liquidator and one or more of the company's creditors may act in such a way that the liquidator comes to stand in the position of agent to such creditors. Such agency may arise by express agreement or it may be inferred from the parties' conduct. It may also be created upon the relevant creditors ratifying *ex post* the conduct of the liquidator previously undertaken on their behalf. Upon ratification, agency operates retroactively to validate the liquidator's conduct.

See RM-2 ¶ 90.

> Dr. Mokal further opines that:

> Since the liquidator *qua* liquidator acts in the interests of the company's creditors in any event though not formally as their agent, it may be perfectly proper for a liquidator, in appropriate circumstances, to agree formally to act as agent of some or all of the company's creditors. This may be the case, for example, where the liquidator, as a repeat-playing insolvency professional, is more efficaciously able to press a set of claims vested in a diverse and dispersed group of creditors lacking expertise in litigation in insolvency contexts than are those creditors themselves. For the liquidator in appropriate circumstances formally to act as an agent of certain creditors may create no conflict with the liquidator's functions *qua* liquidator and indeed may be complementary to proper discharge of such functions.

See RM-3 ¶ 57.

---

[21] This Court held *in re Hellas Telecommunications (Luxembourg) II SCA*, 524 B.R. 488, 522-23 (Bankr. S.D.N.Y. 2015) (Glenn, J.) that whether a foreign liquidator is entitled to bring claims on behalf of the estate's creditors is a matter of the law of the location of the foreign proceeding, and that agency principles will apply in the absence of statutory law permitting liquidators to bring claims on behalf of creditors. This Court refused to find an agency relationship in *Hellas*, under circumstances where the *Hellas* liquidators asserted an agency relationship on little more that consent from the estate's liquidation committee. *Hellas* is clearly distinguishable from this case, where the entire thrust of the Cayman Proceeding was for the JOLs to protect and assert the creditors' rights, the JOLs have been asserting claims on behalf of the Cayman creditors since the initial filing of the complaint against FDIC-R in February 2024, the Grand Court expressly sanctioned the bringing of claims against SVBFT and the Cayman creditors have manifested assent and reliance with respect to the agency while also being provided an opportunity to opt out of an agency relationship with the JOLs.

Dr. Mokal then set forth the various manners in which Cayman liquidators could be conferred agency status by an estate's creditors: (i) the liquidator may act in such a way as to assume the character of agent to some or all of the company's creditors, if such an agency relationship is entirely proper as a matter of Cayman law if and insofar as the liquidator's role, powers, duties, and functions *qua* agent to the creditors were consistent with the liquidator's other duties and functions; (ii) through consent, whether through express consent or acquiescence; (iii) the conduct of both the purported principal and agent, which can be inferred through circumstantial evidence; (iv) agency through *ex post* ratification. (RM-3 ¶ 89-95).

In other words, the JOLs (like any other third party) may be conferred the role of agent by the creditors of the SVB Cayman estate, and there is nothing about the JOLs appointment that somehow prohibits them from serving in an agency role. To the contrary, the JOLs' statutory duty to act in the interests of the Cayman creditors make them the logical and natural choice to serve as agent for the creditors and bring claims in the United States against those responsible for their losses.

The evidence that the Cayman creditors have consented to the JOLs acting as their agents is overwhelming:

- <u>First</u>, the Grand Court entered the Winding Up Order for the express purpose of permitting the JOLs to investigate matters and "take actions to establish the status of the Cayman Depositors." (Ledwidge Decl. ¶ 25). All relevant parties thereafter believed and undertook manifestations assent both as a matter of reliance as well as in furtherance of the explicit agency relationship. Subsequently, the Grand Order has issued Sanction Orders authorizing the JOLs to file litigations against FDIC-R, FDIC-C and SVBFG and the Cayman managers, including claims on behalf of the Cayman Depositors. (Ledwidge Decl. ¶¶ 31-34).

- <u>Second</u>, the JOLs have filed these claims on behalf of the creditors in the public records (other than the forthcoming Cayman manager claims), with the first complaint being filed against FDIC-R in February 2024. The JOLs have not received any affirmative objection from the creditors of the SVB Cayman estate in connection with the filing of this or any other litigation in the Unites States. To the contrary, since the outset, the creditors have

expected the JOLs to represent and protect their interest.  At the Chapter 15 hearing, a representative for a Cayman Depositor testified that he fully supports the JOLs' efforts to assert their rights. See Chapter 15 Case ECF No. 48 at  p. 64:6-9 (Regis Dale, Senior Advisor of SVB Cayman accountholder Bin Yuan Capital, responding affirmatively when asked if he supported "the activities and work of the [JOLs] as [the Cayman depositors'] judicially appointed agent").

- <u>Third</u>, to foreclose any uncertainty as to their role as agents, the JOLs issued an opt-out notice to all creditors of the SVB Cayman Estate, providing them the opportunity to opt-out of the JOLs acting as their agents in connection with the litigations filed and to be filed by the JOLs on their behalf.  Substantially all of the creditors did not choose to opt-out of the agency relationship and the circumstances make clear that the effect was understood. (Ledwidge Decl. ¶¶ 62-63).[22]

The JOLs have an agency relationship with the creditors of the SVB Cayman estate, and as Dr. Mokal states, Cayman law permits this agency relationship to be ratified on both a prospective and a retroactive basis.  To the extent that SVBFG seeks to challenge the agency relationship, its own expert has admitted in deposition testimony that such challenge is a trial issue. (Said Tr. 312:3-15).

## CONCLUSION

WHEREFORE, for the reasons set forth herein, the JOLs respectfully request entry of an Order finding that they have standing to assert the claims set forth in the Amended Complaint and the Amended POC, and for whatever additional relief this Court deems just and proper.

---

[22] As set forth in the Ledwidge Decl., the JOLs did receive a small number of opt-outs from the Cayman creditors. The JOLs do not assert claims on behalf of these opt-out creditors, and neither do the JOLs assert claims on behalf of the *Knight League* plaintiffs.  (Ledwidge Decl. ¶ 62-63).  But this is an issue for quantum of damages at trial, and in no way effects the agency relationship that exists between the JOLs and substantially all of the SVB Cayman creditors.

Dated:  New York, New York
         March 25, 2025

                                   Respectfully submitted,

                                   HOLLAND & KNIGHT LLP


                          By:      */s/ Warren E. Gluck*
                                   Warren E. Gluck, Esq.
                                   HOLLAND & KNIGHT LLP
                                   787 Seventh Avenue, 31st Floor
                                   New York, New York 10019
                                   Telephone: (212) 513-3200
                                   Email: warren.gluck@hklaw.com

                                   Richard A. Bixter, Jr., Esq. (*pro hac vice*)
                                   HOLLAND & KNIGHT LLP
                                   150 N. Riverside Plaza Suite 2700
                                   Chicago, Illinois 60606
                                   Telephone: 312-263-3600
                                   Email: richard.bixter@hklaw.com

                                   *Counsel for the Joint Official Liquidators*
                                   *of Silicon Valley Bank (in Official Cayman*
                                   *Islands Liquidation)*

## **CERTIFICATE OF SERVICE**

I, Warren Gluck, an attorney, certify that on March 25, 2025, I caused the foregoing and accompanying Declaration of Niall Ledwidge to be served on all parties registered to accept electronic service through the CM/ECF system by filing the same through the CM/ECF system.

_/s/ Warren Gluck_