Robert A. Sacks
James L. Bromley
Adam S. Paris
Christian P. Jensen
**SULLIVAN & CROMWELL LLP**
125 Broad Street
New York, NY 10004-2498
Telephone: (212) 558-4000
Facsimile: (212) 558-3588

*Counsel to SVB Financial Trust, as successor*
*to the Debtor*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| SVB FINANCIAL GROUP, | : | |
| Reorganized Debtor.[1] | : | Case No. 23-10367 (MG) |
| | : | |
| JOINT OFFICIAL LIQUIDATORS OF SILICON VALLEY BANK (IN OFFICIAL CAYMAN ISLANDS LIQUIDATION), | : | Adv. Case No. 24-4014 (MG) |
| Plaintiff, | : | |
| v. | : | |
| SVB FINANCIAL GROUP, | : | |
| Defendant. | : | |

**SVB FINANCIAL TRUST'S MEMORANDUM OF LAW**
**IN FURTHER SUPPORT OF ITS OBJECTION TO THE JOLs' STANDING**

---

[1] The last four digits of SVB Financial Group's tax identification number are 2278.

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ...................................................................................................................1

BACKGROUND ...................................................................................................................3

    A.    SVB, SVB Cayman, and SVBFG .................................................................3

    B.    The Cayman Winding-Up Order......................................................................4

    C.    The JOLs' Failed Attempt to Gain Chapter 15 Recognition...................................5

    D.    The JOLs' Litigation Against the FDIC in the District of Columbia.......................7

    E.    The JOLs' Proofs of Claim and Adversary Complaint Against SVBFG .................7

    F.    The October 2024 Sanction Order ..........................................................8

    G.    SVBFG's Litigation Against the FDIC ..............................................................8

    H.    The JOLs' Litigation Against the FDIC in California ...........................................10

    I.    The JOLs' Second Amended Proof of Claim and Amended Complaint................10

ARGUMENT ...................................................................................................................11

I.    The JOLs Have No Standing to Pursue the Officeholder and Creditor Claims
Under the Bankruptcy Code..................................................................................11

II.    FIRREA Bars All of the JOLs' Proposed Claims. ............................................15

    A.    Courts Have Adopted Two Interpretations of Section 1821(d)(2)(A)(i)...............15

    B.    The JOLs Have No Standing Under *Zucker* and *Verdi*'s Textual
Interpretation of Section 1821(d)(2)(A)(i)..............................................................18

        1.    The JOLs Are Asserting the Rights of the "Insured Depository
Institution" or Its "Depositors."..................................................................19

        2.    The Company and Creditor Claims Are "with Respect to" SVB and
Its Assets. .....................................................................................................20

    C.    The JOLs Have No Standing Under Section 1821(d)(2)(A)(i) Even If the
Direct-Derivative Distinction Applies. ....................................................................20

        1.    The Laws of the Depository Institution's State of Incorporation
Determine Whether a Claim Is Derivative for Purposes of
Section 1821(d)(2)(A)(i)................................................................................21

2.    The Company and Creditor Claims Are Derivative Under California Law. .......................................................................22

D.    The JOLs Have No Standing to Pursue the Officeholder Claims Under Section 1821(j)...............................................................................26

E.    The JOLs' Arguments Resisting the Application of FIRREA Are Meritless. .........27

1.    "Extraterritorial" Application of FIRREA ...............................................27

2.    "Particularized Harm to Cayman Depositor-Customers" ..........................29

3.    "Impingement" on FDIC-R's Rights and Double Recovery.....................31

III.    The JOLs Have No Standing to Pursue Any Proposed Claim Under Cayman Law..........31

A.    Company Claims.................................................................................31

B.    Creditor Claims.................................................................................32

C.    Officeholder Claims...........................................................................36

D.    Rule in *Gibbs* ...................................................................................39

CONCLUSION.............................................................................................40

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aaron* v. *Illinois Nat'l Ins. Co.*,
2023 WL 7389034 (E.D. La. Nov. 8, 2023) ........................................................................18

*Abitron Austria GmbH* v. *Hetronic Int'l, Inc.*,
600 U.S. 412 (2023)......................................................................................................27, 28

*Adato* v. *Kagan*,
599 F.2d 1111 (2d Cir. 1979)...............................................................................................30

*In re Adelphia Commc'ns Corp.*,
365 B.R. 24 (Bankr. S.D.N.Y. 2007)...................................................................................16

*AHW Inv. P'ship* v. *Citigroup, Inc.*,
806 F.3d 695 (2d Cir. 2015)................................................................................................21

*Am. Nat'l Ins. Co.* v. *JPMorgan Chase & Co.*,
893 F. Supp. 2d 218 (D.D.C. 2012) ....................................................................................21

*Anderson* v. *Derrick*,
32 P.2d 1078 (Cal. 1934) ....................................................................................................25

*AP-Fonden* v. *Depaolo*,
2025 WL 879800 (E.D.N.Y. Mar. 21, 2025).............................................................16, 17, 18

*Atherton* v. *FDIC*,
519 U.S. 213 (1997)............................................................................................................21

*Avikian* v. *WTC Fin. Corp.*,
120 Cal. Rptr. 2d 243 (Ct. App. 2002).......................................................................23, 25, 29

*Barnes* v. *Harris*,
783 F.3d 1185 (10th Cir. 2015) ................................................................................16, 22, 26

*Bartlett* v. *Baasiri*,
81 F.4th 28 (2d Cir. 2023) ...................................................................................................13

*In re Beach First Nat. Bancshares, Inc.*,
702 F.3d 772 (4th Cir. 2012) ....................................................................................16, 25, 26

*In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*,
389 B.R. 325 (S.D.N.Y. 2008)..............................................................................................12

*In re Bozel*,
    434 B.R. 86 (Bankr. S.D.N.Y. 2010)........................................................................12

*Cortlandt St. Recovery Corp.* v. *Hellas Telecomms., S.a.r.l*,
    790 F.3d 411 (2d Cir. 2015)..................................................................................35

*Cotton* v. *Expo Power Sys., Inc.*,
    89 Cal. Rptr. 3d 112 (Ct. App. 2009)...................................................................22

*In re Coudert Bros. LLP*,
    673 F.3d 180 (2d Cir. 2012)..................................................................................21

*Courtney* v. *Halleran*,
    485 F.3d 942 (7th Cir. 2007) ...............................................................................16

*First Empire Bank-New York* v. *FDIC*,
    572 F.2d 1361 (9th Cir. 1978)..............................................................................30

*First Nat. Bank of Bos. (Int'l)* v. *Banco Nacional de Cuba*,
    658 F.2d 895 (2d Cir. 1981)..................................................................................19

*In re Gaston & Snow*,
    243 F.3d 599 (2d Cir. 2001)..................................................................................21

*Gross* v. *AT&T Inc.*,
    2019 WL 3500496 (S.D.N.Y. July 31, 2019) ......................................................35

*Grosset* v. *Wenaas*,
    175 P.3d 1184 (Cal. 2008) ...................................................................................22

*Hamid* v. *Price Waterhouse*,
    51 F.3d 1411 (9th Cir. 1995) ...............................................................................16

*In re Hellas Telecomms. (Luxembourg) II SCA*,
    535 B.R. 543 (Bankr. S.D.N.Y. 2015)............................................................15, 32

*Hindes* v. *FDIC*,
    137 F.3d 148 (3d Cir. 1998)..................................................................................27

*In re Iida*,
    377 B.R. 243 (B.A.P. 9th Cir. 2007)...............................................................11, 13

*Levin* v. *Miller*,
    763 F.3d 667 (7th Cir. 2014) .................................................................16, 20, 31

*In re Loy*,
    380 B.R. 154 (Bankr. E.D. Va. 2007)...........................................11, 13, 14, 15

*Lubin* v. *Skow*,
    382 F. App'x 866 (11th Cir. 2010) ..................................................................16, 21, 25, 26

*In re Markus*,
    610 B.R. 64 (Bankr. S.D.N.Y. 2019) ........................................................................13

*Moyal* v. *Munsterland Gruppe GmbH & Co. KG*,
    539 F. Supp. 3d 305 (S.D.N.Y. 2021) .......................................................................13

*NAF Holdings, LLC* v. *Li & Fung (Trading) Ltd.*,
    772 F.3d 740 (2d Cir. 2014)......................................................................................21

*Nelson* v. *Anderson*,
    84 Cal. Rptr. 2d 753 (Ct. App. 1999).........................................................................23

*O'Hare* v. *Marine Elec. Co.*,
    39 Cal. Rptr. 799 (Ct. App. 1964).............................................................................25

*O'Melveny & Myers* v. *FDIC*,
    512 U.S. 79 (1994)......................................................................................16, 21, 32

*Oakland Raiders* v. *Nat'l Football League*,
    32 Cal. Rptr. 3d 266 (Ct. App. 2005).........................................................................24

*Orchard Enter. NY, Inc.* v. *Megabop Recs. Ltd.*,
    2011 WL 832881 (S.D.N.Y. Mar. 4, 2011) ..............................................................12

*PacLink Commc'ns Int'l, Inc.* v. *Super. Ct.*,
    109 Cal. Rptr. 2d 436 (Ct. App. 2001).........................................................24, 25, 29, 30

*Pareto* v. *FDIC*,
    139 F.3d 696 (9th Cir. 1998) ..........................................................................16, 22, 24, 26

*Rsrv. Int'l Liquidity Fund, Ltd.* v. *Caxton Int'l Ltd.*,
    2010 WL 1779282 (S.D.N.Y. Apr. 29, 2010)........................................................12, 13, 14, 15

*Schrage* v. *Schrage*,
    284 Cal. Rptr. 3d 279 (Ct. App. 2021).......................................................................23

*Schuster* v. *Gardner*,
    25 Cal. Rptr. 3d 468 (Ct. App. 2005).........................................................................22, 30, 31

*In re Sunrise Sec. Litig.*,
    916 F.2d 874 (3d Cir. 1990)......................................................................................16, 21

*Thole* v. *U.S. Bank N.A.*,
    590 U.S. 538 (2020).................................................................................................35

*Trikona Advisers Ltd.* v. *Chugh,*
    846 F.3d 22 (2d Cir. 2017)...................................................................................13

*Tuli* v. *Specialty Surgical Ctr. of Thousand Oaks, LLC,*
    326 Cal. Rptr. 3d 357 (Ct. App. 2024)................................................................30

*Turner* v. *Victoria,*
    532 P.2d 1101 (Cal. 2023) .................................................................................24

*United States* v. *BCCI Holdings (Luxembourg), S.A.,*
    48 F.3d 551 (D.C. Cir. 1995).......................................................................15, 19

*United States* v. *J.A. Jones Const. Grp., LLC,*
    333 B.R. 637 (E.D.N.Y. 2005) ...........................................................................12

*Verdi* v. *FDIC,*
    2024 WL 4252038 (S.D.N.Y. Sept. 20, 2024).............................................. *passim*

*Vertiv, Inc.* v. *Wayne Burt PTE, Ltd.,*
    92 F.4th 169 (3d Cir. 2024) ...............................................................................13

*Volges* v. *Resol. Tr. Corp.,*
    32 F.3d 50 (2d Cir. 1994) ..................................................................................26

*Zucker* v. *Rodriguez,*
    919 F.3d 649 (1st Cir. 2019) ............................................................... *passim*

**Statutes**

11 U.S.C. § 109(b) ...................................................................................................5

11 U.S.C. § 541(d) ...................................................................................................8

11 U.S.C. § 1501(c) .................................................................................................5

11 U.S.C. § 1509(b) ................................................................................2, 11, 13, 14

11 U.S.C. § 1509(f).................................................................................2, 13, 14, 15

12 U.S.C. § 1821(d)(2)(A)(i) ............................................................................ *passim*

12 U.S.C. § 1821(j)................................................................................2, 26, 27

California Corporations Code § 506 .........................................................................25

California Financial Code § 1406 .............................................................................39

**Other Authorities**

Ballantine & Sterling California Corporation Law (4th ed. 2025) ..................................................23

Collier on Bankruptcy (16th ed. 2025) ...................................................................................12, 13

H.R. Rep. No. 109-31 (2005)............................................................................................................11

Marsh's California Corporation Law (5th ed. 2025) ....................................................................25

Pub. L. No. 101-73, 103 Stat. 183 (1989)....................................................................................30

SVB Financial Trust ("<u>SVBFT</u>"), as successor-in-interest to SVB Financial Group ("<u>SVBFG</u>" or the "<u>Debtor</u>"), submits this memorandum in further support of its objection ("<u>Objection</u>") (Dkt. No. 1048)[2] to the standing of the Joint Official Liquidators of Silicon Valley Bank (in Official Cayman Islands Liquidation) (the "<u>JOLs</u>") to pursue their proofs of claim (Nos. 1247, 1450, 1489) and adversary proceeding in Case No. 24-4014 (MG) ("<u>Adv. Dkt.</u>").

## <u>INTRODUCTION</u>

Fifteen months after the August 11, 2023 claim bar date, and more than three months after the Court held a hearing on the JOLs' standing on July 18, 2024, the JOLs filed a Second Amended Proof of Claim and an Amended Complaint in November 2024, alleging a total of five counts against SVBFG.  (Claim No. 1489 ("<u>Second Amended POC</u>"); Adv. Dkt. No. 11 ("<u>Amended Complaint</u>").)[3]  Counts I of the Second Amended POC and the Amended Complaint both seek to "clawback" the $294 million dividend that Silicon Valley Bank ("<u>SVB</u>") paid SVBFG in 2022.  Counts II, III, and IV of the Second Amended POC assert that SVBFG was negligent for mismanaging SVB and its Cayman Islands branch ("<u>SVB Cayman</u>").  Because multiple causes of action are embedded within each count, the parties' experts (Mr. Sebastian Said for SVBFT and Dr. Riz Mokal for the JOLs) divide the JOLs' claims (the "<u>Proposed Claims</u>") into three categories:

- <u>Officeholder Claims</u>. These are claims to avoid the $294 million dividend under sections 145, 146, and 147 of the Cayman Companies Act ("<u>Companies Act</u>"), which are asserted in Counts I of the Second Amended POC and the Amended Complaint.  (Second Am. POC ¶¶ 145-147; Am. Compl. ¶¶ 161-169.)  Both experts agree that these claims are vested in the JOLs as Cayman "officeholders" and do not constitute assets of SVB.

