REED SMITH LLP
Kurt F. Gwynne, Esq.
Casey D. Laffey, Esq.
599 Lexington Avenue
New York, NY 10022
Telephone: (212) 521-5400
Facsimile: (212) 521-5450
E-mail: kgwynne@reedsmith.com
E-mail: claffey@reedsmith.com

*Counsel to the Federal Deposit Insurance Corporation,
as Receiver for Silicon Valley Bank*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| SVB FINANCIAL GROUP, | : | Case No. 23-10367 (MG) |
| | : | |
|       Reorganized Debtor. | : | |
| | : | |

-------------------------------------------------------x

| | | |
|---|---|---|
| JOINT OFFICIAL LIQUIDATORS OF | : | Adv. Proceeding No. 24-04014 (MG) |
| SILICON VALLEY BANK (IN OFFICIAL | : | |
| CAYMAN ISLANDS LIQUIDATION), | : | |
| | : | |
|       Plaintiffs. | : | |
| | : | |
|       vs. | : | |
| | : | |
| SVB FINANCIAL GROUP | : | |
| | : | |
|       Defendant. | : | |

-------------------------------------------------------x

**BRIEF OF THE FEDERAL DEPOSIT INSURANCE CORPORATION,
AS RECEIVER FOR SILICON VALLEY BANK,
<u>IN OPPOSITION TO PLAINTIFFS' ALLEGED STANDING</u>**

# <u>TABLE OF CONTENTS</u>

**Page**

FACTUAL BACKGROUND ................................................................................................ 1

    A.    The Appointment of FDIC-R1 as Receiver for Silicon Valley Bank ......................... 1

    B.    Appointment of Joint Official Liquidators of SVB (Cayman Branch) ...................... 1

    C.    FDIC-R1's Affirmative Defenses in Litigation with SVB Financial Group ............. 1

    D.    The Claims Asserted by the JOLs ......................................................................... 2

        1.    Claims Asserted in the Proof of Claim ......................................................... 2

        2.    Claims Asserted in the First Amended Adversary Complaint ...................... 5

ARGUMENT ................................................................................................................... 6

    A.    Standing in General .............................................................................................. 6

    B.    The JOLs Lack Standing to Assert the Claims under the Succession Clause, Which
        Confers upon FDIC-R1 "All" Rights and Titles to the Claims. ............................... 7

        1.    The Claims Belong to FDIC-R1 Because They Are Based on General Harm
            to SVB, Not Particularized Harm to the Cayman Accountholders or JOLs. . 7

        2.    The JOLs Cannot Assert SVB's Claims as "Direct" Claims on Behalf of the
            Cayman Accountholders. ........................................................................... 10

        3.    The FDIC-R1 Succeeds to the Claims Even if They Are Direct Claims. ..... 11

        4.    Applying the Plain Language of the Succession Clause to Direct Claims
            Does Not Lead to a "Takings Clause" Issue. ............................................... 13

        5.    The JOLs Have No Claim Under 12 U.S.C. § 1821(d)(17) ......................... 17

        6.    Determining the JOLs Lack Standing Under the Succession Clause Is a
            Permissible Domestic Application of the Succession Clause. ..................... 19

    C.    Any Cayman Law Contrary to Title 12 of the United States Code Should Not Be
        Granted Extraterritorial Effect (Comity) in the United States. ............................... 22

CONCLUSION ............................................................................................................... 27

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Constitution**

U.S. Const. Amendment V .................................................................................................14

**Cases**

*Aaron v. Ill. Nat'l Ins. Co.*,
    2023 U.S. Dist. LEXIS 200450 (E.D. La. Nov. 8, 2023) ........................................12

*Abrishamchi v. Abisse United States*,
    2021 Cal. Super. LEXIS 62667 (Cal. Super. Ct. June 14, 2021)..............................8

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
    677 F.3d 60 (2d Cir. 2012)......................................................................................20

*Adar 980 Realty, LLC v. Sofer (In re Sofer)*,
    613 Fed. App'x 92 (2d Cir. 2015).............................................................................6

*Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns
    Corp.)*,
    365 B.R. 24 (Bankr. S.D.N.Y. 2007)........................................................................8

*Am. W. Bank Members v. Utah*,
    2023 U.S. Dist. LEXIS 108485 (D. Utah June 21, 2023).......................................12

*In re America's Ins. Ctr.*,
    620 B.R. 528 (Bankr. D.N.J. 2020) ...........................................................................8

*Ap-Fonden v. DePaolo*,
    2025 U.S. Dist. LEXIS 52788 (E.D.N.Y. Mar. 21, 2025)....................11, 13, 23, 25

*Ariz. Christian Sch. Tuition Org. v. Winn*,
    563 U.S. 125 (2011)....................................................................................................6

*AT&T Corp. v. Walker*,
    2006 U.S. Dist. LEXIS 64542 (W.D. Wash. Sept. 11, 2006)....................................8

*Atherton v. FDIC*,
    519 U.S. 213 (1997).................................................................................................11

*In re Atlas Shipping A/S*,
    404 B.R. 726 (Bankr. S.D.N.Y. 2009) ....................................................................18

*Baker v. Carr*,
    369 U.S. 186 (1962)...................................................................................................6

*Barnes v. Harris*,
    783 F.3d 1185 (10th Cir. 2015) ...........................................................................8

*Bartfield v. Murphy*,
    578 F. Supp. 2d 638 (S.D.N.Y. 2008)..................................................................10

*Battaglia v. General Motors Corp.*
    169 F.2d 254 (2d Cir. 1948)................................................................................14

*Borders v. Klug (In re Klug)*,
    2011 Bankr. LEXIS 2992 (Bankr. E.D. Ky. Aug. 3, 2011)..................................16

*Bowers v. Whitman*,
    671 F.3d 905 (9th Cir. 2012) ..............................................................................15

*Caplin v. Marine Midland Grace Tr. Co.*,
    406 U.S. 416 (1972)............................................................................................16

*CBF Indústria de Gusa S/A v. Amci Holdings, Inc.*,
    650 F. Supp. 3d 228 (S.D.N.Y. 2023)..................................................................11

*In re Colonial Realty Co.*,
    980 F.2d 125 (2d Cir. 1992)................................................................................18

*Cooperativa de Ahorro y Credito Aguada v. Kidder, Peabody & Co.*,
    993 F.2d 269 (1st Cir. 1993)..........................................................................14, 15

*DeBinder v. Albertson's, Inc.*,
    2009 U.S. Dist. LEXIS 2981 (D. Ariz. Jan. 7, 2009) ..........................................10

*Deutsche Bank Nat'l Tr. Co. v. FDIC*,
    744 F.3d 1124 (9th Cir. 2014) ............................................................................24

*Dittmer Properties, L.P. v. FDIC*,
    708 F.3d 1011 (8th Cir. 2013) ............................................................................25

*Durkin v. Shields (In re Imperial Corp. of Am.)*,
    1997 U.S. Dist. LEXIS 20942 (S.D. Cal. June 4, 1997)..............................9, 16, 17

*Edgar v. MITE Corp.*,
    457 U.S. 624 (1982)............................................................................................11

*Engquist v. Oregon Dep't of Agric.*,
    478 F.3d 985 (9th Cir. 2007) ..............................................................................14

*Esther Sadowsky Testamentary Tr. v. Syron*¸
    2009 U.S. Dist. LEXIS 131781 (S.D.N.Y. Jan. 28, 2009)..............................16, 21

*FDIC v. Am. Cas. Co.*,
    975 F.2d 677 (10th Cir. 1992) ...............................................................................20

*FDIC v. Morgan Stanley Capital I Inc.*,
    2015 U.S. Dist. LEXIS 36988 (D. Colo. Mar. 14, 2015) .........................................7

*FDIC v. OneBeacon Midwest Ins. Co.*,
    883 F. Supp. 2d 754 (N.D. Ill. 2012) ....................................................................26

*FDIC v. US Titles, Inc.*,
    939 F. Supp. 2d 30 (D.D.C. 2013) ...........................................................................8

*Freeman v. FDIC*,
    56 F.3d 1394 (D.C. Cir. 1995) ...............................................................................25

*Gill v. Marsh USA, Inc.*,
    2024 U.S. Dist. LEXIS 127161 (N.D. Cal. July 18, 2024)....................................11

*Gross v. AT&T Inc.*,
    2019 U.S. Dist. LEXIS 128615 (S.D.N.Y. July 31, 2019) .......................................6

*Hall v. Sunshine Mining Co. (In re Sunshine Precious Metals, Inc.)*,
    157 B.R. 159 (Bankr. D. Idaho 1993).....................................................................10

*In re Hamilton*,
    240 F.3d 148 (2d Cir. 2001).....................................................................................23

*Hindes v. FDIC*,
    137 F.3d 148 (3d Cir. 1998).....................................................................................25

*Hosking v. Hellas Telcoms. (Lux.) II SCA (In re Hellas Telcoms. (Lux.) II SCA)*,
    524 B.R. 488 (Bankr. S.D.N.Y. 2015)....................................................................19

*Ileto v. Glock, Inc.*,
    565 F.3d 1126 (9th Cir. 2009) ...............................................................................15

*Knight League Ltd. v. FDIC*,
    No. 1:23-cv-03063 (APM) (D.D.C. filed Oct. 13, 2023).......................................17

*Landgraf v. USI Film Products*,
    511 U.S. 244 (1994).................................................................................................14