- <u>Creditor Claims</u>.  These include (i) the negligence claims asserted in Counts II, III, and IV of the Second Amended POC (to the extent they allege harm specific to SVB's Cayman depositors); and (ii) claims under the Cayman Fraudulent Dispositions Act ("<u>FDA</u>") in connection with the $294 million dividend, which are asserted in Counts I of the Second

---

[2] Unless otherwise specified, docket citations are to entries in this chapter 11 case.

[3] SVBFT separately disputes these filings' validity and timeliness.  (Dkt. No. 1605.)

Amended POC and Amended Complaint.  (Second Am. POC ¶¶ 145-155; Am. Compl. ¶ 161-169.)  Both experts agree that these claims are vested in SVB's creditors.

- Company Claims.  These include (i) claims for unlawful dividend under section 34(2) of the Companies Act, which are asserted in Counts I of the Second Amended POC and Amended Complaint; and (ii) the negligence claims asserted in Counts II, III, and IV of the Second Amended POC to the extent they do not allege harm specific to Cayman depositors. (Second Am. POC ¶¶ 145-155; Am. Compl. ¶ 161-169.)  The experts do not dispute that these claims are vested in SVB.

Under either U.S. or Cayman law, the JOLs lack standing to assert any of these claims.

*First*, having lost chapter 15 recognition, the JOLs have no "capacity to sue and be sued in a court in the United States" under U.S. bankruptcy law.  11 U.S.C. § 1509(b).  The limited exception in section 1509(f) applies only to "a claim which is the property of the [chapter 15] debtor."  The JOLs thus have no standing to pursue the Officeholder and Creditor Claims, which both experts agree are *not* property of SVB Cayman or SVB.

*Second*, whether the Court adopts the broader or narrower reading of 12 U.S.C. § 1821(d)(2)(A)(i), the Federal Deposit Insurance Corporation ("FDIC") succeeds to the Company and Creditor Claims because they (i) constitute "rights … of the insured depository institution," its "accountholder," or "depositor"; (ii) are "with respect to [SVB] and the assets of [SVB]"; and (iii) are derivative of harm to SVB.  Section 1821(j) further bars the Court from allowing the JOLs to pursue the Officeholder Claims because doing so would "restrain or affect the exercise of [the FDIC's] powers or functions."

*Third*, Cayman law points to the same result.  The JOLs have no standing to pursue the Company Claims, as both experts agree that Cayman law looks to U.S. law to decide who may act on behalf of SVB.  The JOLs have no standing to assert the Creditor Claims because they are not (and cannot be) Cayman depositors' agents either in their capacity as liquidators or under Cayman's general principles of agency.  The JOLs also have no standing to bring the Officeholder Claims, since they have no power as ancillary liquidators to assert claims extraterritorially.

Dr. Mokal's contrary assertions—which are inconsistent with his testimony in the chapter 15 case and precedent since the 19th century—are unavailing.

For these reasons, as further amplified below, the Court should disallow the JOLs' proofs of claim and dismiss their adversary proceeding against SVBFG all for lack of standing.

## **BACKGROUND**

### A.    SVB, SVB Cayman, and SVBFG

SVB was an FDIC-insured, California-chartered, and California-headquartered bank founded in 1983.  (No. 24-10076 (MG) (Bankr. S.D.N.Y.) ("Ch. 15 Dkt."), Dkt. No. 44 ("Ch. 15 Opn.") at 7.)  In 2007, SVB registered as a foreign company in the Cayman Islands and was granted a Class "B" banking license by the Cayman Islands Monetary Authority ("CIMA").  (*Id.* at 8.)  Although SVB operated a branch in the Cayman Islands pursuant to the license, SVB Cayman "was *not* separately incorporated," had "no employees," and maintained nothing "more than a mail-drop presence in the Cayman Islands."  (*Id.* at 2, 23-25.)

SVB Cayman offered its customers ("Cayman Depositors") three types of accounts—Eurodollar Sweep Accounts, Eurodollar Money Market Accounts, and Eurodollar Operating Accounts.  (*Id.* at 2.)  The JOLs admit that "*all* of the credits associated with all of the SVB Cayman accounts were geographically sitused in the United States at all times material."  (Ch. 15 Dkt. No. 42 ¶ 47; *see also id.* Dkt. No. 1 ¶¶ 5, 47-48, 71-72.)

Before March 10, 2023, SVBFG was the parent company of SVB.  (Dkt. No. 21 ("First Day Decl.") ¶ 6.)  SVBFG was incorporated in Delaware, with offices in California and New York.  (*Id.* ¶ 1; *id.* Ex. I.)  SVBFG was never registered and had no employees or assets in the Cayman Islands.  (*Id.* Exs. A, H.)

On March 10, 2023, SVB was closed on the order of the California Department of Financial Protection and Innovation ("DFPI").  (Ch. 15 Opn. 12.)  The DFPI appointed the FDIC as receiver

of SVB ("FDIC-R1") that same day.  (*Id.*)  On March 12, 2023, the Treasury Secretary, Federal Reserve Board, and FDIC issued a joint statement announcing that all depositors of SVB would have full access to their deposits.  (*Id.*)  The next day, the FDIC transferred substantially all assets of SVB and its deposits to Silicon Valley Bridge Bank, N.A. ("Bridge Bank")  (*Id.*)  On March 27, 2023, First Citizens Bank & Trust Company ("First Citizens") purchased certain SVB assets from Bridge Bank, which did not include SVB Cayman.  (*Id.* at 13)  Bridge Bank was placed into FDIC's receivership ("FDIC-R2," together with FDIC-R1, "FDIC-R") on March 26, 2023.  (Obj. ¶ 8.)

On March 17, 2023, SVBFG filed a voluntary chapter 11 petition with the Court.  (Dkt. No. 1.)  The Court confirmed SVBFG's Second Amended Plan of Reorganization (the "Plan") on August 2, 2024 (Dkt. No. 1379), and the Plan became effective on November 7, 2024 (Dkt. No. 1563).  SVBFT is SVBFG's successor-in-interest under the Plan.  (Dkt. No. 1379.)

### B.    The Cayman Winding-Up Order

On June 13, 2023, certain SVB Cayman depositors submitted a petition to the Grand Court of the Cayman Islands ("Cayman Court"), seeking to wind up SVB Cayman under the Cayman Companies Act.  (Ch. 15 Opn. 14.)  SVBFG was not notified of the filing and was never afforded an opportunity to make an appearance.

On June 30, 2023, the Cayman Court issued an order winding up SVB ("Winding-Up Order") and appointed Messrs. Childe, Pearson, and Ledwidge as the JOLs.  (Dkt. No. 1335-9 ¶ 2.)  Although the Winding-Up Order provided that the entire SVB "be wound up … under the provisions of the Companies Act," it limited the JOLs' powers to "acting in respect of the assets and affairs of the *Cayman Islands branch* of [SVB] and its creditors"—not SVB itself.  (*Id.* ¶¶ 1-2 (emphasis added).)

The Cayman Court explained its reasons in a judgment dated July 21, 2023.  (Dkt. No. 1335-10 ("Winding-Up Judgment").)  Although the Winding-Up Judgment noted that "[t]here

appears to be a battle looming in respect of the treatment of the American and Cayman depositors"
by *FDIC-R* (*id.* ¶¶ 7, 63), neither the Winding-Up Judgment nor Order concerned any alleged
wrongdoing by *SVBFG*, or any mistreatment of Cayman Depositors in *SVBFG*'s bankruptcy (*see
id.*; Dkt. No. 1335-9).

### C.    The JOLs' Failed Attempt to Gain Chapter 15 Recognition

On January 10, 2024, without notice to SVBFG, the JOLs requested that the Cayman Court
sanction "[t]he filing of an application by the JOLs for recognition by [this] Court pursuant to
Chapter 15 of the [U.S.] Bankruptcy Code." (Dkt. No. 1335-11 ("January Sanction Order") ¶¶ 1-2.)
The Cayman Court granted the application the following day. (*Id.*)

On January 18, 2024, once again without notice to SVBFG, the JOLs filed their chapter 15
petition with the Court. (Ch. 15 Dkt. No. 1; Dkt. No. 1605 ¶ 4.) After holding an evidentiary
hearing on February 14, 2024—which included examinations of the JOLs' and FDIC's Cayman
law experts, Dr. Riz Mokal and Thomas Lowe KC—the Court dismissed the petition on
February 22, 2024. (Ch. 15 Opn. 6-7.) The Court concluded that "SVB Cayman's existence was
inseparable from that of Silicon Valley Bank," and a bank is ineligible for relief under
sections 109(b)(2) and 1501(c)(1) of the Bankruptcy Code. (*Id.* at 23-26.) Regarding Cayman
Depositors' participation in the FDIC claims process, the Court observed:

> [A]ll but 11 of the approximately 615 of SVB Cayman's former clients with
> positive balances in the SVB Cayman Deposit Accounts have submitted claims to
> the FDIC-R in its capacity as receiver for the Bank. Of the 605 claims filed by such
> creditors, the FDIC indicates that 501 have been fully allowed, 18 have been
> partially allowed, and 76 have been disallowed. Of the remaining 10 timely filed
> claims, six were duplicative claims and four were ultimately withdrawn.
> Additionally, of the 94 claims that were fully or partially disallowed, 67 holders of
> such claims are currently challenging the FDIC's denial of their claims in the SVB
> Receivership in the case captioned *Knight League Limited* v. *FDIC*, Case
> No. 23-cv-03063-APM, U.S. Dist. Ct., Dist. of Colum., seeking determinations on
> a *de novo* basis.

5

(*Id.* at 16 (citations omitted).)[4]

On February 10, 2025, the District Court (Schofield, J.) affirmed the Court's dismissal of the JOLs' chapter 15 petition.  (No. 24-cv-1871 (LGS) (S.D.N.Y.), Dkt. 10 ("Ch. 15 Affirmance").)  Like both the Court and the Cayman Court, the District Court held that SVB Cayman was "*a branch of SVB without a separate legal existence from SVB*" such that it "did not exist or operate entirely independently from SVB."  (*Id.* at 8 (emphasis added).)  The District Court rejected the JOLs' argument that "by operation of the Cayman winding-up order, SVB Cayman became an insolvency estate and trust under Cayman Islands law," because this "extraordinary proposition" had "no legal authority" and "each step of its foundation is faulty."  (*Id.* at 8-9.)  The District Court also observed that "SVB did not cease to exist as a bank for purposes of the Bankruptcy Code when the FDIC placed it in receivership" (*id.* at 9), such that "the FDIC stepping into SVB's shoes and succeeding to SVB's rights does not transform SVB Cayman into a new legal entity that is something other than the foreign branch of a domestic, FDIC-insured bank" (*id.* at 10).  After noting "the overarching purpose of FDIC receiverships to give the FDIC exclusive powers to administer failed banks and their assets and liabilities" (*id.*), the District Court cautioned that the JOLs "want Chapter 15 to compete and interfere with the FDIC's treatment of SVB Cayman, which is exactly what the exclusion of FDIC-insured banks from Chapter 15 was trying to avoid" (*id.* at 11).  Rather, "the FDIC stepped into the shoes of SVB—including SVB Cayman—and assumed all of SVB's rights and liabilities."  (*Id.*)

---

[4] Plaintiffs and the FDIC in the *Knight League* action entered into a joint stipulation of dismissal on June 14, 2024, and the district court dismissed the action with prejudice on June 17, 2024.  (No. 23-cv-3063 (APM) (D.D.C.), Dkt. Nos. 28, 29.)

**D.      The JOLs' Litigation Against the FDIC in the District of Columbia**

The FDIC imposed a July 10, 2023 deadline for filing claims in the SVB receivership.  That

day, the JOLs submitted a proof of claim in Bridge Bank's, rather than in SVB's, receivership.

(Ch. 15 Dkt. No. 42-17.)  The FDIC disallowed the JOLs' claim on December 26, 2023.

On February 23, 2024, the JOLs filed a complaint against the FDIC in the District of

Columbia.  (*Ledwidge* v. *FDIC*, No. 24-cv-513 (APM) (D.D.C.).)  The operative complaint pleads

eleven claims under U.S. and Cayman law, including (i) *de novo* review of the FDIC's

disallowance, (ii) conversion and avoidance in connection with the alleged dissipation of SVB

Cayman deposits, (iii) breach of SVB Cayman account agreements, and (iv) violation of Due

Process under the U.S. Constitution.  (*Id.* Dkt. No. 4 ¶¶ 114-207.)  The FDIC's motion to dismiss

for lack of standing remains pending.  (*Id.* Dkt. No. 12.)

**E.      The JOLs' Proofs of Claim and Adversary Complaint Against SVBFG**

The JOLs first appeared in this chapter 11 case when it filed a proof of claim (the "<u>Initial

Proof of Claim</u>") on the August 11, 2023 claim bar date.  (Dkt. No. 1048 at 22-25.)  The Initial

Proof of Claim included little detail, but noted that (i) the JOLs had filed a claim in the Bridge

Bank receivership, and (ii) the JOLs intended to "reserve the right to amend or supplement" their

proof of claim.  (*Id.* at 30, 40.)