*Levin v. Miller*,
    763 F.3d 667 (7th Cir. 2014) ...........................................................................9, 11, 12

*Little Hearts Marks Fam. II L.P. v. Carter (In re 305 E. 61st St. Grp. LLC)*,
    644 B.R. 75 (Bankr. S.D.N.Y. 2022)......................................................................10

iv

*Lubin v. Skow*,
    382 Fed. App'x 866 (11th Cir. 2010) (unpublished) (per curiam) ...........................................9

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)...........................................................................................................6

*Matagorda Cnty. v. Russell Law*,
    19 F.3d 215 (5th Cir. 1994) ...........................................................................................20

*McCullough v. Virginia*,
    172 U.S. 102 (1898)........................................................................................................14

*Morrison v. Natl. Australia Bank Ltd.*,
    561 U.S. 247 (2010).................................................................................................19, 20

*O'Melveny & Myers v. FDIC*,
    512 U.S. 79 (1994)..........................................................................................................26

*Oakland Raiders v. Nat'l Football League*,
    32 Cal. Rptr. 3d 266 (Cal. Ct. App. 2005) .....................................................................10

*Paramount Health Sys., Inc. v. Wright*,
    138 F.3d 706 (7th Cir. 1998) ..........................................................................................15

*Pareto v. FDIC*,
    139 F.3d 696 (9th Cir. 1998) .....................................................................................16, 21

*Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE*,
    763 F.3d 198 (2d Cir. 2014)............................................................................................19

*In re Picard*,
    917 F.3d 85 (2d Cir. 2019)........................................................................................19, 21

*Powers v. Ohio*,
    499 U.S. 400 (1991)..........................................................................................................6

*Pravin Banker Assocs. v. Banco Popular Del Peru*,
    109 F.3d 850 (2d Cir. 1997)............................................................................................23

*Progressive Cas. Ins. Co. v. FDIC*,
    80 F. Supp. 3d 923 (N.D. Iowa 2015).............................................................................11

*Radian Ins., Inc. v. Deutsche Bank Nat'l Tr. Co.*,
    2009 U.S. Dist. LEXIS 92197 (E.D. Pa. Oct. 1, 2009).....................................................25

*Rajamin v. Deutsche Bank Nat'l Tr. Co.*,
    757 F.3d 79 (2d Cir. 2014).................................................................................................6

*Responsible Person of Musicland Holding Corp. v. Best Buy Co. (In re Musicland Holding Corp.)*,
    398 B.R. 761 (Bankr. S.D.N.Y. 2008) ..................................................................10

*RJR Nabisco, Inc. v. European Cmty.*,
    579 U.S. 325 (2016)...........................................................................................20, 21

*Roberts v. Fed. Hous. Fin. Agency*,
    889 F.3d 397 (7th Cir. 2018) .................................................................................11

*RTC v. Cruce*,
    972 F.2d 1195 (10th Cir. 1992) ..............................................................................18

*RTC v. Love*,
    36 F.3d 972 (10th Cir. 1994) ..................................................................................20

*In re Silicon Valley Bank Cayman Islands Branch*,
    2025 U.S. Dist. LEXIS 23681 (S.D.N.Y. Feb. 7, 2025)................................. *passim*

*In re Silicon Valley Bank (Cayman Islands Branch)*,
    658 B.R. 75 (Bankr. S.D.N.Y. 2024).......................................................................25

*Skinner v. Skinner (In re Skinner)*,
    519 B.R. 613 (Bankr. E.D. Pa. 2014) ......................................................................16

*Sowell v. American Cyanamid Co.*,
    888 F.2d 802 (11th Cir. 1989) .................................................................................15

*Superintendent of Ins. of N. Y. v. Bankers Life & Casualty Co.*,
    404 U.S. 6 (1971).....................................................................................................19

*In re SVB Fin. Grp.*,
    662 B.R. 53 (Bankr. S.D.N.Y. 2024).......................................................... 2, 6, 8, 26

*Telematics Intern., Inc. v. NEMLC Leasing Corp.*,
    967 F.2d 703 (1st Cir. 1992).....................................................................................25

*Thomas v. FDIC*,
    255 P.3d 1073 (Colo. 2011)......................................................................................21

*In re TMI*,
    89 F.3d 1106 (3d Cir. 1996)......................................................................................15

*Two Shields v. United States*,
    119 Fed. Cl. 762 (Fed. Cl. 2015) .............................................................................14

*United States v. Portrait of Wally*,
    2002 U.S. Dist. LEXIS 6445 (S.D.N.Y. Apr. 11, 2002).........................................23

vi

*Verdi v. FDIC*,
  2024 U.S. Dist. LEXIS 170814 (S.D.N.Y. Sept. 20, 2024)..................................11, 12, 13, 15

*Vieira v. Anderson (In re Beach First Nat'l Bancshares, Inc.)*,
  702 F.3d 772 (4th Cir. 2012) ...........................................................................................9, 10

*Volges v. RTC*,
  32 F.3d 50 (2d Cir. 1994) .......................................................................................................25

*WesternGeco LLC v. ION Geophysical Corp.*,
  585 U.S. 407 (2018).........................................................................................................19, 20

*Zucker v. Rodriguez*,
  919 F.3d 649 (1st Cir. 2019)........................................................................................ *passim*

**Statutes**

8 Del. C. § 170(a).....................................................................................................................5

8 Del. C. § 173 .........................................................................................................................5

11 U.S.C. § 544.......................................................................................................................16

11 U.S.C. § 548.......................................................................................................................16

11 U.S.C. § 1521(a)(7)............................................................................................................18

12 U.S.C. § 1813(l)...................................................................................................................3

12 U.S.C. § 1813(l)(5)(A)....................................................................................................3, 24

12 U.S.C. § 1821(c)(3)(B) ........................................................................................................1

12 U.S.C. § 1821(d)(2)(A)(i) ...............................................................................................7, 23

12 U.S.C. § 1821(d)(11)(A)(i)-(iii).........................................................................................24

12 U.S.C. § 1821(d)(17)(D)...............................................................................................17, 18

12 U.S.C. § 1821(j)..................................................................................................................25

12 U.S.C. § 1831r....................................................................................................................24

Cal. Fin. Code § 620 .................................................................................................................1

Cal. Fin. Code § 623 .................................................................................................................1

FIRREA § 101(5).....................................................................................................................20

FIRREA § 101(9)...................................................................................................................20

**Regulations**

12 C.F.R. § 330.3(c)..............................................................................................................3

12 C.F.R. § 330.3(e)..............................................................................................................24

The Federal Deposit Insurance Corporation ("FDIC"), as receiver for Silicon Valley Bank ("FDIC-R1"), submits this *Brief in Opposition to Plaintiffs' Alleged Standing* and states as follows:

## FACTUAL BACKGROUND

### A.    The Appointment of FDIC-R1 as Receiver for Silicon Valley Bank

On March 10, 2023, the California Department of Financial Protection and Innovation, acting under section 620 of the California Financial Code ("CFC"), closed Silicon Valley Bank ("SVB") and appointed the FDIC as its receiver. On that same day, the FDIC accepted the appointment under 12 U.S.C. § 1821(c)(3)(A). Upon acceptance, FDIC-R1 had the powers conferred by applicable federal law and the powers conferred on the commissioner under Chapter 7 of the CFC. *See* 12 U.S.C. § 1821(c)(3)(B); Cal. Fin. Code §§ 620, 623.

### B.    Appointment of Joint Official Liquidators of SVB (Cayman Branch)

More than three months later, on June 29, 2023, the Grand Court of the Cayman Islands, Financial Services Division, appointed Andrew Childe, Michael Pearson, and Niall Ledwidge as joint official liquidators (the "JOLs") of SVB's Cayman branch and purported to grant them authority "limited to acting in respect of the assets and affairs of the Cayman Islands branch of [SVB] and its creditors." Winding-Up Order [Adv. No. 24-04014 (MG), Dkt. #1-9] ¶ 2.

### C.    FDIC-R1's Affirmative Defenses in Litigation with SVB Financial Group

On March 5, 2024, SVB Financial Group ("SVBFG") filed a complaint against, *inter alia,* FDIC-R1 in the United States District Court for the Northern District of California, thereby commencing Case No. 5:24-cv-01321, styled *SVB Financial Group v. Federal Deposit Insurance Corporation, as Receiver for Silicon Valley Bank and Silicon Valley Bridge Bank, N.A.* In that complaint, SVBFG asserted claims concerning SVBFG's alleged $1.9 billion "deposit" claim.

On May 2, 2024, FDIC-R1 filed in this Court a statement of its defensive setoff rights against SVBFG (the "FDIC-R1 Statement") [Dkt. #1081], which "sets out the alleged bases of the

FDIC-R1's claims against the Debtor" and put SVBFG and other parties in interest "on notice" of FDIC-R1's defensive setoff rights. *See In re SVB Fin. Grp.*, 662 B.R. 53, 68, 72 (Bankr. S.D.N.Y. 2024). The FDIC-R1 Statement identified certain bases for FDIC-R1's defensive setoff rights, including (without limitation) aiding and abetting breach of fiduciary duties, payment of an improper $294 million dividend from SVB to SVBFG ("Upstream Distribution"), mismanagement, unjust enrichment, and fraudulent transfer. *See* FDIC-R1 Statement, pp. 3-5; *see also* Dkt. 1111 (May 9, 2024 response to the Debtor's First Amended Plan of Reorganization containing similar information regarding FDIC-R1's affirmative setoff defenses).