On April 18, 2024, SVBFG filed its Objection to the Initial Proof of Claim in part because

the JOLs lack standing.  (Dkt. No. 1048.)  The JOLs responded to the standing argument in

SVBFG's Objection on June 24, 2024 (Dkt. No. 1218), and filed an amended proof of claim on

June 28, 2024 (Claim No. 1450 (the "<u>First Amended POC</u>")).  The First Amended POC alleges

(i) breaches of fiduciary duty (at ¶ 98), (ii) violations of the California Financial Code (at ¶ 100),

and (iii) in two subparagraphs, a laundry list of claims purportedly under Cayman law, including

breach of fiduciary duty (at ¶ 101(a)) and various statutory claims under sections 34(2), 145, 146,

and 147 of the Companies Act and section 4 of the FDA (at ¶ 101(b)).

Both SVBFG and FDIC-R replied to the JOLs' response on July 11, 2024, and the Court held a hearing on July 18, 2024. (Dkt. Nos. 1277-79.) On July 24, 2024, the JOLs filed an adversary complaint and commenced an adversary proceeding against SVBFG. (Adv. Dkt. No. 1 ("Initial Complaint").) The Initial Complaint pleads causes of action under (i) the California Financial Code (Count I), (ii) section 34(2) of the Companies Act (Count II), and (iii) section 541(d) of the Bankruptcy Code (Count III). (*Id.*) All claims pleaded in the First Amended POC and Initial Complaint stemmed from (i) SVBFG's alleged "severe[] mismanage[ment] [of] SVB in the years leading up to the SVB Collapse" and (ii) a $294 million dividend paid by SVB to SVBFG in 2022. (Am. POC ¶ 98; Initial Compl. ¶¶ 110-125.)

### F.      The October 2024 Sanction Order

Almost three months later, in September 2024, the JOLs returned to the Cayman Court for the third time without notice to SVBFG. (Dkt. No. 1605 ¶ 45.) Based on the JOLs' *ex parte* application—which the JOLs have never produced—the Cayman Court granted the JOLs retroactive "sanction to file and pursue the Amended Proof of Claim and the Adversary Complaint against SVB Financial Group, as filed … on 28 June 2024 (Case No. 23-10367)," and "to take all steps in those proceedings as the JOLs consider necessary and appropriate." (Dkt. No. 1561-3 ("October Sanction Order") ¶ 5.) The Order also sanctioned the JOLs to file the February 2024 complaint against the FDIC in the District of Columbia and pursue "claims against the executives and employees of SVB who had responsibility for managing and operating [SVB] Cayman." (*Id.* ¶¶ 4, 6.) All materials that the JOLs submitted in connection with the October Sanction Order remain under seal. (*Id.* ¶ 8.) Neither SVBFT nor the Cayman law experts in this proceeding have reviewed those materials. (Dkt. No. 1605 at 19.)

### G.      SVBFG's Litigation Against the FDIC

As a successor-depositor of the former SVB, SVBFT is seeking the return of its $1.98 billion deposit funds, which the FDIC has refused to make available to SVBFT on account

of certain alleged "setoff" claims.  (*See, e.g.*, Dkt. Nos. 1081, 1268, 1353, 1376, 1378, 1406, 1446.)

FDIC-R asserted in this chapter 11 proceeding that its "setoff" claims were preserved

notwithstanding its failure to timely file a proof of claim and the discharge provisions of the

Bankruptcy Code.  (Dkt. No. 1268.)  On August 2, 2024, the Court ruled that that FDIC-R1's

"defensive" setoff claims are preserved and cannot be discharged post-confirmation.  (Dkt.

No. 1380 (the "Setoff Order").)  The Second Circuit recently granted SVBFT's petition for direct

appeal from the Setoff Order.  (No. 24-2882 (2d Cir.), Dkt. No. 13.)

In connection with the $1.98 billion deposit funds, SVBFT also brought claims against

FDIC-R1, FDIC-R2, and the FDIC in its corporate capacity ("FDIC-C") in the Northern District

of California (the "California Court").  (No. 24-cv-1321 (BLF) (N.D. Cal.) ("FDIC-R N.D. Cal.

Dkt."); No. 23-cv-6543 (BLF) (N.D. Cal.) ("FDIC-C N.D. Cal. Dkt.").)  Relying on the Court's

Setoff Order, FDIC-R asserted multiple "setoff" claims against SVBFG on January 10, 2025, after

the California Court partially denied its motion to dismiss.  (FDIC-R N.D. Cal. Dkt. No. 135

("FDIC-R Answer").)  As relevant here, FDIC-R (i) contends that that SVBFG is vicariously

responsible for breaches of fiduciary duties through the mismanagement of SVB, (ii) claims that

SVBFG was negligent in failing to "avoid causing SVB unnecessary risk of loss and to serve as a

source of financial and managerial strength to SVB," and (iii) seeks to avoid the $294 million

bank-to-parent dividend from 2022 as a fraudulent transfer.  (*Id.* at 122-25.)  On March 20, 2025,

FDIC-C also asserted affirmative defenses based on SVBFG's purported "mismanagement" of

SVB and SVB's "$294 million dividend to SVBFG in December 2022."  (FDIC-C N.D. Cal. Dkt.

No. 175 ("FDIC-C Answer") at 54-57.)  These "setoff" claims and affirmative defenses, as well as

SVBFT's claims against the FDIC, remain pending in the California Court.

### H.    The JOLs' Litigation Against the FDIC in California

On November 22, 2024, the JOLs commenced an action against FDIC-C and its former chairman Martin Gruenberg in the California Court.  (*Ledwidge* v. *FDIC*, No. 24-cv-8352 (BLF) (N.D. Cal.).)  Claims raised by the JOLs in that action mirrored those asserted by SVBFG against FDIC-C.  (*Id.* Dkt. No. 1, ¶¶ 129-183.)  On February 14, 2025, FDIC and Gruenberg moved to dismiss for the JOLs' lack standing to pursue claims on behalf of SVB or SVB Cayman Depositors. (*Id.* Dkt. No. 26.)  That motion remains pending, although the JOLs indicated in a recent filing that it may file an amended complaint on or before April 3, 2025.  (*Id.* Dkt. Nos. 35, 36.)

On March 3, 2025, during deposition of SVBFT's Cayman law expert, counsel for the JOLs introduced a November 21, 2024 order issued by the Cayman Court, which purportedly sanctioned the California action against FDIC-C.  (Dkt. No. 1731, Ex. D ("Said Dep.") at 167-68; Dkt. No. 1727, Ex. I ("November Sanction Order").)  The November Sanction Order was not produced by the JOLs, not attached to any of the JOLs' filings (including expert reports), and not included in the deposition exhibits that the JOLs sent SVBFT's expert prior to deposition.  SVBFT has not had an opportunity to review any materials submitted by the JOLs in connection with the November Sanction Order, which is the subject of SVBFT's pending motion *in limine*.  (Dkt. No. 1727.)

### I.    The JOLs' Second Amended Proof of Claim and Amended Complaint

On November 22, 2024, the JOLs filed an amended adversary complaint and a second amended proof of claim against SVBFG.  The two filings plead duplicative claims and include multiple causes of action within each count.  (*Compare* Second Am. POC ¶ 146 *with* Am. Compl. ¶ 168.)  In short, Count I of the Second Amended POC and Count I of the Amended Complaint seek to avoid the alleged $294 million dividend paid by SVB to SVBFG in 2022, and the remaining counts assert that SVBFG was negligent (directly and vicariously) for the mismanagement of SVB, including SVB Cayman.  (Second Am. POC ¶¶ 145-155; Am. Compl. ¶¶ 161-169.)

These filings significantly depart from the Amended Proof of Claim and Initial Complaint. For instance, the JOLs no longer rely on the California Financial Code and the Bankruptcy Code, which took center stage in the previous filings. (*Compare* Initial Compl. ¶¶ 110-125 *with* Am. Compl. ¶¶ 161-69; Am. POC ¶¶ 97-101 *with* Second Am. POC ¶¶ 145-155.) Moreover, instead of seeking approximately $476 million, the Second Amended POC nearly doubles the claim amount to "[n]ot less than $944,000,000." (*Compare* Am. POC pt. 2 *with* Second Am. POC pt. 2.) The JOLs have not produced any document indicating that they have obtained sanction from the Cayman Court for these filings. (*Cf.* Oct. Sanction Order ¶ 5.)

## ARGUMENT

The JOLs lack standing to pursue the Proposed Claims under the Bankruptcy Code, Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), and Cayman law. The Court should disallow the proofs of claim and adversary complaint filed by the JOLs.

**I.      The JOLs Have No Standing to Pursue the Officeholder and Creditor Claims Under the Bankruptcy Code.**

Chapter 15 of the Bankruptcy Code was enacted in 2005 to implement the Model Law on Cross-Border Insolvency ("Model Law"). H.R. Rep. No. 109-31 ("House Report"), at 105-07 (2005). "The language of chapter 15 tracks the Model Law, with some modifications that are designed to conform the Model Law with existing United States law." *In re Iida*, 377 B.R. 243, 256 (B.A.P. 9th Cir. 2007). "One significant modification … appears in § 1509 relating to the right of direct access to courts." *Id.* at 256-57. Whereas Model Law article 9 provides that a foreign representative is "entitled to apply directly to a court," section 1509(b) modifies that language and requires the foreign representative *first* to obtain recognition under section 1517 before it may "gain[] the capacity to sue and be sued" in a U.S. court, "apply directly to a [U.S.] court … for appropriate relief," or request "comity or cooperation" by a U.S. court. *In re Loy*, 380 B.R. 154, 161-64 (Bankr. E.D. Va. 2007); *see also* 11 U.S.C. § 1509(b)(1)-(3).

The House Report accompanying chapter 15's enactment provides that section 1509 "varies the [Model Law's] language to fit United States procedural requirements" by "impos[ing] recognition of the foreign proceeding as a condition to further rights and duties of the foreign representative."  House Report at 110.  The Report explains that "[s]ubsections (b)(2), (b)(3), and (c) [of section 1509] make it clear that chapter 15 is intended to be the exclusive door to ancillary assistance to foreign proceedings."  *Id.*[5]

In light of the text and legislative history of section 1509, courts require the recognition of a foreign proceeding under section 1517 before a foreign representative may appear in a U.S. court. *See, e.g.*, *Rsrv. Int'l Liquidity Fund, Ltd.* v.  *Caxton Int'l Ltd.*, 2010 WL 1779282, at *6 (S.D.N.Y. Apr. 29, 2010) (before British Virgin Islands ("BVI") liquidators may intervene on behalf of a BVI-incorporated fund in an interpleader action, "they must obtain recognition under Chapter 15"); *United States* v.  *J.A. Jones Const. Grp., LLC*, 333 B.R. 637, 639 (E.D.N.Y. 2005) ("In the absence of recognition under chapter 15," the court "has no authority to consider" the stay request of defendant's Canadian receiver); *Orchard Enter. NY, Inc.* v.  *Megabop Recs. Ltd.*, 2011 WL 832881, at *3 (S.D.N.Y. Mar. 4, 2011) (entering default judgment against defendant and declining the stay request of defendant's English liquidator for lack of recognition); *see also* 8 Collier on Bankruptcy ¶ 1509.02 (16th ed. 2025).[6]

---

[5] "Prior to the enactment of Chapter 15, access to the United States courts by a foreign representative was not dependent on recognition," and under the former section 304, "all relief … was discretionary and based on subjective, comity-influenced factors."  *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 389 B.R. 325, 333 (S.D.N.Y. 2008) (citing cases and academic articles).  Thus, "[r]equiring recognition as a condition to nearly all court access and consequently as a condition to granting comity [also] distinguishes Chapter 15 from its predecessor section 304."  *Id.*

[6] *In re Bozel*, 434 B.R. 86 (Bankr. S.D.N.Y. 2010), is an outlier in the precedent.  There, before obtaining recognition, the BVI liquidator of a parent company filed a motion in the chapter 11 case of its wholly owned subsidiary, seeking to enforce the parent's corporate governance rights.  *Id.* at 93.  Without mentioning section 1509(b), the bankruptcy court ruled that chapter 15 did not preclude the liquidator's standing because "no foreign proceeding involving the [subsidiary] ha[d] been commenced."  *Id.* at 94.  Collier on Bankruptcy observes that "the *Bozel* case appears to be wrongly decided."  8 Collier on Bankruptcy ¶ 1509.02.  "[S]ection 1509 requires recognition of a foreign proceeding before the foreign representative of that proceeding can seek relief in a court in the United States."  *Id.*  That

Section 1509(f) is "[t]he sole specified exception" to this requirement. *Iida*, 377 B.R. at 258. It provides that "the failure of a foreign representative to commence a case or to obtain recognition under [chapter 15] does not affect any right the foreign representative may have to sue in a court in the United States to collect or recover *a claim which is the property of the debtor*." 11 U.S.C. § 1509(f) (emphasis added). This exception "is to be *narrowly* applied." *Caxton*, 2010 WL 1779282, at *15 (emphasis added); *see also Loy*, 380 B.R. at 165 (same). As the House Report explains, section 1509(f) is "a limited exception to the prior recognition requirement so that collection of a claim which is property of the debtor, for example an account receivable, by a foreign representative may proceed without commencement of a case or recognition under this chapter." House Report at 110-11.[7]

Here, the Court denied the JOLs' chapter 15 petition for recognition, and the District Court affirmed the denial on appeal. (Ch. 15 Opn. 29-30; Ch. 15 Affirmance 12.) To the extent that the

---

requirement is not confined "to situations where the foreign representative seeks access to a U.S. proceeding involving a debtor that is also a debtor in a foreign proceeding." *Id.*

In footnote 7 of the Chapter 15 Opinion, the Court cited four cases for the proposition that "courts, turning to principles of international comity, have nonetheless given deference to foreign courts and their judgments without recognition of a Chapter 15 case." (Ch. 15 Opn. 27-28 n.7.) To the extent that the JOLs rely on these cases, they are inapposite here. *Moyal* and *Trikona* did not involve a request for judicial assistance *by a foreign representative* like the JOLs do here. *See Trikona Advisers Ltd.* v. *Chugh*, 846 F.3d 22, 31 (2d Cir. 2017) ("No party to the district court proceeding is a 'representative' of a 'foreign proceeding.'"); *Moyal* v. *Munsterland Gruppe GmbH & Co. KG*, 539 F. Supp. 3d 305, 307, 309 n.1 (S.D.N.Y. 2021) (concerning a motion to dismiss or stay filed by the German insolvent company itself and noting that "chapter 15 recognition is not a prerequisite to grant comity to foreign proceedings *on the request of a party other than a foreign representative*" (emphasis added)). *Bartlett* has since been vacated by the Second Circuit on appeal. *See Bartlett* v. *Baasiri*, 81 F.4th 28, 37 (2d Cir. 2023), *cert. denied*, 144 S. Ct. 1456 (2024). And instead of the question of *standing*, which is the issue here, *Vertiv* addresses *abstention* for "adjudicatory comity" when a foreign proceeding is parallel to "a civil action in a United States court." *Vertiv, Inc.* v. *Wayne Burt PTE, Ltd.*, 92 F.4th 169, 178 (3d Cir. 2024). As to *Vertiv*, Collier further notes that "it is clear from the pleadings in the lower courts that neither party ever raised the issue of whether chapter 15 recognition was required." 8 Collier on Bankruptcy ¶ 1509.02.