On January 10, 2025, FDIC-R1 filed its answer and affirmative defenses in the N.D. Cal Action. [N.D. Cal. Dkt. #135.] Its affirmative defenses include (without limitation): First Affirmative Defense – Setoff for Aiding and Abetting Breaches of Fiduciary Duty; Second Affirmative Defense – Setoff for SVBFG's Liability for Acts of its Agents; Third Affirmative Defense – Setoff for Negligence; Fourth Affirmative Defense – Unclean Hands; Fifth Affirmative Defense – Unjust Enrichment; Sixth Affirmative Defense – Constructive Fraudulent Transfer (arising from the Upstream Distribution) (collectively, the "Affirmative Defenses"). *See id*. ¶¶ 1-142. In the factual background and through its Sixth Affirmative Defense, FDIC-R1 alleged that the Upstream Distribution was improper. *See id.* ¶¶ 90-108. FDIC-R1 also alleged negligence and mismanagement with respect to SVBFG's management of SVB and its assets. *See id*. *passim*.

### D.    The Claims Asserted by the JOLs

The JOLs allege multiple causes of action against SVBFG in a proof of claim (as amended) and in the Complaint (as amended, as defined below).

### 1.    Claims Asserted in the Proof of Claim

On August 8, 2023, the JOLs filed an unsecured proof of claim (Claim #1247) against SVB in a contingent, unliquidated amount. On June 28, 2024, the JOLs filed an amended unsecured

proof of claim (Claim #1450) in the amount of $476,612,862. On November 22, 2024, the JOLs'

filed a further amended proof of claim and an attached addendum (the "POC Addendum") (Claim

#1489). Although the further amended proof of claim reduces the purported size of the uninsured

claim of the Cayman accountholders[1] to approximately $430 million, it nearly doubles the stated

amount of the claim from $476 million to "not less than $944,000,000." *Id.* at 2, POC Addendum,

¶ 144.

In the POC Addendum, the JOLs allege the following causes of action (some of which

appear to be borrowed from FDIC-R1's prior statements of its defensive setoff rights):

- Count I: avoidance and recovery of the Upstream Distribution when SVBFG and SVB directors and officers knew or should have known of SVB's actual or imminent insolvency;

- Count II: SVBFG's negligent failure to oversee SVB's operations in the Cayman Islands;

- Count III: vicarious liability in respect of SVB management with Cayman responsibility (all executives at SVBFG); and

---

[1] Unless the context otherwise requires, the term "Cayman accountholders" as used herein refers to holders of accounts at SVB (Cayman branch) pursuant to either (i) an SVB Eurodollar Money Market Account Agreement (Cayman Branch) or (ii) an SVB Eurodollar Operating Account Agreement (Cayman Branch). "The account agreements for each type of account stated that the accounts were governed by and construed according to California law, were also subject to Cayman Islands law and were not FDIC insured. The account agreements also stated that account balances were not deposits as defined by the FDIC and that, should the bank fail, accountholders would be considered general creditors and not depositors." *In re Silicon Valley Bank Cayman Islands Branch*, 2025 U.S. Dist. LEXIS 23681, *3 (S.D.N.Y. Feb. 7, 2025); SVB Eurodollar Money Market Account Agreement (Cayman Branch), [Adv. No. 24-04014 (MG), Dkt. #1-3]; SVB Eurodollar Operating Account Agreement (Cayman Branch), [Adv. No. 24-04014 (MG), Dkt. #1-4]; *see* 12 U.S.C. § 1813(l)(5)(A) (defining "deposits"). SVB (Cayman branch) also offered a Eurodollar Sweep Account. Unlike the other accounts at SVB (Cayman branch), the Eurodollar Sweep Account was swept on a daily basis to an SVB account in the United States. *See, e.g.,* SVB Eurodollar Sweep Account Agreement (Cayman Branch)*,* [Adv. No. 24-04014 (MG), Dkt. #1-2] ("As of the morning of the following Business Day, the entire balance in the SVB Eurodollar Sweep Account will automatically transfer to the Deposit Account, leaving the SVB Eurodollar Sweep Account with a balance of zero") (defining "Deposit Account" as "your demand deposit account at a U.S. office of Silicon Valley Bank"). When SVB failed, the balances in the Eurodollar Sweep Accounts were associated with the U.S.-payable Deposit Accounts, which are "deposits." *See* 12 U.S.C. § 1813(l); 12 C.F.R. § 330.3(c).

- Count IV: negligent creation of systemic risk that allegedly "only" harmed the Cayman accountholders.

*See* POC Addendum, ¶¶ 145-155.

With respect to Count I (avoidance of the Upstream Distribution), the JOLs assert that "[t]he Upstream Distribution constitutes an avoidable transaction and tort liability under Cayman statutory law available to joint official liquidators, including: (i) Section 145 of the Companies Act (voidable preference); (ii) Section 146 of the Companies Act (disposition of property made at an undervalue); (iii) Section 4(1) of the Cayman Islands Fraudulent Dispositions Law; (iv) Section 147 of the Companies Act (liability for carrying out business of SVB with intent to defraud the company's creditors); and (v) Section 34(2) of the Companies Act and Cayman common law (pertaining to unlawful distributions)." *Id.* at ¶ 146. The JOLs assert that, "[u]pon the issuance of the Winding Up Order, this claim exclusively vested in the JOLs." *Id.* at ¶ 145. The JOLs assert that "[t]his claim, rooted in Cayman law, could not have vested with" FDIC-R1 because of "territorial limitations" on FDIC-R1's rights. *Id.* at ¶ 147.

With respect to Count II (negligent oversight), the JOLs assert that SVBFG negligently failed to oversee SVB and its Cayman operations and thereby failed to ensure the protection of Cayman accountholders' funds. *Id.* at ¶ 148. With respect to Count III, the JOLs assert that SVBFG is vicariously liable for its executives' decisions that allowed the withdrawal of funds from the "jurisdictionally significant Cayman account to the SVB" receivership and the "orphaning of SVB Cayman proximate to the FDIC-First Citizens Agreement." *Id.* at ¶ 151. With respect to Count IV (negligent creation of systemic risk), the JOLs assert "a conditional negligence claim against SVBFG," that is allegedly "specific and particular to the Cayman [accountholders]," asserting that "SVBFG engaged in gross mismanagement practices by prioritizing short-term interests and executive compensation over long-term stability. This included failing to maintain appropriate risk

4

and liquidity controls and not disclosing the true financial condition of SVB, which was a significant factor in the bank's eventual collapse." *Id.* at ¶ 154. In support of Count IV, the JOLs allege that SVBFG "severely mismanaged SVB in the years leading up to the SVB Collapse, breaching their fiduciary duties to SVB Cayman's creditors-depositors and aided and abetted the breach of fiduciary duties by SVB and its directors and officers." *Id.* at ¶ 155.

### 2.     Claims Asserted in the First Amended Adversary Complaint

On July 24, 2024, the JOLs filed an *Adversary Complaint* against SVBFG [Dkt. #1335] (the "Complaint"), thereby commencing Adv. Proc. No. 24-04014, which is pending in this Court. On November 22, 2024, the JOLs filed their *First Amended Adversary Complaint* ("Amended Complaint") [Adv. No. 24-04014 (MG), Dkt. #11].[2] The Amended Complaint includes a single cause of action seeking a declaratory judgment and imposition of a constructive trust on the ground that the Upstream Distribution is allegedly "void" under Cayman Law. Amended Complaint, ¶¶ 161-169.[3]

For the first time, in the Amended Complaint (and the POC Addendum), the JOLs asserted that their claims do not "impinge" on the FDIC-R1's rights because 12 U.S.C. § 1821(d)(17) ostensibly confers on them an implied cause of action to bring the claims—even though the JOLs admit that section 1821(d)(17) expressly provides that the FDIC's rights are "superior" to those of a trustee or any other party (other than a federal agency) under title 11. Complaint, ¶¶ 6, 138, 163.

---

[2] The Court's November 26, 2024 scheduling order [Dkt. #1606] granted the JOLs leave to file an amended Adversary Complaint on or before November 22, 2024, without prejudice to the Debtor's ability to object to the amended complaint. *Id.*, ¶ 3.

[3] The original adversary complaint included three claims—all related to the Upstream Dividend. *See* Complaint ¶¶ 110-125 (Count 1 (declaratory judgment under CFC § 1406 or alternatively Delaware law (8 Del. C. §§ 170(a), 173))); Count 2 (declaratory judgment under Cayman law (Section 34(2) of the Cayman Companies Act)); Count 3 (imposition of constructive trust under section 541(d) of the Bankruptcy Code)).

The claims asserted in the Complaint, Amended Complaint, and POC Addendum are herein referred to, collectively, as the "Claims."

## ARGUMENT

### A.    Standing in General

Standing "is, of course, a question of federal law." *Baker v. Carr*, 369 U.S. 186, 204 (1962). "[T]he principle that federal law governs Article III standing . . . is elementary." *Gross v. AT&T Inc.*, 2019 U.S. Dist. LEXIS 128615, *7 (S.D.N.Y. July 31, 2019). Foreign law "cannot alter the legal standard by which Article III standing is determined." *Id*. at *8; *see also id*. at *12 (rejecting attempt to sue in federal court under Belgian law; to maintain an action in federal court, party "must satisfy" Article III standing requirements "as construed by the Second Circuit."). The party "invoking federal jurisdiction"—here, the JOLs—"bears the burden to establish" standing. *In re SVB Fin. Grp.,* 662 B.R. at 62.