[7] Of course, "chapter 15 does not constrain a foreign representative from acts that do not require judicial assistance," *In re Markus*, 610 B.R. 64, 79 (Bankr. S.D.N.Y. 2019) (Glenn, J.) (quoting *Iida*, 377 B.R. at 258), such as the exercise of rights to terminate a revocable trust, *id.*, or "shareholder rights to change the directors and officers" of subsidiary corporations," *Iida*, 377 B.R. at 258. Here, however, the JOLs are seeking "to sue … in a court in the United States," 11 U.S.C. § 1509(b)(1), which is a quintessential case for judicial assistance, *see Iida*, 377 B.R. at 258 ("The need for judicial assistance did not arise until the Iidas filed the Declaratory Judgment Action in Hawaii state court.").

13

JOLs have any "capacity to sue" absent recognition, *cf.* 11 U.S.C. § 1509(b)(1), their claims must

fall within the "limited exception" under section 1509(f), *Loy*, 380 B.R. at 165; *Caxton*, 2010

WL 1779282, at *15; (*see also* Ch. 15 Opn. 27-28).

Most of the JOLs' Proposed Claims, however, fall well outside of section 1509(f).  Both

experts agree that the Officeholder Claims (avoidance claims pursuant to sections 145, 146, 147

of the Companies Act) and Creditor Claims (negligence and FDA claims) are *not* "claim[s] which

[are] the property of the [purported chapter 15] debtor"—*i.e.*, SVB Cayman.  11 U.S.C. § 1509(f);

(*see also* Ch. 15 Opn. 22-25 (although the chapter 15 petition was filed in the name of "*SVB

Cayman*," "*SVB Cayman*" was not a separate legal entity from [*SVB*]" (emphasis added)); Ch. 15

Affirmance 8-12 (same); Winding-Up Judgment ¶ 53 (same under Cayman law)).

As to the Officeholder Claims, Dr. Mokal opines that they are claims that *only* the JOLs

may bring "pursuant to statutory powers which are never vested in the debtor and which, in any

given case, do not exist prior to the commencement of the relevant insolvency proceeding."  (Dkt.

No. 1730, Ex. B ("RM-2") ¶ 54; *see also* RM-2 ¶¶ 14.3, 53, 60 ("[T]he debtor itself is not vested

with Officeholder Claims whether it is in the relevant insolvency proceeding or is subject to a

different insolvency proceeding."), ¶ 65; Dkt. No. 1730, Ex. C ("RM-3") ¶ 90 ("[A]ny proceeds

from a successful Officeholder Claim do not fall in the Bank's general estate.").)  Mr. Said agrees.

(Dkt. No. 1731, Ex. A ("SS-1") ¶ 201 (Officeholder Claims "are vested in the liquidators

personally, rather than in the company itself."), ¶ 167 ("[P]roceeds of successful [Officeholder

Claims] are not considered *'assets of the company.'*"), ¶ 178 n.70.)

With respect to the Creditor Claims, Mr. Said states that those claims are vested in the

Cayman Depositors.  (SS-1 ¶ 198 ("[T]o the extent the Negligence Claims are pursued in relation

to loss that has been suffered by the Cayman Depositors …, such claims ought to be brought by

the Cayman Depositors directly."), ¶ 215 ("[T]he FDA Claim should properly be brought by and

in the names of the Cayman Depositors directly."); *see also* Dkt. No. 1731, Ex. B ("SS-2")

¶¶ 73-78.)  This is also the view of Dr. Mokal.  (RM-2 ¶ 102.1 ("First and as would be obvious,

the claim pursuant to the FD[A] is vested not in the liquidator but instead in any creditor prejudiced

by the disposition."), ¶ 104 ("Cayman Creditors may in principle also have a Creditor Claim for

breach of statutory duty."), ¶ 14.1 (describing "Creditor Claims" as those "vested in the company's

creditors").)

In short, the experts both agree that the Officeholder and Creditor Claims are not "claim[s]

which [are] the property of the [chapter 15] debtor."  11 U.S.C. § 1509(f).  These claims therefore

fall beyond the narrow exception of section 1509(f), and the JOLs (whose chapter 15 petition has

been dismissed) have no standing to pursue them against SVBFT.  *Loy*, 380 B.R. at 165.  A contrary

result "would short-circuit" this and the District Court's determination that the Cayman proceeding

is ineligible for recognition and "eviscerate Chapter 15's requirements," and "is incompatible with

Congress' intent in enacting Chapter 15."  *Caxton*, 2010 WL 1779282, at *5-6.[8]

## II.    FIRREA Bars All of the JOLs' Proposed Claims.

Chapter 15 is not the only obstacle to the JOLs' claims.  The JOLs have no standing to

assert the Company and Creditor Claims by operation of 12 U.S.C. § 1821(d)(2)(A)(i), which

holds true whether the Court adopts the broader or narrower reading of the provision.  The JOLs

also have no standing to assert the Officeholder Claims by operation of 12 U.S.C. § 1821(j).

### A.    Courts Have Adopted Two Interpretations of Section 1821(d)(2)(A)(i).

Section 1821(d)(2)(A)(i) provides that FDIC-R "shall … succeed to … all rights, titles,

powers, and privileges of the insured depository institution, and of any stockholder, member,

---

[8] *Accord United States* v. *BCCI Holdings (Luxembourg), S.A.*, 48 F.3d 551, 554 (D.C. Cir. 1995) ("A bank liquidator … stands in the shoes of the bank it represents and enjoys precisely the same rights and interests," and "[the Paraguayan, Turkish and Macanese] branch liquidators … have no more standing to file the petitions than do the branches they represent." (collecting cases)); *cf. In re Hellas Telecomms. (Luxembourg) II SCA*, 535 B.R. 543, 556, 568-96 (Bankr. S.D.N.Y. 2015) (Glenn, J.) (permitting various claims asserted by English liquidators as the "British insolvency officeholder[s]" to proceed *after* "enter[ing] an order granting recognition").

accountholder, depositor, officer, or director of such institution with respect to the institution and the assets of the institution….”  The Supreme Court interpreted this provision to “place[] the FDIC in the shoes of the insolvent [depository institution], to work out its claims under state law….” *O'Melveny & Myers* v. *FDIC*, 512 U.S. 79, 87 (1994); *see also In re Adelphia Commc'ns Corp.*, 365 B.R. 24, 52 (Bankr. S.D.N.Y. 2007) (“[Section] 1821(d)(2)(A)(i) simply gave the FDIC ownership of the claim [of the failed institution].”).

In addition to “all rights” of the “insured depository institution,” section 1821(d)(2)(A)(i) also assigns “all rights” of “stockholder, member, accountholder, depositor, officer, or director of such institution with respect to the institution and [its] assets” to the FDIC.  Courts have thus held that a “stockholder,” “accountholder,” or “depositor” has no standing to assert claims derivatively on behalf of the bank, because section 1821(d)(2)(A)(i) assigns such claims exclusively to the FDIC.[9]

Recent decisions—including a September 2024 opinion issued by a court in this District and a March 2025 decision by a court in the Eastern District of New York—adopted a broader reading of section 1821(d)(2)(A)(i).  *See, e.g.*, *Zucker* v. *Rodriguez*, 919 F.3d 649 (1st Cir. 2019); *Verdi* v. *FDIC*, 2024 WL 4252038 (S.D.N.Y. Sept. 20, 2024) (Ho, J.); *AP-Fonden* v. *Depaolo*, 2025

---

[9] *See Barnes* v. *Harris*, 783 F.3d 1185, 1193 (10th Cir. 2015) (dismissing claims asserted by the failed bank's stockholder because they “are based on harm derivative of injuries to the Bank” and thus “belong to the FDIC” under section 1821(d)(2)(A)(i)); *Levin* v. *Miller*, 763 F.3d 667, 670-71 (7th Cir. 2014) (same when “the theory behind” these claims is that “Banks suffered a loss when the value of their portfolios cratered, and [the stockholder] suffered a derivative loss when the value of its stock in the Banks plummeted”); *In re Beach First Nat. Bancshares, Inc.*, 702 F.3d 772, 777 (4th Cir. 2012) (same when “the only harm pled resulted from the mismanagement and failure of its primary asset, the Bank” (internal quotation marks omitted)); *Lubin* v. *Skow*, 382 F. App'x 866, 870-72 (11th Cir. 2010) (same when the alleged harm “stems from the Bank officers' management of Bank assets”); *Pareto* v. *FDIC*, 139 F.3d 696, 700 (9th Cir. 1998) (same when the “action is one against the former directors for allegedly delivering a fatal blow to the bank”); *Courtney* v. *Halleran*, 485 F.3d 942, 950 (7th Cir. 2007) (dismissing depositors' claims against the failed bank's holding company because depositors' “injuries were entirely dependent on the bank's fate” and their claims therefore “belong[] exclusively to the FDIC”); *In re Sunrise Sec. Litig.*, 916 F.2d 874, 879-82, 879 (3d Cir. 1990) (dismissing depositors' claims against the failed savings-and-loan association's directors, officers, auditors, and outside counsel because they “are derivative and belong to FDIC as receiver”); *Hamid* v. *Price Waterhouse*, 51 F.3d 1411, 1418-19 (9th Cir. 1995) (holding same for depositors' claims against “seventy-seven firms and individuals alleged to have looted the bank for personal gain …, caused it to appear more sound than it was to bank regulators, and otherwise to have contributed to its wrongful conduct or its inability to pay its depositors”).

WL 879800 (E.D.N.Y. Mar. 21, 2025) (Block, J.).  These decisions held, irrespective of the direct-derivative distinction, a claimant has no standing if (i) it asserts the rights of any "stockholder, member, accountholder, depositor, officer, or director" of the bank, and (ii) the rights asserted "relate to or concern the assets of the [b]ank." *Zucker*, 919 F.3d at 656; *Verdi*, 2024 WL 4252038, at *4; *see also AP-Fonden*, 2025 WL 879800, at *3-6.

In *Zucker*, the estate administrator of a bank holding company brought fiduciary-duty claims against the company's directors and officers stemming from "the Bank's failure and the Holding Company's resultant loss of its investment in the Bank." *Zucker*, 919 F.3d at 650. According to the First Circuit, "the direct-derivative distinction appears nowhere in the language of § 1821(d)(2)(A)." *Id.* at 657.  After examining FIRREA's "legislative history" and "legislative intent," the First Circuit also concluded that none of "the Administrator's non-textual interpretive arguments … convince[d] [it] to depart from [its] reading of the plain language." *Id.* at 656, 659-60. In that case, "the Holding Company was the Bank's sole shareholder, so the Holding Company's right to bring legal claims is a 'right[] … of [a] stockholder' of the Bank." *Id.*  Moreover, because "the claims depend on the Holding Company's proving that malfeasance by its directors depressed the Bank's assets," those claims are also "'with respect to … the assets of the institution' in receivership." *Id.* at 656-67.  The First Circuit therefore held that the administrator lacked standing to pursue these claims as they constitute "right[s] … of [a] stockholder … of [the Bank] … with respect to the [Bank] and the assets of the [Bank]," to which "the FDIC as receiver succeeded … 'by operation of law' under § 1821(d)(2)(A)." *Id.* at 656-57.

In *Verdi*, a shareholder of Signature Bank brought claims alleging that "Signature and its leadership made false or misleading statements … immediately prior to Signature's collapse" and that "these statements induced [plaintiff] to purchase additional shares," which "cratered in value following Signature's collapse." *Verdi*, 2024 WL 4252038, at *1.  Interpreting

section 1821(d)(2)(A)(i), the district court observed that there was no "binding authority in the Second Circuit," but "since [the First Circuit issued its opinion in *Zucker*], district courts confronting this question have agreed with *Zucker*'s textual analysis." *Id.* at *3-5.[10]   After conducting its own review, the district court concluded that "the text of [section 1821(d)(2)(A)] does not explicitly require categorizing claims as derivative or direct," and "the structure and purpose of FIRREA also counsel in favor of an expansive reading." *Id.* at *6.  The district court therefore held that "a claim, derivative or not, is covered by [section 1821(d)(2)(A)] if … the claim asserts a 'right of a stockholder' and that right is 'with respect to the institution and the assets of the institution.'"  *Id.* (citation omitted).