The "minimum constitutional requirements for standing" include (among other things) an "injury in fact." *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 133-34 (2011). Such injury "must affect the plaintiff in a personal and individual way." *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 n.1 (1992)). "[A] litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties." *Powers v. Ohio*, 499 U.S. 400, 410 (1991).

"Prudential standing remains a jurisdictional requirement in [the Second] Circuit." *Adar 980 Realty, LLC v. Sofer (In re Sofer)*, 613 Fed. App'x 92, 93 (2d Cir. 2015). "The prudential standing rule normally bars litigants from asserting the rights or legal interests of others in order to obtain relief from injury to themselves." *Id.* (quoting *Rajamin v. Deutsche Bank Nat'l Tr. Co.*, 757 F.3d 79, 86 (2d Cir. 2014)) (internal quotation marks and alteration omitted).

6

For the reasons discussed below, the JOLs lack standing to pursue the Claims because each

Claim belongs to FDIC-R1 under 12 U.S.C. § 1821(d)(2)(A)(i) (the "Succession Clause").

**B.      The JOLs Lack Standing to Assert the Claims under the Succession Clause,
Which Confers upon FDIC-R1 "All" Rights and Titles to the Claims.**

The JOLs claim standing for (i) SVB and (ii) the Cayman accountholders. *See* Amended

Complaint ¶ 9 (asserting "standing to bring claims on behalf of SVB Cayman" and "as the agent

of SVB Cayman's [accountholders]"); POC Addendum ¶¶ 111 ("the JOLs have statutory powers

to bring proceedings to avoid certain acts . . . on behalf of SVB") and 116 (asserting JOLs "act as

agent on behalf of the Cayman [accountholders]-creditors by bringing litigation in the United

States to safeguard the rights and interests of this particular group") (alteration added).

The JOLs' allegations of standing are contrary to the plain language of the Succession

Clause, which gives FDIC-R1 ownership of "all" SVB's claims *and* "all" accountholders' claims

relating to SVB and its assets. The Succession Clause provides, in relevant part, that FDIC-R1 "by

operation of law, succeed[s] to . . . *all rights, titles*, powers, and privileges *of the insured depository*

*institution, and of any* stockholder, member, *accountholder*, depositor, officer, or director of such

institution with respect to the institution and the assets of the institution." 12 U.S.C.

§ 1821(d)(2)(A)(i) (emphasis added). Only FDIC-R1 has standing to assert the Claims.

**1.      The Claims Belong to FDIC-R1 Because They Are Based on General
Harm to SVB, Not Particularized Harm to the Cayman
Accountholders or JOLs.**

The first part of the Succession Clause provides that FDIC-R1 succeeds to "all" of the

"rights" and "titles" of the "depository institution" in receivership. Those rights and titles include

"all" of SVB's claims and causes of action. *See, e.g., FDIC v. Morgan Stanley Capital I Inc.,* 2015

U.S. Dist. LEXIS 36988, *3 n.2 (D. Colo. Mar. 14, 2015) ("Under the Federal Deposit Insurance

Act, the FDIC succeeds to, and is empowered to sue and complain in any court of law to pursue,

7

*all claims* held by banks for which it is the receiver.") (emphasis added); *FDIC v. US Titles, Inc.*, 939 F. Supp. 2d 30, 33 (D.D.C. 2013) ("Upon appointment, the FDIC succeeded to *all* claims held by AmTrust.") (emphasis added); *Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns Corp.)*, 365 B.R. 24, 52 (Bankr. S.D.N.Y. 2007) ("1821(d)(2)(A)(i) simply gave the FDIC ownership of the claim."). Therefore, FDIC-R1's succession to SVB's claims and causes of action includes claims against SVBFG. *See SVB Fin. Grp.*, 662 B.R. at 68 ("FDIC-R1 stands in the shoes of SVB and has the authority to bring claims against the Debtor.").

The Claims to recover the Upstream Distribution (a dividend) is a claim of SVB (and now the FDIC-R1) because those Claims are based on general damage to SVB, not particularized injury to the Cayman accountholders or the JOLs. *See, e.g., Abrishamchi v. Abisse United States*, 2021 Cal. Super. LEXIS 62667, *5 (Cal. Super. Ct. June 14, 2021) ("Where the Board of Directors (for example) wrongfully declares a dividend (such as where the company fails to meet the financial requirements needed for a proper dividend to be paid) the injury is to the company. The company has paid out money that should have remained in the bank and to rectify that situation, the money needs to be returned to the company. . . . [T]he hallmark is that the individual bringing the suit does not get the money; the company gets the money."); *Barnes v. Harris*, 783 F.3d 1185, 1194-95 (10th Cir. 2015) (claims that are based on "injuries to the Bank," including a claim based on wrongful payment of a dividend to shareholders of the Bank's holding company, "belong to the FDIC"); *AT&T Corp. v. Walker*, 2006 U.S. Dist. LEXIS 64542, *9 (W.D. Wash. Sept. 11, 2006) ("The power to bring an action for unlawful dividends" involves "general damage, not particularized injury to a single creditor.").[4]

---

[4] The JOLs' avoidance claims under Cayman law are similar to fraudulent transfer claims under sections 544 and 548 of the Bankruptcy Code, which are considered general or derivative claims that liquidators may bring for the benefit of all creditors rather than particularized claims for which individual creditors have standing. *See In re America's Ins. Ctr.*, 620 B.R. 528, 535 (Bankr. D.N.J. 2020). FDIC-R1 owns those

Similarly, the Claims based on SVBFG's mismanagement of SVB (Counts II-IV in the POC Addendum) are based on general damage to SVB, not particularized damage to the Cayman accountholders or the JOLs. *See Vieira v. Anderson (In re Beach First Nat'l Bancshares, Inc.)*, 702 F.3d 772, 777-78 (4th Cir. 2012) (breach of fiduciary duty claims belonged to the FDIC as receiver because they were based on conduct that "caused injury first to the [b]ank"); *Levin v. Miller*, 763 F.3d 667, 670-71 (7th Cir. 2014) (claims belonged to FDIC, as receiver, notwithstanding artful pleading that defendants (who served as management of both the holding company and the banks) breached a duty "to [the holding company] to protect it from their own behavior at the [b]anks;" such pleading was merely a "veneer" over a claim "based on the harm the [defendants'] choices caused to the [b]anks"); *Lubin v. Skow*, 382 Fed. App'x 866, 871-72 (11th Cir. 2010) (unpublished) (per curiam) (plaintiffs' claims against the bank's officers belonged to the FDIC because "[t]he alleged harm to the [h]olding [c]ompany stems from the [b]ank officers' management of [b]ank assets" and that "harm is inseparable from the harm done to the [b]ank").

In sum, the Claims belonged to SVB because they are premised upon damage to SVB, not particularized damage to its Cayman accountholders or the JOLs. Consequently, FDIC-R1 now owns "all" right and title to such Claims pursuant to the Succession Clause, and it has the exclusive right to control and assert the Claims. Both the Claims related to the Upstream Distribution and SVBFG's mismanagement of SVB are materially indistinguishable from the setoff defenses that the FDIC-R1 has asserted in the Northern District of California. The JOLs have no right to seek to recover based on the same alleged injuries and wrongdoing.

---

fraudulent transfer claims. *See Durkin v. Shields (In re Imperial Corp. of Am.)*, 1997 U.S. Dist. LEXIS 20942, *41 (S.D. Cal. June 4, 1997) ("The FDIC contends that ISA released valuable claims without consideration and that as successor to the rights of ISA's depositors, it may bring an action to avoid that transfer. The Court agrees.").

2.      **The JOLs Cannot Assert SVB's Claims as "Direct" Claims on Behalf of the Cayman Accountholders.**

A plaintiff asserting a derivative claim seeks to recover for injury to the bank while a plaintiff asserting a direct claim seeks redress for injury personal to the plaintiff. *See Little Hearts Marks Fam. II L.P. v. Carter (In re 305 E. 61st St. Grp. LLC)*, 644 B.R. 75, 83-84 (Bankr. S.D.N.Y. 2022). A plaintiff "has no individual cause of action for an alleged wrong against a business entity, even if he or she suffers injury because of that wrong and would share in the recovery." *Id.* at 84.

As discussed above, the Claims were owned by SVB because they are based on injury to SVB. Therefore, when a plaintiff (other than SVB) seeks to assert such claims, the plaintiff can only do so "derivatively" (*i.e.,* on behalf of SVB). *See Bartfield v. Murphy*, 578 F. Supp. 2d 638, 648 (S.D.N.Y. 2008) ("The Court concludes that Bartfield can only derivatively raise claims alleging misappropriation or destruction of assets owned by CFE as he holds no property right in the assets of CF[.]"); *see generally Responsible Person of Musicland Holding Corp. v. Best Buy Co. (In re Musicland Holding Corp.)*, 398 B.R. 761, 784 (Bankr. S.D.N.Y. 2008) (unlawful dividend claim is "derivative rather than direct"); *Hall v. Sunshine Mining Co. (In re Sunshine Precious Metals, Inc.)*, 157 B.R. 159, 164 (Bankr. D. Idaho 1993) (wrongful dividend claim under 8 Del. C. § 174(a) is a derivative claim); *Oakland Raiders v. Nat'l Football League*, 32 Cal. Rptr. 3d 266, 289 (Cal. Ct. App. 2005) (breach of fiduciary duty claim for corporate mismanagement and diverting corporate assets was derivative); *Vieira*, 702 F.3d at 777-78 (breach of fiduciary duty claims were "causes of action for liability derivative of the alleged failures at the [b]ank level" based on "mismanagement of the [b]ank"); *DeBinder v. Albertson's, Inc.*, 2009 U.S. Dist. LEXIS 2981, *29 (D. Ariz. Jan. 7, 2009) (vicarious liability claim was a derivative claim that does not

10

exist without the underlying claim).[5] Accordingly, the JOLs cannot assert the derivative Claims as direct claims on behalf of the Cayman depositors.