Applying this test, the district court held that "any claims Plaintiff may have against Signature are rights in his capacity as 'a stockholder.'"  *Id.*  Moreover, "because [plaintiff's claims] concern Signature's failure after it made alleged misrepresentations about its health (including about its assets)," the district court ruled that the claims "are 'with respect to the institution and the assets of the institution.'"  *Id.*  The district court therefore concluded that plaintiff "lacks standing to sue" because "the FDIC owns [p]laintiff's claims by operation of FIRREA."  *Id.* at *2; *accord AP-Fonden*, 2025 WL 879800, at *3 (adopting *Zucker* and *Verdi*'s reasoning and dismissing a securities-fraud action against Signature's directors, officers, and auditor for lack of standing).

## B.    The JOLs Have No Standing Under *Zucker* and *Verdi*'s Textual Interpretation of Section 1821(d)(2)(A)(i).

The Court should decline to draw the direct-derivative distinction for the reasons explained in *Zucker* and *Verdi*.  "[T]he direct-derivative distinction appears nowhere in the language of § 1821(d)(2)(A)."  *Zucker*, 919 F.3d at 657; *Verdi*, 2024 WL 4252038, at *4.  Although a court's "interpretive efforts [should] stop when, as here, the meaning of a provision's text is plain," *Zucker*,

---

[10] Citing *Am. W. Bank Members* v. *Utah*, 2023 WL 4108352, at *6 (D. Utah June 21, 2023); *Aaron* v. *Illinois Nat'l Ins. Co.*, 2023 WL 7389034, at *4 (E.D. La. Nov. 8, 2023).

919 F.3d at 659, "this plain language reading of the Clause as extending beyond derivative suits [also] appears to comport with FIRREA's statutory structure and purpose of protecting depositors," *Verdi*, 2024 WL 4252038, at *5 (citing *Zucker*, 919 F.3d at 661).

Applying the text of section 1821(d)(2)(A)(i)—and the holding of *Zucker* and *Verdi*—the Court should dismiss the Company and Creditor Claims for lack of standing if they (i) constitute rights of the "insured depository institution" or its "depositor"; and (ii) are "with respect to [SVB] and the assets of [SVB]." 12 U.S.C. § 1821(d)(2)(A)(i). Both conditions are met here.

1.  The JOLs Are Asserting the Rights of the "Insured Depository Institution" or Its "Depositors."

The Company and Creditor Claims constitute rights of SVB or its depositors. In the Second Amended POC and Amended Complaint, the JOLs assert that they are bringing claims "on behalf of **SVB Cayman**" and "as the agent of **SVB Cayman's depositors-creditors**." (Am. Compl. ¶ 9 (emphasis added); *see also* Second Am. POC at ¶ 122 ("[T]he JOLs are duly authorized … to act as the … representatives of **SVB Cayman**. In this circumstance, the JOLs are empowered under Cayman Islands law to assert claims not only on behalf of **SVB Cayman** but are also empowered as agent to assert claims on behalf of **SVB Cayman's creditors**.") (emphasis added).)

"[F]ederal law regards a national bank and its branches as a single entity." *First Nat. Bank of Bos. (Int'l)* v. *Banco Nacional de Cuba*, 658 F.2d 895, 900 (2d Cir. 1981); *accord BCCI*, 48 F.3d at 553 (collecting cases). Consistent with this principle, the Court has held that "SVB Cayman's operations were that of [SVB]," and "SVB Cayman's existence was inseparable from that of [SVB]." (Ch. 15 Opn. 24-25.) The District Court recently affirmed that conclusion on appeal. (Ch. 15 Affirmance at 11 ("SVB Cayman has never been a separate juridical entity from SVB.").)

19

Therefore, any claims that the JOLs assert on behalf of "SVB Cayman" or "SVB Cayman's depositors-creditors" constitute rights of *SVB* or *its* depositors.[11]

        2.    <u>The Company and Creditor Claims Are "with Respect to" SVB and Its Assets.</u>

"[T]he ordinary meaning of the phrase 'with respect to' simply means 'regarding' or 'concerning.'" *Verdi*, 2024 WL 4252038, at *4. Count I of the Amended Complaint and Count I of the Second Amended POC both seek remedies in connection with "the $294 million dividend [allegedly] unlawfully paid by **SVB** to SVBFG." (Second Am. POC ¶ 145 (emphasis added); *see also* Am. Compl. ¶¶ 161-169.) Counts II, III, and IV of the Proof of Claim allege that SVBFG was negligent in "oversee[ing] **SVB** and its Cayman operations," "severely mismanaged **SVB** in the years leading up to the SVB Collapse," or was vicariously liable "in respect of **SVB** management with Cayman responsibility." (Second Am. POC ¶¶ 148-155 (emphasis added).) Because these claims "concern [SVB]'s failure," *Verdi*, 2024 WL 4252038, at *6, and allege "malfeasance [that] depressed [SVB's] assets," *Zucker*, 919 F.3d at 656, they are "with respect to," "regarding," or "concerning" SVB or its assets. *Verdi*, 2024 WL 4252038, at *4.

Under section 1821(d)(2)(A)(i), "the FDIC succeeded to [these] claims," and the JOLs "lack[] standing to assert them." *Id.* at *6.

**C.    The JOLs Have No Standing Under Section 1821(d)(2)(A)(i) Even If the Direct-Derivative Distinction Applies.**

Even if the Court declines to follow *Zucker* and *Verdi*, the JOLs still lack standing because the Company and Creditor Claims are "derivative claim[s] based on the harm … caused to [SVB]." *Levin*, 763 F.3d at 670.

---

[11] The experts agree that as a matter of Cayman law, the Cayman Court's "Winding-Up Order did not have the effect of creating a separate entity." (SS-1 ¶ 161; *see also* Dkt. No. 1731, Ex. E ("<u>Mokal Dep.</u>") at 87-88 (same).)

1.    The Laws of the Depository Institution's State of Incorporation Determine
Whether a Claim Is Derivative for Purposes of Section 1821(d)(2)(A)(i).

For purposes of section 1821(d)(2)(A)(i), courts apply the law of the depository institution's state of incorporation to determine whether a claim is derivative on *its* behalf.[12]  This practice is consistent with the choice-of-law analysis applicable to bankruptcy cases.

The Second Circuit has held that "bankruptcy courts should apply the choice[-]of[-]law rules of the forum state," absent a "significant conflict" with "federal policy or interest." *In re Gaston & Snow*, 243 F.3d 599, 604-08 (2d Cir. 2001) (quoting *Atherton* v. *FDIC*, 519 U.S. 213, 218 (1997)); *In re Coudert Bros. LLP*, 673 F.3d 180, 187-88 (2d Cir. 2012) (same).  Because the "ability of the federal courts to create federal common law and displace state created rules is severely limited," cases warranting departures from the forum state's choice-of-law rules are "few and restricted."  *Gaston*, 243 F.3d at 606 (quoting *O'Melveny*, 512 U.S. at 87)*.*  Courts have held that state laws pose "no significant conflict with, or threat to" the federal interests embodied in FIRREA.  *E.g.*, *Atherton*, 519 U.S. at 217-26; *see also O'Melveny*, 512 U.S. at 87-88 ("*no significant conflict*" between state law tort liability of attorneys and "an identifiable federal policy or interest").  As to the specific question of "whether the [claimants]' claims are derivative in nature" under section 1821(d)(2)(A)(i), courts have applied the forum's choice-of-law rules after finding no significant conflict with federal interests.  *See, e.g.*, *Am. Nat'l Ins. Co.* v. *JPMorgan Chase & Co.*, 893 F. Supp. 2d 218, 228-29 (D.D.C. 2012).

New York is the forum state of this case.  In New York, courts "look to the law of the state of incorporation when adjudicating whether a claim is direct or derivative."  *AHW Inv. P'ship* v. *Citigroup, Inc.*, 806 F.3d 695, 699 (2d Cir. 2015); *NAF Holdings, LLC* v. *Li & Fung (Trading) Ltd.*,

---

[12] *See, e.g.*, *Lubin*, 382 F. App'x at 868, 870 & n.6 (applying Georgia law when the failed bank was "incorporated in Georgia"); *Sunrise*, 916 F.2d at 879 (applying Florida law "on the issue of the derivative nature of plaintiffs[-depositors]' claim" when the failed savings-and-loan association was "a Florida corporation").

21

772 F.3d 740, 743 n.2 (2d Cir. 2014) (same). SVB is the "insured depository institution" under section 1821(d)(2)(A)(i), and SVB's state of incorporation is California. California law therefore determines whether the Company and Creditor Claims are "derivative of harm to [SVB]," such that "those claims belong to the FDIC." *Barnes*, 783 F.3d at 1188; *see also Pareto*, 139 F.3d at 699-700 (applying California law to determine whether the claimant's action was "derivative" of a California-incorporated bank under section 1821(d)(2)(A)(i)).[13]

### 2.    The Company and Creditor Claims Are Derivative Under California Law.

California law instructs that the Company and Creditor Claims are derivative. Under California law, "[a]n action is deemed derivative if the gravamen of the complaint is injury to the corporation, or to the whole body of its stock and property without any severance or distribution among individual holders, or it seeks to recover assets for the corporation or to prevent the dissipation of its assets." *Grosset* v. *Wenaas*, 175 P.3d 1184, 1189 (Cal. 2008) (internal quotation marks and citation omitted). In other words, "[a]n individual cause of action exists only if damages to the shareholders were not *incidental* to damages to the corporation"; otherwise, the claim is derivative. *Schuster* v. *Gardner*, 25 Cal. Rptr. 3d 468, 474 (Ct. App. 2005). Unlike an individual claim, "[a] derivative claim is a property right that belongs to the corporation." *Cotton* v. *Expo Power Sys., Inc.*, 89 Cal. Rptr. 3d 112, 119 (Ct. App. 2009).

Here, the Company and Creditor Claims are derivative because they seek to redress "injury to [SVB]" or "to recover assets for [SVB]." *Grosset*, 175 P.3d at 1189.

*First*, the JOLs assert three negligence claims purportedly on behalf of SVB Cayman and Cayman Depositors. Count II of the Second Amended POC alleges that SVBFG was negligent in

---

[13] Cayman's choice-of-law rules provide the same conclusion. *See* SS-1 ¶ 219 ("[I]f the FDIC was entitled under California law to act in the name of SVB (whether in the Cayman Islands or not), under Cayman principles of private international law, Cayman law would defer to California law on this question of corporate capacity…."); RM-3 ¶ 102 ("[T]he question [of] who may act on behalf of a corporation is for the law of incorporation. In relation to the Bank, this is California law.").

"overseeing the bank's activities in Cayman and ensuring it complied with Cayman laws and regulations as a Class B licensee." (Second Am. POC ¶¶ 148-149.) Count III asserts that SVBFG is vicariously liable for the failure of "the SVB Cayman management team … to protect the assets and interests of SVB Cayman" in connection with the transfer of funds to "the FDIC Receivership" and entry into "the FDIC-First Citizens agreement." (*Id.* ¶¶ 151-152.) And Count IV claims that SVBFG was negligent in causing "[t]he SVB Collapse, SVB Receivership, and invocation of the [systemic risk exception]." (*Id.* ¶ 155.)

Because these claims all allege "misfeasance or negligence in managing [SVB]'s business," including in managing SVB's Cayman branch, it is "for [SVB] to institute and maintain a remedial action" under California law. *Nelson* v. *Anderson*, 84 Cal. Rptr. 2d 753, 762-64 (Ct. App. 1999) (reversing jury verdict in favor of plaintiff-minority-shareholder because plaintiff's claims against the majority shareholder for mismanaging the company's business were derivative). Appellate courts in California have consistently reached the same conclusion. *See, e.g.*, *Schrage* v. *Schrage*, 284 Cal. Rptr. 3d 279, 302 (Ct. App. 2021) (claim alleging that the company's majority shareholders' "mismanagement … squandered the [company]'s assets and ultimately led to its demise" was "a derivative claim"); *Avikian* v. *WTC Fin. Corp.*, 120 Cal. Rptr. 2d 243, 244-45 (Ct. App. 2002) (claims that "defendants mismanaged or looted the assets of [the company], culminating in its involuntary liquidation" were "derivative in nature, and constitute claims made on behalf of [the company] itself"); *see also* 2 Ballantine & Sterling California Corporation Law § 291.03 (4th ed. 2025) (actions are derivative when "the alleged mismanagement injures the corporation").

In *Pareto*, a case concerning section 1821(d)(2)(A)(i)'s direct-derivative distinction, former shareholders of the failed bank sought to bring claims against the bank's former directors for "failing to safeguard [the bank]'s assets and equity, mismanaging its operations, improperly

placing it into voluntary receivership, and failing to exercise due diligence during merger attempts." 139 F.3d at 699. Applying California law, the Ninth Circuit held that plaintiffs had no standing to pursue these claims because they all "describe a direct injury to the bank." *Id.* at 699, 701. Like the claims in *Pareto*, the JOLs' negligence claims allege SVBFG's "mismanagement" of SVB and blame SVBFG for the ultimate "FDIC Receivership" over SVB. (Second Am. POC ¶¶ 148-150, 151, 154.) These allegations are "the language of derivative claims." *Pareto*, 139 F.3d at 699. And like the claimants in *Pareto*, the JOLs here have only alleged harm "incidental to, or an indirect result of, the direct injury to [SVB]'s assets." *Id.* Therefore, the JOLs' claims against SVBFG "for allegedly delivering a fatal blow to the bank … [are] clearly derivative." *Id.* at 700.