### 3.    The FDIC-R1 Succeeds to the Claims Even if They Are Direct Claims.

As discussed *supra,* by the second part of the Succession Clause, FDIC-R1 "succeeds to the rights of others, besides the insured institution." *Progressive Cas. Ins. Co. v. FDIC*, 80 F. Supp. 3d 923, 949-50 (N.D. Iowa 2015). Previously, the Court questioned whether the Succession Clause should be limited to transferring derivative—not direct—claims to the FDIC-R1 to avoid a potential issue under the Takings Clause of the Fifth Amendment of the United States Constitution. *See Levin,* 763 F.3d at 672 (majority of panel suggesting, in dicta, that the Succession Clause should be limited to derivative claims). However, recent case law directly addressing the issue convincingly rejects any such distinction as having no textual basis in the statute. *See, e.g., Zucker v. Rodriguez*, 919 F.3d 649, 657 (1st Cir. 2019) ("the direct-derivative distinction appears nowhere in the language of § 1821(d)(2)(A)"); *Verdi v. FDIC*, 2024 U.S. Dist. LEXIS 170814, *9 (S.D.N.Y. Sept. 20, 2024) (quoting *Zucker,* 919 F.3d at 657 and surveying the caselaw on this issue);  *See Ap-Fonden v. DePaolo, 2025 U.S. Dist. LEXIS 52788, *12* (E.D.N.Y. Mar. 21, 2025) ("Plaintiff

---

[5] The Claims are derivative claims under any applicable law, but to the extent of any conflict of laws (which there is not), the law of the state of SVB's organization (here California) would determine whether claims are "derivative" or "direct" for purposes of section 1821(d)(2)(A) under the internal-affairs doctrine. *See generally Atherton v. FDIC*, 519 U.S. 213, 223-24 (1997) (the "internal affairs doctrine" is "a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs—matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders—because otherwise a corporation could be faced with conflicting demands") (quoting *Edgar v. MITE Corp.*, 457 U.S. 624, 645 (1982)); *see also Roberts v. Fed. Hous. Fin. Agency*, 889 F.3d 397, 408 (7th Cir. 2018) ("The law governing the companies' internal affairs controls whether a claim is direct or derivative for purposes of HERA, just as it would for FIRREA."); *Gill v. Marsh USA, Inc.*, 2024 U.S. Dist. LEXIS 127161, *6 (N.D. Cal. July 18, 2024) ("California has adopted the internal affairs doctrine, a choice of law principle that requires the laws of a business entity's state of incorporation to govern matters concerning its internal affairs"). Both federal and state choice-of-law rules follow the internal affairs doctrine to determine what law classifies actions as "derivative" or "direct." *See CBF Indústria de Gusa S/A v. Amci Holdings, Inc.,* 650 F. Supp. 3d 228, 248 (S.D.N.Y. 2023).

cautions that interpreting the Succession Clause to cover some direct claims could effectuate an unlawful seizure under the Takings Clause of the Fifth Amendment. That is not so."); *Am. W. Bank Members v. Utah*, 2023 U.S. Dist. LEXIS 108485, *15-16 (D. Utah June 21, 2023) ("There is nothing in the plain language of Section 1821(d)(2)(A) that limits the scope of the statute's succession language to derivative claims exclusively."); *Levin*, 763 F.3d at 674 (Hamilton, J. concurring) (interpreting Succession Clause to cover some direct claims "would surely withstand any challenge" under Takings Clause).

FDIC-R1 "succeeds to a claim if two conditions are met: (1) the claim asserts the rights of any stockholder [or] accountholder . . . and (2) the rights asserted are with respect to the institution and the assets of the institution." *Verdi*, 2024 U.S. Dist. LEXIS 170814, *9 (quoting *Zucker*, 919 F.3d at 656) (internal quotation marks omitted). "Those are the *only* two conditions that must be satisfied for a claim to fall within the ambit of the Clause." *Id.* (emphasis added).

In *Zucker,* the First Circuit analyzed whether the two conditions of the second part of the Succession Clause were met. As the plaintiff-holding company was the bank's sole shareholder, the Court easily determined that the claims asserted rights of a stockholder, thereby satisfying the first condition. 919 F.3d at 656. The Court determined that the second condition was satisfied because the plaintiff-holding company's claims depended on proving that malfeasance by the holding company's directors "depressed the Bank's assets." *Id.* The Court reasoned that such claims were "with respect to" the failed bank and its assets because they "relate[d] to" or "concern[ed]" the bank's assets. *Id.* at 656-57; *see also Aaron v. Ill. Nat'l Ins. Co.*, 2023 U.S. Dist. LEXIS 200450, *51-52 (E.D. La. Nov. 8, 2023) (stating that *Zucker* rejected the direct/derivative distinction but "does not reject a 'source of the harm' inquiry").

Here, both **conditions** are satisfied. The first condition is satisfied because the JOLs allege that they have standing, as the exclusive agent, to assert claims on behalf of the Cayman accountholders. *See* Amended Complaint ¶¶ 2, 9; POC Addendum ¶ 116. The second condition is satisfied because the Claims are "regarding" or "concerning" SVB and its assets. *Verdi*, 2024 U.S. Dist. LEXIS 170814, *9-10 ("the ordinary meaning of the phrase 'with respect to' simply means 'regarding' or 'concerning'"). Absent harm to SVB and its assets, the Cayman accountholders would not have any alleged damages. Therefore, FDIC-R1 owns the Claims (whether direct or derivative) because both conditions of the second part of the Succession Clause are satisfied.[6] *Zucker*, 919 F.3d at 656 (holding that claims "relate to" failed bank's assets where they depended on "proving that malfeasance by [holding company's] directors depressed the Bank's assets") (alteration added); *Ap-Fonden*, 2025 U.S. Dist. LEXIS 52788, *13-14 (claims were "with respect to" failed bank and its assets where such claims were based on "evading risk management measures, endangering Signature [Bank] and its assets" and where "the ultimate harm to [plaintiffs] stemmed from a harm to Signature and its assets—unforeseen mass withdrawals and the lack of risk management measures") (alteration added).Applying the Plain Language of the Succession Clause to Direct Claims Does Not Lead to a "Takings Clause" Issue.

Contrary to the Seventh Circuit's dicta in *Levin,* applying the Succession Clause to direct claims does *not* give rise to a constitutional "Takings Clause" issue under the Fifth Amendment of

---

[6] The JOLs also assert that their alleged claims related to the Upstream Distribution are unaffected by the Succession Clause because these claims "arose months after any claims of" SVB were transferred to FDIC-R1. Amended Complaint, ¶ 5. That contention goes nowhere. The District Court held that SVB Cayman was *not* a separate legal entity entitled to pursue relief outside of the FDIC's control. *See Silicon Valley Bank (Cayman Islands Branch),* 2025 U.S. Dist. LEXIS 23681, *15 ("It would run counter to this legislative purpose to hold that the initiation of an FDIC receivership converts former branches into separate entities that may then independently pursue relief through the bankruptcy process, outside of the FDIC's control."). In any event, as the Succession Clause transferred "all" of SVB's rights to the FDIC-R1 upon its appointment as receiver, there was nothing left for the JOLs to succeed to months later—or at any time.

the U.S. Constitution because there can be no "taking" as a matter of law as neither the Cayman

accountholders nor the JOLs have a final judgment on any of the Claims.

The Takings Clause states that "private property [shall not] be taken for public use,

without just compensation." U.S. CONST. amend. V. However, not all property interests fall

within the ambit of the Takings Clause of the Fifth Amendment. As the Supreme Court

explained in *Landgraf v. USI Film Products*, "[t]he Fifth Amendment's Takings Clause

prevents the [government] from depriving private persons of *vested* property rights[.]" 511 U.S.

244, 266 (1994) (emphasis added). To determine whether a particular property interest has

"vested" for Takings Clause purposes, "the relevant inquiry is the certainty of one's expectation

in the property interest at issue." *Engquist v. Oregon Dep't of Agric.*, 478 F.3d 985, 1002 (9th

Cir. 2007). Consequently, if the property interest is "contingent and uncertain," "speculative,"

or "discretionary," the government's modification or removal of the interest will not give rise to

an unconstitutional taking. *Id.* at 1003-04.