*Second*, the remaining claims asserted by the JOLs all seek to "clawback" the $294 million dividend paid from SVB to SVBFG, its shareholder. (Second Am. POC ¶¶ 145-47; Am. Compl. ¶¶ 161-169.) In particular, these claims allege that the "dividend [was] unlawfully paid by SVB to SVBFG" when "SVBFG and SVB directors and officers knew or should have known of SVB's actual or imminent insolvency." (Second Am. POC ¶ 145.)

California courts have long held that "[a]n action is deemed derivative if … it seeks to recover assets for the corporation or to prevent the dissipation of its assets." *Turner* v. *Victoria*, 532 P.2d 1101, 1105-06 (Cal. 2023) (quoting *Grosset*, 175 P.3d at 1189). "[T]he essence" of these avoidance claims "is that the assets of [SVB]"—*i.e.*, the $294 million dividend—"were fraudulently transferred without any compensation being paid to [SVB]." *PacLink Commc'ns Int'l, Inc.* v. *Super. Ct.*, 109 Cal. Rptr. 2d 436, 440 (Ct. App. 2001) (claims for fraudulent transfer of company's assets could only be brought as derivative action). "This constitutes an injury to the company itself," *id.*, and the avoidance claims therefore are "plainly derivative and were not maintainable as part of [a] direct action," *Oakland Raiders* v. *Nat'l Football League*, 32 Cal. Rptr. 3d 266, 289 (Ct. App. 2005) (Oakland Raiders's claims that the NFL "diver[ted] … NFL revenues

belonging to the NFL member clubs to finance the creation and operation of the new World League" were "plainly derivative"); *see also Anderson* v. *Derrick*, 32 P.2d 1078, 1078-79 (Cal. 1934) (claims seeking to recover directors' "transfer of the entire corporate assets to one of their number, thereby depriving the corporation and its stockholders … of everything of value," were "purely derivative in character"). Indeed, a leading treatise on California corporation law states that "situations where the alleged wrongful actions of the defendants have reduced the corporate assets and net worth" are "[t]he clearest cases" of derivative actions. Marsh's California Corporation Law § 15.11[A][1] (5th ed. 2025) (hereinafter "<u>Marsh</u>").

Furthermore, where—as here—a claimant seeks to recover a "distribution" that a corporation made to a "shareholder," California statute expressly provides that the action must be made "in the name of the corporation." Cal. Corp. Code § 506(a)-(b); *accord* Marsh § 15.11[A][6] ("With respect to the illegal payment of dividends by the corporation, [California law] expressly provide[s] for an action in the name of the corporation, initiated by a shareholder or a creditor, to recover … from the shareholders receiving the illegal dividend the amount of such illegal distribution."); *O'Hare* v. *Marine Elec. Co.*, 39 Cal. Rptr. 799, 801 (Ct. App. 1964) ("If [dividends] were wrongfully paid, their recovery is for the corporation….").

More fundamentally, whether it is the alleged mismanagement of SVB (including SVB's Cayman branch) or the purported $294 million dividend payment from SVB to SVBFG, the JOLs have only alleged "conduct [that] caused injury first to the Bank and then only indirectly to [SVB's Cayman Depositors]." *Beach*, 702 F.3d at 778; *see also Avikian*, 120 Cal. Rptr. 2d at 247-48. "This is a classic derivative harm, as the wrong done by [SVBFG], if any, was a wrong done to [SVB]." *Lubin*, 382 F. App'x at 871 (internal quotation marks and citation omitted); *see also PacLink*, 109 Cal. Rptr. 2d at 439-40. Cases applying section 1821(d)(2)(A)(i) consistently hold that claims alleging mismanagement of the bank or dissipation of the bank's assets are derivative because the

harm alleged is incidental to the harm suffered by the bank.[14]   Therefore, even under the narrower

reading of section 1821(d)(2)(A)(i), the Company and Creditor Claims are derivative, and thus

"belong to the FDIC" instead of the JOLs.  *Barnes*, 783 F.3d at 1195.

### D. The JOLs Have No Standing to Pursue the Officeholder Claims Under Section 1821(j).

Section 1821(j) provides that "no court may take any action, except at the request of the

[FDIC] Board of Directors by regulation or order, to restrain or affect the exercise of powers or

functions of the [FDIC] as a conservator or a receiver."  This "broad[]" and "unequivocal[]"

statement is a "direct manifestation of Congress's intent to prevent courts from interfering with the

[FDIC] in the exercise of its statutory powers."  *Volges* v. *Resol. Tr. Corp.*, 32 F.3d 50, 52 (2d Cir.

1994).

The JOLs' Officeholder Claims seek to "clawback" the $294 million dividend SVB paid

to SVBFG in 2022 under sections 145, 146, and 147 of the Companies Act based on statutory

powers that the JOLs purportedly enjoy as Cayman "officeholders."   (Second Am. POC

¶¶ 145-147; Am. Compl. ¶¶ 161-169.)   Relying on the Court's Setoff Order, FDIC-R in the

California Court also asserted a claim against SVBFG to avoid the same "$294 million bank-

to-parent dividend in December 2022" as "constructive[ly] fraudulent."  (FDIC-R Answer at 123.)

Because there is only one 2022 "$294 million bank-to-parent dividend" to "clawback"

(Second Am. POC ¶¶ 145-147), permitting the JOLs to proceed on the Officeholder Claims will

"restrain or affect" a litany of FDIC-R's "powers or functions," 12 U.S.C. § 1821(j), including its

---

[14] *See, e.g.*, *Barnes*, 783 F.3d at 1193-94 (claims that bank holding company's directors and officers "made improper dividend payments to the Holding Company's shareholders" were derivative because "the dividend payments left the Holding Company unable to serve as a source of financial strength for the Bank" and thus "did not cause any independent harm, but rather resulted in injury because of the Bank's failure"); *Beach*, 702 F.3d at 777-78 (same for claims alleging that bank holding company's directors were responsible for "the lack of management and oversight that led to the Bank's failure"); *Lubin*, 382 F. App'x at 869, 871-72 (same for claims alleging "mismanagement and risky lending practices"); *Pareto*, 139 F.3d at 699-700 (same for claims alleging failure "to safeguard [bank's] assets and equity, mismanaging its operations, improperly placing it into voluntary receivership, and failing to exercise due diligence during merger attempts").

powers to "collect all obligations and money due [to SVB]," *id.* § 1821(d)(2)(B)(ii); and to "realize upon the assets of [SVB]," *id.* § 1821(d)(2)(E). This is what section 1821(j) seeks to avoid. *See Hindes* v. *FDIC*, 137 F.3d 148, 160 (3d Cir. 1998) ("[T]he statute, by its terms, can preclude relief even against a third party" where "the result is such that the relief restrains or *affects* the exercise of powers or functions of the [FDIC] as a conservator or a receiver." (internal quotation marks omitted)). The JOLs have no standing to pursue the Officeholder Claims, because doing so would interfere with FDIC-R's statutory prerogatives and thus be barred by section 1821(j).

### E.    The JOLs' Arguments Resisting the Application of FIRREA Are Meritless.

The JOLs made several arguments against the application of FIRREA. None has any merit.

### 1.    "Extraterritorial" Application of FIRREA

The JOLs argued for the first time during the July 18, 2024 hearing before the Court that "the FIRREA statute is expressly territorial[]" and "does not apply to the same causes of action … that inure to the estate of the ancillary liquidation pursuant to the Cayman Islands law." (July 18, 2024 H'rg Tr. 74:10-13, 75:14-16.) The JOLs are mistaken.

***First***, this case does not involve the extraterritorial application of FIRREA. As the Supreme Court has explained, "the presumption against extraterritoriality[] refers to a presumption against application *to conduct in the territory of another sovereign*." *Abitron Austria GmbH* v. *Hetronic Int'l, Inc.*, 600 U.S. 412, 417 (2023) (emphasis added) (internal quotation marks and citation omitted). If "Congress has provided an unmistakable instruction that the provision is extraterritorial, then claims alleging exclusively foreign conduct may proceed." *Id.* at 418. If not, a court must first identify the "focus" of a statutory provision and then ascertain whether "the *conduct relevant to that focus* occurred in United States territory." *Id.* "[I]f the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application of the statute, even if other conduct occurred abroad." *Id.* at 419 (internal quotation marks omitted).

The focus of section 1821(d)(2)(A)(i) is the "rights … of the insured depository institution, and of any stockholder, member, accountholder, depositor, officer, or director of such institution with respect to the institution and [its] assets." 12 U.S.C. § 1821(d)(2)(A)(i). Both the JOLs and FDIC seek to exercise those rights in *U.S.* courts by asserting claims against SVBFG, a *U.S.* defendant, on account of (i) a dividend paid from a *U.S.* bank to a *U.S.* parent and (ii) the *U.S.* parent's purported mismanagement of the *U.S.* bank. Any "conduct relevant" to section 1821(d)(2)(A)(i)'s "focus" is therefore "occur[ing] in United States territory." *Abitron*, 600 U.S. at 418. The JOLs' expert acknowledges that the territoriality of FIRREA becomes relevant only "[t]o the extent that the Bank was required to act *from within the Cayman Islands* to deal with its assets, liabilities, and/or affairs." (RM-2 ¶ 115.2 (emphasis added).) That is not the case here, as the FDIC has never brought claims against SVBFG or any of its former officers or directors in *Cayman*. Quite the contrary, the Cayman JOLs are acting extraterritorially by bringing Cayman claims against SVBFG in *the U.S.*

**Second**, both experts further agree that "Cayman law would recognize the transfer of the proprietary rights in the property ([*e.g.,*] choses in action) in accordance with that property's *lex situs*," with the *lex situs* for "choses in action" determined by the laws of "the jurisdiction where the defendant resides"—here, the U.S. (SS-1 ¶¶ 23(b), 176; *see also* SS-1 ¶¶ 172-178; RM-2 ¶ 112 ("[W]hether and to what extent the FDIC Receiver was able effectively to act on the Bank's behalf was a matter for the applicable US law."); RM-3 ¶¶ 91-93, 102.) In other words, the extraterritoriality issue is academic because, whether FIRREA or Cayman law applies, they both point to the same analysis—discussed *supra* in sections II.A to II.D—to determine what choses in action were transferred to the FDIC.

2.    "Particularized Harm to Cayman Depositor-Customers"

In the JOLs' unauthorized sur-reply, styled as a "presentation" filed on the morning of the July 18, 2024 hearing, they assert that the Proposed Claims are based on "particularized harm" unique to Cayman Depositors.  (JOLs-165 ("July 18 Sur-Reply") at 14.)  This argument misstates the nature of the Proposed Claims.  The Amended Complaint and the Second Amended POC do not allege that SVBFG unlawfully transferred **Cayman deposits** to the U.S. or that SVBFG breached any duties owed uniquely to the **Cayman Depositors**.  Instead, the Proposed Claims seek to "clawback" a $294 million dividend payment **from SVB to SVBFG** and assert that SVBFG breached its duties allegedly owed to **SVB**.[15]

"In determining whether an individual action as opposed to a derivative action lies," California courts "look[] at the gravamen of the wrong alleged in the pleadings."  *PacLink*, 109 Cal. Rptr. 2d at 441 (internal quotation marks omitted).  Here, the gravamen of the Proposed Claims is that SVBFG **mismanaged SVB** as a whole and unlawfully received the **$294 million dividend from SVB**, which purportedly harmed SVB's overall financial position.  These are quintessential derivative claims.  *See, e.g.*, *Avikian*, 120 Cal. Rptr. 2d at 247-49 (claims for alleged mismanagement resulting in involuntary liquidation were derivative); *PacLink*, 109 Cal. Rptr. 2d at 439-40, 442 (claims for fraudulent transfer of company's assets were derivative).  As such, "whether [the JOLs] seek[] to recover on behalf of all [creditors], or tr[y] to pursue claims on behalf of some subset, the damages sought are still incidental to the alleged injury to [SVB], and

---

[15] *See* Second Am. POC ¶¶ 145, 148 (Count II of the Amended POC alleges that SVBFG breached its "duty to oversee **SVB and its Cayman operations**."); ¶ 151 (Count III "seek[s] to address and rectify the financial and operational mismanagement under the stewardship of SVBFG as parent and supervisory company of **the bank**."); ¶ 154 (Count IV claims that "leading up to **SVB's** collapse, SVBFG engaged in gross mismanagement practices," such as by "failing to maintain appropriate risk and liquidity controls and not disclosing the true financial condition of **SVB**, which was a significant factor in **the bank's eventual collapse**") (emphases added).

any recovery should go to [SVB]." *Schuster*, 25 Cal. Rptr. 3d at 475; *see also PacLink*, 109 Cal. Rptr. 2d at 440-41.[16]

This reasoning applies *a fortiori* because the JOLs seek far more than "the loss of the amount of SVB Cayman's uninsured depositor-creditor base." (July 18 Sur-Reply 14.) The total damages that the JOLs demand in connection with the Proposed Claims (excluding "interest or other charges") have somehow ballooned to "**[n]ot less than $944,000,000.00**." (Second Am. POC at pt. 2, item 7 (emphasis added); *see also id.* ("Does this amount include interest or other charges? No.").) This amount exceeds by orders of magnitude the total value of the claims collectively held by the Cayman Depositors, the majority of whom have participated in, and obtained relief from, the FDIC's deposit-recovery process. (*Id.* ¶ 139 ("[T]he JOLs have received 295 filed claims from SVB Cayman depositors, with an aggregate claim value of $284,457,173.26."); ¶ 137 (159 creditors holding "an aggregate claim value of $252,792,537.27" participated in the October 31, 2023 Cayman Liquidation Committee meeting); Ch. 15 Opn. 16.) This vast gulf between how the JOLs characterize their claims and what they actually seek to recover is all the more a reason for the Court to "guard against tactical efforts to recharacterize actions as direct when in reality they are derivative in character." *Tuli* v. *Specialty Surgical Ctr. of Thousand Oaks, LLC*, 326 Cal. Rptr. 3d 357, 375 (Ct. App. 2024).