Applying these principles, courts have held that a party's right in any cause of action does

not "vest" until a final judgment is obtained. *E.g.*, *McCullough v. Virginia*, 172 U.S. 102, 123-24

(1898) (although "it is not within the power of a legislature to take away rights which have been

once vested by a judgment," "[l]egislation . . . may abate actions pending"); *Battaglia v. General

Motors Corp.* 169 F.2d 254, 259 (2d Cir. 1948) (upholding Congress' power to take away

statutorily created rights "so long as the claims . . . had not ripened into final judgment");

*Cooperativa de Ahorro y Credito Aguada v. Kidder, Peabody & Co.*, 993 F.2d 269, 273 n.11 (1st

Cir. 1993) ("[A] party's property right in a cause of action does not vest until a final, unreviewable

judgment has been obtained." (internal citation, quotation omitted)); *accord Two Shields v. United

States,* 119 Fed. Cl. 762, 787 (Fed. Cl. 2015); *In re TMI*, 89 F.3d 1106, 1115 n.9 (3d Cir. 1996);

*Sowell v. American Cyanamid Co.*, 888 F.2d 802, 805 (11th Cir. 1989). Indeed, even the Seventh

Circuit (which decided *Levin*) has recognized that when "[t]here was no final judgment," there was

"no taking under the 'vested rights' line of cases." *Paramount Health Sys., Inc. v. Wright*, 138 F.3d

706, 710 (7th Cir. 1998).

    Both the *Zucker* and *Verdi* courts (decided post-*Levin*) establish that application of the

Succession Clause to direct claims does not give rise to a Takings Clause issue. In *Zucker*, the First

Circuit rejected the plaintiff's assertion of a Takings Clause issue because the plaintiff did not have

a final, unreviewable judgment. 919 F.3d at 659 ("There is no constitutional problem in any event..

. . [F]or purposes of the Takings Clause, [i]t is well established that a party's property right in a

cause of action does not vest until a final, unreviewable judgment has been obtained.") (quoting

*Cooperativa*, 993 F.2d at 273 n.11) (internal quotation marks omitted). Similarly, the Southern

District of New York recognized in *Verdi* that the Succession Clause does not present a Takings

Clause issue where allegedly direct claims have not been reduced to a final, nonappealable

judgment. 2024 U.S. Dist. LEXIS 170814, *11. Here, too, the JOLs and the Cayman

accountholders (on whose behalf the JOLs purport to act), "had, at most, a cause of action, not a

final judgment. [Their] right to sue was therefore not a property interest protected by the Takings

Clause." *Bowers v. Whitman*, 671 F.3d 905, 914 (9th Cir. 2012); *see also Ileto v. Glock, Inc.*, 565

F.3d 1126, 1141 (9th Cir. 2009). Therefore, application of the plain language of the Succession

Clause to the Claims does not give rise to any Takings Clause issue. *See, e.g., Zucker,* 919 F.3d at

659; *Verdi,* 2024 U.S. Dist. LEXIS 170814, *11.

    In this regard, Congress' grant of exclusive power to pursue fraudulent transfer claims to

the FDIC under the Succession Clause is akin to Congress' grant of exclusive power to pursue

fraudulent transfer claims to a trustee (or a debtor in possession) under sections 544 and 548 of the

Bankruptcy Code. *See* 11 U.S.C. §§ 544, 548. As discussed *supra,* the Succession Clause permits

the FDIC, as receiver, alone to assert fraudulent transfer claims as it succeeds to "all" right and

title to such claims. *See Imperial Corp. of Am.*, 1997 U.S. Dist. LEXIS 20942, *41. Similarly,

sections 544 and 548 of the Bankruptcy Code give the trustee (or debtor in possession) the sole

right to pursue state law fraudulent transfer claims that, prior to commencement of a bankruptcy

case, can be asserted only by creditors. *See Skinner v. Skinner (In re Skinner)*, 519 B.R. 613, 615

(Bankr. E.D. Pa. 2014) ("With regard to his fraudulent transfer claim, the Plaintiff lacks standing

because . . . the Bankruptcy Code vests exclusive standing to prosecute fraudulent transfer claims

in the trustee"); *Borders v. Klug (In re Klug),* 2011 Bankr. LEXIS 2992, *8-9 (Bankr. E.D. Ky.

Aug. 3, 2011) ("[T]he law is clear that creditors have no standing to prosecute a fraudulent transfer

action in their own right and for their own benefit during a bankruptcy even if they would have

had standing to do so outside of bankruptcy. The Trustee has the exclusive right to bring an action

for fraudulent conveyance pursuant to 11 U.S.C. § 548 and/or § 544 during the pendency of

bankruptcy proceedings.").

The Supreme Court has recognized Congress' power to vest creditors' claims exclusively

in a bankruptcy trustee. *See Caplin v. Marine Midland Grace Tr. Co.*, 406 U.S. 416, 434-35 (1972)

("Congress could determine that the trustee in a reorganization was so well situated for bringing

suits against indenture trustees that he should be permitted to do so" and "might also determine

that the trustee's action was exclusive" of any right of bondholders to assert such claims). Here,

Congress has exercised its power to "transfer[] everything it could to the FDIC," thereby placing

the right to pursue the Claims "firmly in the hands of a single, congressionally designated agency."

*Esther Sadowsky Testamentary Tr. v. Syron*, 2009 U.S. Dist. LEXIS 131781, *7-8 (S.D.N.Y. Jan.

28, 2009) (quoting *Pareto v. FDIC*, 139 F.3d 696, 700 (9th Cir. 1998)).

16

In sum, because the Cayman accountholders and JOLs' alleged claims have not been reduced to a final, unreviewable judgment, they are not vested private property interests within the ambit of the "Takings Clause." Consequently, Congress' transfer of such claims—even if "direct" claims—to FDIC-R1 by the Succession Clause does not give rise to an unconstitutional "taking." Therefore, the Court should apply the plain language of the Succession Clause and hold that FDIC-R1 alone holds all right and title to the Claims.[7]

### 4.    The JOLs Have No Claim Under 12 U.S.C. § 1821(d)(17)

As indicated above, state law fraudulent transfer claims fall within the purview of the Succession Clause. *See Imperial Corp. of Am.*, 1997 U.S. Dist. LEXIS 20942, *41. Congress also vested the FDIC, as receiver, with a federal claim for intentionally fraudulent transfers under 12 U.S.C. § 1821(d)(17) and provided in section 1821(d)(17)(D) that such claims "shall be superior to any rights of a trustee or any other party (other than any party which is a Federal agency) under title 11." 12 U.S.C. § 1821(d)(17)(D).

According to the JOLs, the "superiority" of FDIC-R1's rights under this provision implies that Congress both recognized an "inferior" right for the JOLs to assert the Claims and that fraudulent transfer rights are not covered by the Succession Clause. Amended Complaint ¶¶ 6-8. The JOLs are wrong for multiple reasons.

First, the JOLs have no right to assert an avoidance action "under title 11" because SVB (including its Cayman branch) is ineligible to be a "debtor" under any chapter of the Bankruptcy Code. *See In re Silicon Valley Bank (Cayman Islands Branch)*, 2025 U.S. Dist. LEXIS 23681, *10

---

[7] Even ignoring the Succession Clause, the JOLs cannot establish standing to assert any direct claims of the Cayman accountholders because they have not identified any provision of the Winding-Up Order (or Cayman Islands law) that authorized them to do so. The conduct of the Cayman accountholders also disproves the JOLs' alleged standing. Sixty-eight (68) Cayman accountholders asserted their own claims against FDIC-R1 in the United States District Court for the District of Columbia. *See Knight League Ltd. v. FDIC*, No. 1:23-cv-03063 (APM) (D.D.C. filed Oct. 13, 2023).

("The dismissal of the Petition is affirmed because SVB Cayman was at all relevant times a foreign branch of a United States, FDIC-insured bank and, as such, is ineligible to be a debtor under 11 U.S.C. § 109(b)."). [8]

Second, Section 1821(d)(17)(D) provides rights to the FDIC as receiver, not to others, and therefore is not an independent basis for the JOLs (or anyone else) to assert claims. *See In re Colonial Realty Co.*, 980 F.2d 125, 130 (2d Cir. 1992) (cause of action under section 1821(d)(17) "springs directly from the status of the FDIC as receiver of the failed banks and is expressly *granted to the FDIC* by that statute") (emphasis added). Section 1821(d)(17) *augments* the FDIC-R's rights; it does not pare back the Succession Clause by supplying others with "inferior" or any other rights. *See RTC v. Cruce*, 972 F.2d 1195, 1199 (10th Cir. 1992) (section 1821(d)(17)'s text "evidences Congress' clear intent to *augment*" FDIC's "ability to avoid fraudulent conveyances") (emphasis added). Moreover, even if the statute conferred rights on other parties (and it does not), FDIC-R1's rights would be expressly (and by the JOLs' own admission) "superior" to "any rights of a trustee or any other party" (other than a federal agency) "under title 11." 12 U.S.C. § 1821(d)(17)(D). Thus, even a legitimate plaintiff lacks any avoidance claim "under title 11" when the FDIC-R1's superior rights are being exercised defensively in the Northern District of California litigation.

---

[8] Even if the JOLs' chapter 15 petition for the Cayman branch was not dismissed, it would lack the power to assert any avoidance actions. *See* 11 U.S.C. § 1521(a)(7) (court cannot permit a chapter 15 debtor to assert avoidance actions). A chapter 7 or 11 petition is required to assert an avoidance action under the Bankruptcy Code. *See In re Atlas Shipping A/S*, 404 B.R. 726, 742-43 (Bankr. S.D.N.Y. 2009) ("Section 1521(a)(7) carves out avoidance powers under §§ 544, 547 and 548, which are only available to the trustee in a full case under another chapter.").