---

[16] The JOLs may invoke *Adato* v. *Kagan*, 599 F.2d 1111 (2d Cir. 1979), for the proposition that the Proposed Claims are direct, rather than derivative, because these claims allege "particularized harm to Cayman depositors-customers." (July 18 Sur-Reply 14-15.) If so, the JOLs' reliance is misplaced. *First*, *Adato* was decided in **1979**, a decade before FIRREA's passage, including section 1821(d)(2)(A)(i), by Congress in **1989**. *See* Pub. L. No. 101-73, 103 Stat. 183 (1989) (enacting FIRREA). The version of section 1821(d) in effect in 1979 read: "it shall be the duty of the Corporation as such receiver … to wind up the affairs of such closed bank in conformity with the provisions of law relating to the liquidation of closed national banks." *First Empire Bank-New York* v. *FDIC*, 572 F.2d 1361, 1370 (9th Cir. 1978). The "all … rights" language appearing in the current version of section 1821(d)(2)(A)(i) simply did not exist when *Adato* was decided. **Second**, *Adato* concerned "a New York chartered commercial bank." 599 F.2d at 1113-14. Under New York's choice-of-law rule, if the *Adato* court were to confront the question of whether a claim was derivative or direct, the question would have been governed by the law of **New York**, where the bank at issue was incorporated. (*See supra* section II.C.1.) Therefore, even if *Adato* is relevant at all to section 1821(d)(2)(A)(i), a provision enacted *after Adato* was decided, the case is not relevant to the precise issue here: whether the Proposed Claims are derivative or direct under the law of **California**, where SVB was incorporated.

### 3.    "Impingement" on FDIC-R's Rights and Double Recovery

Also in their July 18 Sur-Reply, the JOLs argue that permitting them to pursue the Proposed

Claims would not "impinge[] on 'exclusive' FDIC-R rights" to bring claims against SVBFG under

section 1821(d)(2)(A)(i).  (July 18 Sur-Reply 3.)

However, given the overlap between FDIC-R's and JOLs' allegations and theories of

recovery (*see* FDIC-R Answer at 122-25), permitting the JOLs to pursue the Proposed Claims

"would authorize multitudinous litigation and ignore the corporate entity," *Schuster*, 25 Cal. Rptr.

3d at 473 (internal quotation marks omitted).  This is what section 1821(d)(2)(A)(i) seeks to

prevent.  *See Levin*, 763 F.3d at 670-71 ("The FDIC, not [plaintiff], therefore owns any claim

against the Managers that depends on the choices they made as directors or employees of the Banks.

Any recovery by [plaintiff] would be double counting.").[17]

## III.    The JOLs Have No Standing to Pursue Any Proposed Claim Under Cayman Law.

Finally, Cayman law—to the extent that it applies—leads to the same conclusion as U.S.

law.  Under either, the JOLs lack the ability to pursue any of the Proposed Claims.

### A.    Company Claims

The Company Claims—alleged in Counts I of the Second Amended POC and Amended

Complaint (unlawful dividend under section 34(2) of the Companies Act), and Counts II, III, and

IV of the Second Amended POC (negligence with respect to SVB)—are property of SVB and must

be brought "in the name of the company."  (SS-1 ¶¶ 188-190.)[18]  Again, both experts agree that

---

[17] In the JOLs' July 18 Sur-Reply, the JOLs attempted to distinguish *Zucker* by emphasizing that *Zucker* is a case where "the holding company seeks to recover from assets … *that the FDIC also seeks in its own action related to the Bank's failure*."  (July 18 Sur-Reply 12 (emphasis added).)  This is the case here, where the JOLs and FDIC both seek to recover from SVBFG based on the $249 million dividend and the alleged mismanagement of SVB.

[18] *See also* SS-1 ¶¶ 191-194 (unlawful dividend claims are "property of SVB"), ¶¶ 196-197 (negligence claims are "property of the company"); RM-3 ¶¶ 91-93 (not disputing the foregoing).

Cayman law would defer to U.S. law to determine whether the FDIC may act on behalf of SVB.[19]

Because the FDIC "steps into the shoes" of SVB under U.S. law, the FDIC—not the JOLs—has

standing to bring the Company Claims. *O'Melveny*, 512 U.S. at 86-87; *see also supra* section II.

Dr. Mokal's contrary conclusion is a tautology, as he does not provide any authority for his

positions and admits he was "instructed to assume" that the FDIC has no authority to assert the

Company Claims "under applicable US law." (RM-2 ¶ 114; *see also* RM-3 ¶¶ 103-104 (same).)

### B. Creditor Claims

Both experts agree that the Creditor Claims—alleged in Counts I of the Second Amended

POC and Amended Complaint (under the FDA) and Counts II, III, IV of the Second Amended

POC (negligence with respect to SVB Cayman Depositors)—are vested in the Cayman

Depositors.[20] Both experts also agree that the JOLs cannot assert the Creditor Claims in their

capacity as SVB Cayman's liquidators,[21] or by virtue of the October Sanction Order.[22] Instead,

---

[19] *See* SS-1 ¶ 219 ("[I]f the FDIC was entitled under **California law** to act in the name of SVB (whether in the Cayman Islands or not), under Cayman principles of private international law, Cayman law would defer to California law on this question of corporate capacity."); RM-3 ¶ 102 ("[T]he question who may act on behalf of a corporation is for the law of incorporation. In relation to the Bank, this is **California law**."); RM-2 ¶ 111 ("It is a fundamental rule of the Cayman law of applicable law that the law of the place of incorporation of a company determines who may act on the company's behalf.") (emphases added).

[20] *See* SS-1 ¶ 198 ("[T]o the extent the Negligence Claims are pursued in relation to loss that has been suffered by the Cayman Depositors …, such claims ought to be brought by the Cayman Depositors directly."), ¶ 215 ("[T]he FDA Claim should properly be brought by and in the names of the Cayman Depositors directly."); RM-2 ¶ 102.1 ("First and as would be obvious, the claim pursuant to the FD[A] is vested not in the liquidator but instead in any creditor prejudiced by the disposition."), ¶ 104 ("Cayman Creditors may in principle also have a Creditor Claim for breach of statutory duty."), ¶ 14.4 (describing "Creditor Claims" as those "vested in the company's creditors; *cf. Hellas*, 535 B.R. at 583 ("[N]othing in … any U.K. Law presented to the Court by the parties supports the conclusion that the Plaintiffs, as liquidators, have the authority to bring *any or all* claims on behalf of [the foreign debtor]'s creditors." (internal quotation marks omitted)).

[21] *See* SS-1 ¶ 103 ("It is very well-established that during the liquidation, as a matter of Cayman law, the liquidators act as agents *of the company* over which they were appointed. I have been unable to identify any support for the further proposition that liquidators have the power to act as agents of, or bring claims on behalf of, the company's creditors directly." (emphasis added)); RM-3 ¶ 53 ("[L]iquidators are agents *of the company* to which they are appointed but not, *qua* liquidator, agents of the company's creditors. It follows that liquidators do not, in their capacity as liquidators, have power to act on behalf of such creditors.") (emphases added).

[22] *See* SS-1 ¶ 149 ("To the extent the JOLs may seek to rely on the granting of the October Sanction Order to suggest that the Cayman Court has explicitly ruled that, as a matter of Cayman law, the JOLs have the power to act on behalf

Dr. Mokal asserts that the JOLs may press claims on behalf of SVB Cayman Depositors under "general principles of agency law." (RM-3 ¶ 62.) According to Dr. Mokal, the Cayman Depositors consented to the JOLs' agency because "[t]he JOLs have over an extended period pressed Creditor Claims through various means in relevant US proceedings" and through a negative "notice sent by email by the JOLs on or around 1 October 2024 to all Cayman Creditors" (the "Opt-Out Notice"). (RM-2 ¶¶ 96-97; SVBFT-28.) As Mr. Said explains at length in his reports (SS-1 ¶¶ 103-156; SS-2 ¶¶ 62-97), this assertion is untenable as a matter of Cayman law.[23]

*First*, Mr. Said notes that general agency principles "have not previously been applied in the liquidator/creditor context." (SS-2 ¶ 67.) Dr. Mokal does not identify any Cayman or English authority indicating otherwise. Rather, he relies on two Scottish cases, which Cayman courts rarely cite because Scotland is "a mixed, rather than a common law, jurisdiction." (*Id*. ¶¶ 65-66.) Given the absence of applicable precedent, Mr. Said opines that agency principles do not entitle the JOLs "to exercise this novel, extra-statutory function" to act as Cayman Depositors' agents. (*Id.* ¶ 67.)

*Second*, even general agency principles do not support the existence of an agency relationship between the JOLs and the Cayman Depositors. It is well-established that "where one person purports to act on behalf of another, the assent of that other will not be presumed merely from *silence*, unless there is *further indication* that the latter acquiesces in the agency." (SS-2 ¶ 68(a) (quoting *Bowstead & Reynolds* at [2-031]) (emphasis added).) Despite this principle, "the JOLs expressly rely on the silence of the Cayman Depositors because it was their failure to respond to the Opt-Out Notice that was apparently distributed on October 1, 2024 … that is said to be the basis for the agency relationship." (*Id.* ¶ 68(b); *see also* RM-2 ¶ 97.)

---

of the Cayman Depositors as their agent, I would respectfully disagree for four reasons."); RM-3 ¶ 66 ("First, the JOLs' status as agent of the Cayman Creditors arises[] not by virtue of the October 2024 Sanction Order….").

[23] Mr. Said also explains that the "statutory trust" concept, the Winding-Up Order, or the SVB Cayman deposit agreements do not create an agency relationship between the JOLs and the Cayman Depositors. (SS-1 ¶¶ 101-156.)

Nor have the JOLs shown any "further indication" that the Cayman Depositors acquiesced in the agency.  (SS-2 ¶ 68(a).)  Under Cayman law, "*ex post facto* ratification may be implied from inactivity" only "if the inactivity of the principal can be taken as *manifesting assent*," as "there can be a range of *other explanations for inactivity* that make a finding of an intention to ratify unproven."  (*Id.* ¶ 68(c) (emphasis added) (quoting *Bowstead & Reynolds* at [2-079]).)  In the specific context of ratifying previously "unauthorized court filings," courts have held that acquiescence requires "(i) '*clear adoptive acts*,' and (ii) the relevant conduct '*must be unequivocal.*'"  (*Id.* (quoting *McHugh* v. *Eastern Star Gas Ltd* [2012] NSWCA 169).)

Based on facts alleged and materials made available by the JOLs, Mr. Said opines that there is no "legal acquiescence, or inactivity manifesting assent, for the purposes of finding that Cayman Depositors ratified the JOLs acting as their agents."  (*Id.* ¶ 68(d).)  Mr. Said notes that:  (i) the Opt-Out Notice misrepresents the legal effect of a Cayman court order, an observation shared by Dr. Mokal (*id.* ¶ 68(d)(i); Mokal Dep. 127-32); (ii) the Opt-Out Notice was apparently sent by e-mail, which in Cayman "is not considered sufficient to constitute proper service due to concerns about reliability" (SS-2 ¶ 68(d)(ii)); and (iii) the Opt-Out Notice "appears to have been sent in English" even though the JOLs have alleged elsewhere that "more than 90% of the uninsured depositors of SVB Cayman are of Chinese origin or China-investment connected" (*id.* ¶ 68(d)(iii) (internal quotations marks omitted)).

***Third***, Mr. Said highlights a more fundamental problem with the JOLs' position—there are clear conflicts and inconsistencies between the JOLs' role as SVB Cayman's *liquidators* and their purported role as agents of SVB Cayman's *creditors*.  (SS-2 ¶¶ 69-70.)  As SVB Cayman's liquidators, the JOLs "must maintain an even and impartial hand between *all the individuals* whose interests are involved in the winding up."  (*Id.* ¶ 69(a) (quoting *Johnson* v. *Deloitte & Touche AG* [1997 CILR 120] at 141) (emphasis added).)  As purported agents of SVB Cayman Depositors,

the JOLs would need to act in the interests of *Cayman Depositors who consented to the agency*. (*Id.* ¶ 69(b); RM-2 ¶ 101.)   This "misalignment" of interests is particularly pronounced here because (based on materials produced by the JOLs to date) "three of the Cayman Depositors have expressly opted[ ]out of having the JOLs act on their behalf."   (SS-2 ¶ 69(b).)   "For the claims brought by the JOLs on behalf of SVB, *all* of the Cayman Depositors have an (indirect) interest; whereas for the creditor claims, most but *not all* of the Cayman Depositors have an interest."   (*Id.*)[24]

**Fourth**, even if the JOLs were agents of Cayman Depositors under Cayman law, the Second Circuit's "caselaw confirms that a purported assignee of a claim must plead a proprietary interest in that claim, and not simply the ability to pursue the claim on behalf of another, to bring the claim in his or her own name and satisfy the requirements of constitutional standing." *Cortlandt St. Recovery Corp.* v. *Hellas Telecomms., S.a.r.l*, 790 F.3d 411, 420 (2d Cir. 2015).   In all of their filings, the JOLs have not shown that they have suffered any injury *of their own* as required under Article III.   *See Thole* v. *U.S. Bank N.A.*, 590 U.S. 538, 543 (2020) ("[T]o claim the interests of others, the litigants themselves still must have suffered an injury in fact, thus giving them a sufficiently concrete interest in the outcome of the issue in dispute." (internal quotation marks omitted)).   Because "[foreign] law cannot alter the legal standard by which Article III standing is determined," the JOLs have no standing to sue on behalf of Cayman Depositors even if an agency relationship existed between them under Cayman law.   *Gross* v. *AT&T Inc.*, 2019 WL 3500496, at *2 (S.D.N.Y. July 31, 2019).