18

5.      **Determining the JOLs Lack Standing Under the Succession Clause Is
a Permissible Domestic Application of the Succession Clause.**

The Court need not address the JOLs' assertion of "territorial limitations" on the FDIC-

R1's receivership that allegedly limit its reach to the United States because the issues before the

Court do *not* involve an extraterritorial application of the Succession Clause: They involve a

permissible *domestic* application of the Succession Clause. *See* POC Addendum, p. 2 and ¶ 147;

Amended Complaint ¶ 5.

Whether application of the Succession Clause to the Claims is a domestic or extraterritorial

application of the statute is akin to a choice of law question. *See Parkcentral Global Hub Ltd. v.

Porsche Auto. Holdings SE,* 763 F.3d 198, 220 (2d Cir. 2014) ("The question whether application

of [a securities fraud statute] to a particular set of transnational facts would be impermissibly

extraterritorial has much in common with the choice-of-law question that arises when a court must

determine which state or nation's law most appropriately governs a case involving interstate or

transnational facts."); *Hosking v. Hellas Telcoms. (Lux.) II SCA (In re Hellas Telcoms. (Lux.) II

SCA)*, 524 B.R. 488, 517 n.32 (Bankr. S.D.N.Y. 2015) (quoting *Parkcentral*, 763 F.3d at 220).

The Supreme Court instructs that we must look to a statute's "focus" to determine whether

a case involves its domestic application. *See Morrison v. Natl. Australia Bank Ltd.,* 561 U.S. 247,

266-67 (2010); *see also In re Picard*, 917 F.3d 85, 96 (2d Cir. 2019). "The focus of a statute is

'the objec[t] of [its] solicitude,' which can include the conduct it 'seeks to "regulate,"' as well as

the parties and interests it 'seeks to "protec[t]"' or vindicate." *WesternGeco LLC v. ION

Geophysical Corp.*, 585 U.S. 407, 413-14 (2018) (quoting *Morrison*, 561 U.S. at 267) (quoting

*Superintendent of Ins. of N. Y. v. Bankers Life & Casualty Co.*, 404 U.S. 6, 12 (1971)). "'If the

conduct relevant to the statute's focus occurred in the United States, then the case involves a

permissible domestic application' of the statute, 'even if other conduct occurred abroad.'" *Id.* at

414 (quoting *RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325, 337 (2016)).

"When determining the focus of a statute, we do not analyze the provision at issue in a

vacuum." *Id*. at 414 (quoting *Morrison*, 561 U.S. at 267). "If the statutory provision at issue works

in tandem with other provisions, it must be assessed in concert with those other provisions.

Otherwise, it would be impossible to accurately determine whether the application of the statute

in the case is a 'domestic application.'" *Id.* (quoting *RJR Nabisco,* 579 U.S. at 337). "And

determining how the statute has actually been applied is the whole point of the focus test." *Id*.

In addition to focusing on the conduct that is the "focus" of a federal statute, the Supreme

Court also has applied a "transactional test." *Morrison*, 561 U.S. at 269-70. *Morrison* applied the

transactional test to determine whether a case involved a domestic or extraterritorial application of

a securities law statute focused on the purchase or sale of securities in the United States or the

listing of securities on a domestic exchange. *Id.* Applying that test, the Second Circuit has held

that a sale of securities is domestic if "irrevocable liability is incurred or title passes within the

United States." *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 67 (2d Cir. 2012).

Congress enacted the Financial Institutions Reform, Recovery and Enforcement Act of

1989 ("FIRREA") in response to the national crisis involving failed financial institutions. *See RTC

v. Love*, 36 F.3d 972, 975 (10th Cir. 1994). FIRREA's purposes include strengthening the powers

of the FDIC as receiver. *Matagorda Cnty. v. Russell Law*, 19 F.3d 215, 218 (5th Cir. 1994) (citing

FIRREA § 101(9)). FIRREA also was intended "to revamp[] the deposit insurance fund system in

order to strengthen the country's financial system." *FDIC v. Am. Cas. Co.*, 975 F.2d 677, 681 (10th

Cir. 1992); FIRREA, § 101(5) ("To put the Federal deposit insurance funds on a sound financial

footing."). FDIC, as receiver, must preserve and conserve the failed bank's assets and property,

liquidate those assets where appropriate, and pay all valid obligations of the failed bank in accordance with statutory priorities. *See Thomas v. FDIC*, 255 P.3d 1073, 1078 (Colo. 2011). The Succession Clause is a central feature of this system. By transferring to the FDIC all claims of *both* the failed bank and any stockholder, member, accountholder, or depositor with respect to the institution and its assets, the Succession Clause avoids competing claims to recover for the same or overlapping injuries by transferring all the claims to one party—namely the FDIC as receiver. *Esther Sadowsky¸* 2009 U.S. Dist. LEXIS 131781, *7-8; *Pareto v. FDIC*, 139 F.3d at 700.

The relevant "focus" of FIRREA's solicitude is the regulation of conduct relating to an insured bank and strengthening the powers of FDIC, as receiver, to preserve the deposit insurance fund and strengthen the country's financial system. That "focus" includes avoiding losses to the deposit insurance fund by ensuring that FDIC, as receiver, can pursue claims of a failed bank and (among others) its depositors, accountholders, and shareholders so long as such claims are "with respect to" the failed bank and its "assets."

Here, the particular "rights" or claims at issue involve domestic application of the Succession Clause. Where "the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad[.]" *Picard,* 917 F.3d at 96 (quoting *RJR Nabisco*, 579 U.S. at 337). With respect to a fraudulent transfer, "[t]he relevant conduct . . . is the debtor's fraudulent transfer of property, not the transferee's receipt of property." *Id.* at 100. "When a domestic debtor commits fraud by transferring property from a U.S. bank account," the regulated conduct "takes place in the United States." *Id.* The relevant conduct relating to avoidance of the Upstream Distribution occurred in the United States when SVB transferred from its California account the Upstream Distribution to SVBFG's accounts. Accordingly, as applied in the present case to the Upstream Distribution, the

Succession Clause involves a domestic transfer of property from SVB to SVBFG.

Additionally, all decisions concerning the management of SVB were made in the United States. SVBFG's mismanagement of SVB (including its Cayman branch) occurred in the United States as SVBFG's offices were located in New York and California[9] and its board members were residents of the United States.

The JOLs and the Cayman accountholders should not be surprised that United States law governs the ownership of the Claims based on those decisions. SVB Cayman Branch "did not have a physical presence in the Cayman Islands" (other than a mailing address) and "did not have . . . employees in the Cayman Islands." *Silicon Valley Bank Cayman Islands Branch*, 2025 U.S. Dist. LEXIS 23681, *3. SVB Cayman Branch agreed that any disputes related to the services provided by SVB's "head office" in the United States would be heard in U.S. courts. *See Intra-Group Service Level Agreement,* dated February 10, 2020, by and between SVB Cayman Branch, as the recipient, and SVB (US Head Office), as the provider [Adv. No. 24-04014 (MG), Dkt. #1-5], § 32.1 ("This agreement will be governed by and construed in accordance with the laws of the State of California and will be subject to the exclusive jurisdiction of the state and federal courts situated in Santa Clara, CA.").

### C.    Any Cayman Law Contrary to Title 12 of the United States Code Should Not Be Granted Extraterritorial Effect (Comity) in the United States.

The JOLs seek the extraterritorial application of Cayman law to conduct occurring in the United States. This Court should not afford comity to permit Cayman law to override multiple provisions of Title 12 applicable to a transfer and other conduct occurring *in the United States*.

---

[9] *See* Exhibit H to the *Declaration of William C. Kosturos in Support of the Debtor's Chapter 11 Petition And First Day Pleadings* [Dkt. No. 21].

"Under the principles of international comity, United States courts ordinarily . . . defer to [judicial acts and] proceedings taking place in foreign countries, allowing those acts and proceedings to have extraterritorial effect in the United States" unless doing so "would be contrary to the policies or prejudicial to the interests of the United States." *Pravin Banker Assocs. v. Banco Popular Del Peru*, 109 F.3d 850, 854 (2d Cir. 1997). "The principle of comity has never meant categorical deference to foreign proceedings. It is implicit in the concept that *deference should be withheld where appropriate to avoid the violation of the laws [or] public policies . . . of the United States*." *In re Hamilton*, 240 F.3d 148, 157 (2d Cir. 2001) (emphasis and alteration added) (footnote omitted). "[W]hen there is true conflict with the laws of a foreign nation, *United States courts will not yield in the name of comity if doing so conflicts with the law or policy of the United States*." *United States v. Portrait of Wally*, 2002 U.S. Dist. LEXIS 6445, *34 (S.D.N.Y. Apr. 11, 2002) (emphasis added). Permitting the JOLs to pursue the Claims would violate at least four provisions of Title 12: §§ 1821(d)(2)(A)(i), 1821(d)(11)(A)(i)-(iii), 1831r, and 1821(j).

By the Succession Clause, Congress exclusively conferred on FDIC-R1, a federal agency, the right to assert "all" claims of SVB and its stockholder (SVBFG) and accountholders (including the Cayman accountholders). *See* 12 U.S.C. § 1821(d)(2)(A)(i). Permitting the JOLs to pursue the Claims would violate the Succession Clause, particularly when the FDIC-R1 is already utilizing the same injuries and misconduct as affirmative defenses in the Northern District of California.