---

[24] Dr. Mokal appears to suggest that the October Sanction Order absolved this conflict.  (RM-3 ¶ 67.)  But Cayman law is clear that one may not act as an agent for persons with conflicting interests "unless they ensure they fully disclose all the material facts to each party and obtain their informed consent to their so acting."  (SS-2 ¶ 70 (quoting *Bowstead & Reynolds* at [6-048]).)   The October Sanction Order did not "fully disclose" any "material facts" to Cayman Depositors or "obtain their informed consent" to the JOLs' agency.  (*Id.*)  And Dr. Mokal himself has not reviewed—or even asked to review—the materials supporting the October Sanction Order, which the JOLs have not disclosed to SVBFT or the Court.  (RM-2 ¶ 28.2; RM-3 ¶ 39.)

### C.    Officeholder Claims

The Officeholder Claims—alleged in Counts I of the Second Amended POC and Amended Complaint (avoidance of the $294 million bank-to-parent dividend under sections 145, 146, and 147 of the Companies Act)—are vested in the JOLs.  (SS-1 ¶ 201; RM-2 ¶ 54.)  Neither expert, however, has identified a single precedent authorizing ancillary liquidators like the JOLs to assert those claims extraterritorially.  (SS-2 ¶¶ 33-35; RM-3 ¶ 46.)

Citing well-established precedent, Mr. Said notes that "insolvency process in the jurisdiction of the company's place of incorporation is treated as the primary insolvency process" (SS-1 ¶ 77),[25] and "[t]he law of the place of incorporation is said to govern the collection and distribution of the company's assets on an extraterritorial, worldwide basis" (*id.* ¶ 78).[26]  Where, as here, "the foreign company is subject to insolvency proceedings in its home jurisdiction, the Cayman winding-up operates as *ancillary* to that foreign proceeding."  (Dkt. No. 1730, Ex. A ("RM-1") ¶ 46 (emphasis added); *see also* SS-1 ¶¶ 74-76.)  In an ancillary proceeding, "the [ancillary] liquidators' role is likely, perforce, to be limited to getting in, realising and distributing the [ancillary jurisdiction's] assets."  (SS-1 ¶¶ 81-83).[27]  This is consistent with Dr. Mokal's opinion in the chapter 15 proceeding, which Dr. Mokal fully incorporates here.  (RM-1 ¶¶ 45-48; Ch. 15 Hr'g Tr. 166:1-12; RM-2 ¶¶ 12-13.)  In light of these principles, "despite the English judicial practice of ancillary liquidations going back to (at least) … 1884," Mr. Said and Dr. Mokal have been unable to "identify *any* case where an ancillary liquidator has been permitted to assert avoidance claims within the jurisdiction of the primary insolvency (still less any case where those

---

[25] Citing *Singularis Holdings Ltd* v. *PricewaterhouseCoopers* [2014] UKPC 36, [2015] AC 1675 ("Singularis") at [23] and [112]; *Re GTI Holdings Ltd* [2022] (1) CILR 472] ("GTI Holdings") at [29]-[53]; *Re Silver Base Group Holdings Ltd* (unrep., 8 December 2021, Doyle, J.) at [6]-[12]; and *Re Sun Cheong Development Holdings Ltd* [2020] (2) CILR 942] at [6].

[26] Citing *Singularis* at [10]; *Stichting Shell Pensioenfonds* v. *Krys* [2014] UKPC 41, [2015] AC 616 at [14].

[27] Quoting *Re Bank of Credit and Commerce International SA (No 10)* [1997] Ch 213 at 241-242.

steps can fairly be characterized as hostile to the primary insolvency itself)." (SS-1 ¶ 84 (emphasis added) & n.35; *accord* RM-3 ¶ 46.)

Dr. Mokal argues that the JOLs should be permitted to depart from (what he called) the "standard practice established in England since the late nineteenth century" for the first time. (RM-1 ¶ 46.) This proposition is meritless.

**First**, the Cayman Court's Winding-Up Order on its face does not contemplate a novel and significant deviation from settled precedent. Both experts agree that given "the careful delimitation of [its] terms," the Winding-Up Order is a "standard, ancillary winding up order." (Ch. 15 Hr'g Tr. 131:5-8; *see also* SS-1 ¶ 85; Ch. 15 Opn. 29.) Both experts also agree that the Winding-Up Order reflects the "long established practice" of "disappl[ing] the [Cayman] statutory trust and [Cayman] liquidators' duties in relation to assets located outwith the reach of [Cayman] courts."[28] But through the Officeholder Claims, the JOLs are seeking to "get in and realise the company's *foreign* assets" (SS-1 ¶ 81 (quoting *GTI Holdings* at [47]) (emphasis added)), as those claims demand the "clawback" of the "$294 million dividend … paid by SVB to SVBFG" in 2022 (Second Am. POC ¶ 145; Am. Compl. ¶¶ 129, 166). In the five pleadings that the JOLs submitted to date (three proofs of claims and two complaints), there is no allegation anywhere that the $294 million dividend has any connection to Cayman whatsoever—let alone that it constitutes Cayman assets.[29] And, contrary to Dr. Mokal's suggestion, the **Officeholder Claims**—pleaded in Counts I of the Second Amended POC and the Amended Complaint—do not concern Cayman deposits allegedly "misapplied prior to the making of the Winding-Up Order" or "mismanagement"

---

[28] RM-1 ¶¶ 47.2, 48 (citing *In re HIH Casualty and General Insurance Limited* [2008] 1 WLR 852 (HL), at [8]-[10]); Ch. 15 Hr'g Tr. 150:24-151-1 ("THE COURT: Justice Doyle was very clear that he was limiting his order to the assets in the Cayman Islands. [Dr. Mokal]: Yes, that's right. That's right."); *accord* SS-1 ¶ 81.

[29] *Cf.* SS-1 ¶ 176 ("[C]hoses in action[] are for legal purposes localized and are situated where they are properly recoverable and are properly recoverable where the [defendant] resides." (quoting *Jabbour* v. *Custodian of Israeli Absentee Property* [1954] 1 WLR 139 (QB) at 145)).

of SVB Cayman "by one or more persons located outside" of Cayman.  (RM-2 ¶ 11; RM-3 ¶¶ 38.1-38.2.)[30]

*Second*, Dr. Mokal appears to claim that there is "discrimination … against Cayman [Depositors] in the *FDIC process*," and that discrimination justifies the extraterritorial pursuit of the Officeholder Claims against *SVBFG*, contrary to centuries of precedent.  (RM-3 ¶¶ 29-32, 41-44 (emphasis added).)  The authority that Dr. Mokal cites on this point provides that "the principles of ancillary winding up require that English creditors are not discriminated against in the foreign liquidation."  (RM-3 ¶ 29.)  Other than this line of authority, Dr. Mokal provides no explanation or cites any support for the proposition that the JOLs should be allowed to address the discrimination in the *FDIC process* by asserting claims against *SVBFG*.  More fundamentally, there is no suggestion by any Cayman Depositors that they have been subject to any discrimination in *SVBFG*'s chapter 11 proceeding overseen by the Court.  To the extent that there is any improper-yet-unproven discrimination against Cayman Depositors in the *FDIC process* (which, notably, has fully allowed 501 out of 615 of their claims), Cayman Depositors had the opportunity to press constitutional and other claims *against the FDIC* in the *Knight League* and *Ledwidge* cases in the District of Columbia.

*Third*, the Cayman Court's sanction orders are of no help to the JOLs.  (*Contra* RM-3 ¶ 39.)  As a threshold matter, "the [Cayman] Court *cannot*, on a sanction application, expand the duties of the JOLs beyond their appointment, functions[,] and duties under the statutory scheme."  (SS-1 ¶ 150; *accord* Mokal Dep. 152:12-23.)  Here, "consistent with what is typically done," the JOLs' appointment "is limit[ed] … to the assets within Cayman."  (*E.g.*, Ch. 15 Hr'g Tr. 34:11-14, 150:24-151-1; RM-1 ¶¶ 47-48.)  But even if the sanction orders could expand the functions of the

---

[30] Indeed, the JOLs conceded repeatedly that "*all* of the credits" associated with Cayman Depositors "were geographically located in the United States."  (Ch. 15 Dkt. No. 42 ¶ 47; *see also id.* Dkt. No. 1 ¶¶ 5, 47-48, 71-72.)

JOLs beyond their appointment, the sanction orders do not permit the JOLs to bring the Officeholder Claims. The October Sanction Order refers to "the Amended Proof of Claim and the Adversary Complaint" against SVBFG filed "on 28 June 2024," *not* the Second Amended POC and Amended Complaint filed in November 2024 now pursued by the JOLs. (Oct. Sanction Order ¶ 5.) In fact, the "Adversary Complaint" does not plead any claims under sections 145, 146, or 147 of the Companies Act. (Initial Compl. ¶¶ 110-125.) While the First "Amended Proof of Claim" mentions sections 145, 146, and 147 in a laundry list of "further" claims (many have since been abandoned), the focus of that document and the "Adversary Complaint" was on *U.S. law* claims against SVBFG—including under "California Financial Code § 1406" and "Section 541(d) of the Bankruptcy Code" (Am. POC ¶ 99; Initial Compl. ¶¶ 101-115, 121-125)—which are not Officeholder Claims under Cayman law (SS-1 ¶ 209).

Most troublingly, *only* the JOLs—and *not* SVBFT, the experts, or the Court—know what Justice Doyle actually reviewed or sanctioned in connection with the October Sanction Order since none of the documents filed in relation to that Order has been produced by the JOLs to SVBFT, the experts, or the Court. (SS-1 ¶ 54; Mokal Dep. 132:15-134:12.) What we *do* know is that a Cayman court "would typically provide a written judgment" when "deciding a novel and difficult issue." (Mokal Dep. 50:10-22; SS-1 ¶ 210.) But, in this case, although the JOLs claim Justice Doyle sanctioned ancillary liquidators to bring Officeholder Claims extraterritorially for the first time in Cayman and English history, he did so without any written judgment explaining his logic. (SS-1 ¶ 210.)

### D.     Rule in *Gibbs*

Finally, under what is known as the rule in *Gibbs*, a Cayman-law governed debt is usually recognized as discharged only if the discharge occurred in accordance with Cayman law. (SS-1 ¶ 221.) There is a well-established exception to this rule, which is when a creditor files a claim in

a *foreign* liquidation, the filing amounts to a submission to the foreign jurisdiction "whether or not the creditor received a dividend." (*Id.* ¶ 222.) The reason for this exception is that "the creditor 'should not be allowed to benefit from the insolvency proceeding without the burden of complying with the orders made in that proceeding.'" (*Id.* (quoting *Rubin* v. *Eurofinance SA* [2012] UKSC 46, [2013] 1 AC 236 at [167]).)

Here, nearly all of the Cayman Depositors the JOLs claim to represent fall under this exception. As the Court recognized, "all but 11 of the approximately 615 of SVB Cayman's former clients with positive balances in the SVB Cayman Deposit Accounts have submitted claims to the FDIC-R." (Ch. 15 Opn. 16.) If those claims are discharged under U.S. law, absent "mistake, deceit, misrepresentation, fraud, or duress" (RM-3 ¶ 95), "the JOLs would be obliged to reject the creditor claims … or to apply to expunge the claims if they had already been admitted" under the exception to the rule in *Gibbs* (SS-1 ¶ 226). "The effect of this would be a radically reduced creditor constituency in the Cayman liquidation, with a very small number of remaining creditors standing to benefit from any recoveries made by the JOLs on any claim." (SS-1 ¶ 227.)

## **CONCLUSION**

For the foregoing reasons, the JOLs lack standing to pursue the Proposed Claims. There is no legal basis under either U.S. or Cayman law to support any theory of recovery by the JOLs against SVBFT. Accordingly, the Court should disallow and expunge the JOLs' proofs of claim (Nos. 1247, 1450, 1489) and dismiss the adversary proceeding pending in Case No. 24-4014 (MG) with prejudice.

Respectfully Submitted,

Dated: March 25, 2025                          /s/ *James L. Bromley*
New York, New York                             Robert A. Sacks
                                               James L. Bromley
                                               Adam S. Paris
                                               Christian P. Jensen
                                               Mathew T. Souza
                                               James R. Bowen
                                               **SULLIVAN & CROMWELL LLP**
                                               125 Broad Street
                                               New York, NY 10004
                                               Telephone:    (212) 558-4000
                                               Facsimile:    (212) 558-3588
                                               E-mail:       sacksr@sullcrom.com
                                                             bromleyj@sullcrom.com
                                                             parisa@sullcrom.com
                                                             jensenc@sullcrom.com
                                                             souzam@sullcrom.com
                                                             bowenjr@sullcrom.com

                                               *Counsel to SVB Financial Trust,*
                                               *as successor to the Debtor*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 25, 2025, I caused a true and correct copy of the foregoing

to be served upon counsel to the JOLs *via* ECF.

/s/ *Matthew T. Souza*
Matthew T. Souza

*Counsel to SVB Financial Trust,*
*as successor to the Debtor*