Permitting the JOLs to pursue the Claims would also enable the JOLs to circumvent the priority provisions that Congress expressly set forth in section 1821(d)(11)(A) of title 12. *See Ap-Fonden*, 2025 U.S. Dist. LEXIS 52788, *11-12 (direct-derivative "dichotomy could also circumvent FIRREA's priority scheme for satisfying [failed bank's] outstanding obligations" as "[e]rroneously reading in a direct-derivative distinction would usurp claims that the FDIC could

23

recover from and then distribute proceeds pursuant to the priority scheme") (alteration added) (citing *Zucker*, 919 F.3d at 658). That section provides for the payment of claims in "the following order of priority: (i) Administrative expenses of the receiver; (ii) Any deposit liability of the institution; [and] (iii) any other general . . . liability of the institution" (which is not a lower priority liability). 12 U.S.C. § 1821(d)(11)(A)(i)-(iii). Clearly, liability to the Cayman accountholders is not a first-priority administrative expense *of* FDIC-R1. Further, as a matter of statutory law, the liability to the Cayman accountholders is not a second-priority "deposit" liability of SVB.[10] Accordingly, any liability to the Cayman accountholders cannot be paid until FDIC-R1's first-priority administrative expenses and second-priority "deposit" liability have been paid.[11]

The statutory priorities in section 1821(d)(11)(A)(i)-(iii) provide no exception for any species of general liability. *See Deutsche Bank Nat'l Tr. Co. v. FDIC*, 744 F.3d 1124, 1135 (9th Cir. 2014). In fact, FDIC-R1 is prohibited by law from paying the Cayman accounts as second-priority domestic U.S. "deposits." *See* 12 U.S.C. § 1831r. Therefore, permitting the JOLs to usurp FDIC-R1's standing would enable the JOLs to use litigation proceeds from the Claims to make

---

[10] The Cayman accountholders are "accountholders" but not "depositors" as those terms are used in the Succession Clause. The Cayman accountholders do not hold "deposits" as defined in section 1813 of Title 12 because the definition of "deposits" expressly excludes "any obligation of a depository institution which is carried on the books and records of an office of such bank or savings association located outside of any State." 12 U.S.C. § 1813(l)(5)(A); 12 C.F.R. § 330.3(e). The account agreement for each of the Eurodollar accounts at the Cayman branch provides that such accounts were payable only at the SVB Cayman Branch and not at any office of the Bank within the United States. *See SVB Eurodollar Money Market Account Agreement (Cayman Islands Branch)*, [Adv. No. 24-04014 (MG), Dkt. #1-3] ("The obligations related to the SVB Eurodollar Money Market Account will be payable and collectible only at and by the Cayman Branch."); and *SVB Eurodollar Operating Account Agreement (Cayman Islands Branch)*, [Adv. No. 24-04014 (MG), Dkt. #1-4] (same regarding the obligations related to the SVB Eurodollar Operating Account).

[11] Notably, the Cayman accountholders knew or should have known that they were third-priority general creditors, rather than second-priority "depositors," under U.S. law. *See, e.g., SVB Eurodollar Money Market Account Agreement (Cayman Islands Branch)*, [Adv. No. 24-04014 (MG), Dkt. #1-3] ("Funds in the Eurodollar Money Market Account are not 'deposits' as defined by the FDIC, and your status in the event of a Bank failure would be that of a general creditor, and not a depositor."); *SVB Eurodollar Operating Account Agreement (Cayman Islands Branch)*, [Adv. No. 24-04014 (MG), Dkt. #1-4] (same regarding funds in the Eurodollar Operating Account).

distributions on account of Cayman accountholders' third-priority "general creditor" claims before payment in full of second-priority "deposit" claims in violation of the priorities set forth in section 1821(d)(11)(A)(i)-(iii) *and* in derogation of the prohibition in section 1831r. *See Zucker,* 919 F.3d at 658 (noting that plaintiff's interpretation of the Succession Clause would "turn" the section 1821(d)(11)(A) "priority scheme on its head"). Moreover, it would enable the Cayman accountholders to recover more than their pro rata share of any distribution to holders of third-priority general claims. *Ap-Fonden*, 2025 U.S. Dist. LEXIS 52788, *15 ("the Court will not—and cannot—disrupt Congress's rational and reasoned decision to compensate depositors over those lower in the priority scheme") (citing *Zucker*, 919 F.3d at 661).Granting comity to the Winding-Up Order and Cayman law (as they are interpreted by the JOLs) also would violate section 1821(j) of Title 12. Section 1821(j) provides, in relevant part, that "no court may take any action . . . to restrain or affect the exercise of powers or functions of the [FDIC] as . . . receiver." 12 U.S.C. § 1821(j); *In re Silicon Valley Bank (Cayman Islands Branch)*, 658 B.R. 75, 85 (Bankr. S.D.N.Y. 2024). Section 1821(j) is "a sweeping ouster of courts' power to grant equitable remedies" and declaratory relief against the FDIC as receiver, *Freeman v. FDIC*, 56 F.3d 1394, 1399 (D.C. Cir. 1995), and "broadly and unequivocally" prohibits any court from "affect[ing]" FDIC-R1's exercise of its powers or functions, *Volges v. RTC*, 32 F.3d 50, 52 (2d Cir. 1994). Section 1821(j) also bars claims for equitable or declaratory relief against third parties (like the JOLs' claims against SVBFG) "where the relief would have the same practical result as an order directed against the FDIC" itself. *Hindes v. FDIC*, 137 F.3d 148, 161 (3d Cir. 1998); *accord Telematics Intern., Inc. v. NEMLC Leasing Corp.*, 967 F.2d 703, 707 (1st Cir. 1992); *Dittmer Properties, L.P. v. FDIC*, 708 F.3d 1011, 1017-18 (8th Cir. 2013); *see also Radian Ins., Inc. v. Deutsche Bank Nat'l Tr. Co.*, 2009 U.S. Dist. LEXIS 92197, *52 (E.D. Pa. Oct. 1, 2009) (section 1821(j) bars claims against a third

25

party that could affect the FDIC as receiver even when the FDIC as receiver "has not yet indicated its intent to pursue any claims" and "the interference is only hypothetical at this time"); *FDIC v. OneBeacon Midwest Ins. Co.*, 883 F. Supp. 2d 754, 765 (N.D. Ill. 2012) (same); *see generally In re Silicon Valley Bank (Cayman Islands Branch)*, 2025 U.S. Dist. LEXIS 23681, *15 (recognizing that "Congress carved out FDIC-insured banks from the default bankruptcy process so as not to interfere with the FDIC's exclusive procedures for failed banks" and that the JOLs sought to use the bankruptcy process "to compete and interfere with the FDIC's treatment of SVB Cayman, which is exactly what the exclusion of FDIC-insured banks from Chapter 15 was trying to avoid").

This Court has already recognized that the merits of FDIC-R1's right to set off the distribution will be decided in the Northern District of California. *In re SVB Fin. Grp.*, 662 B.R. at 65 ("The merits of [FDIC-R1's] defensive set rights . . . is ultimately a matter for the applicable district court to address."). Here, the JOLs seek relief (*e.g.,* a constructive trust in their favor) against SVBFG that would affect the FDIC's ability to assert its affirmative defenses in the Northern District of California. Section 1821(j) bars such relief.

In sum, enabling the JOLs to prosecute the Claims would interfere with FDIC-R1's exercise of its powers and functions and would be contrary to the public policies and national interests that underlie FIRREA. FDIC-R1 would be deprived of its ability to assert the subject matter of the Claims to prevent dissipation of the deposit insurance fund and thereby strengthen the country's financial system. The Court should not grant comity (*i.e.,* extraterritorial effect in the United States) to allegedly contrary provisions in the Winding-Up Order or Cayman law.[12]

---

[12] The JOLs conflate the law governing the Cayman accountholder's alleged claims against SVBFG and the issue of the law governing *ownership* of the accountholders' alleged claims (whether derivative or direct) against SVBFG. The former issue *may be* governed by law other than Title 12, but the latter issue *is* governed by the Succession Clause. *See O'Melveny & Myers v. FDIC*, 512 U.S. 79, 87 (1994) ("§ 1821(d)(2)(A)(i) places the FDIC in the shoes of the insolvent S&L, to work out its claims under state law, except where some provision in the extensive framework of FIRREA provides otherwise").

## **CONCLUSION**

The Claims asserted by the JOLs belong to FDIC-R1. Accordingly, FDIC-R1 respectfully

submits that the JOLs lack standing to assert such Claims, and the Court should disallow the JOLs'

proof of claim (as amended) and dismiss the Amended Complaint, in its entirety.

Dated: March 25, 2025                          Respectfully submitted,
New York, New York

                                            REED SMITH LLP

                                            */s/ Kurt F. Gwynne*
                                            Kurt F. Gwynne, Esq.
                                            Casey D. Laffey, Esq.
                                            599 Lexington Avenue
                                            New York, NY 10022
                                            Telephone: (212) 521-5400
                                            Facsimile: (212) 521-5450
                                            E-mail: kgwynne@reedsmith.com
                                            E-mail: claffey@reedsmith.com

                                            *Counsel to the Federal Deposit Insurance*
                                            *Corporation, as Receiver for Silicon Valley Bank*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 25th day of March 2025, a true and correct copy of the foregoing was electronically filed with the Clerk of Court using the CMF/ECF. I also certify that the foregoing document is being served this day via transmission of Notice of Electronic Filing generated by CM/ECF on all parties of record.

*/s/ Kurt F. Gwynne*
Kurt F. Gwynne
